2

FEAR WADDELL, P.C.
Peter L. Fear, No. 207238
pfear@fearlaw.com
Gabriel J. Waddell, No. 256289
gwaddell@fearlaw.com
Peter A. Sauer, No. 255957
psauer@fearlaw.com
7650 North Palm Avenue, Suite 101
Fresno, California 93711
(559) 436-6575
(559) 436-6580 (fax)

Proposed Counsel for CAPITAL FARMS, INC.,
  Debtor in Possession

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

| | |
|---|---|
| In re:<br><br><br>CAPITAL FARMS, INC.,<br><br><br><br><br>Debtor and Debtor-in-Possession. | Case No. 25-10074-A-12<br><br>Chapter 12<br><br>D.C. No. FW-2<br><br>**Cont'd Preliminary Hearing**<br>Date: January 22, 2025<br>Time: 9:30 a.m.<br>Place: Dept. A, Courtroom 11, 5th Floor<br>       United States Courthouse<br>       2500 Tulare St., Fresno, California<br>Judge: Hon. Jennifer E. Niemann |

**SUPPLEMENTAL EXHIBITS C THROUGH G FOR MOTION FOR AUTHORITY TO USE CASH COLLATERAL**

**INDEX OF EXHIBITS**

| Exhibit | Title | Page No. |
|---------|-------|----------|
| C | Crop Assignments from H&J to Capital Farms, Inc. | 3 |
| D | Crop Share Farming Lease between AKT Brewer 315 & Capital Farms, Inc. (Brewer Ranch) | 7 |

EXHIBIT - 1

| Exhibit | Title | Page No. |
|---------|-------|----------|
| E | Agricultural Lease between Sutter Land, LLC & H&J Management Services (Brawley Ranch) | 70 |
| F | Agricultural Lease between Sutter Land, LLC & Capital Farms, Inc. (Sankey Ranch) | 80 |
| G | Agricultural Lease between Sutter Land, LLC & Capital Farms, Inc. (Natomas Ranch) | 90 |

# EXHIBIT

# C

# ASSIGNMENT OF CROP PROCEEDS

ASSIGNOR/LESSOR:
H&J Management Services

ASSIGNEE/LESSEE:
Capital Farms, Inc.

This Assignment of Crop Proceeds is made and entered into on this 23 day of December, 2024 at Sacramento, California by H&J Management Services ("Assignor") and CAPITAL FARMS, INC, ("Assignee").

Assignor hereby assigns to Assignee all funds payable to H&J Management Services by Campos Bros. regarding the 2024 almond crop delivered from the Brawley Ranch (described below). Accordingly, the proceeds of any almonds delivered to Campos Bros. by H&H Management Services are to be paid to Capital Farms, Inc.

The Brawley Ranch 280 consists of a total of 280 +/- acres of farm land planted to almonds, located on Conejo and Brawley Avenues in Fresno County, APN: 041-231-36S, 041-231-37S, 041-231-39S, 041-231-08S, 041-231-38S, 041-370-07S and 041-379-8S

WE APPROVE THE FOREGOING.

ASSIGNOR
Harsaajan S. Gill dba H&J MANAGEMENT SERVICES

_____Harsaajan S Gill_____          Dated: December 23, 2024

Harsaajan Gill


ASSIGNEE
CAPITAL FARMS, INC.

BY: _Gurmej Singh Gill_          Dated: December 23, 2024
Gurmej Gill

-1-

# ASSIGNMENT OF CROP PROCEEDS

ASSIGNOR/LESSOR:
H&J Management Company

ASSIGNEE/LESSEE:
Capital Farms, Inc.

This Assignment of Crop Proceeds is made and entered into on this 23 day of December, 2024 at Sacramento, California by H&J Management Company ("Assignor") and CAPITAL FARMS, INC, ("Assignee").

Assignor hereby assigns to Assignee all funds payable to H&J Management Company by Duche Nut Company regarding the 2024 almond crop delivered from the Jamison Ranch (described below). Accordingly, the proceeds of any almonds delivered to Duche Nut Company by H&J Management Company are to be paid to Capital Farms, Inc.

The Jamison Ranch consists of total of 152.49 +/- acres of farm land planted to almonds, located near South Jamison and Mt. View Avenues near Riverdale, CA in Fresno County, APN: 041-070-29S, 041-060-32S, 041-070-27S

WE APPROVE THE FOREGOING.

ASSIGNOR
H&J Management Company

_Harsaajan S. Gill_

Harsaajan Gill                    Dated: December 23, 2024

ASSIGNEE
CAPITAL FARMS, INC.

BY: _Gurmej Singh Gill_

Gurmej Gill                       Dated: December 23, 2024

-1-

# ASSIGNMENT OF CROP PROCEEDS

ASSIGNOR/LESSOR:
H&J Management Services

ASSIGNEE/LESSEE:
Capital Farms, Inc.

This Assignment of Crop Proceeds is made and entered into on this 23rd day of December, 2024 at Sacramento, California by H&J Management Services ("Assignor") and CAPITAL FARMS, INC. ("Assignee").

Assignor hereby assigns to Assignee all funds payable to H&J Management Services by Vann Family Orchards regarding the 2024 almond crop delivered from the Sankey Ranch (described below). Accordingly, the proceeds of any almonds delivered to Vann Family Orchards by H&H Management Services are to be paid to Capital Farms, Inc.

The Sankey Ranch 280 consists of a total of 280 +/- acres of farm land planted to almonds, located on near Pleasant Grove in Sutter County. APN: 03 5-170-074

WE APPROVE THE FOREGOING.

ASSIGNOR
Harsaajan S. Gill dba H&J MANAGEMENT SERVICES

_Harsaajan S. Gill_      Dated: December 23, 2024
Harsaajan Gill

ASSIGNEE
CAPITAL FARMS, INC.

BY: _Gurmej Singh Gill_      Dated: December 23, 2024
Gurmej Gill

# EXHIBIT D

# CROP SHARE FARMING LEASE
## (Brewer 315, Placer County)

THIS CROP SHARE FARMING LEASE (the "**Lease**") is made and entered into to be effective as of July 8 , 2015 (the "**Effective Date**"), by and between AKT Brewer 315, LLC, a California limited liability company ("**Lessor**"), and Capital Farms, Inc., a California Corporation ("**Lessee**"). For convenience, Lessor and Lessee are sometimes referred to herein collectively as the "Parties" and individually as a "Party." This Lease is made with respect to the following facts and circumstances which the Parties affirm as true and accurate:

A. Lessor is the owner of certain real property located in the County of Placer (the "**County**"), California, consisting of approximately 315 acres, commonly known as Assessor's Parcel Nos. 017-130-006 and 017-130-021 (the "**Land**"), as described on **Exhibit A**, attached hereto and incorporated herein. The premises that are the subject of this Lease (the "**Premises**") shall consist of the Land, of which, 302.4 acres are "**Plantable Acres**" in the area depicted on **Exhibit B**, attached hereto and incorporated herein. As used herein, "**Plantable Acres**" means all of the acres within the Premises planted as part of the Orchard, and includes the portions of the Premises improved with roads, pumps, wells and ditches used to service the orchard.

B. Lessor and Lessee have mutually agreed upon an "**Initial Development Plan**," which, taken together with the Final Development Plan (as defined in Section 6(a) below), details the acres comprising the Premises, and the Lessee's development obligations with respect to the Premises and Lessee's intended development and use of the Premises as an almond orchard (the "**Orchard**"). The Orchard, as used herein, shall include all improvements on the Premises existing as of the Effective Date or built as part of the Lessee's development of the Premises and the Orchard (the "**Improvements**"). The Initial Development Plan is attached hereto and incorporated herein as **Exhibit C**. The "Final Development Plan" as more specifically described in Section 6(a) below, shall be attached to the Lease Amendment as an exhibit, as described in Section 6(a) below.

C. In consideration for Lessor's agreement to prepare this Lease, prior to the Effective Date, Lessee has delivered the amount of $20,000.00 to Lessor ("**Cash Payment**"), which shall be applicable to the first years' Rent due upon the Effective Date.

D. Lessee desires to lease the Premises and Lessor is willing to lease the Premises to Lessee, all in accordance to the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and obligations set forth in this Lease, Lessor and Lessee agree as follows:

1. <u>Lease of Premises; Acceptance of Premises</u>. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor the Premises. Lessee understands that this Lease is made subject to any and all road, levee, ditch, lateral, power line or other rights-of-way or easements now existing, whether adverse or permissive, and all matters of record. Lessee has been assured by means of its own due diligence investigation, independent of Lessor or any agent of Lessor,

AKT Brewer 315-Farming Lease

of the truth concerning the acreage and condition of the Premises (including, without limitation, environmental and sensitive habitat conditions), the water supply (including, without limitation quality, quantity and availability), delivery system improvements and appurtenant facilities, and has made its own determination of their suitability for Lessee's farming plan. Based on the foregoing analysis and determination, Lessee accepts the Premises, the water supply, delivery system, the improvements thereon and the facilities appurtenant thereto, in their "as-is, where is, with all faults" present condition, and subject to the encumbrances shown on the preliminary report prepared by Placer Title Company, attached hereto and incorporated herein as **Exhibit D**.

　　　2.　　　Term.  The term of this Lease shall commence on January 1, 2016 and end on December 31, 2040 (the "**Lease Term**").  A "**Lease Year**" for purposes of this Lease shall be from January 1 to December 31 of any calendar year.  Provided Lessee is not in default beyond any applicable cure period hereunder, Lessee shall have the option to extend the Lease Term (the "**Option to Extend**") for an additional five year period (the "**Extended Term**").  If Lessee elects to exercise its Option to Extend, it shall provide written notice to Lessor of such election in the period between January 1, 2038 and March 31, 2038.  Lessee's failure to timely give such notice shall be deemed Lessee's election to not exercise the Option to Extend.  Rent for the Extended Term shall be as set forth in Section 3(a) below including annual increases of one percent (1%) to the Minimum Cash Rent as mentioned below. Any reference herein to "Lease Term" shall be deemed to include the Extended Term if Lessee exercises its Option to Extend as provided in this Section 2. Lessor to allow Lessee to commence development of the currently unplanted +/- 87 acres on the NE corner of the property as of July 1, 2015 and Lessee shall pay Lessor the sum of $4,350.  ~~$4,350.~~

　　　3.　　　Rent.  Rent for the Premises shall be as set forth in this Section 3.

　　　　　(a)　　　Minimum Cash Rent.  Commencing on the Effective Date and continuing through the Lease Term, Lessee shall pay to Lessor the following dollar amounts per acre per Lease Year (or portion thereof) (the "**Minimum Cash Rent**"):

| Lease Year | Minimum Cash Rent Per Plantable Acre | Number of Plantable Acres | Annual Minimum Cash Rent |
|---|---|---|---|
| 1-5 | $275 per Plantable Acre* | 302.4 | $83,160.00* |
| 6-24 | $775 per Plantable Acre* | 302.4 | $234,360.00* |

　　　　　*Subject to a one percent (1%) annual increase at the end of the first year of the Lease Term to the Minimum Cash Rent only.

　　　　　(b)　　　Crop Share Rent.  Commencing on the sixth Lease Year and continuing each Lease Year thereafter for the remainder of the Lease Term, Lessee hereby agrees to pay the greater of the Minimum Cash Rent or the Crop Share Rent (as defined below).  Notwithstanding the foregoing, however, if the amount of the Crop Share Rent exceeds the Minimum Cash Rent during any of the first five years of the Lease Term, then the Crop Share Rent shall be due to Lessor.  Minimum Cash Rent and Crop Share Rent are sometimes collectively referred to herein as "**Rent.**"

The term **"Crop Share Rent"** as used herein shall be 17.5% of the gross Crop Proceeds, with no deductions.

The term **"Crop Production"** as used herein means the all farming products and crop yields cultivated and/or produced on the Premises during the applicable Lease Year.

The term **"Crop Proceeds"** as used herein shall mean the gross proceeds (including retains, if any) from the sale of all Crop Production (including almonds on a net good meat basis as defined by the USDA Incoming Inspection), together with any proceeds from insurance for crop damage, received by or due Lessee and that relate, directly or indirectly, to farming activities and/or operations on the Premises during the applicable Lease Year.

Except for the first payment of Minimum Cash Rent (in the amount of $83,050.00 less the Cash Payment referred to in Recital C) for the first year of the Lease Term, of which half ($41,525.00) is due on the Effective Date and half on January 1, 2016, Minimum Cash Rent shall be payable semi-annually, in advance, on the first (1st) day of January and the first (1st) day of July of each Lease Year.   The first semi-annual payment of Rent, which would be due July 1, 2016, shall be allocated into six equal installments of $6,920.83 and paid to Lessor (in addition to any other Rent due hereunder) each July 1st, beginning on July 1, 2017, and continuing through July 1, 2022.  Lessee shall receive a credit against the last payment of Rent under this Lease in the amount of $41,525.00 (the amount of the first semi-annual payment).  The Crop Share Rent, when due and payable pursuant to the terms of this Lease, shall be payable annually, on January 1 of each Lease Year following a crop year during the Term of this Lease, except in 2040 the Crop Share Rent shall be due and payable on December 31.  All Rent due hereunder shall be payable in lawful currency of the United States of America.

(c)      Subpar Production Years.  Beginning in the sixth year of the Lease Term, for the years during which: (i) the crop demand or the commodity price for each of the crops are more than twenty percent (20%) below the prior year's industry average, or (ii) each crop's production was more than twenty percent (20%) below the prior year, the Minimum Cash Rent shall be reduced to the greater of $387.50 per acre (subject to 1% increases to the Minimum Cash Rent per year consistent with Section 3(a) above)  or Crop Share Rent (the **"Reduced Minimum Cash Rent"**).  The difference between the Reduced Minimum Cash Rent and the Minimum Cash Rent that would have otherwise been due shall be due and payable twelve months following the date that the Reduced Minimum Cash Rent was paid.  Not less than 30 days prior to the Rent due date, Lessee shall provide reasonably detailed evidence in support of Lessee's payment of Reduced Minimum Cash Rent rather than Minimum Cash Rent (or the Crop Share Rent).  Lessee covenants and agrees that Lessee shall pursue the highest available price for the Crop Production each year of the Lease Term, based on commercially reasonable, industry standards.

4.      Annual Accounting.

(a)      Estimated Annual Accounting.  Lessee shall provide an annual accounting to Lessor on the first day of December of each Lease Year during the Lease Term (the **"Annual Accounting"**) to indicate the expected amount of Crop Share Rent. The Annual Accounting shall include, but is not limited to, production records, contracts entered into by Lessee in connection with the Premises, tax records, including tax returns which shall be timely filed and copies of

which shall be provided to Lessor within 15 days following preparation, and any other information reasonable requested by Lessor relating to the farming operations for the Premises. Lessor shall have thirty (30) days to review the Annual Accounting. During this period, Lessor may make any reasonable inspections, investigations and audits with regard to the information contained in the Annual Accounting to ensure the accuracy of the Crop Share Rent and Lessee shall make all production records, including financial records, available for this purpose. If Lessor makes no objection to the Annual Accounting within the thirty (30) day period, the estimated Crop Share Rent shall be deemed confirmed. If Lessor does object to the contents of the Annual Accounting, including, but not limited to, objecting to the calculation of the Crop Share Rent, then the parties shall submit the records to a mutually agreed upon accountant who shall review the relevant documents and calculate the Crop Share Rent which determination shall be conclusive as between the parties. If the parties are not able to mutually agree upon an accountant, each party shall hire their own accountant. Those accountants so hired shall hire a third accountant, who shall perform the review of relevant documents to determine the Crop Share Rent. Should the accountant determine that the Lessor's share is greater than that shown in the Annual Accounting, then Lessee shall pay the value of any difference found between the value of the Crop Share Rent as calculated in the Annual Accounting and the Crop Share Rent determined by the accountant, plus interest at a rate of ten percent (10%) per annum, within fifteen (15) days following the accountant's determination. Should the accountant determine that the Lessor's share is less than that shown in the Annual Accounting, Lessor shall pay the value of any difference found between the value of Crop Share Rent as calculated in the Annual Accounting and the Crop Share Rent determined by the accountant, plus interest at a rate of ten percent (10%) per annum, within fifteen (15) days following the accountant's determination. At Lessee's election, Crop Share Rent may be paid directly to Lessor from any buyer or producer of the Crop Production, but such election shall not relieve Lessee from its obligations to pay Rent hereunder.

(b)    _Final Accounting_. Lessee shall provide an annual accounting to Lessor on the first day of December following each Lease Year during the Lease Term and in 2040 after the Lease Term (the "**Final Annual Accounting**") to compute the amount of Crop Share Rent. The Final Annual Accounting shall include, but is not limited to, production records, contracts entered into by Lessee in connection with the Premises, Lessee's tax records, including Lessee's tax returns for the prior Lease Year which shall be timely filed. Lessor shall have thirty (30) days to review the Final Annual Accounting. During this period, Lessor may make any reasonable inspections, investigations and audits with regard to the information contained in the Final Annual Accounting to ensure the accuracy of the Crop Share Rent and Lessee shall make all production records, including financial records, available for this purpose. If Lessor makes no objection to the Final Annual Accounting within the thirty (30) day period, the estimated Crop Share Rent shall be deemed confirmed. If Lessor does object to the contents of the Final Annual Accounting, including, but not limited to, objecting to the calculation of the Crop Share Rent, then the parties shall submit the records to a mutually agreed upon accountant who shall review the relevant documents and calculate the Crop Share Rent which determination shall be conclusive as between the parties. If the parties are not able to mutually agree upon an accountant, each party shall hire their own accountant. Those accountants so hired shall hire a third accountant, who shall perform the review of relevant documents to determine the Crop Share Rent. Should the accountant determine that the Lessor's share is greater than that shown in the Final Annual Accounting, then Lessee shall pay the value of any difference found between

the value of the Crop Share Rent as calculated in the Annual Accounting and the Crop Share Rent determined by the accountant, plus interest at a rate of ten percent (10%) per annum, within fifteen (15) days following the accountant's determination. Should the accountant determine that the Lessor's share is less than that shown in the Final Annual Accounting, Lessor shall pay the value of any difference found between the value of Crop Share Rent as calculated in the Annual Accounting and the Crop Share Rent determined by the accountant, plus interest at a rate of ten percent (10%) per annum, within fifteen (15) days following the accountant's determination.

5.     Processing of Crops.

(a)     Hulling and Shelling.  It is agreed that Lessee may select the huller and sheller(s) of its choice (who may be an affiliate of Lessee), for one hundred percent (100%) of the Crop Production, provided that Lessee shall guarantee a minimum level of performance that meets or exceeds the turnouts of independent hullers and shellers and evidence of the same shall be included in the Annual Accounting.

(b)     Handling and Marketing.  It is agreed that Lessee may select the handler of its choice (who may be an affiliate of Lessee), for one hundred percent (100%) of the crops from the Premises.

6.     Final Development Plan; Operations on Property.

(a)     Final Development Plan.  No later than August 15, 2015, Lessee shall develop and prepare a final development plan detailing Lessee's development plan for the Premises (the **"Final Development Plan"**).  The Final Development Plan shall include all modifications to the Initial Development that the Parties have mutually agreed upon in writing, and shall include the following components, to the extent the same are not included in the Initial Development Plan approved by Lessor: (i) a detailed map of the specific acreage within the Land that Lessee proposes shall comprise the Premises, together with an acreage schedule setting forth the total acreage, dry acreage and irrigated acreage of the Premises, and a color coded map delineating the location of the different acreage categories relative to the Land; (ii) a detailed timeline and phasing schedule for Lessee's proposed orchard development for the Premises, including, without limitation, the schedules, timelines and locations for well development, irrigation and related improvements, and tree planting; and (iii) Lessor shall have 10 business days following Lessor's receipt of the Final Development Plan to review the Final Development Plan and either approve or disapprove the Final Development Plan, in Lessor's sole and absolute discretion.  Lessor's failure to either approve or disapprove the Final Development Plan within the required time frame shall be deemed Lessor's approval of the Final Development Plan for all purposes.  If Lessor disapproves any portion of the Final Development Plan, then the parties shall meet and confer in an attempt to agree upon the contents of the Final Development Plan.  If Lessor, in its sole and absolute discretion, and Lessee have not agreed upon the Final Development Plan by September 15, 2015, then Lessor shall have the right, in its sole and absolute discretion, to terminate this Lease, and the Parties shall have no further responsibilities to each other except those obligations that survive the termination of the Lease, either expressly or through necessary implication.  The Final Development Plan, together with the Initial Development Plan, shall collectively be referred to as the **"Development Plan."**  In the event of a conflict between the Final Development Plan and the Initial Development Plan, the Final

Development Plan shall control. If Lessor disapproves the Final Development Plan, and this Lease is terminated in connection therewith, then Lessor shall refund the Cash Payment to Lessee within 30 days of such termination.

    (i)    <u>Independent Consideration</u>.  As consideration to Lessee for Lessor's rights set forth in Section 6(a) above, including, without limitation, Lessor's right to either approve or disapprove the Final Development Plan in Lessor's sole and absolute discretion and to terminate this Lease, concurrently with Lessor's execution of this Lease, Lessor shall pay and deliver to Lessee the sum of $100.00 which shall be non-refundable to Lessor.  Lessor shall also return to Lessee and deposit or Cash Payment made to Lessee.

    (b)    <u>Use of Premises</u>.  It is agreed that the Premises are being leased to Lessee solely for the development and operation of the Orchard.  Lessor acknowledges that in the course of farming the Premises, various fertilizers, pesticides, herbicides, fungicides and other chemicals will be applied to the Premises and Lessee assumes all liability in connection with the use and application of the same; provided, however, Lessee agrees not to apply pesticides, insecticides, fungicides, herbicides, or other chemical treatments upon the Premises except as necessary to develop the Orchard, and no Hazardous Substances shall be stored on the Premises for use on the Premises other than as reasonably necessary for the particular application thereof and in accordance with all applicable Laws.  No Hazardous Substances shall be stored on the Premises for use on other property. Lessee shall be allowed to place a mobile home, shop and related septic system and domestic well on the premises. All such improvements must be in compliance with applicable law and zoning and Lessee shall be solely responsible for all costs.  Also, Lessee shall have the right to move ditches on the property to maximize useful acreage and square the farm roads after receiving Lessor's written approval.

    (c)    <u>Performance Standards</u>.  All operations conducted on the Premises by Lessee shall be conducted in accordance with the best course of almond orchard husbandry (as applicable) practiced in the geographical vicinity of the Premises.  Should Lessee fail to take any action required by the best course of husbandry practiced in the geographical vicinity of the Premises or should Lessee fail to conduct any operation undertaken by Lessee on the Premises in accordance with the best course of almond orchard husbandry (as applicable) practiced in the geographical vicinity of the Premises, Lessor may serve notice to Lessee of such failure in the manner provided for service of notices in this Lease.  Such notice shall constitute a notice of default pursuant to Section 20 below, and failure of Lessee to cure accordingly shall constitute a material default of this Lease permitting Lessor to pursue all remedies available in law and equity including termination of the Lease.  Lessor may thereafter enter the Premises and take such action as Lessor may deem necessary to protect Lessor's interest in the Lease and in the Premises.  If Lessor prevails on the issues of almond orchard husbandry then Lessee shall reimburse Lessor on demand for the cost of any action taken by Lessor pursuant to the provisions of this paragraph within thirty (30) days of receipt of notice.

    (d)    <u>Performance under Development Plan</u>.  The Development Plan sets forth Lessee's obligations with respect to the development of the Premises as the Orchard, including: (i) required timelines and phasing schedules for Lessee's orchard development for the Premises; and (ii) required schedules, timelines and locations for well development, irrigation and related improvement development, and tree planting (collectively, **"Development Milestones,"** and

each a "**Development Milestone**"). If Lessee fails to substantially and timely comply with each Development Milestone set forth in the Development Plan, and such failure continues for a period of 30 days following Lessor's delivery of written notice to Lessee detailing such failure, then, in addition to any other remedies available to Lessor under this Lease or at law or equity, Lessor shall have the right and option, but not the obligation, to terminate this Lease by providing Lessee 60 days' written notice of such termination. However if any failure or delay in Lessee's performance of the Development Milestones is caused by reason of any prevention, delay, stoppage due to strikes, lockouts, acts of God, or any other cause, beyond the reasonable control or anticipation of Lessee or Lessor (collectively, a "**Force Majeure**"), or due to the condition of the Premises at the Effective Date of this Lease due to activities of a prior tenant, then the specific Development Milestone so affected shall be extended one day for each day caused by Force Majeure so long as Lessee gives notice to Lessor within three (3) business days detailing the Force Majeure event.

        (e)     <u>Replants</u>. During the Lease Term, Lessee shall at its own expense remove from the Premises on an annual basis and in a timely manner according to generally accepted orchard management practices in the area any and all trees that are dead, diseased, mangled, or that in any other way become unproductive or unprofitable. Lessee will pay for any and all replacement trees, and will pay for any expense incurred in replanting trees, including, but not limited to, the cost of backhoeing, fumigating, planting, and pruning.

        (f)     <u>Removal of Trees</u>. At the end of the Lease Term, or earlier termination of this Lease, Lessee shall do one of the following at Lessor's discretion: (i) remove the trees comprising the Orchard, or (ii) leave the trees in place. Lessor shall provide written notice to Lessee of its election under this Section within 30 days following the expiration or earlier termination of this Lease. At the beginning of the fifth year of the Lease Term, Lessee shall establish a certificate of deposit account in the name of both Lessor and Lessee into which Lessee shall annually deposit the amount of $3,020.00 (the "**Tree Removal Fund**") until the expiration or earlier termination of the Lease. At the expiration or earlier termination of the Lease, if Lessor has elected to have the trees comprising the Orchard removed, the Tree Removal Fund shall be used to fund the expense of such removal and fumigation of the Premises ("**Tree Removal**"). If the cost of the Tree Removal exceeds the amount in the Tree Removal Fund, such cost shall be at Lessor's sole cost and expense. If Lessor elects to leave the trees in place, the Tree Removal Fund shall be released to Lessee.

        (g)     <u>Waste Water Management</u>. During the term of this Lease, Lessee shall be solely responsible for, at Lessee's sole cost and expense (with Lessor's cooperation, at no expense to Lessor), meeting the requirements of the California Clean Water Act (California Water Code §13260, et.seq.) as applicable to the Premises. In meeting those requirements, Lessee shall be solely responsible for enrolling the Premises in a coalition group having as its purpose satisfying its members' responsibilities with respect to maintaining their conditional waiver from compliance with waste water discharge requirements otherwise imposed by the Clean Water Act, as provided by §13269. Lessee shall pay all membership and general watershed or area monitoring assessments charged or assessed by such group. If unable to enroll the Premises in a coalition group, Lessee shall pay, if required, all costs of monitoring discharges directly from the Premises and implementing any actions or practices under the Clean Water Act, as implemented by regulations and orders adopted by the California Regional Water Quality

AKT Brewer 315-Farming Lease

Control Board properly exercising jurisdiction over the Premises. Should any Regional Water Quality Control Board of the State of California, or any other local, state, or federal agency, commence any legal or administrative action or institute any penalty against the Premises, Lessor, or Lessee arising out of Lessee's failure to properly enroll the Premises in a coalition group or otherwise provide for monitoring of discharge as required by the California Clean Water Act, Lessee shall be solely responsible for any and all resulting penalties and other costs, and shall indemnify, defend, release and hold harmless Lessor as against any damages, claims, costs, expense and liability arising from such action, including any attorney's fees and costs incurred. Any issues regarding the above that may have originated before Lessee has possession of the Premises shall be the responsibility of the Lessor.

      (h)    <u>Pest Management Program</u>. Lessee shall be solely responsible for and shall advise Lessor regarding the pest management program to be followed for each growing season during the term of this Lease. In connection therewith, Lessee shall: (i) provide Lessor with a copy of the "Restricted Materials Permit," if any, for the crop within ten (10) days of obtaining such permit from the County of Agricultural Commissioner; (ii) apply any and all materials on said Restricted Materials Permit only pursuant to and in accordance with a recommendation issued by a California Licensed Pest Control Advisor; and (iii) upon receipt, provide Lessor with copies of all of the pest reports prepared for the Premises. The pest reports prepared in accordance with this section may be delivered to Lessor directly from the party who prepared such report concurrently with delivery to Lessee.

      7.    <u>Taxes and Assessments</u>.

      (a)    <u>Lessee Payment Obligations</u>. During the Lease Term, Lessor shall pay all taxes and assessments levied against the Premises. However, throughout the Lease Term, Lessee shall be responsible for the payment of any increase in property taxes and assessments resulting from a reassessment related to Lessee's development of the Orchard. During the Lease Term, Lessee shall also promptly pay and discharge all taxes and assessments levied or assessed on or against all equipment and other personal property owned by Lessee and located on the Premises. If Lessee fails to pay any taxes or assessments Lessee is obligated to pay pursuant to the terms of this Lease, Lessor shall have the right and option to pay such amounts and hold Lessee liable for all such payments made by Lessor (including, but not limited to, penalties and interest); and if such payments are made by Lessor, interest on the amounts paid by Lessor shall accrue at the rate of ten percent (10%) per annum from the date of such payment until Lessee reimburses Lessor.

      8.    <u>Water</u>. Lessor makes no representation or warranty whatsoever regarding the quantity and/or quality of water provided to or available to the Premises, and Lessor shall have no responsibility for providing water to the Premises or paying the cost of any water supplied to or used on the Premises. Any water produced from sources available at the Premises shall be used by Lessee only on the Premises in connection with Lessee's Orchard operations. Lessor assumes no responsibility for, and does not warrant, the quality or quantity of the water supplied to the Premises. Lessee shall pay any water district costs and/or taxes assessed against the Premises. The cost of water actually delivered to the Premises for use by Lessee for the irrigation of the crops shall be paid by Lessee. Lessee is responsible for all costs associated with water acquisition needed in connection with its operation s on the Premises, and is

responsible for all required water reporting throughout the Lease Term, even if such requirements arise out of changes in the applicable laws following the Effective Date. Lessee must promptly disclose all water usage to Lessor contemporaneously with Annual Accountings unless sooner requested.

In addition, Lessee shall at Lessee's sole cost shall timely file any and all water usage and other required filings with the necessary governing entities. Documentation establishing compliance with the above requirements shall be available to Lessor upon request.

9.    Utilities. Lessee shall promptly pay all charges for light, power, water, and other utility services furnished to the Premises during the Lease Term and all such accounts shall be in Lessee's name and invoices for the same delivered directly to Lessee. Lessor shall have no responsibility for providing utilities or paying the cost of any such utilities. If Lessee fails to pay any utilities for which Lessee is responsible, Lessor shall have the option to pay such amounts and hold Lessee liable for all such payments; and if such payments are made by Lessor, interest on the amount paid by Lessor shall accrue at the rate of ten percent (10%) per annum from the date of such advancement until Lessee reimburses Lessor.

10.    Maintenance and Repairs. Lessee shall be responsible, at its sole cost and expense, for maintaining the Premises, including without limitation the Improvements, in good condition and repair and in compliance with all applicable laws at all times during the Lease Term, including, but not limited to, all maintenance, repair and replacement in connection with: (a) developing, maintaining and managing the Orchard or other crops planted; and (b) maintaining all irrigation and pumping equipment, fences, wells, ditches, bridges, roadways, and the approaches to and other appurtenances of the Premises; and (c) using best farming practices to control noxious weeds, grasses and rodents. In addition to its maintenance, replacement and repair obligations above, Lessee shall be responsible for the cost of any repairs due to its neglect, abuse or overuse, and all resulting damages.

11.    Alterations; Improvements.

(a)    Alterations. As long as not inconsistent with the Development Plan, and subject to Lessors' prior written consent, which consent Lessor shall not unreasonably withhold, Lessee shall be free to make any alterations, modifications, or improvements on the Premises as Lessee shall deem necessary consistent with the purpose of this Lease and in compliance with all applicable laws and regulations (the "**Lessee Improvements**"). All Lessee Improvements shall be made in compliance with applicable laws and zoning requirements. All Lessee Improvements placed on the Premises by the Lessee shall be and remain the property of Lessee so long as this Lease is in effect but shall become the property of the Lessor at Lease termination in accordance with Section 11(b) below. Lessee shall keep the Premises free from any and all liens, including, without limitation, mechanics' liens, arising out of the work performed, materials furnished, or obligations incurred by Lessee. Lessor may post and keep posted on the Premises notices of non-responsibility.

(b)    Lessor's Ownership of Improvements Upon Termination. Upon the expiration or earlier termination of this Lease, the Improvements, all Lessee Improvements, any and all crops, trees, vines and/or bushes (whether growing, harvested, un-harvested, or

otherwise) and/or farm products or related well or irrigation improvements remaining on or otherwise attached to the Premises (collectively, the "**Orchard Improvements**") shall become the sole property of Lessor, at no cost or expense to Lessor whatsoever, and Lessee acknowledges and agrees that Lessee will have no right, title or interest of any kind in or to any Orchard Improvements remaining on the Premises (notwithstanding any characterization of the Orchard Improvements as personal property), and Lessee shall cause any liens or security interests affecting or encumbering the Orchard Improvements to be immediately removed at Lessee's sole expense. Any Orchard Improvements that are permanent buildings and any other permanent improvements, including without limitation, irrigation equipment including pipes, gates, water valves, electrical lines, wells, bridges, and fences provided by Lessee, shall become and remain the property of Lessor, free of cost to Lessor. Lessee shall remove any trade fixtures, temporary buildings, removable equipment, and other personal property from the Premises. Notwithstanding any legal, statutory or equitable principles to the contrary, Lessor shall have no obligation to pay or reimburse Lessee for the value of, the cost incurred by Lessee in connection with, or any increase in value of the Premises as a result of the work or development performed by Lessee on the Premises or the Orchard Improvements.

12.　　Chemical and Other Substances.

(a)　　Lessee shall use any fertilizers, pesticides, herbicides and petroleum products (collectively, "**Agricultural Chemicals**") on the Premises only in accordance with best agricultural practices and as required or permitted by state, federal and local rules and regulations.

(b)　　Lessee acknowledges its responsibility under California Health and Safety Code Section 25359.7(b) to give Lessor written notice whenever Lessee knows or has reasonable cause to believe that any Hazardous Substance, as defined in subsection (f) below, has come to be located on or beneath the Premises. Such notice shall be given to Lessor within ten (10) days of the event giving rise to Lessee's obligation to give such notice to Lessor, except that in the event of a spill, or other introduction into the environment, of any toxic or hazardous substance, Lessee or Lessee's agents or employees shall, within twelve (12) hours of becoming aware of such a problem, overnight mail a written notice of such occurrence to Lessor. Lessee shall defend, indemnify, and hold harmless Lessor from any and all claims, judgments, suits, damages, causes of action, liabilities, costs (including, without limitation, the defense thereof and reasonable attorneys' fees, paralegals' fees, and other professionals' fees and expenses), penalties, and/or fines arising out of or related to any toxic or Hazardous Substance release or leak occurring during the Lease Term, at Lessee's own cost, and Lessee shall return the Premises to Lessor free and clean of any Hazardous Substance that was not present at the Effective Date. If this Lease is terminated for a breach of the terms of this Section, or for any other reason, Lessee shall not be released from Lessee's obligations under this Section, all of which obligations shall survive.

(c)　　Lessee covenants that during the Lease Term it will meet and comply with all Environmental Requirements, as defined in subsection (e) below, and not use, generate, produce, store, manufacture, release, discharge, or dispose of on, under, or about the Premises, any Hazardous Substances without prior written notification to and written consent by Lessor.

(d)     In addition to any other indemnification provided by Lessee under this Lease, Lessee shall indemnify, defend, and hold harmless Lessor, and its agents, representatives, successors, and assigns, and each of them, from and against any and all claims, judgments, suits, damages, losses, liabilities, penalties, fines, and expenses (including, without limitation, the defense thereof and reasonable attorneys' fees, paralegals' fees, and other professionals' fees and expenses) arising from or related to any Hazardous Substances upon, about, or beneath the Premises and which is a result of, arises out of, or is in any way connected to Lessee's activities on the Premises.

(e)     The term "**Environmental Requirements**" means all state, federal and local applicable present and future statutes, regulations, rules, ordinances, codes, licenses, and permits relating to the protection of human health or the environment; including without limitation, all requirements pertaining to Hazardous Substances.

(f)     The term "**Hazardous Substances**" means any substance whose nature and/or quantity of existence, use, manufacture or effect renders it subject to federal, state or local regulation, investigation, assessment, remediation or removal as potentially injurious to public health or welfare or to the environment. Notwithstanding the foregoing, the term "Hazardous Substances" shall not include any Agricultural Chemicals used as permitted under this Lease, stored and applied on the Premises in a manner consistent with their respective registrations and applicable laws.

13.    <u>Compliance with Law</u>.  Lessee shall, at its sole cost and expense, comply with all laws, regulations, rules and orders of any federal, state or local governmental authority or agency and all requirements of all governmental authorities, in force either now or in the future, applicable to the Premises or affecting Lessee's operations on or use of the Premises, and shall faithfully observe during its use, maintenance, or occupancy of the Premises all laws, rules, and regulations of these authorities, in force either now or in the future relating to Lessee's use of or operations on the Premises. Lessee shall also fully comply with all applicable laws and regulations having to do with workers' compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer/employee related subjects including, without limitation, the Immigration Reform and Control Act of 1986, as amended.

14.    <u>Quiet Enjoyment</u>.  Except as otherwise specifically provided in this Lease, Lessor covenants that Lessee, upon paying the Rent and performing the covenants herein undertaken on Lessee's part, may quietly and peaceably have, enjoy, and hold the Premises for the Lease Term. Lessor shall warrant and defend the Lessee's possession against any and all persons as long as this Lease remains in effect and the Lessee is not in default under the terms of this Lease.

15.    <u>Security Deposit</u>.  Intentionally Deleted

16.    <u>Guaranty; Liens</u>.

(a)     <u>Guaranty</u>.  As further security for the performance of Lessee's obligations under this Lease, Gurmej S. Gill shall collectively execute and deliver to Lessor,

contemporaneously with Lessee's execution of this Lease, the guaranty in the form attached hereto and incorporated herein as **Exhibit E**.

      (b)   <u>Liens by Lessor</u>.  Lessor shall promptly pay any and all amounts secured by a lien imposed on the Premises by Lessor ("**Lessor's Liens**").  Lessee shall have the right to request a notification of default from the secured party on any or all of Lessor's Liens.  If Lessor fails to pay any such amount for which Lessor is responsible regarding any of Lessor's Liens, Lessee shall have the option to pay such amounts and hold Lessor liable for all such payments; and if such payments are made by Lessee, interest on the amount paid by Lessee shall accrue at the rate of ten percent (10%) per annum from the date of such advancement until Lessor reimburses Lessee.  If Lessor has not reimbursed Lessee by the date upon which the next payment of either Minimum Cash Rent or Crop Share Rent is due, Lessee is authorized to withhold such amounts, and any accrued interest thereon, as a credit against and a reduction from such payment of Minimum Cash Rent, or Crop Share Rent, as appropriate.

    17.   <u>Crop Loans; Other Liens; Lessee Covenants</u>.

      (a)   <u>Crop Loans; Liens by Lessee</u>.  Lessee shall not incur or suffer any liens or encumbrances to be levied or asserted against the Premises, including any improvement thereon or appurtenances thereto, without the Lessor's prior written consent, which consent Lessor may withhold in Lessor's sole and absolute discretion.

      (b)   <u>Financing Requirements and Covenants</u>.  In connection with any loan or financing for which: (A) the Lessee Improvements; (B) the crops or farm products (as such term is defined in the California Commercial Code), or proceeds thereof, produced at the Premises (collectively, "**Crop Collateral**"); and/or (C) Lessee's leasehold rights under this Lease (the "**Leasehold**") will be mortgaged or otherwise used as collateral, Lessee covenants as follows:  (i) Lessee, as a single purpose entity, shall be the borrower and any such loan/financing will be obtained by Lessee in the ordinary course of Lessee's business and shall be on commercially reasonable terms and conditions; (ii) the funds and proceeds of any such loan/financing shall be used solely in connection with Lessee's operations on and development of the Premises; (iii) the amount of such loan/financing shall not exceed seventy-five percent (75%) of the estimated costs (determined in Lessee's commercially reasonable judgment) of developing the Orchard and improvements related thereto; (iv) such loan/financing shall not be cross defaulted with, and the Lessee Improvements , Leasehold and/or Crop Collateral shall not be used as collateral for, any other loan or financing arrangement; (v) the lender will covenant to Lessor that lender will perform and be bound (and any third party foreclosure purchaser or deed in lieu grantee will be bound) by the terms and conditions of this Lease in the event it succeeds to the Leasehold (whether through foreclosure or deed in lieu); (vi) the lender will provide assurance to Lessor and confirm that the loan/financing complies with the financing conditions and requirements under this Lease; and (vii) Lessor will have no obligation to modify or change any of its rights under the Lease or otherwise incur additional liability or obligations beyond those already set forth in the Lease.

    18.   <u>Insurance</u>.  Lessee shall obtain and keep in full force and effect (and cause its consultants and contractors to obtain and keep in full force and effect) the insurance described below.  In accordance with section 18(g) below, as of the Effective Date and as evidence of

specified insurance coverage, Lessee deliver to Lessor the following items: (i) written evidence that Lessor has been named an additional insured on such policies; (ii) evidence that such policies contain written waivers by the insurance carriers of all rights of subrogation which the insurer might otherwise, if at all, have against Lessor; and (iii) certificates from the insurance carrier stating that the insurance is in full force and effect, that the premiums have been paid thereon, and that the insurance carrier will give Lessor at least ten (10) days prior written notice before termination, cancellation, or modification of the terms of such insurance. Insurance required to be maintained by Lessee below shall be required to be maintained at all times during the Lease Term. Insurance required to be maintained by Lessee's consultants and contractors below shall only be required to be maintained during those periods during which such consultant or contractor is performing work or otherwise accessing the Premises.

       (a)     <u>Type of Insurance</u>. Lessee and its consultants and contractors shall, at its/their sole cost and expense, maintain in full force and effect, with companies acceptable to Lessor, which acceptance shall not be unreasonably withheld, the following insurance: (i) Property damage insurance on the improvements that exist on the Premises at the commencement of this Lease or are constructed on the Premises during the term of this Lease, that covers the hazards of fire, and flood insurance if required for the Premises, with all standard extended coverage, including vandalism and malicious mischief, in an amount equal to their full insurable value, with a replacement cost endorsement; (ii) Workers Compensation Insurance (at the minimum limit required by law) for all persons employed in carrying out activities on the Premises; (iii) Commercial General Liability Insurance on an "occurrence" basis, covering its activities and the activities of it and its agents, employees, contractors and consultants on the Premises and any and all resulting injury to persons and damage to the Premises, with a combined single limit for bodily injury and property damage of not less than Two Million Dollars ($2,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate, and (iv) Should Lessee employ an aerial or ground agricultural chemical applicator, the applicator(s) shall furnish Lessor with a certificate of liability insurance with a minimum of Two Hundred Fifty Thousand Dollars ($250,000.00) combined single limit per occurrence naming Lessor as additional insured prior to providing any chemical application services to Lessee. Lessee's Commercial General Liability Insurance policy shall include contractual indemnity coverage for the indemnities of Lessee given to Lessor under this Section 18.

       (b)     <u>Additional Insureds</u>. Those entities and persons named below (including without limitation: Kyriakos Tsakopoulos, Anatolia, LLC and AKT Investments, Inc., a California corporation) shall be included as an additional insured under the coverage specified above with the following provisions included within each applicable policy:

       Coverage afforded by this Policy shall also apply to Lessor and its affiliates and all of their respective trustees, officers, directors, shareholders, and employees and all of their respective successors and assigns, as additional insureds, but only with respect to legal liability or claims caused by, arising out of or resulting from the acts or omissions of the named insured or others performing acts on behalf of the named insureds.

       (c)     <u>Policy Requirements</u>. Each insurance policy required under this Section 18 shall: (i) be issued by insurance carriers licensed and approved to do business in California, having a general policyholders rating of not less than "A" and financial rating of not

less than "VIII" in the most current Best's Insurance Report; (ii) contain a provision that the policy shall not be subject to material alteration to the detriment of Lessor or Lessee or cancellation without at least thirty (30) days' prior written notice being given to Lessor by registered mail; (iii) provide that such policy or policies and the coverage evidenced thereby are primary and any insurance maintained by the additional insureds is noncontributing with such primary coverage; and (iv) contain severability of interest and cross liability clauses.

(d)     <u>Crop Insurance</u>. During the Orchard's productive years, Lessee shall obtain crop insurance covering the production from the Orchard, such insurance to be for the benefit of both Lessor and Lessee's share of the crop. Lessee shall be solely responsible for the cost of such insurance. If there is a crop failure entitling the parties to insurance payments, Lessee shall still be responsible for any rent or penalties owed pursuant to this Lease.

(e)     <u>Concurrency of Primary, Excess, and Umbrella Policies</u>. Lessee's liability insurance coverage may be provided by a combination of primary, excess, and umbrella policies. The coverage of any excess or umbrella policy must be at least as broad as the coverage of the primary policy.

(f)     <u>"Per Location" Endorsement</u>. Lessee shall, at Lessee's sole expense, procure a "per location" endorsement or equivalent reasonably acceptable to Lessor so that the general aggregate limit of the primary policies apply separately and specifically to the Premises.

(g)     <u>Evidence of Insurance</u>. As evidence of specified insurance coverage, Lessee shall, prior to the Effective Date and from time to time thereafter at the request of Lessor, deliver to Lessor certificates evidencing the insurance policies required hereunder. Lessor has the right to review certified policies as reasonably necessary. Such evidence shall be delivered to Lessor before any entry by Lessee, or any consultant or contractor of Lessee, on the Premises. Lessee shall not permit any consultant to enter onto the Premises or commence work on or relating to the Premises until such parties have complied with the insurance requirements of this Section 18. Lessee shall also include Lessor and the other indemnified parties in any indemnity provisions with such consultants for defense and indemnification to the same extent Lessee is defended and indemnified.

19.     <u>Surrender of Possession of Premises</u>. Lessee agrees that it will peacefully surrender possession of the Premises to Lessor at the expiration of this Lease, free and clear of all liens and encumbrances made, done, or suffered by the Lessee, in as good condition as reasonable wear and tear will permit.

20.     <u>Events of Default</u>. In addition to other events of default described in this Lease, any of the following events or occurrences shall constitute a material breach of this Lease by Lessee and, after the expiration of any applicable grace period, shall constitute an event of default (each an "**Event of Default**"):

(a)     The failure by Lessee to pay the Rent, or any other amount due, in full, within ten (10) days after written demand of Lessor

(b)     The failure by Lessee to perform any obligation under this Lease, which by its nature Lessee has no capacity to cure;

(c)      Except as set forth in (a) and (b) above, the failure by Lessee to perform any other term, covenant, condition, or obligation under this Lease, if the failure has continued for a period of thirty (30) days after Lessor demands in writing that Lessee cure the failure. If the failure to perform the term, condition, covenant, or obligation is of the nature that the failure cannot be cured within the thirty (30) days, Lessee's failure to cure within thirty (30) days shall not constitute an Event of Default under this Lease, so long as Lessee undertakes to cure the failure within thirty (30) days of Lessor's demand and diligently and continuously attempts to complete the cure as soon as reasonably possible. Lessee shall indemnify and defend Lessor against any liability, claim, damage; loss, or penalty that may be threatened or may in fact arise from that failure during the period the failure is uncured;

(d)      Any of the following: (i) a general assignment by Lessee for the benefit of Lessee's creditors; (ii) any voluntary filing, petition, or application by Lessee under any law relating to insolvency/bankruptcy, whether for a declaration of bankruptcy, a reorganization, an arrangement, or otherwise; (iii) the abandonment, vacation, or surrender of the Premises by Lessee without Lessor's prior written consent; or (iv) the dispossession of Lessee from the Premises (other than by Lessor) by process of law or otherwise; or

(e)      The appointment of a trustee or receiver to take possession of all or substantially all of Lessee's assets; or the attachment, execution, or other judicial seizure of all or substantially an of Lessee's assets located on the Premises or of Lessee's interest in this Lease, unless the appointment or attachment, execution, or seizure is discharged within thirty (30) days; or the involuntary filing against Lessee of: (i) a petition to have Lessee declared bankrupt, or (ii) a petition for reorganization or arrangement of Lessee under any law relating to insolvency or bankruptcy, unless, in the case of any involuntary filing, it is dismissed within sixty (60) days.

(f)      An event of default by Lessee under any loan or financing entered into in accordance with Section 17(b) above.

21.    <u>Lessor's Remedies on Default</u>. Upon the occurrence of an Event of Default, if Lessor and Lessee are unable to mutually agree upon a written agreement for Lessor to take over operations of the Orchard, then Lessor, in addition to any other rights or remedies available to Lessor by statute, at law or in equity, shall have the right to:

(a)      Terminate this Lease and all rights of Lessee under this Lease by giving Lessee written notice that this Lease is terminated. Once Lessor has terminated this Lease, Lessee shall immediately surrender the Premises to Lessor. On termination of this Lease, Lessor may recover from Lessee all of the following: (a) The worth at the time of the award of any unpaid Rent that had been earned at the time of the termination, to be computed by allowing interest rate of ten percent (10%) but in no case greater than the maximum amount of interest permitted by law; (b) The worth at the time of the award of the amount by which the unpaid Rent that would have been earned between the time of the termination and the time of the award exceeds the amount of unpaid Rent that Lessee proves could reasonably have been avoided, to be computed by allowing interest the rate of ten percent (10%) but in no case greater than the maximum amount of interest permitted by law; (c) The worth at the time of the award of the amount by which the unpaid Rent for the balance of the Lease Term after the time of the award exceeds the amount of unpaid Rent that Lessee proves could reasonably have been avoided, to be

computed by discounting that amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent (1%); (d) Any other amount necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform obligations under this Lease, including brokerage commissions and advertising expenses, expenses of restoring the Premises for a new tenant (whether for the same or a different use), and any special concessions made to obtain a new tenant; and (e) Any other amounts, in addition to or in lieu of those listed above, that applicable law may permit.

LESSEE, TO THE EXTENT ALLOWED BY LAW, HEREBY WAIVES ANY AND ALL RIGHTS CONFERRED BY SECTION 3275 OF THE CIVIL CODE OF CALIFORNIA AND BY SECTIONS 1174(c) AND 1179 OF THE CODE OF CIVIL PROCEDURE OF CALIFORNIA AND ANY AND ALL OTHER LAWS AND RULES OF LAW FROM TIME TO TIME IN EFFECT DURING THE LEASE TERM PROVIDING THAT LESSEE SHALL HAVE ANY RIGHT TO REDEEM, REINSTATE OR RESTORE THIS LEASE FOLLOWING ITS TERMINATION BY REASON OF LESSEE'S BREACH;

(b)     Continue this Lease without waiver of Lessor's right to terminate this Lease for this Event of Default or any subsequent Event of Default;

(c)     Re-let the Premises or any part thereof on behalf of Lessee on terms and at the Rent that Lessor, in Lessor's sole discretion, may deem advisable; all with the right to make alterations and repairs to the Premises, at Lessee's cost, and apply the proceeds of re-letting to the Rent and other amounts payable by Lessee. To the extent that the Rent and other amounts payable by Lessee under this Lease exceed the amount of the proceeds from re-letting, Lessor may recover the excess from Lessee as and when due;

(d)     Re-enter the Premises, with or without terminating this Lease, and remove all persons and property from the Premises. Lessor may store the property removed from the Premises in a public warehouse or elsewhere at the expense and for the account of Lessee;

(e)     None of the remedial actions mentioned herein, alone or in combination, shall be construed as an election by Lessor to terminate this Lease unless Lessor has in fact given Lessee written notice that this Lease is terminated or unless a court of competent jurisdiction decrees termination of this Lease: (i) any act by Lessor to maintain or preserve the Premises; (ii) any efforts by Lessor to re-let the Premises; (iii) any re-entry, repossession, or re-letting of the Premises; or (iv) any re-entry, repossession, or re-letting of the Premises by Lessor pursuant to this Section. If Lessor takes any of the above remedial actions without terminating this Lease, Lessor may nevertheless at any later time terminate this Lease by written notice to Lessee;

(f)     Except where this Section is inconsistent with, or contrary to, any provisions of this Lease, no right or remedy conferred upon or reserved to either Party is intended to be exclusive of any other right or remedy, or any right or remedy given now or later existing at law or in equity or by statute. Except to the extent that either Party may have otherwise agreed in writing, no act of forbearance by either Party to exercise a remedy for any violation or nonperformance by the other Party is deemed a waiver by that Party of the rights or remedies with respect to that violation or nonperformance.

Any act that Lessor is entitled to do in exercise of Lessor's rights upon any Event of Default may be done, in Lessor's sole and exclusive discretion, at a time and in any manner deemed reasonable by Lessor, and Lessee irrevocably authorizes Lessor to act in all things done on Lessee's account.

22.    <u>Eminent Domain</u>. If all or any part of the Premises is taken for any public or quasi-public use, this Lease shall terminate with regard to the portions so taken, it being expressly understood that Lessee shall have no further obligation to pay Rent with respect to the part of the Premises so taken. Lessor shall be entitled to the entire award in condemnation, except that any amount specifically allocated or attributable to Lessee Improvements shall be paid to Lessee. Lessor shall have the sole right to defend or settle any such condemnation action with respect to all interests in the Premises, however, Lessee shall have the right to participate in the defense of any condemnation in connection with the Lessee Improvements in coordination with Lessor.

23.    <u>Hunting Rights; Right to Enter</u>.

(a)    <u>Hunting Rights</u>. All hunting rights and privileges on the Premises are reserved to Lessee; provided however, that upon not less than 48 hours advance notice, Lessor may enter the Premises for the purpose of hunting on Saturdays and Sundays only. For these purposes, Lessor, Lessor's guests, agents and hunting right Lessee's have the right of ingress and egress over and on existing farm roads, canal banks, ditch banks and levees on the Premises as a means of access.

(b)    <u>Right to Enter</u>. In addition to the right to enter the Premises to exercise Lessor's hunting rights pursuant to Section 23(a) above, Lessor may, at any reasonable time, enter in and upon the Premises for the purpose of: (i) posting and/or maintaining any necessary signs or notices; (ii) showing the Premises to prospective purchasers, tenants or lenders; (iii) altering, improving or repairing the Premises in accordance with its rights under this Lease; (iv) providing ingress, egress and access to and from other property owned by Lessor; (v) ascertaining if the covenants, promises, and agreements of this Lease are being properly performed; and (vi) view the crops and the Orchard Improvements. In addition, Lessor shall have the right to enter the portion of the Premises that do not comprise Plantable Acres, at any time, and for any purposes so long as Lessor's activities thereon do not materially adversely impact Lessee's agricultural operations on the Premises. Lessor shall use reasonable efforts to minimize any material interference with Lessee's operations upon the Leased Premises arising from Lessor's entry upon the Premises; provided, however, Lessor shall not be liable for any inconvenience or loss that such entry may cause Lessee.

24.    <u>Waste</u>. Lessee shall not commit, or permit others to commit, on the Premises waste or a nuisance.

25.    <u>Indemnification</u>. Lessee shall indemnify, defend (with counsel acceptable to Lessor), protect, and hold Lessor (and its members, officers, directors, shareholders, agents, employees, representatives, contractors, customers, licensees, trustees, beneficiaries, successors and assigns and the Premises and property of Lessor) harmless from and against any and all damages, damages to or loss of property, losses, liens, judgments, penalties, injuries, claims

(including, without limitation, claims for injury or wrongful death), expenses, costs (including reasonable attorneys' fees and costs and experts' fees and costs) and/or liabilities arising from or in any way related to (either directly or indirectly): (i) any act, omission, fault or neglect of Lessee (or Lessee's agents, employees, representatives or contractors); (ii) Lessee's (or Lessee's agents', employees', representatives' or contractors') operations on or about the Premises; (iii) any damage or injury to any person or property occurring on the Leased Premises or any part thereof; (iv) Lessee's failure to comply with the requirements and recommendations under the Environmental Habitat Reports; and/or (v) any breach by Lessee of its obligations under this Lease, but Lessee's indemnification obligations under subsection (iii) shall not apply to the extent of damages directly caused by the sole active negligence or willful misconduct of Lessor or its agents occurring during the Lease Term.  Lessee shall defend all claims and actions and pay all costs and expenses incidental to such claims and actions.

26.    <u>Disclaimer of Warranty; As-Is</u>.  Lessor makes no warranty of the suitability of the soil of the Premises for growing the crops Lessee is authorized to grow under this Lease, nor as to the drainage of the Premises, nor as to the condition or productivity of trees on the Premises, nor as to any other condition of the Premises for Lessee's intended use.  Lessee warrants to Lessor that Lessee has made its own inspection of the Premises and expressly acknowledges that it is leasing the Premises "AS IS", "Where-Is," and with all faults.  Lessee acknowledges and agrees that Lessee is an experienced and sophisticated party, familiar with the requirements of developing and operating farming operations such as the Orchard and other than the express representations and warranties made by Lessor herein, Lessee is solely relying on its own investigations and inspections of the Premises in determining their suitability.

27.    <u>Limitation of Lessor's Liability</u>. Except as otherwise provided by applicable law, for any breach of this Lease the liability of Lessor (including all persons and entities that comprise Lessor) and any recourse by Lessee against Lessor shall be limited to the interest of Lessor in and to the Premises.  On behalf of itself and all persons claiming by, through, or under Lessee, Lessee expressly waives and releases Lessor (and all persons and entities that comprise Lessor) from any personal liability for breach of this Lease.

(a)    <u>No Personal Liability of Lessor's Shareholders, et al</u>.  The trustees, officers, agents and employees of Lessor have no power to bind its shareholders, members or partners personally, and no obligation of Lessor shall be binding personally upon its shareholders, partners, trustees, members, officers, agents, or employees.  All persons dealing with Lessor, its trustees, officers, agents, employees or representatives shall look solely to Lessor's interest in and to the Premises for satisfaction of claims of any nature arising in connection with the affairs of Lessor under this Lease.

28.    <u>Transfer of Lessor's Interest</u>.  Lessor has the right to transfer all or part of its interest in the Premises and in this Lease.  On such a transfer, and/or in the event Lessor no longer owns the Land, Lessor shall automatically be released from all liability accruing under this Lease, and Lessee shall look solely to the transferee/owner for the performance of Lessor's obligations under this Lease after the date of transfer/ownership change.  Lessor may assign its interest in this Lease, in an amount equal to not more than 75% of the value of its interest in the Premises, to a mortgage lender as additional security and such an assignment shall not release Lessor from its obligations under this Lease.  In the event Lessor transfers all or part of its

interest in the Land and/or this Lease, Lessor shall retain, on a non-exclusive basis, the benefit of all of the following: (i) any and all obligations of Lessee under this Lease to protect, defend, indemnify and hold harmless Lessor; (ii) any and all assumptions of liability, waivers and releases made by Lessee for the benefit of Lessor under this Lease; (iii) any and all obligations of Lessee to pay Rent attributable to periods during which Lessor holds or held an interest in the Land, Premises and/or this Lease; (iv) any and all obligations of Lessee under Section 12, related to Hazardous Substances; and (v) all obligations which, by their terms, are intended to survive the expiration or termination of this Lease.

    29.   <u>Right of First Refusal</u>.  Lessor hereby grants to Lessee, during the Lease Term, the right of first refusal to purchase the Premises, together with all structures, fixtures, easements, rights of way and other appurtenances to the Premises owned by Lessor, and all improvements owned by Lessor now existing or installed on or about the Premises (collectively, the "**Improvements**" and together with the Premises, the "**Property**") on the terms and conditions set forth herein (the "**Right of First Refusal**"), subject to this Lease.  Upon Lessor's receipt of a bona fide offer to purchase the Property ("**Offer**"), including a deposit of not less than $250,000, which Offer Lessor is willing to accept, from a party who is in no way associated with or affiliated with Lessor or associated with any member of the Tsakopoulos family and their related affiliates or entities that they control ("**Third Party**"), Lessor shall give written notice to Lessee (the "**Third Party Offer Notice**") of Lessor's intent to accept the Offer.  The Third Party Offer Notice, in order to be effective, shall be accompanied by a complete and correct copy of the Offer, excluding the buyer's and broker's information. In order to deliver the Third Party Offer Notice, Lessor does not need to have negotiated a complete purchase and sale agreement with the Third Party but may merely have agreed upon the material economic terms of the proposed agreement of purchase and sale (the "**Proposed Purchase and Sale Agreement**"), and Lessee must make its decision with respect to the Offer as long as it has received an adequate description of all key, material economic terms. In the event Lessee elects to exercise its Right of First Refusal, Lessee shall, within fourteen (14) days of Lessee's actual receipt of the Third Party Offer Notice, deliver written notice to Lessor of Lessee's election to purchase the Property on the same terms and conditions set forth in the Offer (the "**Exercise Notice**").  If Lessee timely delivers the Exercise Notice, Lessor and Lessee shall promptly (but in any event within thirty (30) calendar days after Lessor's receipt of Lessee's Exercise Notice) enter into an agreement of purchase and sale for the Property on the same terms and conditions set forth in the Offer.  In the event Lessee fails to deliver an Exercise Notice to Lessor within said fourteen (14) day period, Lessee shall be deemed to have declined to exercise its Right of First Refusal and Lessor shall have the right to proceed with the sale of the Property (free and clear of this Right of First Refusal) to the Third Party on terms and conditions not materially less favorable than the terms and conditions set forth in the Offer.  If, after satisfying its obligations hereunder, Lessor consummates the purchase and sale of the Property to the Third Party, this Right of First Refusal shall terminate and be of no further force and effect.  If, however, Lessor does not consummate a sale of the Property to the Third Party as aforesaid, this Right of First Refusal shall not terminate, but shall be revived and continue for the then remaining balance of the Lease Term.  If the terms of the Proposed Purchase and Sale Agreement become materially less favorable to Lessor than those set forth in the Third Party Offer Notice (it being understood and agreed that "materially less favorable" shall mean that the net present value of the material economic terms of the modified transaction is at least ten percent (10%) less than the net present value of the material economic terms set forth in the

Third Party Offer Notice) then Lessor agrees that Lessee's rights under this Section 29 with respect to the Property shall revive and be reinstated and Lessor shall provide Lessee with a Third Party Offer Notice if, as, and to the extent, required under the terms of this Section 29. This Right of First Refusal is personal to Lessee, and its members and owners, and shall not be applicable to any other party.

30.    Surrender; Holdover; Waiver.

(a)    Condition of Premises Upon Surrender.  Lessee shall, on the expiration or earlier termination of this Lease, surrender the Premises to Lessor in good condition and repair, reasonable use, wear and damage by the elements excepted.  Lessee agrees to remove all of Lessee's property from the Premises at the expiration or termination of this Lease, subject to the specific terms of Section 11 above regarding Lessee's Improvements located on the Premises that Lessor is allowed to retain pursuant to Section 11 and the rights of Lessor regarding the removal of trees in accordance with Section 6(e) above.

(b)    Holdover.  Lessee shall have no right to remain in possession of the Premises after expiration or earlier termination of the Lease.  Any holding over by Lessee after Lease expiration or early termination shall not constitute a renewal or extension of the Lease Term, nor give Lessee any rights in or to the Premises except as expressly provided in this Lease. Any holding over after Lease termination with the consent of Lessor shall be construed to be a tenancy from month to month, with monthly rental to be at 130% of one-twelfth (1/12) of the yearly Rent for the year preceding Lease termination, in addition to all monetary obligations under the terms of this Lease, and shall otherwise be on the terms and conditions herein specified insofar as applicable.  If Lessee remains in possession of the Premises after Lease termination without Lessor's consent, Lessee shall be a Lessee at sufferance and may be evicted by Lessor at any time in accordance with applicable law.

(c)    Waiver.  Lessee expressly waives the benefits conferred by Section 1161, Subdivision 2 of the California Code of Civil Procedure relating to the holding over upon agricultural land after the termination of a lease.

Lessee's Initials

31.    Assignment and Subletting.

(a)    Lessee shall not without the prior written consent of Lessor, assign this Lease, or any of its rights hereunder, or sublet the Premises or any portion thereof, which consent may be given or withheld in Lessor's commercially reasonable discretion.  Should Lessor consent to an assignment of the entire Lease, Lessee shall be released from any and all obligations under the Lease.

(b)    .  Notwithstanding the foregoing, Lessee shall be permitted to sublease to or assign this Lease to a business entity (including a partnership, corporation, limited liability company) which is owned or controlled by Lessee ("**Authorized Assignee**"), provided that such Authorized Assignee, pursuant to an assignment agreement reasonably acceptable to Lessor, assumes the obligations and liabilities of Lessee under the Lease and agrees to comply with all of

the terms, covenants, and conditions of the Lease. No such assignment and subletting will release Lessee from any of its obligations hereunder.

32.    <u>Relationship Limited</u>. It is expressly understood and agreed that the relationship of Lessor and Lessee is one of Lessor and Lessee and not one of partnership or joint venture, and that Lessor shall not be responsible for any debt or obligation contracted or incurred by Lessee nor shall Lessee become responsible for any debt or obligation contracted or incurred by Lessor.

33.    <u>Entire Agreement</u>. This Lease constitutes the entire agreement between the Parties hereto with respect to its subject matter, and all offers, acceptances, oral representations, agreements and writings between the Parties heretofore made are merged herein and shall be of no force or effect unless contained in this Lease or the Exhibits attached hereto and incorporated herein by reference.

34.    <u>Notices</u>. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed duly served and given when personally delivered to or actually received by the party to whom it is directed or, in lieu of such personal service or receipt: (i) the next business day (Monday through Friday) after being deposited with an overnight air courier such as Federal Express or DHL; or (ii) upon the sender's confirmation of good delivery if sent by telecopier or facsimile transmission on a business day between the hours of 9:00 a.m. and 5:00 p.m., the recipient's time, otherwise, at 9:00 a.m., the recipient's time, on the next following business day, in each case addressed as follows:

If to Lessee:                        Capital Farms, Inc.,
                                        a California corporation
                                        Attention: Gurmej S. Gill, President
                                        1496 Bridge Street, Suite 1
                                        Yuba City, CA 95993
                                        Phone: (530) 681-3112
                                        Fax: (916) 209-7099

If to Lessor:                        AKT Brewer 315 LLC
                                          c/o AKT Investments, Inc.
                                        Attention: Chris Donnelly
                                        7700 College Town Drive, Suite 101
                                        Sacramento, CA 95826
                                        Phone: (916) 383-2500
                                        Fax: (916) 383-0552

35.    <u>Amendment</u>. This Lease may be modified or amended only by a writing duly authorized and executed by all of the Parties hereto.

36.    <u>Time of the Essence</u>. Time is of the essence in each and every provision, covenant and condition herein contained.

37.     <u>Governing Law</u>.  This Lease shall be construed and interpreted in accordance with the laws of the State of California.

38.     <u>Binding Effect</u>.  This Lease benefits and binds the heirs, successors, executors, administrators and assigns of the Parties to this Lease.

39.     <u>Counterparts</u>.  This Lease may be executed in any number of counterparts, all of which executed counterparts shall be deemed an original, but all of which, together, shall constitute one and the same instrument.  Duly executed signatures to this Lease may be delivered by facsimile or email, and signature pages delivered by such method shall be deemed equivalent to and of the same force and effect as original signature pages.  Signature pages may be detached from the counterparts and attached to a single copy of this document to physically form one document.

40.     <u>Memorandum of Lease</u>.  Upon completion and approval of the Final Development Plan, which shall include the legal description of the acreage comprising the Premises, the Parties will acknowledge, notarize and caused to be recorded in the Official Records of Placer County, California, a Memorandum of this Lease sufficient to create constructive notice of the existence of this Lease and the Parties' respective rights and duties hereunder.  The Memorandum shall be in the form attached hereto as **<u>Exhibit F</u>**.

41.     <u>Attorneys' Fees; Pre-litigation Dispute Resolution</u>.  Each Party shall pay the fees and expenses of its own attorneys in connection with the preparation, negotiation and execution of this Lease.  In the event of any action between the Parties for breach of or to enforce any provision or right hereunder, the unsuccessful Party in such action shall pay to the successful Party, all reasonable costs and expenses incurred by such Party in connection with such action, including, but not limited to, reasonable attorneys' and experts' fees and costs. The Parties agree that before either institutes litigation against the other arising from or related to this Lease, it will make a good faith attempt to negotiate with the other Party and attempt to resolve the dispute without litigation.

42.     <u>Waiver</u>.  No waiver by any Party of any covenant, condition, or breach hereunder shall be deemed a continuing waiver or a waiver of any subsequent covenant, condition, or breach of this Lease.

43.     <u>Survival</u>.  All (i) obligations to protect, defend, indemnify and hold harmless; and (ii) waivers and releases, shall survive termination of this Lease.

44.     <u>Days of the Week</u>.  If any date for performance herein falls on a Saturday, Sunday or holiday, as defined in section 6700 of the California Government Code, the time for such performance shall be extended to 5:00 p.m. Pacific Time on the next business day.  A "business day" shall mean a day that is not a Saturday, Sunday or legal holiday in the State of California.

45.     <u>Subordination; Estoppel Certificate</u>.  At Lessor's option, this Lease shall be subordinated to any mortgages or deeds of trust in any amount or amounts whatsoever (including renewals, extensions, modifications, consolidations and replacements thereof) which shall hereafter be placed upon the Premises or on or against Lessor's interest or estate therein, without the necessity of the execution and delivery of any further instruments on the part of

Lessee to effectuate such subordination. Nevertheless, provided that Lessee's obligations under the Lease are not increased by the express terms of such instrument, Lessee agrees to execute and deliver upon demand, any instrument, without cost to it, which may be deemed necessary to further effect the subordination of this Lease to the lien of any mortgages or deeds of trust. Provided, however, such mortgage or deed of trust shall provide, or the mortgagee or beneficiary thereunder shall agree, in writing in recordable form of Subordination, Non-Disturbance and Attornment Agreement (the "**SNDA**") delivered to Lessee, that, so long as Lessee is not in default under this Lease, foreclosure of any such mortgage or deed of trust or sale pursuant to exercise of any power of sale thereunder shall not affect this Lease but such termination, foreclosure or sale shall be made subject to this Lease which shall continue in full force and effect, binding on the Lessee and transferee. Lessee shall thereafter attorn to the transferee as if said transferee was the Lessor under this Lease. Lessor shall use its commercially reasonable efforts to obtain an Non-Disturbance and Attornment Agreement (an "**NDA**") from its existing lender (the "**Existing Lender**") within 60 days following the Effective Date of this Lease, in the form similar to that attached as **Exhibit G**, attached hereto and incorporated herein.

46. Estoppel Certificate. Each Party (as "**Responding Party**") shall within ten (10) days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing, in such reasonable form as requested by a party or their lender certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect), and the date to which rental and other charges are paid in advance, if any, (b) acknowledging that there are not, to the Responding Party's knowledge, any uncured defaults on the part of Lessor or Lessee, or specifying such defaults if any are claimed, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party. Failure to execute and deliver such statement within the time required shall, at the Requesting Party's election, be a default under this Lease.

47. Brokers. Lessor and Lessee hereby represent that they are represented in this transaction by Ag Land Real Estate ("**Broker**") and Lessor and Lessee shall each be responsible for the payment of a commission to Broker pursuant to the terms and conditions of a separate agreements with between each of Lessor and Lessee and Broker. Except for Broker, neither party has had any contact or dealings regarding the subject matter of this transaction through any licensed real estate broker or other person other than the Broker who can claim a commission or finder's fee as a procuring cause of the lease transaction contemplated herein. Each party agrees to defend and indemnify the other against any claim for commission or other compensation based upon dealings with such party.

48. Lease Buy-Out. Lessor shall have the right after January 1, 2031 to buy out the lease. The price for the buy-out will be determined by appraisal as the fair market value of the Lessee's improvements on the per acre basis plus $10,000 for each planted acre. If the buy-out occurs before the harvest of the crop, the appraised value is to include culture costs the Lessee incurred.

IN WITNESS WHEREOF, the undersigned have executed this Lease to be effective as of the date first above written.

**LESSOR:**

AKT BREWER 315, LLC,
a California limited liability company

By:    AKT Investments, Inc.
        a California corporation
        Its Managing Member

        By: _____

        Name: Chris Donnelly

        Its: CFO

**LESSEE:**

Capital Farms, Inc.,
a California corporation

By: _____

Name: Gurmej S. Gill

Its: President

# EXHIBIT "A"

## LEGAL DESCRIPTION OF PREMISES

**Exhibit "A"**
**Legal Description**

<u>Parcel One:</u>

The Southeast quarter of Section 30, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Excepting therefrom the interest conveyed to the County of Placer in Deed recorded January 4, 1922 in Book 193 of Deeds, Page No. 318, Placer County Records.

Apn: 017-130-006

<u>Parcel Two:</u>

The Northeast quarter of Section 31, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Apn: 017-130-021

## EXHIBIT "B"
### Depiction of Premises

# Brewer 315

Brewer Farmable Acres

153 Farmable Acres

113 Farmable Acres

36 Farmable Acres

Net Farmable +/- 302 Acres



## EXHIBIT "C"

## INITIAL DEVELOPMENT PLAN

### (Brewer 315 Crop Share Lease)

Lessee is planning to plant the entire property to almonds.

Lessee will start the ground prep for the NE 87 acres in summer or fall of 2015, this shall include ripping, disking, floating and berming. The remaining 66 acres of the northern 153 acres shall be prepped in early spring 2016 and shall include the installation of the irrigation system for the 153 acres. The total northern acreage of 153 acres shall be planted by late spring of 2016.

The remaining 149 acres on the southern portion of the property shall be prepped by fall of 2016 or in early spring 2017. The 149 acre orchard shall be planted by late spring of 2017.

The land prep and planting of this orchard will be weather permitting and subject to nursery availability of the desired almond trees. If there is still moisture in the ground Lessee must wait to prep the ground to obtain optimal results.

Lessee's tentative plan for tree spacing, rootstock and variety is as follows:

- Variety: Independence
- Rootstock: Krymsk
- Tree spacing: 21'x14'

# EXHIBIT "D"

## PRELIMINARY REPORT

D-1

# stewart title

of placer

## Preliminary Report

**Issued for the sole use of:**
Stewart Title of Sacramento

AKT Investments, Inc.

**Our Order No.: 34-248412**

**Reference: CM-15015273-SW**

When Replying Please Contact:
Stewart Title of Sacramento
Antigone Vaccaro
1425 River Park Drive #110
Sacramento, CA 95815
Phone # 916-441-4950-Fax # 916-564-5840

**Property Address:**

In response to the above referenced application for a policy of title insurance, **Stewart Title Guaranty Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown referred to as an Exception in Schedule B or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage of said Policy or Policies are set forth in the attached list. Copies of the Policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit "B" of this report carefully. Limitations on covered risks applicable to the CLTA/ALTA Homeowner's Policy of Title Insurance which establish a deductable amount and a maximum dollar limit of liability for certain coverages are set forth in Exhibit "B". The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

**This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a binder or commitment should be requested.**

Dated as of _____ June 22, 2015 _____ at 7:30 a.m. _____

Title Officer
Alan Murray / lp

CLTA PRELIMINARY REPORT (Effective 1-1-84)

**Preliminary Report**                                  **Order Number: 34-248412**

**Schedule A**

The form of policy of title insurance contemplated by this report is:

CLTA STANDARD

The estate or interest in the land hereinafter described or referred to covered by this Report is:  A Fee

Title to said estate or interest at the date hereof is vested in:

Kyriakos Tsakopoulos, a single man, as to an undivided 50.9210% interest; and Anatolia, LLC, a California limited liability company, as to an undivided 49.0790% interest

The land referred to in this Report is situated in the State of California, County of Placer, and is described as follows:

See Exhibit "A" attached hereto and made a part hereof.

Preliminary Report                Order Number: 34-248412

## Legal Description
## Exhibit "A"

**Parcel One:**

The Southeast quarter of Section 30, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Excepting therefrom the interest conveyed to the County of Placer in Deed recorded January 4, 1922 in Book 193 of Deeds, Page No. 318, Placer County Records.

Apn: 017-130-006

**Parcel Two:**

The Northeast quarter of Section 31, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Apn: 017-130-021

Preliminary Report                                    Order Number: 34-248412

## Schedule B

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in the policy form designated on the face page of this report would be as follows:

A.  Taxes for the Fiscal Year 2015-2016, a lien not yet due or payable.

B.  Said land lies within the boundaries of the Placer County Mosquito Abatement, and is subject to assessments or charges levied thereby. Which amounts are collected with county taxes. Amounts may be obtained by contacting said district at (800) 273-5167.

C.  The Lien of Supplemental Taxes, if any, assessed pursuant to the provisions of Chapter 3.5, Revenue and Taxation Code, Section 75 et seq.

1.  Rights of the public and of the County of Placer in and to that portion of hereinabove described property, lying within Brewer Road, a public road.

2.  Rights of the public and of the County of Placer in and to that portion of hereinabove described property, lying within Jackson Road, a public road.

**TAX NOTE FOR PRORATION PURPOSES ONLY:**
General and Special Taxes for the Fiscal Year 2014-2015, and any assessments and charges collected therewith,

1st Installment $6,472.31                    Paid

2nd Installment $6,472.31                    Paid

Parcel No. 017-130-006                       Code Area 067-004
Land $ 1,115,000.00

Included in the above installments is the amount of $45.62, for Placer County Mosquito Abatement.

General and Special Taxes for the Fiscal Year 2014-2015, and any assessments and charges collected therewith,

1st Installment $6,521.63                    Paid

2nd Installment $6,521.63                    Paid

Parcel No. 017-130-021                       Code Area 067-004
Land $ 1,121,000.00

Included in the above installments is the amount of $45.70, for Placer County Mosquito Abatement.

According to those public records which under the recording laws impart constructive notice to the title to the land described herein, the following matters constitute the chain of title for the thirty-six month period preceding the dated hereof:

NONE

**Note:** **California "Good Funds" Law** Effective January 1, 1990, California Insurance Code Section 12413.1 (Chapter 598, Statutes OF 1989), Prohibits A Title Company From Disbursing Funds From An Escrow Or Sub-Escrow Account, (Except For Funds Deposited By **Wire Transfer, Electronic Payment Or Cash**) Until The Day These Funds Are Made Available To The Depositor Pursuant To Part 229 Of Title 12 Of The Code Of Federal Regulations, (Reg. CC). items such as cashier's, certified or teller's checks may be available for disbursement on the business day following the business day of deposit: however, other forms of deposits may cause extended delays in closing the escrow or sub-escrow.

**"Stewart Title Of Placer Will Not Be Responsible For Accruals Of Interest Or Other Charges Resulting From Compliance With The Disbursement Restrictions Imposed By State Law".**

**Note:** If an ALTA residential owner's policy is requested and if the property described above is determined to be eligible for this policy, the following Exceptions From Coverage will appear in the policy:

1. Taxes or assessments which are not shown as liens by the public records or by the record of any taxing authority.
2. (a) Water rights, claims or title to water; (b) Reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) Unpatented mining claims; whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
3. Any rights, interests or claims of parties in possession of the land which are not shown by the public records.
4. Any easements or liens not shown by the public records. This exception does not limit the lien coverage in Item 8 of the Covered Title Risks.
5. Any facts about the land which a correct survey would disclose and which are not shown by the public records. This exception does not limit the forced removal coverage in Item 12 of the Covered Title Risks.

# Exhibit "B"

CLTA PRELIMINARY REPORT FORM
LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS
(Revised 06/17/06)

CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, Or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors, rights laws.

EXCEPTIONS FROM COVERAGE
SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

PRELIM.B1.06

PAGE 1 OF 7

5.     (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6.     Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (02-03-10)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.     Governmental police power, and the existence or violation of those portions of any law or government regulation concerning: a. building; b. zoning; c. land use; d. improvements on the Land; e. land division; and f. environmental protection This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2.     The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes, This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3.     The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4.     Risks: a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records; b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date; c. that result in no loss to You; or d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28,
5.     Failure to pay value for Your Title.
6.     Lack of a right: a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and b. in streets, alleys, or waterways that touch the Land This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.     The transfer of the Title to You is invalid as preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

\*     For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1 % of Policy Amount or $ 2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1% of Policy Amount or $ 5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1% of Policy Amount or $ 5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1% of Policy Amount or $ 2,500.00 (whichever is less) | $ 5,000.00 |

PRELIM.32.06

PAGE 2 OF 7

AMERICAN LAND TITLE ASSOCIATION
RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.    Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
* Land use * Improvements on the land * Land division * Environmental protection
This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.

2.    The right to take the land by condemning it, unless:
* a notice of exercising the right appears in the public records
* on the Policy Date
* the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking

3.    Title Risks:
* that are created, allowed, or agreed to by you
* that are known to you, but not to us, on the Policy Date -- unless they appeared in the public records
* that result in no loss to you
* that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks

4.    Failure to pay value for your title

5.    Lack of a right:
* to any land outside the area specifically described and referred to in Item 3 of Schedule A
OR
* in streets, alleys, or waterways that touch your land
This exclusion does not limit the access coverage in Item 5 of Covered Title Risk.

AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)
WITH ALTA ENDORSEMENT - FORM 1 COVERAGE
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.    (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.    Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.    Defects, liens, encumbrances, adverse claims or other matters:
(a) created, suffered, assumed or agreed to by the insured claimant;
(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
(c) resulting in no loss or damage to the insured claimant;

PRELIM.S1.06

PAGE 3 OF 7

(d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or

(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof. which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law,

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

(i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

(ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine or equitable subordination; or

(iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:

(a) to timely record the instrument of transfer; or

(b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy forms may be issued to afford either Standard Coverage or Extended Coverage In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following General Exceptions:

EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof. which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

2006 ALTA LOAN POLICY (06/17106)

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(i) the occupancy, use, or enjoyment of the Land;

(ii) the character, dimensions, or location of any improvement erected on the Land;

PAGE 4 OF 7

PRBJJM.S4.06

(iii) the subdivision of land; or

(iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations, This Exclusion I (a) does not modify or limit the coverage provided under Covered Risk 5.

(b) Any governmental police power. This Exclusion I (b) does not modify or limit the coverage provided under Covered Risk 6.

2.    Rights of eminent domain, This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8,

3.    Defects, liens, encumbrances, adverse claims, or other matters.

(a) created, suffered, assumed, or agreed to by the Insured Claimant;

(b) not Known to the Company, not recorded in the Public Records at Date of Policy. but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

(c) resulting in no loss or damage to the Insured Claimant;

(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.    Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.    Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law,

6.    Any claim, by reason of the operation of federal bankruptcy. state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

(a) a fraudulent conveyance or fraudulent transfer, or

(b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy

7.    Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records, This Exclusion does not modify or limit the coverage provided under Covered Risk 11 (b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage, In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1.    (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2..    Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.    Easements, liens or encumbrances, or claims thereof. not shown by the Public Records.

4.    Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.    (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water. whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.    Any lien or right to a lien for services, labor or material not shown by the public records.

**PAGE 5 OF 7**

## AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10/11/92)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect. lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
   (a) to timely record the instrument of transfer; or
   (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.
   The above policy forms may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

PRELIM.06.06

### PAGE 6 OF 7

## 2006 ALTA OWNER'S POLICY (06/17/06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i) the occupancy, use, or enjoyment of the Land;
    (ii) the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv) environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion I (a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims, or other matters.
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor or material not shown by the public records.

PRELDM.S7.06

### PAGE 7 OF 7

Order: maps Comment:
Description: Placer,CA Assessor Map 17.13 Page: 1 of 1



## EXHIBIT "E"

## FORM OF GUARANTY

**THIS LEASE GUARANTY** ("**Guaranty**") is given by the undersigned, Gurmej S. Gill (collectively, "**Guarantor**"), to AKT Brewer 315, LLC, a California limited liability company ("**Landlord**"), with respect to that certain Crop Share Faming Lease (the "**Lease**"), by and between Landlord and Capital Farms, Inc., a California corporation ("**Tenant**"), pursuant to which Tenant leases from Landlord certain premises described in the Lease, located in the County of Placer California.

In order to induce Landlord to execute the Lease, and for other good and valuable consideration, the receipt and sufficiency of which Guarantor acknowledges, Guarantor promises and agrees as follows:

1.      Obligations Guaranteed.  Guarantor hereby absolutely, irrevocably and unconditionally guarantees: (a) the due and punctual payment to Landlord of all rentals, charges, sums and any other monies due Landlord by Tenant under the Lease; and (b) the full and faithful performance of all of the terms, covenants, conditions and agreements contained in the Lease (and any amendments or extensions thereto) to be performed by Tenant.  If Tenant fails to timely pay any amount due Landlord and is in default under the terms and conditions of the Lease, Guarantor shall pay, within ten (10) business days of Landlord's written demand, the amount due Landlord by cashier's check or wire transfer.

2.      Representations and Warranties.  Guarantor hereby represents and warrants to Landlord that: (a) Guarantor has investigated fully whether any benefit will inure to Guarantor by reason of the execution of this Guaranty, and has determined that a direct or indirect benefit will inure to Guarantor by reason of the execution of this Guaranty; (b) Guarantor is not aware of any facts or circumstances that would contradict that this Guaranty is a legal, valid and binding agreement of Guarantor which is enforceable in accordance with its terms; (c) Guarantor has full right, power and authority to execute and deliver this Guaranty, and to perform the undertakings contained herein and the transactions contemplated hereby; and (d) in the case of a Guarantor which is not an individual, all corporate or other action necessary to authorize the execution and delivery of this Guaranty, and the performance of the undertakings contained herein, have been taken.

3.      Authority of Landlord.  Guarantor hereby agrees that, without notice to Guarantor, Landlord may, in conformance with the terms of the Lease, alter, modify, extend or otherwise change any term of the Lease, and Guarantor's obligations hereunder shall automatically apply to the Lease as altered, modified, extended or changed.  No exercise or non-exercise by Landlord of any right given Landlord by this Guaranty, and no dealing by Landlord with Guarantor or any other guarantor or any other person, shall in any way affect any of the obligations of Guarantor hereunder or give Guarantor any recourse against Landlord. Notwithstanding the foregoing, in the event that Tenant assigns its rights under the Lease to a third party which is not an affiliate of Guarantor, then Guarantor shall not be obligated with

E-1

respect to any increased obligation of such assignee tenant resulting from any alteration, modification, extension or other change of the Lease that is made without notice to Guarantor.

4.    <u>Waivers by Guarantor</u>.  Guarantor hereby expressly waives and relinquishes all rights and remedies accorded by applicable law to guarantors or sureties, and agrees not to assert or take advantage of any such rights or remedies, including, but not limited to:  (a) any right to require Landlord, as a condition precedent or concurrent to enforcement of this Guaranty, to proceed against Tenant or any other person or to proceed against or exhaust any security held by Landlord at any time or to pursue any other right or remedy in Landlord's power before proceeding against Guarantor; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Landlord to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons; (c) notice of the acceptance of this Guaranty by any person; (d) demand, notice of default or nonpayment and all other notices of any kind to which Guarantor might otherwise be entitled in connection with this Guaranty or the Lease, except as provided above in Section 1 of this Guaranty; (e) any defense based upon an election of remedies by Landlord; (f) any defense of whatsoever nature on the part of Tenant which otherwise may have been asserted by Guarantor as a defense hereunder; and (g) any defense arising because of Landlord's election, in any proceeding instituted under the federal Bankruptcy Code, of the application of Section 1111(b)(2) of the federal Bankruptcy Code of 1978, as amended; it being agreed by the Guarantor that this Guaranty is an absolute Guaranty of payment and performance and not of collection, that the failure of Landlord to exercise any rights or remedies Landlord has or may have against Tenant shall in no way impair the obligation of the Guarantor and that the liability of the Guarantor hereunder is and shall be direct and unconditional.  Without limiting the generality of the foregoing or any other provision hereof, Guarantor hereby expressly waives any other rights of subrogation, reimbursement, indemnification, contribution, or any other rights and defenses that may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855 inclusive, and/or any amendments thereto, and/or successor statutes.

5.    <u>No Discharge of Guarantor</u>.  Guarantor agrees that: (a) this Guaranty shall not be discharged or affected by the death or incompetency of the Guarantor; (b) Guarantor shall indemnify, defend, protect and hold Landlord harmless from any loss, cost or expense arising from or attributable to the failure of performance of any obligation, condition or event that is hereby guaranteed; and (c) the liability of Guarantor under this Guaranty shall be reinstated and revived, and the rights of Landlord shall continue, with respect to any amount at any time paid on account of the Lease, which shall thereafter be required to be restored or returned by Landlord upon the bankruptcy, insolvency or reorganization of Tenant, Guarantor or any other guarantor, or otherwise, all as though such amount had not been paid.

6.    <u>Independent Investigation by Guarantor</u>.  Guarantor has made an independent investigation of the financial condition of Tenant and the ability of Tenant to perform the obligations hereby guaranteed prior to making this Guaranty.  Guarantor hereby waives any defense that Guarantor may have by reason of the failure of Landlord to provide the Guarantor with any information respecting the financial condition of Tenant, or Tenant's ability to perform any of the obligations hereby guaranteed, and any duty on the part of Landlord to disclose to Guarantor any facts that Landlord may now or hereafter know about Tenant, regardless of

E-2

whether Landlord has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to Guarantor. Guarantor understands and agrees that Guarantor is fully responsible for being and keeping informed of the financial condition of Tenant and of all circumstances bearing on the risk of nonperformance of any obligations hereby guaranteed.

7.    Counterparts. This Guaranty may be signed in multiple counterparts, with the same effect as if all signatories had executed the same counterpart.

8.    Waiver of Subrogation. Until all obligations guaranteed hereby and all obligations of Guarantor hereunder have been fully performed, Guarantor shall have no right of subrogation or right of reimbursement from Tenant or any guarantor and waives any right to enforce any remedy which Landlord now has or may hereafter have against Tenant and any benefit of, and any right to participate in, any security now or hereafter held by Landlord.

9.    Actions. The obligations of Guarantor hereunder are independent of the obligations of Tenant and, in the event of any default hereunder, a separate action or actions may be brought and prosecuted against Guarantor, whether or not Tenant is joined therein or a separate action or actions are brought against Tenant. Landlord may maintain successive actions for other defaults. This Guaranty may be enforced by an action against Guarantor, without the necessity of joining in such action any other guarantor of the obligations of Tenant guaranteed hereby. Landlord's rights hereunder shall not be exhausted by exercise of any of the rights or remedies of Landlord or by any such action or by any number of successive actions until and unless all indebtedness and all obligations, the performance and payment of which are hereby guaranteed, have been paid and fully performed.

10.    Payments; Attorneys' Fees. All payments, advances, charges, costs and expenses, including reasonable attorneys' fees, made or incurred by Landlord in the enforcement of this Guaranty or due from Guarantor in the collection or performance of the Lease obligations guaranteed hereby, or any portion thereof, shall be paid by Guarantor within ten (10) business days of demand by Landlord, together with interest thereon accruing from and after the lapse of such ten (10) business days at the rate of ten percent (10%) per annum. Payment shall be made by cashier's check or wire transfer. Attorneys' fees shall include, but not be limited to, all costs, attorneys' fees and expenses incurred by Landlord in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceedings involving Guarantor which affect the exercise by Landlord of the rights and remedies of Landlord hereunder. If Guarantor is the prevailing party in any litigation or action to enforce this Guaranty, Landlord shall reimburse Guarantor for all costs, attorneys' fees and expenses incurred by Guarantor in connection with such proceeding.

11.    Severability. If any provision or portion thereof of this Guaranty is declared or found by a court of competent jurisdiction to be unenforceable or null and void, such provision or portion thereof shall be deemed stricken and severed from this Guaranty, and the remaining provisions and portions thereof shall continue in full force and effect.

E-3

12. <u>Binding Effect; Assignment</u>. This Guaranty shall inure to the benefit of Landlord, its successors and assigns, and shall bind the heirs, executors, administrators, personal representatives, successors and assigns of Guarantor. This Guaranty may be assigned by Landlord but only in connection with Landlord's assignment of Landlord's interest under the Lease and, when so assigned, Guarantor shall be liable to the assignees under this Guaranty without in any manner affecting the liability of Guarantor hereunder. Prior notice from Landlord of assignment or transfer is hereby waived by Guarantor.

13. <u>Amendments</u>. This Guaranty can only be amended in writing. Guarantor cannot be released from Guarantor's obligations hereunder, except by a writing duly executed by Landlord. Notwithstanding the return of this Guaranty to Guarantor by Landlord, or the execution of a release hereof by Landlord, this Guaranty and all obligations of Guarantor hereunder shall remain in effect for all periods of time thereafter during which any payments made by the Tenant with respect to the Lease may be claimed to be a voidable preference under applicable provisions of the federal Bankruptcy Code of 1978, as amended.

14. <u>Miscellaneous</u>. When the context and construction so require, all words used in the singular herein shall be deemed to have been used in the plural, and the masculine shall include the feminine and neuter, and vice versa. The word "person," as used herein, shall include any individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever. Each reference to "Guarantor" herein shall mean the undersigned, and each of them, and any combination of them. If Guarantor is comprised of more than one person, then each person comprising Guarantor shall be jointly and severally liable for the obligations of Guarantor hereunder.

15. <u>Governing Law</u>. This Guaranty shall be governed by and construed in accordance with the laws of the State of California.

16. <u>Integration</u>. Except as provided in any other written agreement now or at any time hereafter in force between Landlord and Guarantor, this Guaranty shall constitute the entire agreement of Guarantor with Landlord with respect to the subject matter hereof. All representations, understandings, promises and conditions concerning the subject matter hereof are expressed herein.

17. <u>Notices</u>. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed duly served and given when personally delivered to or actually received by the party to whom it is directed or, in lieu of such personal service or receipt: (i) the next business day (Monday through Friday) after being deposited with an overnight air courier such as Federal Express, UPS or DHL; or (ii) upon the sender's confirmation of good delivery if sent by facsimile transmission on a business day between the hours of 9:00 a.m. and 5:00 p.m., the recipient's time, otherwise, at 9:00 a.m., the recipient's time, on the next following business day, in each case addressed as follows:

If to Landlord:

AKT Brewer 315, LLC
c/o AKT Investments, Inc.
Attention: Chris Donnelly
7700 College Town Drive, Suite 101
Sacramento, CA 95826
Phone: (916)383-2500
Fax: (916) 383-0552

If to Guarantor:

Gurmej S. Gill
1496 Bridge Street, Suite 1
Yuba City, CA 95993
Phone: (530) 681-3112
Fax: (916) 209-7099
Email: gurmejgill@yahoo.com

Either party hereto may, from time to time, by written notice to the other, designate a different address which shall be substituted for the one specified above.

**Guarantor:**

Dated: 7-8-15

Gurmej S. Gill

Guaranty

**EXHIBIT "F"**

MEMORANDUM OF LEASE WITH RIGHT OF FIRST REFUSAL

Recording Requested by and
After Recordation, Mail to:

AKT Brewer 315, LLC
c/o AKT Investments, Inc.
Attention: Chris Donnelly
7700 College Town Drive, Suite 101
Sacramento, CA 95826

MEMORANDUM OF CROP SHARE FARMING LEASE
WITH RIGHT OF FIRST REFUSAL

       This Memorandum of Crop Share Farming Lease With Right of First Refusal is executed in connection with that certain Crop Share Farming Lease dated _____ ___, 2015, (the "**Lease**"), between AKT Brewer 315, LLC, a California limited liability company ("**Lessor**"), and Capital Farms, Inc., a California corporation or its Authorized Assignee as therein provided ("**Lessee**").

RECITALS:

    A.    Lessor owns certain real property located in the County of Placer, California consisting of approximately 315 acres, commonly known as Assessor's Parcel Nos.017-130-006 and 017-130-021, as more particularly described on Schedule A attached hereto and incorporated herein by reference (the "**Premises**").

    B.    Lessor and Lessee have entered into that certain unrecorded Crop Share Farming Lease dated _____ ___, 2015 pursuant to which Lessor has granted to Lessee the right to Lease the Premises and a right of first offer to purchase the Premises from Lessor upon the terms and conditions set forth therein.

    C.    Lessor and Lessee desire to execute this Memorandum and cause the same to be recorded in the Official Records for the purpose of memorializing the unrecorded Lease and its terms and to provide third parties with notice of the same.

    NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee hereby acknowledge and agree as follows:

AGREEMENTS:

    1.    Lessee has the right to use and occupy the Premises in accordance with the terms of the Lease until December 31, 2040, unless sooner terminated in accordance with its terms. The Lease grants to the Lessee the right of first refusal to purchase (in accordance with the

F-1

terms and conditions of the Lease) the Premises upon Lessor's desire to transfer or sell the Premises to an unaffiliated party during the term of the Lease. The Lease grants to Lessee the right to extend the Lease Term for an additional five year period.

2.      The sole purpose of this Memorandum is to give notice of the Lease and the right of first offer granted therein and all of its terms, covenants and conditions to the same extent as if the Lease were fully set forth herein, and this Memorandum is subject to all of the terms, conditions and provisions of the Lease.  In the event of a conflict between this Memorandum and the terms and conditions of the Lease, the Lease shall control.

3.      Unless sooner terminated in accordance with its terms or extended pursuant to Lessee's option to extend the Lease Term, the Lease will automatically expire and be of no further force or effect on 11:59:59 p.m. on December 31, 2040.

4.      This Memorandum may be executed in one or more separate counterparts each of which shall be a fully binding and enforceable contract and agreement against the party signing such counterpart, but all such counterparts shall together constitute but one agreement.

5.      The provisions of the Lease shall inure to the benefit of and are binding upon the successors and assigns of the parties thereto.

IN WITNESS WHEREOF, the parties have executed this Memorandum as of the date first above written.

**LESSOR:**

AKT BREWER 315, LLC,
a California limited liability company

By:     AKT Investments, Inc.
        Its Managing Member

        By: _____
        Name: _____
        Its: _____

**LESSEE:**

Capital Farms, Inc.,
a California corporation

By: _____
Name: Gurmej S. Gill
Its: President

F-2

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____

On _____, before me, _____, Notary Public personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

F-3

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or validity
of that document.

State of California
County of _____

On _____, before me, _____, Notary Public
personally appeared _____, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____          (Seal)

669173.6

### SCHEDULE A
## LEGAL DESCRIPTION

**Exhibit "A"**
**Legal Description**

<u>Parcel One:</u>

The Southeast quarter of Section 30, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Excepting therefrom the interest conveyed to the County of Placer in Deed recorded January 4, 1922 in Book 193 of Deeds, Page No. 318, Placer County Records.

Apn: 017-130-006

<u>Parcel Two:</u>

The Northeast quarter of Section 31, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Apn: 017-130-021

## EXHIBIT "G"

### FORM OF NDA

RECORDING REQUESTED BY AND

WHEN RECORDED RETURN TO:

_____

_____

_____

_____

_____

(Space above this line for Recorder's use)

### NON-DISTURBANCE
### AND ATTORNMENT AGREEMENT

NOTICE:     THIS NON-DISTURBANCE AND ATTORNMENT AGREEMENT RESULTS IN YOUR LEASEHOLD ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF A SECURITY INSTRUMENT

THIS NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is entered into as of _____, 20___, by and between _____ ("Beneficiary"), _____ ("Lessee"), and _____ ("Lessor").

### RECITALS

A.     Lessee and Lessor have entered into that certain _____ Lease dated as of _____, 20___ (the "Lease"), covering the real property described in Exhibit A attached hereto (the "Property").

B.     Lessor has a loan with Beneficiary (the "Loan") in the amount of $_____ secured by the lien of a first priority Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (which, together with all renewals, modifications, amendments, consolidations, supplements, replacements and extensions thereto and thereof, is hereinafter referred to as the "Deed of Trust") encumbering the Property.

C.     Lessee has requested that Beneficiary is not to disturb Lessee's possessory rights in the Premises in the event Beneficiary should foreclose the Deed of Trust judicially or nonjudicially (a "foreclosure" or "foreclosure sale"), provided that Lessee is not in default under the Lease and provided that Lessee attorns to Beneficiary or the purchaser at any such foreclosure sale of the Property.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and of other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.　　Notwithstanding anything to the contrary set forth in the Lease, the Lease and the leasehold estate created thereby and all of Lessee's rights thereunder shall be and shall at all times remain subject, subordinate and inferior to the Deed of Trust and the lien thereof.

2.　　In the event of foreclosure of the Deed of Trust, or upon a transfer of the Property by deed-in-lieu of foreclosure (a "deed-in-lieu"), then so long as Lessee is not in default under any of the terms, covenants, or conditions of the Lease, the Lease shall continue in full force and effect as a direct lease between the succeeding owner of the Property and conditions of the Lease for the balance of the term of the Lease.  Lessee hereby agrees to attorn to and accept any such successor owner as landlord under the Lease, and to be bound by and perform all of the obligations imposed by the Lease, and Beneficiary or any such successor owner of the Property will not disturb the possession of Lessee, and will be bound by all of the obligations imposed by the Lease upon the landlord thereunder; provided, however, that the Beneficiary, or any purchaser at a foreclosure sale or any successor owner of the Property shall not be:

　　　　(a)　　liable for any act or omission of a prior landlord (including the Lessor); or

　　　　(b)　　subject to any offsets or defenses which the Lessee might have against any prior landlord (including the Lessor); or

　　　　(c)　　bound by any rent or additional rent which the Lessee might have paid in advance to any  prior landlord (including the Lessor) for a period in excess of one month; or

　　　　(d)　　bound by any agreement or modification of the Lease made without the written consent of the Beneficiary;

　　　　(e)　　liable or responsible for or with respect to the retention, application and/or return to Lessee of any security deposit paid to any prior landlord (including Lessor), whether or not still held by such prior landlord, unless and until Beneficiary or such other purchaser has actually received for its own account as Lessor the full amount of such security deposit; or

　　　　(f)　　liable or responsible for any indemnification obligations undertaken by any prior Lessor (including Lessor) with respect to the presence of hazardous substances; or

　　　　(g)　　bound by any provision under the Lease or any other agreement between Lessee and any prior landlord (including Lessor) obligating the landlord to construct any improvements.

3.　　Upon the written request of either Beneficiary or Lessee to the other given at the time of a foreclosure or deed-in-lieu, the parties agree to execute a lease of the Premises upon the same terms and conditions as the Lease between the Lessor and Lessee, which lease shall cover any unexpired term of the Lease existing prior to such foreclosure sale or deed-in-lieu.

4.      Lessee from and after the date hereof, in the event of any act or omission by Lessor which would give Lessee the right, either immediately or after the lapse of time, to terminate the Lease or to claim a partial or total eviction or to offset against the rental due under the Lease any amount due Lessee as a result of a breach by Lessor, will not exercise any such right: (a) until it has given written notice of such act to Beneficiary; and (b) until the same period of time as is given to Lessor under the Lease to cure such act or omission shall have elapsed following such giving of notice to Beneficiary and following the time when Beneficiary shall have become entitled under the Deed of Trust to remedy the same.

5.      Lessor, as landlord under the Lease and trustor under the Deed of Trust, agrees for itself and its heirs, successors and assigns, that: (a) this Agreement does not (i) constitute a waiver by Beneficiary of any of its rights under the Deed of Trust, or (ii) in any way release Lessor from its obligation to comply with the terms, conditions, covenants, and agreements of the Deed of Trust or any other document, instrument or agreement evidencing, securing or otherwise relating to the Loan; (b) the provisions of the Deed of Trust and each other document, instrument or agreement evidencing, securing or otherwise relating to the Loan remain in full force and effect and must be complied with the Lessor; and (c) in the event of a default under the Deed of Trust, Lessee may pay all rent and all other sums due under the Lease to Beneficiary as provided in this Agreement.

6.      Lessee acknowledges that it has notice that the Lease and the rent and all other sums due thereunder have been assigned or are to be assigned to Beneficiary as security for the Loan secured by the Deed of Trust.  In the event that Beneficiary notifies Lessee of a default under the Deed of Trust and demands that Lessee pay its rent and all other sums due under the Lease to Beneficiary, Lessee agrees that it will honor such demand and pay its rent and all other sums due under the Lease directly to the Beneficiary or as otherwise required pursuant to such notice.

7.      Lessee from and after the date hereof shall send a copy of any notice or statement under the Lease to Beneficiary at the same time such notice or statement is sent to the Lessor under the Lease.

8.      Whenever any party hereto shall desire to give or serve any notice required or contemplated hereunder, each such notice shall be in writing and shall be effective only if the same is delivered by personal service or mailed by registered or certified mail, postage prepaid, return receipt requested, addressed to the address set forth below.  Any communication which is mailed as provided above shall be deemed delivered 72 hours after mailing.  Any party may at any time change its address for such notices by delivering or mailing to the other parties hereto, as aforesaid, a notice of such change.

Lessor:          _____

                 _____

                 _____

                 _____

669173.6

Lessee:            _____
                   _____
                   _____
                   _____
                   _____

Beneficiary:       _____
                   _____
                   _____
                   _____

9.      This Agreement supersedes any inconsistent provisions of the Lease.

10.     Nothing contained in this Agreement shall be construed to derogate from or in any way impair or affect the lien and charge or provisions of the Deed of Trust, except as specifically set forth herein.

11.     This Agreement shall inure to the benefit of the parties hereto, their successors and permitted assigns; provided however, that in the event of the assignment or transfer of the interest of Beneficiary, all obligations and liabilities of Beneficiary under this Agreement shall terminate, and thereupon all such obligations and liabilities shall be the responsibility of the party to whom Beneficiary's interest is assigned or transferred; and provided further that the interest of Lessee under this Agreement may not be assigned or transferred without the prior written consent of Beneficiary.

12.     Lessee agrees that this Agreement satisfies any condition or requirement in the Lease relating to the granting of a non-disturbance agreement.

13.     This Agreement shall be governed by and construed in accordance with the laws of the State of California.

14.     This Agreement and all subsequent modifications, amendments, waivers, consents or supplements hereof, if any, may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, and all such counterparts together shall constitute one and the same instrument.

NOTICE:     THIS AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON THE LEASE TO OBTAIN A LOAN, A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE PROPERTY.

669173.6

IT IS RECOMMENDED THAT PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT THERETO.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first set forth above.


Lessor:


Lessee:


Beneficiary:


By:_____
Name:_____
Title:_____

## Exhibit A

Legal Description

**Exhibit "A"**
**Legal Description**

**Parcel One:**

The Southeast quarter of Section 30, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Excepting therefrom the interest conveyed to the County of Placer in Deed recorded January 4, 1922 in Book 193 of Deeds, Page No. 318, Placer County Records.

Apn: 017-130-006

**Parcel Two:**

The Northeast quarter of Section 31, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Apn: 017-130-021

ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies
only the identity of the individual who signed the document to which
this certificate is attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____

On _____, before me, _____, Notary Public
personally appeared _____, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____          (Seal)

669173.6

ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____

On _____, before me, _____, Notary Public personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____          (Seal)

# EXHIBIT

# E

# AGRICULTURAL LEASE

This Agricultural Lease ("Lease") is made and entered into on this First day of November 1, 2023, at Caruthers, California by SUTTER LAND LLC (hereinafter "Lessor") and UNITED FARM LLC/ H&J MANAGEMENT SERVICES (hereinafter "Lessee").

## RECITALS

WHEREAS Lessor is the owner of certain farm land real property, commonly referred to as "The Brawley Ranch", located in Fresno County and composed of 277 +/- acres of farm land which is planted to almonds.  It is composed of 7 parcels identified as Assessor's Parcel Numbers: 041-231-36S, 041-231-37s, 041-231-39s, 041-231-08s, 041-231-38S, 041-370-07S, 041-370-08S and legally described in Exhibit "A" which, along with property descriptions, is attached to this Lease and incorporated herein by this reference (hereinafter "the Leased Property");

WHEREAS there is 3 pump and well located on the Leased Property.

WHEREAS the Lessee desires to lease the Leased Property  pursuant to this lease as set forth herein;

NOW, THEREFORE, the Lessor and Lessee agree as follows:

## AGRICULTURAL LEASE

The following constitutes the terms and conditions of the Lease including the above Recitals which are included by reference.

1.    Leased Property. Lessor hereby exclusively leases to Lessee and Lessee exclusively hires from Lessor that certain agricultural real property in the County of  Fresno, State of California composed of approximately  277 +/- acres identified by the Fresno County Tax Assessor's Office as APN: : 041-231-36S, 041-231-37s, 041-231-39s, 041-231-08s, 041-231-38S, 041-370-07S, 041-370-08S, legally  described on Exhibit A attached hereto and incorporated herein.

2.    Water - Pump and Well:    There are 3 pumps on the Leased Property.  Lessor is also the owner of  277 acres, planted to almonds. The  pumps on the Leased Property are all used to irrigate the Leased Property.  The Lessor and Lessee will enter into a pump, water and well sharing agreement for the joint use of these pumps and wells on the Leased Property and the Adjacent Property.  The Leased Property is in the Consolidated Irrigation District and eligible to receive water from the District.

3.    Term of the Lease.    The initial term of this Lease term shall be 1 year, commencing on November 1, 2023 and  terminating on December 31, 2024 unless sooner terminated as provided herein.

4. <u>Extensions of the Lease Term</u>. Included in this Lease are two one-year options to extend the Lease term. At the end of the initial one- year Lease term, December 31, 2024, the Lessee shall have an option to extend the Lease term an additional one-year period on the same terms and conditions and, at the end of that first one-year Lease extension, the Lessee shall have an additional option to extend the Lease term an additional one year period on the same terms and conditions, with the final termination being December 31, 2024. Lessee shall give notice to Lessor of intent to exercise its options to extend the lease by December 1, 2025 for the first option.

5. <u>Rent for the Leased Property</u>. The rent for the property shall be set forward as follows:

      a.   The first year lease payment shall be minimum rent equal to debt service,

6. <u>Compliance</u>. Lessee shall, at Lessee's sole cost and expense, comply with any and all laws, ordinances, rules, regulations, requirements and orders present or future and any federal, state, county or municipal government regulations which may in any way apply to the use, maintenance and production of crops on the Leased Property or the sale or disposition of those crops.

7. <u>Operating Costs</u>. During the term of this Lease, the Lessee shall be responsible for and pay for all growing and harvesting costs in connection with Lessee's operations upon the Leased Property including but not limited to, farming costs, production costs, costs of tools and labor, electricity and other utilities.

8. <u>Taxes and Assessments</u>. The Lessor shall be responsible for land and current structures, pumps wells, etc. , and county property taxes. . Any irrigation district taxes, assessments and water costs will be paid by Lessee. The Lessee agrees to keep said property taxes paid current each year.

9. <u>Insurance</u>. Lessee shall maintain on the Leased Property during the Lease term at Lessee's expense, general liability insurance and adequate workman's compensation insurance. The limits of general liability policy are to be in amounts not less than Two Million Dollars ($2,000,000) for any one person injured, or less than One Million Dollars ($1,000,000) for property damage. Lessee shall furnish proof of said insurance to Lessor within thirty (30) days of the execution hereof and shall name Lessor as an additional insured on such policy(s) and the policy(s) shall provide that the carrier shall provide Lessor at least 30 days prior written notice of any termination or policy modification. The Lessee shall annually furnish to Lessor copies of certificates of workers compensation and general liability insurance, with Lessor as additional insured.

10. <u>Improvements and Mechanics Liens</u>. During the term of the Lease and respecting the Lessee constructing improvements on the Leased Property then in such event the Lessee shall pay for all materials adjoined or fixed to said Leased Property and pay in full all persons who perform labor upon said Leased Property at the Lessee's instance and request. Lessee shall not permit or suffer any mechanic or materialman's liens of any kind or nature to be enforced against the Leased Property for any work done, or materials furnished thereon at Lessees' instance or

request. Lessee agrees to indemnify and hold Lessor harmless against any and all such liens. Lessor shall have the right to pay any amount to obtain releases of any such liens, or to defend any action brought thereon, and to pay any judgment entered therein. Lessee shall be liable to Lessors for all costs, damages and reasonable attorneys fees and any amounts expended in defending any proceeding, or in the payment of any of said liens or any judgment obtained therefor. Lessor may post and maintain upon the Leased Property notices of non-responsibility as provided by law.

11. <u>Waste and/or Nuisance</u>. During the term of the Lease the Lessee shall not commit or permit others to commit any waste upon the Leased Property. The Lessee shall not maintain, commit, or permit the maintenance or commission of any nuisances as defined in Civil Code Section 3479 on the Leased Property. Furthermore, the Lessee shall not use or permit the use of the Leased Property for any unlawful purpose. Lessee agrees that any waste or nuisance will be cleaned up within five (5) days from receiving notice from Lessor.

12. <u>Crop Financing</u>. Lessee shall have the right to mortgage or hypothecate only the growing crops grown and produced upon the Leased Premises during the Lease. The land shall not be encumbered, only the growing crops. Lessor reserves all rights and the right to exercise all rights and remedies conferred upon Lessor under the terms of this Lease and under the laws of the State of California. Lessee shall notify Lessor at the time of recording any lien on the crops. The Lessee does not have the right to record any deeds of trust on the Lease Property.

13. <u>Chemicals, Hazardous Material</u>.

   a. <u>Chemicals</u>. Lessee agrees not to use pesticides that will have a residual effect beyond the existence of the Lease without the prior written consent of Lessor. No poison, herbicide, pesticide, fertilizer or other chemical or substance (hereinafter "Chemicals"), other than those approved by the United States Department of Agriculture, and by the California Department of Agriculture, shall be applied to the Leased Property or crops growing thereon. Any and all of such Chemicals shall be applied in strict compliance with, and only at the time or times set forth on the label or manufacturer's instructions. No experimental Chemicals shall be applied to the Leased Property, or the crops growing thereon, without the prior written consent of Lessor. Lessee shall make and keep pertinent records of all such Chemicals used or applied on the Leased Property, including identity, dates of, and rates of application during the term hereof and shall make them available to Lessor and Lessor's agents and assigns, at all reasonable times, for inspection and copying. All Chemicals which Lessee may apply to the Leased Property, or crops growing thereon, shall be used and applied at Lessee's sole cost, risk and liability, and Lessee does hereby agree to indemnify, defend, hold and save Lessor, its successors and assigns and their agents and employees free, clear and harmless from and against any and all claims, demands, damages or liabilities of whatever kind, character or nature which in any manner arise out of or result from any use or application of any of such Chemicals.

   b. <u>Hazardous Material</u>.

      (1) As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material, or waste which is or becomes regulated by any local, state or federal governmental authority, the State of California, or the United States

government.

   (2) Lessor represents and warrants that to the best of its knowledge the Leased Property is as of the day before Lessee came into possession, in compliance with all laws and regulations then in existence regulating the handling, transportation, storage, treatment use and disposition of Hazardous Material.

   (3) Lessee shall not cause or permit any Hazardous Material to be brought upon or used in or about the Leased Property by Lessee, its agents, contractors or invitees without the prior consent of Lessor, which shall not be unreasonably withheld by Lessor conditioned upon Lessee's demonstration to Lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to Lessee's farming effort and will be used and stored in compliance with all laws, regulations and ordinances regulating such Hazardous Material. Notwithstanding the above, Lessee shall not be required to obtain any prior written consent from Lessor for the use of any Chemicals actually consumed or utilized in the farming of the Leased Property in compliance with all then existing applicable laws, regulations and ordinances.

  14. <u>Lessees Acceptance of Property Condition</u>. Subject to Lessee's due diligence and inspection pursuant to this Paragraph 14 and Paragraph 15, Lessee accepts the Leased Property, as well as the improvements thereon and facilities appurtenant thereto in their present "As Is" condition. The Lessee agrees and represents to Lessor, that the Leased Property has been inspected by Lessee and Lessee has been assured by means independent of Lessor or Lessor's agents of the truth of all facts material to this Lease and that the Leased Property is being leased by Lessee as a result of its inspection and investigation and not as a result of any representations by Lessors or Lessors' agents. Lessees agree to indemnify and save the Lessors harmless of and from all claims and demands of every person, firm, or corporation for injuries to persons, wrongful death, or damage to property which may arise with respect to the Leased Premises, the condition thereof, or any act or mission occurring thereon during the term of this Lease, and shall carry public liability and property damage insurance as set forth above.

  15. <u>Inspections by Lessors and Lessees</u>. During the term of the Lease, the Lessees shall permit the Lessors or Lessors' agents, or employees to enter the Leased Property at reasonable times to determine whether the Lessees are complying with the terms of this Lease and for the purpose of doing other lawful acts that may be necessary to protect the Lessors' interest in the Leased Property.

  16. <u>Indemnity</u>. Lessee shall indemnify, hold harmless and defend Lessor, its employees, agents and successors and assigns from all liabilities, damages, claims, penalties or actions including attorneys' fees and costs, arising from any death, injury or damage to any person, or property of any kind while upon or in any way connected with the Leased Property or Lessee's farming operation including, but not limited to the Lessee's farming expenses. Lessee's obligations to indemnify, hold harmless and defend under this paragraph shall include, without limitation (I) all consequential damages, directly or indirectly arising out of the use, generation, storage, or disposal of Hazardous Material and/or chemicals on the Leased Property by Lessee or any of its agents or employees, and (ii) the cost of any required or necessary repair, cleanup, or detoxification and the preparation of any required plans, whether such action is required or

necessary during the term of this Lease or subsequent thereto to the full extent that such action is attributable, directly or indirectly, to the presence or use, generation, storage, release, threatened release, or disposal of Hazardous Material by any person on the Leased Property during the term of this Lease.

17.    Assignment. The Lessee shall have a right to assign or transfer all or any portion of the Lease only with the approval of the Lessor.    Lessee will provide financial and other information about the proposed assignee to Lessor.    Lessee shall have the right to assign this Lease to an entity owned and controlled 100% by the Lessee.   Lessee shall have a right to assign or transfer all or any portion of the Lease only with the written approval of the Lessor.   Lessee will provide to Lessor financial and other pertinent information regarding the proposed assignee. Lessee will remain fully responsible of the Lease, regardless of an assignment or transfer of the Lease.

18.    Acts Constituting Default.  Any or all of the following actions shall constitute a default of this Lease if Lessee, upon 30 days prior written notice of default, fails to cure or initiate a cure and pursue to completion (where the cure will take more than 30 days), within such 30 day period:

a.    Use of the Premises for any purpose other than as authorized in this Lease;

b.    Default in the payment of rent or any other sums owing when due;

c.    Abandonment or vacation by Lessee from the Premises;

d.    A default in the performance of any of the terms, covenants, and conditions hereof;

e.    Filing of voluntary petition in bankruptcy or adjudication as a bankrupt in any involuntary bankruptcy proceeding; or

f.    Appointment of a receiver or judicial trustee or custodian for Lessee, or if any lien or any writ of attachment, garnishment or execution shall be levied upon Lessee's rights or interests under this Lease.

19.    Remedies Upon Default.  In the event of a default of this Lease, and in addition to all other rights and remedies Lessor may have at law, in equity or otherwise, Lessor shall have the option to do any or all of the following:

a.    Reentry.  After expiration of the 30 day notice period, immediately reenter and remove all persons and property from the Leased Property, storing the personal property in a public warehouse or elsewhere at the sole cost and expense of and for the account of Lessee.  No such reentry or taking possession of the Leased Property by Lessor shall be construed as an election on Lessor's part to terminate this Lease unless a written notice of such intention is given by Lessor to Lessee.

b.    Collection of Rent.  To collect by suit or otherwise, pursuant to the provisions of section 1951.4 of the California Civil Code, each installment of rent or other sum as it becomes due hereunder, or to enforce, by suit or otherwise, any other term or provision hereof on the part of Lessee required to be kept or performed, it being specifically agreed that all

unpaid installments of rent or other sums shall bear interest at the highest rate authorized by law from the due date thereof until paid.

     c.   <u>Termination of Lease</u>.  After the expiration of the 30 day notice period, termination of this Lease, in which event Lessee shall immediately surrender possession of the Leased Property, and pay to Lessor, in addition to any other remedy Lessor may have, all damages Lessor may incur by reason of Lessee's default, including the cost of recovering the Leased Property.

     20.   <u>Holding Over</u>. Any holding over by the Lessee after the expiration of the term hereof, with the consent of the Lessor, provided said consent is express and in writing, shall extend the term of the Lease to a new date by written agreement of the Lessor and Lessee.

     21.   <u>DISCLAIMER OF WARRANTIES</u>.  LESSORS MAKES NO WARRANTY OF (I) THE SOIL'S SUITABILITY FOR GROWING AUTHORIZED CROPS; (ii) THE ABSENCE OF DELETERIOUS ORGANISMS OR CHEMICALS IN THE SOIL, AND (iii) THE PREVAILING CLIMATIC CONDITIONS AND/OR OTHER FACTORS THAT MIGHT PERTAIN TO THE ABILITY TO SUCCESSFULLY PRODUCE CROPS. LESSEE HAS MADE ITS OWN INDEPENDENT INVESTIGATION OF THE SUITABILITY OF THE GROWING CONDITIONS.

     22.   <u>Condemnation</u>.  Lessor shall give Lessee Notice that a taking has been threatened, within Thirty (30) days after it receives any information that such a taking has been threatened.

     a.   <u>Effect on Rights and Obligations</u>.  If, during the term of the Lease or the period between the date of execution of this Lease and the date on which the term begins, there is any condemnation of all or part of the Leased Property, the rights and obligations of the parties shall be determined under this paragraph 22, and Rent shall not be affected or abated except as expressly provided in this paragraph 22.  In case of a taking of any part of the Leased Property as the result of the exercise of the right of eminent domain, or a sale in lieu or in anticipation of such exercise (a "Taking"), this Lease shall terminate as to the part taken on the date title vests in the condemnor, and shall continue as to the remaining part, except as otherwise provided in this Lease. If all or such a substantial part of the Leased Property is taken so that, in Lessees' reasonable opinion, there does not remain a portion of the Leased Property susceptible of economic use by Lessee, this Lease shall terminate on the date title vests in the condemnor. The condemnation award shall be allocated between Lessor and Lessee, based on the years left on the Lease Term and the costs the Lessees incurred in developing the Property and the loss of net income from the Property for the balance of the Lease Term.

**b.   <u>Proration of Rent</u>.  If this Lease is terminated, then the termination shall be effective as of the date title vests in the Condemnor for the calendar year in which the Lease is terminated.**

     c.   Should the condemnation occur within the term of the Lease, the entire Lease will be terminated and Lessee will be compensated based on the government's assessment

of the improvement loss evaluated by their agency or within their jurisdiction. Lessor shall not be responsible or liable for any aspects of compensation or payments. The responsible governmental agency shall be the responsible source of compensation, if any. Should there be any disagreements or disputes with any related matters concerning compensation, Lessee shall deal directly with the condemnor.

23. <u>Force Majeure</u>. A Party will not be considered to be in breach or default of its obligations under this Lease to the extent that performance of such obligations or its efforts to cure are delayed, hindered, adversely affected or prevented due to a Force Majeure Event (in each case, whether or not the applicable Force Majeure Event was foreseeable as of the Effective Date). For purposes of this Lease, "**Force Majeure Event**" means: plague, contagion, epidemics, pandemics, outbreaks of infectious disease or any other public health crisis (including, without limitation, any measures of any governmental authority related thereto, including, without limitation, quarantine or other restrictions), fire, earthquake, flood, tornado or other acts of God and natural disasters; strikes or labor disputes; war, civil strife or other violence; any law, order, proclamation, regulation, ordinance, action, demand or requirement of any government agency or supranational agency, or any other act or condition beyond the reasonable control of a Party.

24. <u>Notices</u>. Except as otherwise expressly provided by law, any and all notices, demands, requests, exercises, and other communications required or permitted by this Lease or by law to be served on or given to either party by the other party, shall be in writing and shall be deemed duly served and given when personally delivered to the other party to whom they are directed or in lieu of such personal service, deposited into the united states mail, first class postage prepaid, addressed to the other party as follows:

  Lessor:  Sutter Land LLC
       130 Shrike Circle
       Sacramento, CA 95834
       Cell: (916) 997-5163
       Email: shawn.gill@yahoo.com

  Lessee:  United Farm LLC / H&J Management Services
       130 Shrike Cir
       Sacramento, CA 95834
       Cell: (916) 997-5163
       E-mail: shawn.gill@yahoo.com

Either party may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

25. <u>Amendments to the Lease</u>. This Lease may be amended only by a writing signed by the parties against whom or against whose successors and assigns enforcement of the change is sought.

26. <u>Effect of Partial Invalidity</u>. If any term of provision of this Lease or any application thereof shall be held invalid or unenforceable the remainder of this Lease and any application of the terms and provision shall not be affected thereby, but shall remain valid and enforceable pursuant to the terms of this Lease or California law.

27.     Waiver. The waiver of any breach of any of the provisions of this Lease by either party hereto shall not constitute a continuing waiver or a waiver of any subsequent breach by either party, either of the same or any other provision of this Lease.

28.     Time and Specific Performance of the Essence. Time and specific performance are of the essence of this Lease and of each and every agreement contained herein, and each provision is made and declared to be a material, necessary, and essential part of this Lease.

29.     Governing Law. This Lease shall be governed by and construed in accordance with the laws of the State of California. The Property subject of this Lease is situated in Fresno County, the parties executing this agreement acknowledge that this agreement is being executed in Fresno County, and both parties agree by their signatures below that in the event of any litigation to enforce the terms and conditions of this Lease that Fresno County shall be the County of jurisdiction and venue.

30.     Attorneys' Fees and Costs.     In the event Lessor employs the services of an attorney for the purpose of enforcing this Lease or for any relief against the Lessee with respect to the Leased Premises and Lessor prevails with respect thereto, the Lessee agrees to pay any reasonable attorney's fees as are incurred by the Lessor and in the event the Lessor brings suit and said suit is prosecuted to judgment, and such judgment is in favor of Lessor, the Court shall fix the amount of such fees and the same shall become a part of the judgment. In the event the Lessor is made a party to any litigation resulting from any transaction, act, or omission of the Lessee with respect to Lessee's performance of this Agreement or with respect to the Leased Premises, then the Lessee agrees to defend such suit and hold the Lessor harmless of and from such suit and all claims referred to therein, and will reimburse the Lessor for all reasonable attorney's fees and expenses incurred by Lessor in connection with such suit or claim. In the event the Lessee is the prevailing party in the event of litigation between the Lessor and Lessee, then the Lessee shall be awarded its reasonable attorneys fees and costs.

31.     Right to Record Memorandum of Lease. For purposes of disclosing this Lease, the Lessor and Lessee agree that a memorandum or abstract of this Lease (See Exhibit "B" attached hereto) will be recorded by the Lessees after execution of this Lease.

32.     Right of First Refusal. Lessor grants to Lessee a Right of First Refusal to purchase this Property, composing approximately 277 +/- acres, in the event Lessor elects to sell said Leased Property to third parties.  In the event Lessor elects, at any time, to sell the Leased Property, then Lessee shall have the right to purchase the Leased Property for the same price as Lessor is willing to sell to a third party.

If Lessee elects to exercise his Right of First Refusal and acquire the Leased Property on the same terms and conditions as the third party purchaser, then upon Lessor receiving an offer from a third party which Lessor will likely accept, Lessor shall promptly inform Lessee in writing of said offer and Lessee shall have thirty (30) days from the date of receiving said offer to exercise his Right of First Refusal by accepting the purchase agreement and proceed with

closing a purchase transaction on the same terms and conditions as set forward in the purchase agreement.

33. <u>Termination of Lease</u>. Immediately upon termination of this Lease, the Lessee shall properly execute and acknowledge and deliver to Lessor within thirty (30) days of request therefor, such documents as the Lessor requires to clear title of the Leased Property from the Lease and any crop and improvement security documentation including but not limited to a release, quitclaim deed, release of abstract of Lease, UCC termination notices in recordable form and any other documents required by the title company or Lessor to verify the termination of this Lease. Upon termination of this Lease the Lessee shall have thirty (30) days to remove all the Lessee's improvements to the Leased Property other than real property improvements such as vines or trees.

34. <u>Entire Lease</u>. This Lease including its Exhibits attached hereto, contains the entire agreement between the parties relating to this Lease. Any oral representations or modifications concerning this Lease shall be of no force and effect excepting a subsequent modification in writing signed by the parties to be charged.

35. <u>Mediation/Arbitration</u>. The Lessor and Lessee agree that any and all disputes respecting their obligations and rights under this Lease Agreement shall be resolved first via mediation and, if mediation is not successful, then by binding arbitration utilizing an arbitrator agreed to by both Lessor and Lessee.

36. <u>Review by Legal Counsel</u>. The Lessor and Lessee agree that they have had separate legal counsel review this agreement and the other related documents and have had their right and obligations fully explained to them via said separate counsel

**LESSOR:**

Sutter Land, LLC

By: _____          Date: November 1, 2023

**LESSEE:**

United Farm LLC

By: _____          Date: November 1, 2023

H&J Management Services

By: _____          Date: November 1, 2023

# EXHIBIT

# F

# AGRICULTURAL LEASE

This Agricultural Lease ("Lease") is made and entered into on this Tenth day of January 10, 2020, at Sacramento, California by SUTTER LAND, LLC (hereinafter "Lessor") and CAPITAL FARMS INC (hereinafter "Lessee").

## RECITALS

WHEREAS Lessor is the owner of certain farm land real property, commonly referred to as "The Sankey Ranch", located in Sutter County and composed of 238 +/- acres of farm land which is planted to almonds. It is composed of one-238 acre parcels , identified as Assessor's Parcel Numbers: 035-170-074 and legally described in Exhibit "A" which, along with property descriptions, is attached to this Lease and incorporated herein by this reference (hereinafter "the Leased Property");

WHEREAS there is 2 pumps and well located on the Leased Property.

WHEREAS the Lessee desires to lease the Leased Property pursuant to this lease as set forth herein;

NOW, THEREFORE, the Lessor and Lessee agree as follows:

## AGRICULTURAL LEASE

The following constitutes the terms and conditions of the Lease including the above Recitals which are included by reference.

1.    <u>Leased Property</u>. Lessor hereby exclusively leases to Lessee and Lessee exclusively hires from Lessor that certain agricultural real property in the County of Sutter, State of California composed of approximately 238+/- acres identified by the Sutter County Tax Assessor's Office as APN: 035-170-074 , legally described on Exhibit A attached hereto and incorporated herein.

2.    <u>Water - Pump and Well</u>: There are two pumps and well on the Leased Property. Lessor is also the owner of 238 acres, planted to almonds (the "Adjacent Property"), which is located adjacent to the Leased Property. The Lessor and Lessee will enter into a pump, water and well sharing agreement for the joint use of these pumps and wells on the Leased Property and the Adjacent Property. The Leased Property is in the Consolidated Irrigation District and eligible to receive water from the District.

3.    <u>Term of the Lease</u>. The initial term of this Lease term shall be 5 year, commencing on January 10, 2020 and terminating on January 10, 2025 unless sooner terminated as provided herein.

4.    <u>Extensions of the Lease Term</u>. Included in this Lease are two one-year options to extend the Lease term. At the end of the initial 5 year Lease term, January 10, 2025, the Lessee shall have an option to extend the Lease term an additional one-year period on the same terms and conditions and, at the end of that first 5 year Lease extension, the Lessee shall have an

additional option to extend the Lease term an additional one year period on the same terms and conditions, with the final termination being January 10, 2026. Lessee shall give notice to Lessor of intent to exercise its options to extend the lease by December 31, 2025 for the first option and by December 31, 2026 for the second option.

    5.    <u>Rent for the Leased Property</u>.  The rent for the property shall be set forward as follows:

        a.    The first five years lease payments shall be minimum rent equals debt service.

        b.    The sixth year lease payment (if extended) shall be minimum rent equals plus $10,000 due January 10, 2026

        c.    The seventh year lease payment (if extended) shall be minimum rent equals debt service plus $15,000, due January 10, 2027

    6.    <u>Compliance</u>.  Lessee shall, at Lessee's sole cost and expense, comply with any and all laws, ordinances, rules, regulations, requirements and orders present or future and any federal, state, county or municipal government regulations which may in any way apply to the use, maintenance and production of crops on the Leased Property or the sale or disposition of those crops.

    7.    <u>Operating Costs</u>.  During the term of this Lease, the Lessee shall be responsible for and pay for all growing and harvesting costs in connection with Lessee's operations upon the Leased Property including but not limited to, farming costs, production costs, costs of tools and labor, electricity and other utilities.

    8.    <u>Taxes and Assessments</u>.  The Lessor shall be responsible for land and current structures, pumps wells, etc. , and county property taxes. .  Any irrigation district taxes, assessments and water costs will be paid by Lessee.  The Lessee agrees to keep said property taxes paid current each year.

    9.    <u>Insurance</u>.  Lessee shall maintain on the Leased Property during the Lease term at Lessee's expense, general liability insurance and adequate workman's compensation insurance. The limits of general liability policy are to be in amounts not less than Two Million Dollars ($2,000,000) for any one person injured, or less than One Million Dollars ($1,000,000) for property damage.  Lessee shall furnish proof of said insurance to Lessor within thirty (30) days of the execution hereof and shall name Lessor as an additional insured on such policy(s) and the policy(s) shall provide that the carrier shall provide Lessor at least 30 days prior written notice of any termination or policy modification.  The Lessee shall annually furnish to Lessor copies of certificates of workers compensation and general liability insurance, with Lessor as additional insured.

    10.    <u>Improvements and Mechanics Liens</u>. During the term of the Lease and respecting the Lessee constructing improvements on the Leased Property then in such event the Lessee shall pay for all materials adjoined or fixed to said Leased Property and pay in full all persons who perform labor upon said Leased Property at the Lessee's instance and request. Lessee shall not

Doc 44

permit or suffer any mechanic or materialman's liens of any kind or nature to be enforced against the Leased Property for any work done, or materials furnished thereon at Lessees' instance or request. Lessee agrees to indemnify and hold Lessor harmless against any and all such liens. Lessor shall have the right to pay any amount to obtain releases of any such liens, or to defend any action brought thereon, and to pay any judgment entered therein. Lessee shall be liable to Lessors for all costs, damages and reasonable attorneys fees and any amounts expended in defending any proceeding, or in the payment of any of said liens or any judgment obtained therefor. Lessor may post and maintain upon the Leased Property notices of non-responsibility as provided by law.

11. <u>Waste and/or Nuisance</u>. During the term of the Lease the Lessee shall not commit or permit others to commit any waste upon the Leased Property. The Lessee shall not maintain, commit, or permit the maintenance or commission of any nuisances as defined in Civil Code Section 3479 on the Leased Property. Furthermore, the Lessee shall not use or permit the use of the Leased Property for any unlawful purpose. Lessee agrees that any waste or nuisance will be cleaned up within five (5) days from receiving notice from Lessor.

12. <u>Crop Financing</u>. Lessee shall have the right to mortgage or hypothecate only the growing crops grown and produced upon the Leased Premises during the Lease. The land shall not be encumbered, only the growing crops. Lessor reserves all rights and the right to exercise all rights and remedies conferred upon Lessor under the terms of this Lease and under the laws of the State of California. Lessee shall notify Lessor at the time of recording any lien on the crops. The Lessee does not have the right to record any deeds of trust on the Lease Property.

13. <u>Chemicals, Hazardous Material</u>.

a. <u>Chemicals</u>. Lessee agrees not to use pesticides that will have a residual effect beyond the existence of the Lease without the prior written consent of Lessor. No poison, herbicide, pesticide, fertilizer or other chemical or substance (hereinafter "Chemicals"), other than those approved by the United States Department of Agriculture, and by the California Department of Agriculture, shall be applied to the Leased Property or crops growing thereon. Any and all of such Chemicals shall be applied in strict compliance with, and only at the time or times set forth on the label or manufacturer's instructions. No experimental Chemicals shall be applied to the Leased Property, or the crops growing thereon, without the prior written consent of Lessor. Lessee shall make and keep pertinent records of all such Chemicals used or applied on the Leased Property, including identity, dates of, and rates of application during the term hereof and shall make them available to Lessor and Lessor's agents and assigns, at all reasonable times, for inspection and copying. All Chemicals which Lessee may apply to the Leased Property, or crops growing thereon, shall be used and applied at Lessee's sole cost, risk and liability, and Lessee does hereby agree to indemnify, defend, hold and save Lessor, its successors and assigns and their agents and employees free, clear and harmless from and against any and all claims, demands, damages or liabilities of whatever kind, character or nature which in any manner arise

out of or result from any use or application of any of such Chemicals.

    b.    <u>Hazardous Material</u>.

        (1)    As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material, or waste which is or becomes regulated by any local, state or federal governmental authority, the State of California, or the United States government.

        (2)    Lessor represents and warrants that to the best of its knowledge the Leased Property is as of the day before Lessee came into possession, in compliance with all laws and regulations then in existence regulating the handling, transportation, storage, treatment use and disposition of Hazardous Material.

        (3)    Lessee shall not cause or permit any Hazardous Material to be brought upon or used in or about the Leased Property by Lessee, its agents, contractors or invitees without the prior consent of Lessor, which shall not be unreasonably withheld by Lessor conditioned upon Lessee's demonstration to Lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to Lessee's farming effort and will be used and stored in compliance with all laws, regulations and ordinances regulating such Hazardous Material. Notwithstanding the above, Lessee shall not be required to obtain any prior written consent from Lessor for the use of any Chemicals actually consumed or utilized in the farming of the Leased Property in compliance with all then existing applicable laws, regulations and ordinances.

    14.    <u>Lessees Acceptance of Property Condition</u>. Subject to Lessee's due diligence and inspection pursuant to this Paragraph 14 and Paragraph 15, Lessee accepts the Leased Property, as well as the improvements thereon and facilities appurtenant thereto in their present "As Is" condition. The Lessee agrees and represents to Lessor, that the Leased Property has been inspected by Lessee and Lessee has been assured by means independent of Lessor or Lessor's agents of the truth of all facts material to this Lease and that the Leased Property is being leased by Lessee as a result of its inspection and investigation and not as a result of any representations by Lessors or Lessors' agents. Lessees agree to indemnify and save the Lessors harmless of and from all claims and demands of every person, firm, or corporation for injuries to persons, wrongful death, or damage to property which may arise with respect to the Leased Premises, the condition thereof, or any act or mission occurring thereon during the term of this Lease, and shall carry public liability and property damage insurance as set forth above.

    15.    <u>Inspections by Lessors and Lessees</u>. During the term of the Lease, the Lessees shall permit the Lessors or Lessors' agents, or employees to enter the Leased Property at reasonable times to determine whether the Lessees are complying with the terms of this Lease and for the purpose of doing other lawful acts that may be necessary to protect the Lessors' interest in the Leased Property.

    16.    <u>Indemnity</u>. Lessee shall indemnify, hold harmless and defend Lessor, its employees, agents and successors and assigns from all liabilities, damages, claims, penalties or actions including attorneys' fees and costs, arising from any death, injury or damage to any

person, or property of any kind while upon or in any way connected with the Leased Property or Lessee's farming operation including, but not limited to the Lessee's farming expenses. Lessee's obligations to indemnify, hold harmless and defend under this paragraph shall include, without limitation (I) all consequential damages, directly or indirectly arising out of the use, generation, storage, or disposal of Hazardous Material and/or chemicals on the Leased Property by Lessee or any of its agents or employees, and (ii) the cost of any required or necessary repair, cleanup, or detoxification and the preparation of any required plans, whether such action is required or necessary during the term of this Lease or subsequent thereto to the full extent that such action is attributable, directly or indirectly, to the presence or use, generation, storage, release, threatened release, or disposal of Hazardous Material by any person on the Leased Property during the term of this Lease.

17. _Assignment_. The Lessee shall have a right to assign or transfer all or any portion of the Lease only with the approval of the Lessor. Lessee will provide financial and other information about the proposed assignee to Lessor. Lessee shall have the right to assign this Lease to an entity owned and controlled 100% by the Lessee. Lessee shall have a right to assign or transfer all or any portion of the Lease only with the written approval of the Lessor. Lessee will provide to Lessor financial and other pertinent information regarding the proposed assignee. Lessee will remain fully responsible of the Lease, regardless of an assignment or transfer of the Lease.

18. _Acts Constituting Default_. Any or all of the following actions shall constitute a default of this Lease if Lessee, upon 30 days prior written notice of default, fails to cure or initiate a cure and pursue to completion (where the cure will take more than 30 days), within such 30 day period:

      a.    Use of the Premises for any purpose other than as authorized in this Lease;

      b.    Default in the payment of rent or any other sums owing when due;

      c.    Abandonment or vacation by Lessee from the Premises;

      d.    A default in the performance of any of the terms, covenants, and conditions hereof;

      e.    Filing of voluntary petition in bankruptcy or adjudication as a bankrupt in any involuntary bankruptcy proceeding; or

      f.    Appointment of a receiver or judicial trustee or custodian for Lessee, or if any lien or any writ of attachment, garnishment or execution shall be levied upon Lessee's rights or interests under this Lease.

19. _Remedies Upon Default_. In the event of a default of this Lease, and in addition to all other rights and remedies Lessor may have at law, in equity or otherwise, Lessor shall have the option to do any or all of the following:

      a.    _Reentry_. After expiration of the 30 day notice period, immediately reenter and remove all persons and property from the Leased Property, storing the personal property in a public warehouse or elsewhere at the sole cost and expense of and for the account of Lessee. No

such reentry or taking possession of the Leased Property by Lessor shall be construed as an election on Lessor's part to terminate this Lease unless a written notice of such intention is given by Lessor to Lessee.

   b. Collection of Rent. To collect by suit or otherwise, pursuant to the provisions of section 1951.4 of the California Civil Code, each installment of rent or other sum as it becomes due hereunder, or to enforce, by suit or otherwise, any other term or provision hereof on the part of Lessee required to be kept or performed, it being specifically agreed that all unpaid installments of rent or other sums shall bear interest at the highest rate authorized by law from the due date thereof until paid.

   c. Termination of Lease. After the expiration of the 30 day notice period, termination of this Lease, in which event Lessee shall immediately surrender possession of the Leased Property, and pay to Lessor, in addition to any other remedy Lessor may have, all damages Lessor may incur by reason of Lessee's default, including the cost of recovering the Leased Property.

   20. Holding Over. Any holding over by the Lessee after the expiration of the term hereof, with the consent of the Lessor, provided said consent is express and in writing, shall extend the term of the Lease to a new date by written agreement of the Lessor and Lessee.

   21. DISCLAIMER OF WARRANTIES. LESSORS MAKES NO WARRANTY OF (I) THE SOIL'S SUITABILITY FOR GROWING AUTHORIZED CROPS; (ii) THE ABSENCE OF DELETERIOUS ORGANISMS OR CHEMICALS IN THE SOIL, AND (iii) THE PREVAILING CLIMATIC CONDITIONS AND/OR OTHER FACTORS THAT MIGHT PERTAIN TO THE ABILITY TO SUCCESSFULLY PRODUCE CROPS. LESSEE HAS MADE ITS OWN INDEPENDENT INVESTIGATION OF THE SUITABILITY OF THE GROWING CONDITIONS.

   22. Condemnation. Lessor shall give Lessee Notice that a taking has been threatened, within Thirty (30) days after it receives any information that such a taking has been threatened.

   a. Effect on Rights and Obligations. If, during the term of the Lease or the period between the date of execution of this Lease and the date on which the term begins, there is any condemnation of all or part of the Leased Property, the rights and obligations of the parties shall be determined under this paragraph 22, and Rent shall not be affected or abated except as expressly provided in this paragraph 22. In case of a taking of any part of the Leased Property as the result of the exercise of the right of eminent domain, or a sale in lieu or in anticipation of such exercise (a "Taking"), this Lease shall terminate as to the part taken on the date title vests in the condemnor, and shall continue as to the remaining part, except as otherwise provided in this Lease. If all or such a substantial part of the Leased Property is taken so that, in Lessees' reasonable opinion, there does not remain a portion of the Leased Property susceptible of economic use by Lessee, this Lease shall terminate on the date title vests in the condemnor. The condemnation award shall be allocated between Lessor and Lessee, based on the years left on the Lease Term and the costs the Lessees incurred in developing the Property and the loss of net income from the Property for the balance of the Lease Term.

      b.    <u>Proration of Rent</u>.  If this Lease is terminated, then the termination shall be effective as of the date title vests in the Condemnor for the calendar year in which the Lease is terminated.

      c.    Should the condemnation occur within the term of the Lease, the entire Lease will be terminated and Lessee will be compensated based on the government's assessment of the improvement loss evaluated by their agency or within their jurisdiction.  Lessor shall not be responsible or liable for any aspects of compensation or payments.  The responsible governmental agency shall be the responsible source of compensation, if any.  Should there be any disagreements or disputes with any related matters concerning compensation, Lessee shall deal directly with the condemnor.

      23.    <u>Force Majeure</u>.  A Party will not be considered to be in breach or default of its obligations under this Lease to the extent that performance of such obligations or its efforts to cure are delayed, hindered, adversely affected or prevented due to a Force Majeure Event (in each case, whether or not the applicable Force Majeure Event was foreseeable as of the Effective Date).  For purposes of this Lease, "**Force Majeure Event**" means: plague, contagion, epidemics, pandemics, outbreaks of infectious disease or any other public health crisis (including, without limitation, any measures of any governmental authority related thereto, including, without limitation, quarantine or other restrictions), fire, earthquake, flood, tornado or other acts of God and natural disasters; strikes or labor disputes; war, civil strife or other violence; any law, order, proclamation, regulation, ordinance, action, demand or requirement of any government agency or supranational agency, or any other act or condition beyond the reasonable control of a Party.

      24.    <u>Notices</u>.  Except as otherwise expressly provided by law, any and all notices, demands, requests, exercises, and other communications required or permitted by this Lease or by law to be served on or given to either party by the other party, shall be in writing and shall be deemed duly served and given when personally delivered to the other party to whom they are directed or in lieu of such personal service, deposited into the united states mail, first class postage prepaid, addressed to the other party as follows:

Lessor:      Sutter Land LLC
               130 Shrike Circle
               Sacramento, CA 95834
               Cell: (916) 997-5163
               Email: shawn.gill@yahoo.com

Lessee:      Capital Farms, Inc
               Gurmej S Gill
               1973 HARDIAL DR
               YUBA CITY, CA. 95993
               Cell: 530-681-3112
               E-mail: GURMEJGILL@YAHOO.COM

Either party may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

25.     Amendments to the Lease. This Lease may be amended only by a writing signed by the parties against whom or against whose successors and assigns enforcement of the change is sought.

26.     Effect of Partial Invalidity. If any term of provision of this Lease or any application thereof shall be held invalid or unenforceable the remainder of this Lease and any application of the terms and provision shall not be affected thereby, but shall remain valid and enforceable pursuant to the terms of this Lease or California law.

27.     Waiver. The waiver of any breach of any of the provisions of this Lease by either party hereto shall not constitute a continuing waiver or a waiver of any subsequent breach by either party, either of the same or any other provision of this Lease.

28.     Time and Specific Performance of the Essence. Time and specific performance are of the essence of this Lease and of each and every agreement contained herein, and each provision is made and declared to be a material, necessary, and essential part of this Lease.

29.     Governing Law. This Lease shall be governed by and construed in accordance with the laws of the State of California. The Property subject of this Lease is situated in Fresno County, the parties executing this agreement acknowledge that this agreement is being executed in Fresno  County, and both parties agree by their signatures below that in the event of any litigation to enforce the terms and conditions of this Lease that Fresno County shall be the County of jurisdiction and venue.

30.     Attorneys' Fees and Costs.   In the event Lessor employs the services of an attorney for the purpose of enforcing this Lease or for any relief against the Lessee with respect to the Leased Premises and Lessor prevails with respect thereto, the Lessee agrees to pay any reasonable attorney's fees as are incurred by the Lessor and in the event the Lessor brings suit and said suit is prosecuted to judgment, and such judgment is in favor of Lessor, the Court shall fix the amount of such fees and the same shall become a part of the judgment.  In the event the Lessor is made a party to any litigation resulting from any transaction, act, or omission of the Lessee with respect to Lessee's performance of this Agreement or with respect to the Leased Premises, then the Lessee agrees to defend such suit and hold the Lessor harmless of and from such suit and all claims referred to therein, and will reimburse the Lessor for all reasonable attorney's fees and expenses incurred by Lessor in connection with such suit or claim.  In the event the Lessee is the prevailing party in the event of litigation between the Lessor and Lessee, then the Lessee shall be awarded its reasonable attorneys fees and costs.

31.     Right to Record Memorandum of Lease. For purposes of disclosing this Lease, the Lessor and Lessee agree that a memorandum or abstract of this Lease (See Exhibit "B" attached hereto) will be recorded by the Lessees after execution of this Lease.

32.     Right of First Refusal. Lessor grants to Lessee  a Right of First Refusal to purchase this Property, composing approximately 238 +/- acres, in the event Lessor elects to sell said Leased Property to third parties.  In the event Lessor elects, at any time, to sell the Leased Property, then  Lessee shall have the right to purchase the Leased Property for the same price as Lessor is willing to sell to a third party.

If Lessee elects to exercise his Right of First Refusal and acquire the Leased Property on the same terms and conditions as the third party purchaser, then upon Lessor receiving an offer from a third party which Lessor will likely accept, Lessor shall promptly inform Lessee in writing of said offer and Lessee shall have thirty (30) days from the date of receiving said offer to exercise his Right of First Refusal by accepting the purchase agreement and proceed with closing a purchase transaction on the same terms and conditions as set forward in the purchase agreement.

33.     <u>Termination of Lease</u>.   Immediately upon termination of this Lease, the Lessee shall properly execute and acknowledge and deliver to Lessor within thirty (30) days of request therefor, such documents as the Lessor requires to clear title of the Leased Property from the Lease and any crop and improvement security documentation including but not limited to a release, quitclaim deed, release of abstract of Lease, UCC termination notices in recordable form and any other documents required by the title company or Lessor to verify the termination of this Lease. Upon termination of this Lease the Lessee shall have thirty (30) days to remove all the Lessee's improvements to the Leased Property other than real property improvements such as vines or trees.

34.     <u>Entire Lease</u>. This Lease including its Exhibits attached hereto, contains the entire agreement between the parties relating to this Lease. Any oral representations or modifications concerning this Lease shall be of no force and effect excepting a subsequent modification in writing signed by the parties to be charged.

35.     <u>Mediation/Arbitration</u>.   The Lessor and Lessee agree that any and all disputes respecting their obligations and rights under this Lease Agreement shall be resolved first via mediation and, if mediation is not successful, then by binding arbitration utilizing an arbitrator agreed to by both Lessor and Lessee.

36.     <u>Review by Legal Counsel</u>. The Lessor and Lessee agree that they have had separate legal counsel review this agreement and the other related documents and have had their right and obligations fully explained to them via said separate counsel.

**LESSOR:**

Sutter Land, LLC

By: _____     Date: January 10, 2020
        Sukhwant Gill

**LESSEE:**

By: _____     Date: January 10, 2020
        Gurmej S Gill / Capital Farms Inc.

# EXHIBIT

# G

# AGRICULTURAL LEASE

This Agricultural Lease ("Lease") is made and entered into on this Tenth day of January 10, 2022, at Sacramento, California by SUTTER LAND, LLC (hereinafter "Lessor") and CAPITAL FARMS INC (hereinafter "Lessee").

## RECITALS

WHEREAS Lessor is the owner of certain farm land real property, commonly referred to as "Natomas Ranch", located in Sutter County and composed of 158 +/- acres of farm land which is planted to almonds. It is composed of one- 158 acre parcels, identified as Assessor's Parcel Number: 035-150-013 and legally described in Exhibit "A" which, along with property descriptions, is attached to this Lease and incorporated herein by this reference (hereinafter "the Leased Property");

WHEREAS there is 1 pump and well located on the Leased Property.

WHEREAS the Lessee desires to lease the Leased Property pursuant to this lease as set forth herein;

NOW, THEREFORE, the Lessor and Lessee agree as follows:

## AGRICULTURAL LEASE

The following constitutes the terms and conditions of the Lease including the above Recitals which are included by reference.

1.  <u>Leased Property</u>. Lessor hereby exclusively leases to Lessee and Lessee exclusively hires from Lessor that certain agricultural real property in the County of Sutter, State of California composed of approximately 158+/- acres identified by the Sutter County Tax Assessor's Office as APN: 035-150-013, legally described on Exhibit A attached hereto and incorporated herein.

2.  <u>Water - Pump and Well</u>: There is one pump and well on the Leased Property. Lessor is also the owner of 158 acres, planted to almonds (the "Adjacent Property"), which is located adjacent to the Leased Property. The Lessor and Lessee will enter into a pump, water and well sharing agreement for the joint use of these pumps and wells on the Leased Property and the Adjacent Property. The Leased Property is in the Consolidated Irrigation District and eligible to receive water from the District.

3.  <u>Term of the Lease</u>. The initial term of this Lease term shall be 5 year, commencing on January 10, 2022 and terminating on January 10, 2027 unless sooner terminated as provided herein.

4.  <u>Extensions of the Lease Term</u>. Included in this Lease are two one-year options to extend the Lease term. At the end of the initial 5 year Lease term, January 05, 2027, the Lessee shall have an option to extend the Lease term an additional one-year period on the same terms and conditions and, at the end of that first one-year Lease extension, the Lessee shall have an

additional option to extend the Lease term an additional one year period on the same terms and conditions, with the final termination being December 31, 2028. Lessee shall give notice to Lessor of intent to exercise its options to extend the lease by December 31, 2027 for the first option and by December 31, 2028 for the second option.

5.    Rent for the Leased Property.  The rent for the property shall be set forward as follows:

     a.    The first five years lease payment shall be minimum rent equal debt service, due January 10, 2022

     b.    The sixth year lease payment (if extended) shall be minimum rent equals debt service plus $10,000.00, due January 10, 2026

     c.    The Seventh year lease payment (if extended) shall be minimum rent equals debt service plus $15,000.00 due January 10, 2027.

6.    Compliance.  Lessee shall, at Lessee's sole cost and expense, comply with any and all laws, ordinances, rules, regulations, requirements and orders present or future and any federal, state, county or municipal government regulations which may in any way apply to the use, maintenance and production of crops on the Leased Property or the sale or disposition of those crops.

7.    Operating Costs.  During the term of this Lease, the Lessee shall be responsible for and pay for all growing and harvesting costs in connection with Lessee's operations upon the Leased Property including but not limited to, farming costs, production costs, costs of tools and labor, electricity and other utilities.

8.    Taxes and Assessments.  The Lessor shall be responsible for land and current structures, pumps wells, etc. , and county property taxes. .  Any irrigation district taxes, assessments and water costs will be paid by Lessee.   The Lessee agrees to keep said property taxes paid current each year.

9.    Insurance.  Lessee shall maintain on the Leased Property during the Lease term at Lessee's expense, general liability insurance and adequate workman's compensation insurance. The limits of general liability policy are to be in amounts not less than Two Million Dollars ($2,000,000) for any one person injured, or less than One Million Dollars ($1,000,000) for property damage.  Lessee shall furnish proof of said insurance to Lessor within thirty (30) days of the execution hereof and shall name Lessor as an additional insured on such policy(s) and the policy(s) shall provide that the carrier shall provide Lessor at least 30 days prior written notice of any termination or policy modification.  The Lessee shall annually furnish to Lessor copies of certificates of workers compensation and general liability insurance, with Lessor as additional insured.

10.    Improvements and Mechanics Liens. During the term of the Lease and respecting the Lessee constructing improvements on the Leased Property then in such event the Lessee shall pay for all materials adjoined or fixed to said Leased Property and pay in full all persons who perform labor upon said Leased Property at the Lessee's instance and request. Lessee shall not

permit or suffer any mechanic or materialman's liens of any kind or nature to be enforced against the Leased Property for any work done, or materials furnished thereon at Lessees' instance or request. Lessee agrees to indemnify and hold Lessor harmless against any and all such liens. Lessor shall have the right to pay any amount to obtain releases of any such liens, or to defend any action brought thereon, and to pay any judgment entered therein. Lessee shall be liable to Lessors for all costs, damages and reasonable attorneys fees and any amounts expended in defending any proceeding, or in the payment of any of said liens or any judgment obtained therefor. Lessor may post and maintain upon the Leased Property notices of non-responsibility as provided by law.

11.  Waste and/or Nuisance. During the term of the Lease the Lessee shall not commit or permit others to commit any waste upon the Leased Property. The Lessee shall not maintain, commit, or permit the maintenance or commission of any nuisances as defined in Civil Code Section 3479 on the Leased Property. Furthermore, the Lessee shall not use or permit the use of the Leased Property for any unlawful purpose. Lessee agrees that any waste or nuisance will be cleaned up within five (5) days from receiving notice from Lessor.

12.  Crop Financing. Lessee shall have the right to mortgage or hypothecate only the growing crops grown and produced upon the Leased Premises during the Lease. The land shall not be encumbered, only the growing crops. Lessor reserves all rights and the right to exercise all rights and remedies conferred upon Lessor under the terms of this Lease and under the laws of the State of California. Lessee shall notify Lessor at the time of recording any lien on the crops. The Lessee does not have the right to record any deeds of trust on the Lease Property.

13.  Chemicals, Hazardous Material.

a.  Chemicals. Lessee agrees not to use pesticides that will have a residual effect beyond the existence of the Lease without the prior written consent of Lessor. No poison, herbicide, pesticide, fertilizer or other chemical or substance (hereinafter "Chemicals"), other than those approved by the United States Department of Agriculture, and by the California Department of Agriculture, shall be applied to the Leased Property or crops growing thereon. Any and all of such Chemicals shall be applied in strict compliance with, and only at the time or times set forth on the label or manufacturer's instructions. No experimental Chemicals shall be applied to the Leased Property, or the crops growing thereon, without the prior written consent of Lessor. Lessee shall make and keep pertinent records of all such Chemicals used or applied on the Leased Property, including identity, dates of, and rates of application during the term hereof and shall make them available to Lessor and Lessor's agents and assigns, at all reasonable times, for inspection and copying. All Chemicals which Lessee may apply to the Leased Property, or crops growing thereon, shall be used and applied at Lessee's sole cost, risk and liability, and Lessee does hereby agree to indemnify, defend, hold and save Lessor, its successors and assigns and their agents and employees free, clear and harmless from and against any and all claims, demands, damages or liabilities of whatever kind, character or nature which in any manner arise

out of or result from any use or application of any of such Chemicals

    b.    <u>Hazardous Material</u>.

    (1)    As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material, or waste which is or becomes regulated by any local, state or federal governmental authority, the State of California, or the United States government.

    (2)    Lessor represents and warrants that to the best of its knowledge the Leased Property is as of the day before Lessee came into possession, in compliance with all laws and regulations then in existence regulating the handling, transportation, storage, treatment use and disposition of Hazardous Material.

    (3)    Lessee shall not cause or permit any Hazardous Material to be brought upon or used in or about the Leased Property by Lessee, its agents, contractors or invitees without the prior consent of Lessor, which shall not be unreasonably withheld by Lessor conditioned upon Lessee's demonstration to Lessor's reasonable satisfaction that such Hazardous Material is necessary or useful to Lessee's farming effort and will be used and stored in compliance with all laws, regulations and ordinances regulating such Hazardous Material.  Notwithstanding the above, Lessee shall not be required to obtain any prior written consent from Lessor for the use of any Chemicals actually consumed or utilized in the farming of the Leased Property in compliance with all then existing applicable laws, regulations and ordinances.

14.    <u>Lessees Acceptance of Property Condition</u>. Subject to Lessee's due diligence and inspection pursuant to this Paragraph 14 and Paragraph 15, Lessee accepts the Leased Property, as well as the improvements thereon and facilities appurtenant thereto in their present "As Is" condition. The Lessee agrees and represents to Lessor, that the Leased Property has been inspected by Lessee and Lessee has been assured by means independent of Lessor or Lessor's agents of the truth of all facts material to this Lease and that the Leased Property is being leased by Lessee as a result of its inspection and investigation and not as a result of any representations by Lessors or Lessors' agents.  Lessees agree to indemnify and save the Lessors harmless of and from all claims and demands of every person, firm, or corporation for injuries to persons, wrongful death, or damage to property which may arise with respect to the Leased Premises, the condition thereof, or any act or mission occurring thereon during the term of this Lease, and shall carry public liability and property damage insurance as set forth above.

15.    <u>Inspections by Lessors and Lessees</u>.  During the term of the Lease, the Lessees shall permit the Lessors or Lessors' agents, or employees to enter the Leased Property at reasonable times to determine whether the Lessees are complying with the terms of this Lease and for the purpose of doing other lawful acts that may be necessary to protect the Lessors' interest in the Leased Property.

16.    <u>Indemnity</u>.  Lessee shall indemnify, hold harmless and defend Lessor, its employees, agents and successors and assigns from all liabilities, damages, claims, penalties or actions including attorneys' fees and costs, arising from any death, injury or damage to any

person, or property of any kind while upon or in any way connected with the Leased Property or Lessee's farming operation including, but not limited to the Lessee's farming expenses. Lessee's obligations to indemnify, hold harmless and defend under this paragraph shall include, without limitation (I) all consequential damages, directly or indirectly arising out of the use, generation, storage, or disposal of Hazardous Material and/or chemicals on the Leased Property by Lessee or any of its agents or employees, and (ii) the cost of any required or necessary repair, cleanup, or detoxification and the preparation of any required plans, whether such action is required or necessary during the term of this Lease or subsequent thereto to the full extent that such action is attributable, directly or indirectly, to the presence or use, generation, storage, release, threatened release, or disposal of Hazardous Material by any person on the Leased Property during the term of this Lease.

17.    Assignment. The Lessee shall have a right to assign or transfer all or any portion of the Lease only with the approval of the Lessor.    Lessee will provide financial and other information about the proposed assignee to Lessor.  Lessee shall have the right to assign this Lease to an entity owned and controlled 100% by the Lessee.  Lessee shall have a right to assign or transfer all or any portion of the Lease only with the written approval of the Lessor.  Lessee will provide to Lessor financial and other pertinent information regarding the proposed assignee. Lessee will remain fully responsible of the Lease, regardless of an assignment or transfer of the Lease.

18.    Acts Constituting Default. Any or all of the following actions shall constitute a default of this Lease if Lessee, upon 30 days prior written notice of default, fails to cure or initiate a cure and pursue to completion (where the cure will take more than 30 days), within such 30 day period:

a.    Use of the Premises for any purpose other than as authorized in this Lease;

b.    Default in the payment of rent or any other sums owing when due;

c.    Abandonment or vacation by Lessee from the Premises;

d.    A default in the performance of any of the terms, covenants, and conditions hereof;

e.    Filing of voluntary petition in bankruptcy or adjudication as a bankrupt in any involuntary bankruptcy proceeding; or

f.    Appointment of a receiver or judicial trustee or custodian for Lessee, or if any lien or any writ of attachment, garnishment or execution shall be levied upon Lessee's rights or interests under this Lease.

19.    Remedies Upon Default. In the event of a default of this Lease, and in addition to all other rights and remedies Lessor may have at law, in equity or otherwise, Lessor shall have the option to do any or all of the following:

a.    Reentry. After expiration of the 30 day notice period, immediately reenter and remove all persons and property from the Leased Property, storing the personal property in a public warehouse or elsewhere at the sole cost and expense of and for the account of Lessee.  No

such reentry or taking possession of the Leased Property by Lessor shall be construed as an election on Lessor's part to terminate this Lease unless a written notice of such intention is given by Lessor to Lessee.

       b.    <u>Collection of Rent</u>.  To collect by suit or otherwise, pursuant to the provisions of section 1951.4 of the California Civil Code, each installment of rent or other sum as it becomes due hereunder, or to enforce, by suit or otherwise, any other term or provision hereof on the part of Lessee required to be kept or performed, it being specifically agreed that all unpaid installments of rent or other sums shall bear interest at the highest rate authorized by law from the due date thereof until paid.

       c.    <u>Termination of Lease</u>.  After the expiration of the 30 day notice period, termination of this Lease, in which event Lessee shall immediately surrender possession of the Leased Property, and pay to Lessor, in addition to any other remedy Lessor may have, all damages Lessor may incur by reason of Lessee's default, including the cost of recovering the Leased Property.

      20.    <u>Holding Over</u>. Any holding over by the Lessee after the expiration of the term hereof, with the consent of the Lessor, provided said consent is express and in writing, shall extend the term of the Lease to a new date by written agreement of the Lessor and Lessee.

      21.    DISCLAIMER OF WARRANTIES.  LESSORS MAKES NO WARRANTY OF (I) THE SOIL'S SUITABILITY FOR GROWING AUTHORIZED CROPS; (ii) THE ABSENCE OF DELETERIOUS ORGANISMS OR CHEMICALS IN THE SOIL, AND (iii) THE PREVAILING CLIMATIC CONDITIONS AND/OR OTHER FACTORS THAT MIGHT PERTAIN TO THE ABILITY TO SUCCESSFULLY PRODUCE CROPS. LESSEE HAS MADE ITS OWN INDEPENDENT INVESTIGATION OF THE SUITABILITY OF THE GROWING CONDITIONS.

      22.    <u>Condemnation</u>. Lessor shall give Lessee Notice that a taking has been threatened, within Thirty (30) days after it receives any information that such a taking has been threatened.

       a.    <u>Effect on Rights and Obligations</u>.  If, during the term of the Lease or the period between the date of execution of this Lease and the date on which the term begins, there is any condemnation of all or part of the Leased Property, the rights and obligations of the parties shall be determined under this paragraph 22, and Rent shall not be affected or abated except as expressly provided in this paragraph 22.  In case of a taking of any part of the Leased Property as the result of the exercise of the right of eminent domain, or a sale in lieu or in anticipation of such exercise (a "Taking"), this Lease shall terminate as to the part taken on the date title vests in the condemnor, and shall continue as to the remaining part, except as otherwise provided in this Lease. If all or such a substantial part of the Leased Property is taken so that, in Lessees' reasonable opinion, there does not remain a portion of the Leased Property susceptible of economic use by Lessee, this Lease shall terminate on the date title vests in the condemnor. The condemnation award shall be allocated between Lessor and Lessee, based on the years left on the Lease Term and the costs the Lessees incurred in developing the Property and the loss of net income from the Property for the balance of the Lease Term.

     b.    <u>Proration of Rent</u>. If this Lease is terminated, then the termination shall be effective as of the date title vests in the Condemnor for the calendar year in which the Lease is terminated.

     c.    Should the condemnation occur within the term of the Lease, the entire Lease will be terminated and Lessee will be compensated based on the government's assessment of the improvement loss evaluated by their agency or within their jurisdiction. Lessor shall not be responsible or liable for any aspects of compensation or payments. The responsible governmental agency shall be the responsible source of compensation, if any. Should there be any disagreements or disputes with any related matters concerning compensation, Lessee shall deal directly with the condemnor.

     23.    <u>Force Majeure</u>. A Party will not be considered to be in breach or default of its obligations under this Lease to the extent that performance of such obligations or its efforts to cure are delayed, hindered, adversely affected or prevented due to a Force Majeure Event (in each case, whether or not the applicable Force Majeure Event was foreseeable as of the Effective Date). For purposes of this Lease, "**Force Majeure Event**" means: plague, contagion, epidemics, pandemics, outbreaks of infectious disease or any other public health crisis (including, without limitation, any measures of any governmental authority related thereto, including, without limitation, quarantine or other restrictions), fire, earthquake, flood, tornado or other acts of God and natural disasters; strikes or labor disputes; war, civil strife or other violence; any law, order, proclamation, regulation, ordinance, action, demand or requirement of any government agency or supranational agency, or any other act or condition beyond the reasonable control of a Party.

     24.    <u>Notices</u>. Except as otherwise expressly provided by law, any and all notices, demands, requests, exercises, and other communications required or permitted by this Lease or by law to be served on or given to either party by the other party, shall be in writing and shall be deemed duly served and given when personally delivered to the other party to whom they are directed or in lieu of such personal service, deposited into the united states mail, first class postage prepaid, addressed to the other party as follows:

     Lessor:    Sutter Land , LLC
             130 Shrike Circle
             Sacramento, CA 95834
             Cell: (916) 997-5163
             Email: shawn,gill@yahoo.com

     Lessee:    Capital Farms, Inc
             Gurmej S Gill
             1973 Hardial Dr
             Yuba City, Ca. 95993
             Cell: (530) 681-3112
             E-mail: gurmejgill@yahoo.com

Either party may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

25. <u>Amendments to the Lease</u>. This Lease may be amended only by a writing signed by the parties against whom or against whose successors and assigns enforcement of the change is sought.

26. <u>Effect of Partial Invalidity</u>. If any term of provision of this Lease or any application thereof shall be held invalid or unenforceable the remainder of this Lease and any application of the terms and provision shall not be affected thereby, but shall remain valid and enforceable pursuant to the terms of this Lease or California law.

27. <u>Waiver</u>. The waiver of any breach of any of the provisions of this Lease by either party hereto shall not constitute a continuing waiver or a waiver of any subsequent breach by either party, either of the same or any other provision of this Lease.

28. <u>Time and Specific Performance of the Essence</u>. Time and specific performance are of the essence of this Lease and of each and every agreement contained herein, and each provision is made and declared to be a material, necessary, and essential part of this Lease.

29. <u>Governing Law</u>. This Lease shall be governed by and construed in accordance with the laws of the State of California. The Property subject of this Lease is situated in Fresno County, the parties executing this agreement acknowledge that this agreement is being executed in Fresno County, and both parties agree by their signatures below that in the event of any litigation to enforce the terms and conditions of this Lease that Fresno County shall be the County of jurisdiction and venue.

30. <u>Attorneys' Fees and Costs</u>. In the event Lessor employs the services of an attorney for the purpose of enforcing this Lease or for any relief against the Lessee with respect to the Leased Premises and Lessor prevails with respect thereto, the Lessee agrees to pay any reasonable attorney's fees as are incurred by the Lessor and in the event the Lessor brings suit and said suit is prosecuted to judgment, and such judgment is in favor of Lessor, the Court shall fix the amount of such fees and the same shall become a part of the judgment. In the event the Lessor is made a party to any litigation resulting from any transaction, act, or omission of the Lessee with respect to Lessee's performance of this Agreement or with respect to the Leased Premises, then the Lessee agrees to defend such suit and hold the Lessor harmless of and from such suit and all claims referred to therein, and will reimburse the Lessor for all reasonable attorney's fees and expenses incurred by Lessor in connection with such suit or claim. In the event the Lessee is the prevailing party in the event of litigation between the Lessor and Lessee, then the Lessee shall be awarded its reasonable attorneys fees and costs.

31. <u>Right to Record Memorandum of Lease</u>. For purposes of disclosing this Lease, the Lessor and Lessee agree that a memorandum or abstract of this Lease (See Exhibit "B" attached hereto) will be recorded by the Lessees after execution of this Lease.

32. <u>Right of First Refusal</u>. Lessor grants to Lessee a Right of First Refusal to purchase this Property, composing approximately 158 +/- acres, in the event Lessor elects to sell said Leased Property to third parties. In the event Lessor elects, at any time, to sell the Leased Property, then Lessee shall have the right to purchase the Leased Property for the same price as Lessor is willing to sell to a third party.

If Lessee elects to exercise his Right of First Refusal and acquire the Leased Property on the same terms and conditions as the third party purchaser, then upon Lessor receiving an offer from a third party which Lessor will likely accept, Lessor shall promptly inform Lessee in writing of said offer and Lessee shall have thirty (30) days from the date of receiving said offer to exercise his Right of First Refusal by accepting the purchase agreement and proceed with closing a purchase transaction on the same terms and conditions as set forward in the purchase agreement.

33. <u>Termination of Lease</u>. Immediately upon termination of this Lease, the Lessee shall properly execute and acknowledge and deliver to Lessor within thirty (30) days of request therefor, such documents as the Lessor requires to clear title of the Leased Property from the Lease and any crop and improvement security documentation including but not limited to a release, quitclaim deed, release of abstract of Lease, UCC termination notices in recordable form and any other documents required by the title company or Lessor to verify the termination of this Lease. Upon termination of this Lease the Lessee shall have thirty (30) days to remove all the Lessee's improvements to the Leased Property other than real property improvements such as vines or trees.

34. <u>Entire Lease</u>. This Lease including its Exhibits attached hereto, contains the entire agreement between the parties relating to this Lease. Any oral representations or modifications concerning this Lease shall be of no force and effect excepting a subsequent modification in writing signed by the parties to be charged.

35. <u>Mediation/Arbitration</u>. The Lessor and Lessee agree that any and all disputes respecting their obligations and rights under this Lease Agreement shall be resolved first via mediation and, if mediation is not successful, then by binding arbitration utilizing an arbitrator agreed to by both Lessor and Lessee.

36. <u>Review by Legal Counsel</u>. The Lessor and Lessee agree that they have had separate legal counsel review this agreement and the other related documents and have had their right and obligations fully explained to them via said separate counsel.

**LESSOR:**

Sutter Land, LLC

By: _____  Date: January 10, 2022
  Sukhwant Gill

**LESSEE:**

By: _____  Date: January 10, 2022
  Gurmej Gill / Capital Farms, Inc.