11

1  Michael J. Gomez (State Bar No. 251571)
      mgomez@frandzel.com
2  Gerrick M. Warrington (State Bar No. 294890)
      gwarrington@frandzel.com
3  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   1000 Wilshire Boulevard, Nineteenth Floor
4  Los Angeles, California 90017-2427
   Telephone: (323) 852-1000
5  Facsimile: (323) 651-2577

6  Attorneys for Creditor
   TECH AG FINANCIAL GROUP, INC.

7

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                  **EASTERN DISTRICT OF CALIFORNIA**

                              **FRESNO DIVISION**

11

12

13  In re                                      Case No. 25-10074-A-12

14  CAPITAL FARMS, INC.,                        Chapter 12

                                                DCN:  FW-18
        Debtor.
15                                              **OPPOSITION OF TECH AG FINANCIAL**
                                                **GROUP, INC. TO DEBTOR'S MOTION**
16                                              **TO VALUE COLLATERAL**

17                                              Date:   September 4, 2025
                                                Time:   10:30 a.m.
18                                              Place:  Dept. A, Courtroom 11
                                                        5th Floor
19                                                      United States Courthouse
                                                        510 19th Street, Bakersfield, CA
20

21                                              Hon. Jennifer E. Niemann

22

23

24

25

26

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1    Tech Ag Financial Group, Inc. ("Tech Ag") opposes the Motion to Value ("Motion to

2  Value") (Dkt. 263) filed by the Debtor Capital Farms, Inc. ("Debtor").

3  **I.    INTRODUCTION**

4    The Debtor is trying to use its plan and Motion to Value to obtain a windfall for insiders by

5  under-valuing Tech Ag's collateral. It is ignoring its own going-concern valuations in the Plan and

6  picking and choosing the valuation date that best suits it rather than the period required by law.

7  This ignores and even contradicts the Debtor's own Plan valuations. It's also omitting huge

8  portions of collateral, including the 2025 almond harvest proceeds.

9    At the same time, the Debtor is ignoring its own valuable contribution and reimbursement

10  claims against co-obligors, which arise by operation of law due to the Debtor's ongoing payments

11  to creditor Rabo Agrifinance LLC who has various obligors on its debts, but who are paying

12  nothing to satisfy those claims. Those reimbursement/contribution claims constitute a part of

13  Tech Ag's collateral package, either by way of its prepetition perfected lien on general intangibles

14  or its postpetition replacement lien.

15    In short, the Bankruptcy Code does not allow the Debtor to use § 506(a) to upend

16  fundamental bankruptcy policies of maximization of creditor recoveries and avoiding windfalls for

17  insiders.

18    The Court should deny the Motion to Value.

19  **II.    BACKGROUND**

20    The following section provides the background, as relevant to Tech Ag's opposition to the

21  Debtors' Motion to Value.

22    **A.    Tech Ag's secured claim.**

23    On October 20, 2022, Tech Ag made a loan to the Debtor, evidenced by a Master Note and

24  Security Agreement ("Note and Agreement") in the original principal amount of $350,000.00,

25  which the Debtor executed and delivered to Tech Ag (the "Loan").

26    In connection with the Note and Agreement, Tech Ag issued a Loan Commitment Letter

27  dated October 20, 2022 ("Loan Commitment" and together with Note and Agreement, the "Tech

28  Ag Loan Documents"), providing for, among other things, a February 1, 2024, maturity date.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

1        In connection with the Note and Agreement, the Debtor granted Tech Ag a security interest

2   in certain collateral as described therein, including all existing and after-acquired farm products

3   and proceeds thereof, all additions or accessions thereto, and all substitutions and replacements

4   thereof; all crops growing, grown, or to be grown; all harvested crops; all livestock; all warehouse

5   receipts or other documents (negotiable or non-negotiable) issued for storage of such crops; all

6   seed, fertilizer, chemicals and petroleum, and any other crop input products; all contract rights,

7   chattel paper, documents, instruments, accounts, accounts receivable, general intangibles, and cash

8   and non-cash proceeds from the sale, exchange, collection, or disposition of any of the collateral;

9   all entitlements and payments, whether in cash or in kind, arising under any governmental,

10  whether federal or state, agricultural subsidy, deficiency, diversion, conservation, disaster, or any

11  similar or other programs; all farm and business machinery, equipment and tools (the

12  "Collateral").

13       As of January 10, 2025, under the terms of the Tech Ag Loan Documents, Debtor owes

14  Tech Ag not less than $416,312.21.

15  **B.      The Debtor files chapter 12.**

16       On January 10, 2025 ("Petition Date"), the Debtor filed a voluntary chapter 12 bankruptcy

17  petition in the United States Bankruptcy Court for the Eastern District of California, commencing

18  the instant bankruptcy case.

19  **C.      The Debtor grants Tech Ag a replacement lien.**

20       On January 13, 2025, the Debtor filed a motion to use cash collateral (Dkt. 6) ("Cash

21  Collateral Motion"). Later, Tech Ag objected to the Cash Collateral Motion, and requested

22  adequate protection. *See* Dkt. 19.

23       On February 12, 2025, the parties entered into a cash collateral stipulation (Dkt. 77) ("Cash

24  Collateral Stipulation"). The next day, the Court entered an order granting the Cash Collateral

25  Motion and granting Tech Ag, among others:

26       automatically-perfected replacement liens on, and security interests in, all of the
         respective Debtors' tangible and intangible prepetition and postpetition property

27       (retroactive as of the petition date) with the same validity, priority, and extent that
         such creditors had in such prepetition collateral as of the petition date, without the

28       need to file or record financing statements, notices of lien, or similar instruments or

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

to take any other action in order to validate and perfect these replacement liens and security interests.

Dkt. 74 at ¶ 2.

On March 31, 2025, the Court entered an order approving the Cash Collateral Stipulation as well as Tech Ag's replacement lien. *See* Dkt. 126.

**D.      The Debtor files a chapter 12 plan proposing no distribution to Tech Ag.**

On July 31, 2025, the Debtor filed its Chapter 12 Plan (Dkt. 253) ("Plan"). In the Plan, the Debtor classified Tech Ag as being unsecured based on § 506(a), and unsecured claims are proposed to receive no distribution.

**E.      The Debtor files its Motion to Value.**

On August 7, 2025, the Debtor filed its Motion to Value, seeking to value the Collateral at $0.00. The Debtor claims the Collateral is only worth $3,460,805.97, which leaves no value to support Tech Ag's lien because of senior lien claims of Rabo Agrifinance LLC ("Rabo") totaling $5,411,929.24. *See* Motion to Value at ¶ 2.

In support, the Debtor filed a Declaration of Sukhwant Gill ("Gill Declaration") (Dkt. 265), the president of the Debtor and a "Liquidation Analysis" (Dkt. 266 at 3).

**III.      DISCUSSION**

As analyzed below, the Court should deny the Motion.

**A.      The Debtor is using the wrong valuation methodology.**

Section 506(a)(1) of the Bankruptcy Code provides, in pertinent part, that "An allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property…and is an unsecured claim to the extent that the value of such creditor's interest…is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."  11 U.S.C. § 506(a)(1).

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Here, the Debtor claims that it may value Tech Ag's claim at $0.00. In support, the Debtor claims that the senior claims of Rabo total $5,411,929.24, which exceeds the Debtor's $3,460,805.97 liquidation valuation of the Collateral. Accordingly, per the Debtor, there is no value to support the claims that are junior to Rabo, including Tech Ag, and those claims should therefore be valued at $0.00.

There are several problems with this analysis.

First, the Debtor may not use a *liquidation* valuation, but rather it must use the fair market valuation for the Collateral. Indeed, the Debtor is intending on retaining the Collateral and using it in connection with its chapter 12 plan. *See* Plan at § 4.01 ("Debtor will continue to operate the farming operation following confirmation of the Plan and will use their farming income to make payments as described above.") Accordingly, "the proper valuation is fair market value, not foreclosure value." *In re Kim*, 130 F.3d 863, 865 (9th Cir. 1997) (citation omitted). *Cf. Associates Commercial Corp. v. Rash*, 520 U.S. 953, 956 (1997) (discussing replacement valuation). Because the Debtor is using a liquidation valuation methodology of the Collateral, as opposed to a fair market valuation, it is significantly *under*-valuing the Collateral. Indeed, it appears to be netting-out almost $1 million in costs of liquidation, which is the purported purpose of a liquidation analysis. This is improper.

Accordingly, the Court should deny the Motion to Value because it uses the wrong valuation methodology.

**B.    The Debtor is applying its valuation method incorrectly.**

Next, valuation under § 506(a) "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a). *See also In re Taffi*, 96 F.3d 1190, 1192 (9th Cir. 1996) ("When a Chapter 11 debtor or a Chapter 13 debtor intends to retain property subject to a lien, the purpose of a valuation under section 506(a) is not to determine the amount the creditor would receive if it hypothetically had to foreclose and sell the collateral. Neither the foreclosure value nor the costs of repossession are to be considered because no foreclosure is intended. Instead, when the proposed use of the property is continued

retention by the debtor, the purpose of the valuation is to determine how much the creditor will receive for the debtor's continued possession. **Hypothetical sales costs are not to be considered because no sale is intended**.") (emphasis added).

Here, the Debtor intends to retain the Collateral and use it in connection with its chapter 12 plan. *See* Plan at § 4.01. Hence, the Debtor cannot factor any sales costs or liquidation costs into its analysis. To do so unfairly shortchanges the secured creditor in violation of applicable precedent. On this basis alone, the Motion must be denied.[1]

Additionally, the Debtor must use values as of the confirmation date, not the petition date. There is no justification for the Debtor to deviate from the majority rule and use the petition date rather than the confirmation date. *See In re Dheming*, No. 11-56798, 2013 WL 1195652, at *3 (Bankr. N.D. Cal. Mar. 22, 2013) (discussing the majority rule that "the appropriate date for valuing collateral for purposes of fixing a secured creditor's claim is the confirmation date, or a date close to confirmation."). The Debtor is trying to pull off a reorganization. This is not a chapter 7 liquidation. Therefore, the applicable snapshot period for valuing collateral is the time of confirmation. *But the Debtor isn't using confirmation date numbers!*

Instead, the Debtor looks to the petition date, under-valuing its assets **by millions of dollars**. In its plan projections, the Debtor estimated its 2025 crop proceeds at being worth over $4 million. *See* Dkt. 254, Exh. B, Projected Budget, internal page 4, TOTAL CROP REVENUE: "$4,676,625.00." The Debtor also has incoming FSA grant money, which is a general intangible covered by the pre-petition security interests and replacement liens. *Id.* at p. 1, FSA Grant Payments line item, "$498,015.70." The 2025 crop harvest is on now. The FSA payments are being collected now. And per the meeting of creditors testimony, the Debtor expects more. App'x, Exh. 2, described below further. Yet, strangely, the Debtor wants to use figures for its 2024 crop from the beginning of the year. By using the petition date, the Debtor is significantly under-valuing the Collateral, which creates a windfall for the Debtor and its insiders.

---

[1] If the Court were to consider such an analysis, the testimony from the most recent meeting of creditors shows there is no foundation for such values.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

The Court should reject the Debtor's proposed petition date valuation.

**C.　　The Debtor is under-valuing and omitting Collateral.**

In the Debtor's Liquidation Analysis, it sets forth a list that supposedly reflects all of the collateral that it is subject to Tech Ag's perfected liens. But, the Debtor has omitted items of collateral and under-valued the items that it did list. Moreover, the Debtor is making inconsistent valuations in its Liquidation Analysis versus what it is saying in its Plan and under oath.

As stated above, in its Liquidation Analysis, the Debtor used an old, 2024 crop valuation of $2,168,137.47. *See* Dkt. 266 Exh. A. But in the Debtor's own Plan's projections, the Debtor states that its crop revenue for this year, i.e., as of Q4 2025, is ***$4,676,625.00***. *See* Dkt. 254 at 4 of 16. The Debtor confirmed this amount—and that it would be *higher*—under oath at its meeting of creditors. *See* August 19, 2025 Transcript of Meeting of Creditors ("Transcript") Declaration of Michael Gomez Exh. 2 26:5–18. In other words, the Debtor is using an old crop valuation that is over ***$2.5 million*** less than the current crop valuation.

Moreover, the Debtor testified at the meeting of creditors that $70,000.00 of the 2024 almond crop proceeds had still not been collected. *See* Transcript at 22:14–20. That $70,000.00 figure for 2024 almond crop proceeds should, therefore, be included in the Collateral valuation— *in addition to* the $2.5 million due for the 2025 almond crop proceeds.

There are additional problems with the Liquidation Analysis.

The Plan also values the Debtor's FSA grant at $498,015.70 as of September 2025. *See* Dkt. 254 at 5 of 16. That's the approximate valuation that the Debtor testified to at the August 19, 2025, meeting of creditors. *See* Transcript at 19:18–20 ("MR. GOMEZ: I see. So the total FSA monies are about $498,000? MR. GILL: Correct.").

But the Liquidation Analysis values the FSA at *$0.00*. That's an additional half-a-million dollars that the Debtor is excluding from its valuation, but including in its Plan projections.

The Debtor also testified that it may be receiving yet further FSA funds in the near future. *See* Transcript at 45:18–46:5.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

At the meeting of creditors, the Debtor testified that there was approximately $150,000.00 in equipment of Sutter Enterprises, a related entity,[2] that was omitted from the Liquidation Analysis, but that is subject only to a $45,000.00 lien of Ag Direct. *See* Transcript at 16:17–22. None of that equipment (or its value to this estate) is included on the Liquidation Analysis.

The same goes for the Debtor's equipment valuation, which impermissibly short-changes such valuation by including impermissible liquidation costs. *Compare* Liquidation Analysis *with* Plan Projections.

In sum, because the Debtor has not appropriately valued the Collateral, it has failed to meet its burden to demonstrate that the Collateral lacks sufficient value to support Tech Ag's claim.

The Court should deny the motion for this reason alone.

**D.     The Debtor has omitted its own contribution/reimbursement claims.**

At the meeting of creditors, the Debtor testified that there were various non-debtor co-obligors on Rabo debt, including Gurmej Singh Gill, Sutter Enterprises, United Farm, and Sutter Land, and that the Debtor was paying the bill for these non-debtor entities. *See* Transcript at 40:13–41:3. The Debtor estimated this Rabo debt is about $9 million.[3]

The problem is that the Debtor is paying this Rabo debt via its Plan, which is premised on this Motion to Value. By paying the non-debtor insiders' Rabo debt whether historically, or through this case, or via its Plan and Motion to Value, the Debtor is creating claims for contribution and reimbursement. These claims come within Tech Ag's collateral package.

The Debtor's valuation fails to include the value of its own contingent claims for contribution and reimbursement against non-debtor co-obligors of the Rabo debt.

///

---

[2] According to the Debtor, it will be taking over this equipment. The replacement liens readily attach to it. And if not, again this is evidence of the value of the contribution / reimbursement claims that the Debtor is ignoring as discussed *infra*.

[3] Mr. Gill, the Debtor's president, alone claims he owes Rabo $10 million in unsecured debt. This seems confirmed by the bankruptcy schedules of his sibling, Gurmej. *See* Schedule F 25-24095 Dkt. 1 (E.D. Cal. Bankr.) at § 4.6. Further, per Rabo's own loan documents one can ascertain another individual co-obligor such as Baljit Gill.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Such claims would arise by operation of law upon any payment on a joint debt by one obligor. Based on the disclosures, only the Debtor is making these payments. No other co-obligor is contributing a single penny to the effort. Repayment rests on the back of the Debtor. Entry of the order granting the Debtor's Motion to Value and the concomitant confirmation of the Plan would have the effect of valuing Rabo debt as fully secured, entitled to payment of the present value of such allowed secured claim, in full from the Plan.[4] Such payment of Rabo's putatively allowed secured claims would satisfy the debt owed by non-debtor insiders, who are co-obligated with the Debtor on the same Rabo debt. In other words, the Debtor's proposed valuation, if approved, would create a windfall for the co-obligors at the expense of the Debtor.

By operation of law though, the simple repayment of such claims by the Debtor and the Debtor alone creates a claim for contribution and reimbursement in favor of the Debtor and against each of these insider co-obligors. *See Morgan Creek Residential v. Kemp*, 153 Cal. App. 4th 675, 684 (2007) ("The right of contribution, although necessarily related to some former transaction or obligation, exists as an entirely separate contract implied by law. In situations where two or more parties are jointly liable on an obligation and one of them makes payment of more than his share, the one paying possesses a new obligation against the others for their proportion of what he has paid for them.") (citations omitted). Those contribution and reimbursement claims of the Debtor constitute general intangibles, which are included within Tech Ag's collateral package—i.e., the general pool of assets being valued.

And yet, the Debtor's Liquidation Analysis omits these claims entirely. This ignores a fundamental bankruptcy policy of "maximizing the value of the debtor's bankruptcy estate" (4 Collier on Bankruptcy ¶ 506.03[6][a][ii] (Richard Levin & Henry J. Sommer eds., 16th ed.) at 506-36) and avoiding windfalls (*Id.* at ¶ 506.03[4][a][3]).

---

[4] Interestingly, by the Debtor's own misguided valuation in the Motion, Rabo too is under-secured but no effort was made to treat it as a partially undersecured creditor focusing on repayment in full under the Plan, again pointing to the conclusion that the Plan is meant to benefit insiders.

The present, realizable value of these claims is unknown.[5] But these claims would be in an amount that is potentially—dollar-for-dollar—the amount of the resulting allowed secured claim of Rabo. In other words, by omitting these valuable claims of contribution and reimbursement, the Debtor is excluding a significant source of value from the Collateral, which results in an impermissible windfall in contravention of fundamental bankruptcy policy.

**E.      The Debtor has not demonstrated that Rabo's $4.2 million lien claim is senior.**

"As a general rule, minor errors in a UCC financing statement do not affect the effectiveness of the financing statement unless the errors render the document seriously misleading to other creditors.

Section 9506, subdivision (b), however, provides: '[A] financing statement that fails sufficiently to provide the name of the debtor in accordance with subdivision (a) of Section 9503 is seriously misleading.' There is a safe harbor. '[I]f a search of the filing office's records under the debtor's correct name, using the filing office's standard search logic, if any, would nevertheless disclose that financing statement, the name provided does not make the financing statement seriously misleading.'" *Corona Fruits & Veggies, Inc. v. Frozsun Foods, Inc.*, 143 Cal. App. 4th 319, 323–24 (2006) (citations omitted).

Here, Rabo's $4,201,524.97 proof of claim (Claim 12-1) attaches a UCC-1 financing statement filed on December 14, 2021, file number U210110178322, listing the name of the debtor as "Capital Farm, Inc." *See* Claim 12-1 at page 82.

This is incorrect because the Debtor's name is Capital Farm**s**, Inc., not Capital Farm, Inc.

This missing "s" renders the Rabo UCC Financing Statement seriously misleading on its face as a matter of law because a search of the records of the California Secretary of State using the Debtor's correct name does not disclose this financing statement. The Debtor's Motion to Value apparently *assumes* that Rabo's $4.2 million lien claim is perfected as to all assets.

///

///

---

[5] For this, discovery is underway.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Hence, once more from the evidence presented, the Debtor has not met its burden to demonstrate that Ag Tech is out-of-the-money based on the purported $4.2 million senior lien claim of Rabo.

**IV.     CONCLUSION**

For these reasons, the Court must deny the Motion.

DATED: August 21, 2025                    FRANDZEL ROBINS BLOOM & CSATO, L.C.


                                          By:   /s/ Michael J. Gomez
                                                _____
                                                MICHAEL J. GOMEZ
                                                Attorneys for
                                                TECH AG FINANCIAL GROUP, INC.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000