1   Michael J. Gomez (State Bar No. 251571)
mgomez@frandzel.com
2   Gerrick M. Warrington (State Bar No. 294890)
gwarrington@frandzel.com
3   FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 Wilshire Boulevard, Nineteenth Floor
4   Los Angeles, California 90017-2427
Telephone: (323) 852-1000
5   Facsimile: (323) 651-2577

6   Attorneys for Creditor
TECH AG FINANCIAL GROUP, INC.

7

8
     **UNITED STATES BANKRUPTCY COURT**
9
     **EASTERN DISTRICT OF CALIFORNIA**
10
     **FRESNO DIVISION**
11

12

| | |
|---|---|
| 13   In re | Case No. 25-10074-A-12 |
| 14   CAPITAL FARMS, INC., | Chapter 12 |
| 15      Debtor. | DCN: FW-18 |

13   In re

CAPITAL FARMS, INC.,

     Debtor.

Case No. 25-10074-A-12

Chapter 12

DCN: FW-18

**EXHIBIT APPENDIX IN SUPPORT OF TECH AG FINANCIAL GROUP, INC.'S OPPOSITION TO THE DEBTOR'S MOTION TO VALUE COLLATERAL**

Date:      September 4, 2025
Time:      10:30 a.m.
Place:   Dept. A, Courtroom 11
           5th Floor
           United States Courthouse
           510 19th Street, Bakersfield, CA

Hon. Jennifer E. Niemann

Secured creditor Tech Ag Financial Group, Inc. respectfully submit this exhibit appendix in support of its objection to the Debtor's Motion to Value Collateral (Dkt. 263).

| Exhibit No.: | Description of Document: | Beginning at Page No.: | Number of Pages in Length: |
|---|---|---|---|
| 1. | March 10, 2025 Meeting of Creditors Transcript | 4 | 28 |
| 2. | August 19, 2025 Meeting of Creditors Transcript | 33 | 48 |
| 3. | Amended Modified Chapter 13 Plan dated July 29, 2025 Dkt. 254 | 82 | 20 |
| 4. | Rabo AgriFinance LLC Proof of Claim, Claim 11 | 103 | 82 |

DATED: August 21, 2025       FRANDZEL ROBINS BLOOM & CSATO, L.C.

By:   /s/ Michael J. Gomez
       MICHAEL J. GOMEZ
       Attorneys for
       TECH AG FINANCIAL GROUP, INC.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA (FRESNO)

_____
                                        )
IN RE:                                  )
                                        )
CAPITAL FARMS, INC.          CH: 12     )   25-10074
                                        )
                Debtor.                 )
_____ )


                                        March 10, 2025

          BEFORE LILIAN TSANG, Chapter 12 Trustee

<u>APPEARANCES:</u>

 For the Debtor:              Peter L Fear
                              Fear Waddell, P.C.
                              7650 N. Palm Ave.
                              Ste. 101
                              Fresno, CA 93711
                              559-436-6575

 For Rabo Agrifinance, LLC.:  Fernando Almaraz
                              Baker Manock & Jensen
                              Fig Garden Financial Center
                              5260 N. Palm Ave., Suite 201
                              Fresno, CA 93704
                              559-432-5400


 For Tech Ag Financial Group, Michael Gomez
 Inc:

 For Sutter Land Company:     Hagop Bedoyan




Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

1  MARCH 10, 2025                              2:03 P.M.

2          THE TRUSTEE:  Okay, good afternoon, everyone.

3  Today's date for the record is March 10th, 2025.  The time now

4  is 2:03 p.m.  My name is Lilian Tsang.  I am the appointed

5  Chapter 12 Trustee to this current case that I will be

6  calling.

7          Again, for the record, the time now is 2:03 p.m. on

8  March 10th, 2025.  And I am calling the 2:00 matter.  This is

9  the Capital Farms, Inc., case number for reference, it is 25-

10  10074.

11          Just so everyone is aware, we are recording this

12  Section 341 meeting of creditors.  Any other recording,

13  whether it's audio or video by any other party is strictly

14  prohibited.  So, please refrain from doing so.

15          If you need a transcript or a record of what is

16  occurring today, please contact the United States Trustee's

17  Office, or you can also forward your inquiry or your request

18  over to me at my email, which can be found at my website,

19  E-D-C-A-1-2, dot-com (edca12.com).

20          Let's go ahead and start with appearances.  I see

21  Mr. Fear present.  Mr. Fear?

22          MR. FEAR:  Yes, so, do you want me to go ahead, and,

23  sorry.

24          THE TRUSTEE:  Go ahead, go ahead.

25          MR. FEAR:  Yes, Peter Fear, on behalf of the Debtor-

1  In-Possession, and Shawn Gill (phonetic), the President of the

2  Debtor, is here.

3          THE TRUSTEE:  All right, and Mr. Gill, I -- we

4  talked last time.  It looks like Mr. Gomez is joining us.

5  Before I swear Mr. Gill in, who is the designated individual

6  for Capital Farms, Inc., let me get the appearances for other

7  parties that are here as well.

8          I see a Mr. Almaraz.  Can you say your name and who

9  you're representing?

10          MR. ALMARAZ:  Yes, Fernando Almaraz for

11  Rabo Agrifinance, LLC.

12          THE TRUSTEE:  All right, thank you.  Mr. Gomez, your

13  appearance for the record?

14          MR. GOMEZ:  Michael Gomez for Tech Ag Financial

15  Group, Inc.

16          THE TRUSTEE:  And Mr. Bedoyan (phonetic), can you

17  say your name for your appearance?

18          MR. BEDOYAN:  Good afternoon, Hagop Bedoyan

19  (phonetic) on behalf of the Sutter Land Company.

20          THE TRUSTEE:  All right, thank you.  Okay, let me go

21  ahead and swear in the individual, Mr. Gill, the designated

22  individual here, before we start the questioning.

23          I think we left off last time where the Creditors

24  were asking questions.  And I think we have a couple more

25  questions to go before we can cease the questions.  So, let me

1  go ahead.  And, Mr. Gill, can I have you raise your right hand

2  for me, okay?

3       (Shawn Gill sworn)

4          THE TRUSTEE:  All right, thank you.  All right.

5  Let's start with Mr. Almaraz.  Can you go ahead and ask your

6  questions, on behalf of Rabo?

7          MR. ALMARAZ:  No questions today.

8          THE TRUSTEE:  Okay.  And Mr. Gomez, did you have

9  questions?

10         MR. GOMEZ:  Yes.  All right, so, when last we broke,

11  we were talking about a company that's related to yours

12  called, I believe, it's H-and-J, do you remember that?

13         MR. GILL:  Yes.

14         MR. GOMEZ:  All right, and for the record, what does

15  H&J do again?

16         MR. GILL:  It's a leasehold company that's part of

17  us, the almonds.

18         MR. GOMEZ:  And can you elaborate on that a little

19  bit more, you said leasehold company and part of us, almonds?

20         MR. GILL:  Yeah, it's just a, you know, farmed

21  through --

22         MR. GOMEZ:  So, It would be helpful to explain who

23  is H&J, and what do they do, so, what, who is H&J?

24         MR. GILL:  It's a company owned by my son.  It's

25  just a D-B-A, it's owned by my son.  And it's almonds is one

1    of the, run through everything Capital Farm, but it was, it

2    was formed, you know, just through us, like a, farm almonds.

3            MR. GOMEZ:  Okay, so it was formed to farm almonds.

4            MR. FEAR:  Yes.

5            MR. GOMEZ:  And did it actually do any farming?

6            MR. GILL:  I'm sorry?

7            MR. GOMEZ:  Did it actually do any farming?

8            MR. GILL:  No.

9            MR. GOMEZ:  Okay.  And when was it formed?

10           MR. GILL:  I believe it was probably toward the end

11   of 2023.

12           MR. GOMEZ:  Yeah, when you say formed, did he just

13   file like a fictious name or something?

14           MR. GILL:  Yes, yes.

15           MR. GOMEZ:  All right, but is it a separately,

16   legally recognized entity?

17           MR. GILL:  It's just a D-B-A, it's not an entity by

18   itself, no.

19           MR. FEAR:  Right, I think he was saying that it is a

20   sole proprietorship, but just like another name for his son, a

21   D-B-A of his son.

22           MR. GOMEZ:  All right, so it's not a corporation or

23   anything like that?

24           MR. GILL:  No.

25           MR. GOMEZ:  All right.  And what's your son's name?

1          MR. GILL:  Harsaajan.

2          MR. GOMEZ:  How do you spell that for the record?

3          MR. GILL:  H-A-R-S-A-A-J-A-N, Singh, last name,

4   G-I-L-L.

5          MR. GOMEZ:  All right.  And it's my understanding

6   that H&J received, or Harsaajan, since it's a D-B-A, received

7   some of the 2024 almond crop proceeds, is that correct?

8          MR. GILL:  That's correct.

9          MR. GOMEZ:  Okay.  Did H&J do anything else?

10          MR. GILL:  No.

11          MR. GOMEZ:  Okay.

12          MR. GILL:  It was transferred into Capital Farms,

13   the same exact amount was transferred into Capital Farm.

14          MR. GOMEZ:  All right.  And approximately how much

15   of the almond crop was collected by H&J?

16          MR. GILL:  I believe it was six hundred and thirty-

17   seven, I think it was about 749,000 that was collected by H&J,

18   but it was all transferred into Capital Farms for the same

19   exact amount that we received the checks.

20          MR. GOMEZ:  I apologize, did you say 749,000 pounds

21   of almonds?

22          MR. GILL:  No, no, dollar, dollars.

23          MR. GOMEZ:  Okay, $749,000?

24          MR. GILL:  And some change, yeah.  I don't have the

25   exact number but, yeah, it was transferred into Capital Farm.

1        MR. GOMEZ:  Okay.  And previously, you mentioned

2   that H&J, the idea behind it was that it was a way to

3   establish credit for your son in the farming industry?

4        MR. GILL:  Correct.

5        MR. GOMEZ:  Can you please elaborate on that a

6   little more?

7        MR. GILL:  Well, like, like I mentioned last time,

8   we were getting, you know, close to retirement age, and he's

9   going to school for Ag major and we wanted him to, you know,

10  bring him forward to, so he can establish, you know, make him

11  established in the future, so he can take over our, you know,

12  farming operation.

13       MR. GOMEZ:  Okay.  And so, who do you need, does he

14  need some sort of credit history with vendors or lenders,

15  what's the idea behind there?

16       MR. GILL:  Well, both, yes.  And then, also, with

17  the -- he could, you can establish it with the, like, the

18  U.S.D.A. or N.R.C.S., you can, you know, get some, sometimes

19  you can get grants.  And we're trying to -- establish that as

20  well, you know, the longer it is, the better it is, you know,

21  going forward, so, you know, it'll be better for him.

22       MR. GOMEZ:  All right, and approximately how old is

23  your son now?

24       MR. GILL:  Twenty-two.

25       MR. GOMEZ:  Twenty-two, okay.  All right.  And so,

1   the idea was to eventually, hopefully, be able to farm in his

2   own name and get grants in his own name, and that kind of

3   thing, is that right?

4          MR. GILL:  That is correct.

5          MR. GOMEZ:  All right.  And there was some

6   reference, I forget where I read it that you had told Rabo

7   Agrifinance about H&J, and that it might be involved somehow

8   and maybe authorizing some almond proceeds to go to H&J, do

9   you remember anything to that effect?

10          MR. GILL:  Yeah, but, I mean, I can't recall it.

11          MR. GOMEZ:  Okay.  Were any creditors, putting aside

12   for the moment, Rabo Agrifinance, were any other creditors of

13   Capital Farms advised of H&J and its involvement with Capital

14   Farms?

15          MR. GILL:  No, I don't believe so, no.  Because

16   there was no credit, you know, got from anybody else to use

17   his name as far as --

18          MR. GOMEZ:  Okay, and I'm going to mispronounce this

19   name, so, please, I don't mean any offense, but Gurmej Singh

20   Gill (phonetic)?

21          MR. GILL:  Uh-huh.

22          MR. GOMEZ:  Who is that?

23          MR. GILL:  That's my brother.

24          MR. GOMEZ:  Okay.  And what's his responsibility

25   with Capital Farms?

1    MR. GILL:  Well, it was a lot of it mostly, but as

2    I want to correct it from last time, you know, ever since this

3    case has been going on, especially, since last year, that

4    Rabo's been putting a lot of stress on him.  And he's got a

5    really lot of anxiety and depression, so he's under, you know,

6    a doctor's order, he really can't perform much anymore because

7    he's, he's got severe depression and anxiety.

8        He's not the same person that was last year.  He's

9    slowly, we're slowly starting to, you know, put him out there

10   to do something, but he has really, really slowed down in the

11   last year, really slowed down.

12       MR. GOMEZ:  Now, when you say in the last year, you

13   mean since the start of 2024, is that right?

14       MR. GILL:  Yes, basically, February of, yeah,

15   February of last year, yes.

16       MR. GOMEZ:  Okay.  And approximate, well, before he

17   started slowing down, what was his role with -- Capital Farms?

18       MR. GILL:  Well, he's handling day-to-day operation,

19   everything from, you know, employees to fertilizer, to fixing

20   equipment and, you know, managing equipment, everything that

21   was, he was doing most of that stuff.

22       MR. GOMEZ:  So, is it fair to say, he devoted a

23   hundred percent of his time to Capital Farms and to its

24   success?

25       MR. GILL:  Yes, I would say so.

1          MR. GOMEZ:  And you know this because you're

2   intimately involved with Capital Farms, too, right?

3          MR. GILL:  Correct.

4          MR. GOMEZ:  Got you.  All right, previously, we

5   discussed some information that was disclosed to Tech Ag

6   Financial on a financial statement, do you remember that?

7          MR. GILL:  Yes.

8          MR. GOMEZ:  Okay.  And I'm looking at the financial

9   statement.  Do you have a copy of it, Mr. Gill?

10         MR. GILL:  No, I don't.

11         MR. FEAR:  Which one are you talking about?

12         MR. GOMEZ:  There are two that I've seen.  One is

13  attached to that I provided to you that's on our form.  And

14  then there was another one, I'm trying to remember who else

15  filed a lawsuit, forgetting their name?

16         MR. FEAR:  I think it was Wilbur-Ellis.  I think

17  that you had asked about, what's the reason for the

18  discrepancy between the two amounts that are about 10 or 12

19  months apart, I think?

20         MR. GOMEZ:  Yes, sir.

21         MR. FEAR:  So, Mr. Brar (phonetic) is the accountant

22  and he might have some information that, too.  But I can try

23  and find those and pull them up, if you want him to review

24  those or --

25         MR. GILL:  I think Paul did send the information

1  over, Paul?

2          MR. FEAR:  Well, he --

3          MR. BRAR:  Yes.

4          MR. FEAR:  Paul might want to comment about that.

5          MR. GOMEZ:  Go ahead.

6          MR. BRAR:  We provided the financials that were done

7  for the last two years.  And I think the question related to

8  there was a number that was entered on a prior year financial

9  application, and then there was a new application that had a

10  round number, two million, three million, or something.

11          And then, if I recall, the -- what was the basis of

12  that from the financials that we did, it was pretty obvious

13  that the number didn't come from those financials.  It was

14  probably an estimate that was used, you know, what the net

15  value is or many times, a client would ask me, hey, what's my

16  net value of net worth in the company, which is usually your

17  assets minus your debt, and in looking at the '23 financials,

18  it looks like the, you know, the equity portion what, you

19  know, and the asset portion.

20          So, it, it's not, you know, the assets were like

21  five-and-a-half million, but then there's debt on the books.

22  So, maybe the client just kind of netted everything and put a

23  number down.  So, I don't know if it was two million or three

24  million, but that was definitely not an actual number from off

25  the balance sheet.

1          MR. GOMEZ:  Okay, but you don't know exactly, right,

2   because you weren't there when they assigned this, correct,

3   Mr. Brar?

4          MR. FEAR:  You know, it came through really weakly,

5   can you?

6          MR. BRAR:  Can you repeat that, I couldn't hear it?

7          MR. GOMEZ:  Yeah.  You weren't there when they

8   filled out this financial statement, correct, Mr. Brar?

9          MR. BRAR:  That is correct, yes, I was not.

10          MR. GOMEZ:  All right.  And you did not discuss it

11   with them before they assigned it, right?

12          MR. GILL:  No, I did not.

13          MR. BRAR:  I, yeah, I don't believe so, no.

14          MR. GOMEZ:  Okay.  All right, Peter, if you have a

15   copy of the financial statement that was turned in to us?

16          MR. FEAR:  One second, I can't even find it.

17          MR. BRAR:  I'll forward it to you again, Peter, if

18   you want to check the email.

19          MR. FEAR:  What's that, you're going to forward it

20   to me, but you have it right there?

21          MR. BRAR:  Yes.  I have it on my screen.

22          MR. GOMEZ:  Let me know when you're ready.

23          MR. FEAR:  Well, I think you, you forwarded us the

24   financial statements.  You want, did you want him to look, you

25   wanted him to look at the -- application form, right?

1            MR. GOMEZ:  Yes.

2            MR. FEAR:  Yeah, all right, let me find that.  Okay,

3    I think I've found it here.  Let's see if I can make this big

4    enough to review.  Okay, I'm -- he's looking at the email that

5    you, that you sent that has the two amounts in it.

6            MR. GOMEZ:  I'm sorry, what was the date of the

7    email?

8            MR. FEAR:  February 14th.

9            MR. GOMEZ:  All right, let me know when you have our

10   application open that's for Tech Ag?

11           MR. FEAR:  I have the, I have the email open that

12   has kind of a snippet from the application.

13           MR. GOMEZ:  Ah, okay.  Let me send you the full one,

14   if that's okay?

15           MR. FEAR:  Okay.

16           MR. GOMEZ:  That way, they can see the whole thing,

17   you know, not --

18           MR. FEAR:  Okay.

19           MR. GOMEZ:  -- but I'm just showing them a snapshot.

20           It's on its way.

21           MR. FEAR:  Is this Exhibit 1?

22           MR. GOMEZ:  Yes.

23           MR. FEAR:  You're looking at the first page?

24           MR. GOMEZ:  Yes.  Let me know when you're ready,

25   sir.

1          MR. FEAR:  We've got it in front of us.

2          MR. GOMEZ:  Okay.  So, I want to direct your

3    attention to Part D, it's about mid-page.  It says, operating

4    line, Rabo Agrifinance?

5          MR. GILL:  Okay.

6          MR. GOMEZ:  And we see that it shows that the amount

7    of the operating line was 600,000 and the current principal

8    balance was $450,000?

9          Do you see that?

10          MR. GILL:  Yes.

11          MR. GOMEZ:  Okay, fantastic.  Now, was that accurate

12    as of the date this agreement was signed?

13          MR. GILL:  If I --

14          MR. FEAR:  This is dated, let's see.

15          MR. GOMEZ:  October 20th, 2022?

16          MR. FEAR:  October 11th, 2022.

17          MR. GILL:  I, my guess, probably, to the best of my

18    knowledge, yes.

19          MR. GOMEZ:  So, you did not, Rabo Agrifinance

20    anything else on the operating line at that time?

21          MR. GILL:  I think me and Paul, I think we broke it

22    down, right, Paul, like it was posted into it, it was to the

23    United Farm portion was to Sutter Enterprises, is that

24    correct, Paul?  Because we posted and the, because the actual

25    line with credit, I believe, was 3.7 or four million, right?

1  I think, we, think, broke it down to, per each entity based on

2  some percentage, is that correct, Paul, right?

3          MR. BRAR:  Yeah.  So, if you look at the financials,

4  that year, we showed 1.9 million as the Capital's share of the

5  line of credit.

6          MR. GOMEZ:  I'm sorry, can you state that again,

7  Mr. Brar?  I missed the last part.  You showed how much of the

8  line of credit?

9          MR. BRAR:  So, on the year-end financials that we

10  did for '22, the line of credit that was allocated to Capital

11  Farms is one million, nine twenty-four, five forty-nine.

12          MR. GOMEZ:  So --

13          MR. BRAR:  Showing on that page of the financial

14  statement.

15          MR. GOMEZ:  When you say allocated, are you saying

16  that Capital Farms may have signed a document or agreed to pay

17  more, but there was some internal allocation done for purposes

18  of the financials.  And yet some, some of the debt was

19  allocated to Sutter, some of the -- some of the debt was

20  allocated to United, and some of the debt was allocated to

21  Capital.  And out of that allocation, this is the amount?

22          MR. BRAR:  Yes.  In prior years, some of the farming

23  was done under other entities.  So, United Enterprises had

24  some farming that was being done, CAS (phonetic), what's the

25  other one, Sutter Enterprises had some farming that was under

1   it.  Eventually, the goal was to bring everything to Capital.

2            But, so, we just decided on, on some factor based on

3   where it was used or what the revenues were, that a percentage

4   of it went to Capital and some of it went to the other

5   entities.

6            MR. GOMEZ:  Okay.

7            MR. BRAR:  From that -- all the entities owned that

8   line of credit.  So, it was across, you know, all three

9   entities.  It was one line shared by all three.

10            MR. GOMEZ:  All right.  And how was the allocation

11   done?

12            MR. BRAR:  I think the allocation may have been done

13   based on when the monies were pulled and paid back.  So, we'd

14   kind of keep track, you know, maybe we pulled 600,000 or a

15   million from the line to be used in this entity, and then an

16   X-ed amount was paid back to the line from this entity.

17            So, the numbers, for that year, probably had a lot

18   more activity.  And then for the following year, I think we

19   looked at an ending number of what the line was used for.

20   And, you know, I think we had a more approximate number, which

21   was 1.5 million.

22            So, there wasn't any exact science that we used on

23   some of those years.  But we'd try to match it up as much as

24   we could.

25            MR. GOMEZ:  To whom you actually used the funds, is

1   that fair to say?

2          MR. BRAR:  Well, prior years, the funds were used by

3   all the entities.  But starting in '24, all of the funds were

4   being used by, you know, Capital Farms.  That's where all the

5   farming was being done.  But some of those lines were carrying

6   over.

7          And I think if we were to do the '24 financials

8   today, you know, we would probably treat it as if any money

9   that was paid back from the other entities would have reduced

10  their lines, but since all of the expenses going forward are

11  under Capital, a majority of that line is going to be in

12  Capital.  And after '24, all of the line would be on Capital.

13         MR. GOMEZ:  Okay.  Here's where I'm getting,

14  Mr. Gill, do you adopt Mr. Brar's testimony as your own

15  regarding the allocation?

16         MR. GILL:  Yes, yes.

17         MR. GOMEZ:  Okay.  And here's where I'm getting at

18  between the amounts shown on the application to Wilbur-Ellis

19  and the amount shown in terms of assets to Tech Ag, in the

20  last four years before it filed for bankruptcy, did Capital

21  Farms transfer any of its assets to any third parties?

22         MR. GILL:  No.

23         MR. GOMEZ:  Okay.  And the last seven years --

24         MR. FEAR:  So, let me ask you a question real quick.

25         MR. GOMEZ:  Sure.

1          MR. FEAR:  Do you mean other than like United Farms,

2     because there were inner companies that were going back and

3     forth, I think, between United Farms and Capital?

4          MR. GOMEZ:  Yes.

5          MR. FEAR:  Okay.

6          MR. GOMEZ:  So, other than --

7          MR. FEAR:  You mean, other than kind of one of those

8     related entities?

9          MR. GOMEZ:  Right.

10          MR. FEAR:  Okay.

11          MR. GOMEZ:  And which, I think, is just Sutter

12     and --

13          MR. FEAR:  United Farm.

14          MR. GILL:  Sutter and probably the United, and

15     Sutter Land, obviously, and Capital Farms.

16          MR. GOMEZ:  Right.  Apart from those entities, were

17     any assets transferred to any third parties in the last --

18          MR. GILL:  No.

19          MR. GOMEZ:  -- seven?

20          MR. GILL:  Not that I can recall, no.

21          MR. GOMEZ:  All right.  How about in the -- and my

22     last question was for the last four years.  How about in the

23     last seven years, have any assets been transferred to any

24     individuals or entities except for those entities we've

25     discussed earlier?

1          MR. GILL:  No, I believe, no.

2          MR. GOMEZ:  All right.  But you're not certain

3    necessarily why on one financial application it said the

4    assets were 6.4 million, and on the other one, it was, it was

5    only three million, right?

6          MR. GILL:  I can't hear you.  Can you speak up a

7    little bit, I can barely hear you?

8          MR. GOMEZ:  Sure.  So, at the end of the day,

9    though, you're not certain why on one financial application,

10   it said the assets were over six million -- that was to

11   Wilbur-Ellis, and ours, it said that the assets of Capital

12   Farms were only three million.  You're not certain about it?

13          MR. GILL:  I, I, no.

14          MR. GOMEZ:  Okay.  All right, I'm going to, I'm

15   almost done with my questions here.  I just want to ask you a

16   couple of questions.  We've been moving very rapidly with use

17   of cash collateral.  I'm having several hearings.

18          Are all the leases now current as of today?

19          MR. GILL:  Yes, and that's correct, except the Rabo

20   one that we, from last year, that we have not paid that.  But

21   everything else is current, correct.

22          MR. GOMEZ:  When you say, the Rabo one from last

23   year, do you mean where they advanced money to, to pay one of

24   the leases?

25          MR. GILL:  No, I believe, remember they have

1  credited and approved that leasehold payment that was due in

2  July that we --

3          MR. GOMEZ:  But from the last year?

4          MR. GILL:  Yes, yes.

5          MR. FEAR:  Was that a lease, which one was that for?

6          MR. GILL:  That was for a Brewer (phonetic), of

7  Brewer rents for Capital Farm, for Rabo Bank.  The Creditor

8  did not approve the lease payment.

9          MR. FEAR:  Are you talking about for the July coming

10  up or?

11          MR. GILL:  No, no, the past July 2024, that

12  I believe one of the payments was not authorized.

13          MR. FEAR:  I don't, I don't, that wasn't a lease

14  payment, though, was it, wasn't, it was the development loan?

15          MR. GILL:  Yes, the development loan payment.

16  Correct, sorry, Mr. Gomez, it was the development loan payment

17  that was not authorized by the Creditors.  But all the lease

18  payments are correct, they are current.

19          MR. GOMEZ:  Okay.  Mr. Fear, can you clarify on what

20  the development loan payment is because I am unclear.

21          MR. FEAR:  Yeah, so, if you look at the budget,

22  I think the initial budget we had, I need to go back and look

23  at this, too.

24          MR. BEDOYAN:  If I can interrupt, Mr. Gomez.

25  Mr. Gill, did you make the Met Life payment that we were

1  talking about recently on --

2          MR. GILL:  No, we still, remember, I've been sending

3  just emails that -- they want to hold a half a million dollar

4  from their -- the loan that we have.  And me and Peter are

5  going back and forth.  They want to hold a half a million

6  dollars from the proceeds to deduct a loan.  And, and I think

7  the -- but from what Peter said, they can't hold it from my

8  proceeds.  So, until we get the money from them, the money's

9  ready to be disbursed.  Everything's been signed, everything,

10  you know, money is ready to go, it's just they want to hold

11  the half a million dollar proceeds from the proceeds.  And

12  that's where we're stuck right now.  We're trying to get that

13  clarified for, to make the payment.

14          MR. BEDOYAN:  So, your answer that, to Mr. Gomez

15  that all the lease payments are current isn't really accurate

16  if, if the underlying Met Life payment hasn't been made by

17  Sutter, and by Capital Farms, right?

18          MR. GILL:  Pretty much that, yes, correct.

19          MR. BEDOYAN:  Okay.  And so, the big number,

20  Mr. Gomez, is like a hundred forty thousand?

21          MR. GILL:  Well, 145 and some change, yes.  It's

22  under 146.

23          MR. BEDOYAN:  And it's the Sankey Ranch (phonetic)?

24          MR. GILL:  That's correct.

25          MR. BEDOYAN:  Met Life loan payment, Mr. Gomez.

1           MR. GILL:  That's correct.

2           MR. GOMEZ:  Okay.  And then, how much is owed to

3    Dushu (phonetic), the nut processor?

4           MR. GILL:  Well, the one that we sold the nuts,

5    I believe, it was about 389,000 pounds.  So, that whole

6    payment should be eight hundred and some dollars, but they

7    want to deduct that half a million dollar, that loan that we

8    have.  And if they deduct that, then that only, that is only

9    going to leave about 250 to $300,000.  But if they don't take

10   the half a million dollar out, then we have over eight hundred

11   thousand dollar coming for just for the half the almond sale.

12          MR. GOMEZ:  Okay.  And have you made demand on them

13   to at least turn over the two hundred and fifty or 300,000?

14          MR. GILL:  Oh, I believe, I might want to let him?

15          MR. FEAR:  I have been trying to get a hold of the

16   manager based on this.  Because, basically, what they want him

17   to do is sign off something saying they can deduct it, and

18   then they'll send him the, the other 289.  So, I have a call

19   in to say, hey, look, we need to, I need to see the

20   documentation for that loan.  I think it might be an unsecured

21   loan.  And so, we were trying to get that dealt with.  So, he,

22   they have asked for the money, but they sent, and they sent

23   them basically a, you know, okay, sign this receipt, which --

24   essentially says, you can offset the 500,000.  So, that's

25   where we're at, at this point.

1          So, I think he, I called him on Friday.  He called

2     me back today while I was in 341 meetings.  I need to call him

3     back after we're done.

4          MR. GOMEZ:  Understood.

5          MR. BEDOYAN:  Peter, did you ever see a UCC filing?

6          MR. FEAR:  No, that, no, that's the whole, that's

7     the question.  I don't think there's a security agreement

8     there.

9          MR. GILL:  There is no lien on any properties,

10    though, so, it's just basically, they're supposed to deduct it

11    from the proceeds.  That's, there was no other, you know, like

12    a no lien on any properties at all.

13         MR. GOMEZ:  All right.  So, except for the Met Life

14    payment on Sankey, you're current on all leases, correct?

15         MR. GILL:  That's correct.

16         MR. GOMEZ:  All right.  And, Peter, you're going to

17    tell me which one that the Bauman (phonetic) loan is for Rabo?

18         MR. BRAR:  Yeah, I, I think it is the, well, I'm not

19    sure.  I'm going to look at this, so we can --

20         MR. GILL:  It's up there under -- on Brewer Road

21    (phonetic).  It's the one like 9,000 or 7,000 that usually is

22    that.

23         MR. FEAR:  It's not this number right here?

24         MR. GILL:  No, that's the real estate loan payment.

25         MR. FEAR:  Oh, it's right here.  It's the one we

1  listed under leasehold improvements, Brewer, Rabo, a hundred

2  and ten thousand?

3          MR. GILL:  Yeah.

4          MR. FEAR:  It was on the original budget, but I

5  think that it was then taken off because that was, that was

6  not a -- an actual lease payment.  That was secured by the

7  leasehold improvements that are owned by Ray Capital

8  (phonetic).

9          MR. GOMEZ:  Okay.  So, who are the owners of Capital

10 Farms again?

11         MR. GILL:  My brother, Gurmej Gill.

12         MR. GOMEZ:  Just him?

13         MR. GILL:  Uh-huh.

14         MR. GOMEZ:  All right.

15         MR. GILL:  Yes, sir.

16         MR. GOMEZ:  And who are the owners of Sutter Land?

17         MR. GILL:  Me, myself, and Baljit Gill (phonetic).

18         MR. GOMEZ:  Okay, and what's Baljit Gill's

19 relationship to you?

20         MR. GILL:  He's my nephew.  He's Gurmej's son.

21         MR. GOMEZ:  Okay, so, he's Gurmej's son, okay.

22         MR. GILL:  That's correct.

23         MR. GOMEZ:  And is Baljit involved in the business

24 at all?

25         MR. GILL:  I'm sorry?

1          MR. GOMEZ:  Is Baljit involved in the business at

2    all?

3          MR. GILL:  Somewhat.

4          MR. GOMEZ:  All right.  And what percentage

5    ownership, what's the percentage ownership split in Sutter

6    Land, twenty?

7          MR. GILL:  It's 50/50.

8          MR. GOMEZ:  Okay, but it's three people, so how is

9    it 50?

10          MR. GILL:  No, it's 250 -- two people.  Sutter Land

11    is only two people.  It's 50/50 me and Baljit.

12          MR. GOMEZ:  Oh, okay, got it.  How long have you and

13    Baljit owned Sutter Land for?

14          MR. GILL:  I believe since 2012, or '13, somewhere

15    in that neighborhood.

16          MR. GOMEZ:  All right.  And is Baljit employed by

17    Capital Farms at all?

18          MR. GILL:  No.

19          MR. GOMEZ:  All right, but he does do work for

20    Sutter Land, correct?

21          MR. GILL:  Yes, that's correct.

22          MR. GOMEZ:  What's his title at Sutter Land?

23          MR. GILL:  He's a member, managing member.

24          MR. GOMEZ:  Managing member?

25          MR. GILL:  Uh-huh.

1      MR. GOMEZ:  And he's been involved since 2012, you

2  said?

3      MR. GILL:  I believe, 2012, '12 or '13, that's the

4  first loan when we got with the Rabo Bank here in Fresno

5  County.  That's the one where we formed the Sutter Land,

6  I believe, around 2013, somewhere in that neighborhood.

7      MR. GOMEZ:  All right, and is Baljit involved in any

8  other businesses with you?

9      MR. GILL:  Just all these family entities, you know,

10  the Sutter and United, other, that's it.

11      MR. GOMEZ:  Okay.  And, Ms. Tsang, those are my

12  questions.  I'll turn the floor back over to any of the other

13  Creditors, who may want to ask questions.

14      THE TRUSTEE:  All right.  I see the only other

15  Creditor is Mr. Bedoyan.  Do you have any questions?  Wow, you

16  are suddenly quiet.

17      MR. BEDOYAN:  No other.

18      THE TRUSTEE:  And you're not the Creditor, but, yes,

19  do you have any questions?

20      MR. BEDOYAN:  No other questions.  We are actually

21  the landlord, Ms. Tsang.

22      THE TRUSTEE:  Okay.

23      MR. BEDOYAN:  So, we are a creditor.

24      THE TRUSTEE:  Got it.

25      MR. BEDOYAN:  No questions.

27

1          THE TRUSTEE:  All right, thank you.  Okay, and then,

2     it looks like we have no other parties here today that have

3     questions.  So, my plan is to take this over one more time,

4     past the Plan due date, which is April 10th.  And I'm looking

5     at a date of 4-18?  So, April 18th is a Friday.  And a 1:00

6     meeting, just so that all the parties can come together and

7     talk about the plan a little bit.  Hopefully, that would help

8     with the Plan confirmation process.

9          Does the 18th work for everybody?

10          MR. GOMEZ:  It works for me.

11          MR. GILL:  It works for me.

12          THE TRUSTEE:  All right.  So, I'm going to go ahead

13     and docket that continued date of April 18th, Friday, at

14     1:00 p.m.  And then, hopefully, at that day, on that day and

15     time, I will conclude the 341 and then we'll talk about the

16     Plan confirmation matters.

17          All right, thank you all, Parties.

18          MR. FEAR:  We're good.

19          THE TRUSTEE:  And have a good afternoon.

20          MR. GOMEZ:  Thank you.

21          MR. GILL:  Thank you.

22          MR. ALMARAZ:  Thank you.

23          THE TRUSTEE:  And for the record, the time now, it

24     is 2:37.

25          (Proceedings adjourned at 2:37 p.m.)

## C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

EXHIBIT 2

1    In Re:                    )

2    Capital Farms, Inc.    ) Case No. 25-10074-A-12

3    _____)

4

5

6

7

8

9

10

11

12

13

14

15

16                    AUDIO TRANSCRIPTION OF

17                       341 HEARING

18

19

20

21

22

23    Transcribed by:
      JOSIE C. GONZALEZ
24    CSR No. 13435
      Job No. 10171258
25

1

```
1    In Re:                    )

2    Capital Farms, Inc.    ) Case No. 25-10074-A-12

3    _____)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22         Audio Transcription of 341 Hearing, transcribed

23    on August 19th, 2025 in San Diego, California, by

24    JOSIE C. GONZALEZ, Certified Shorthand Reporter

25    No. 13435, in and for the State of California.
```

```
 1                        *  *  *

 2                   Start of Audio

 3                        *  *  *

 4          MS. TSANG:  Okay.  And good afternoon, everyone.

 5   My name is Lilian Tsang.  I am the appointed Chapter 12

 6   trustee for the Eastern District of California and the

 7   District of Nevada.  Today's date, for the record, it is

 8   August 18th, 2025, and the time now it is 2:07.  We are

 9   calling our 2:00 o'clock calendar.  We only have one

10   matter on for 2:00 o'clock, and that is the Capital

11   Farms, Inc. matter.  Case number, it is 2510074.

12          Let's go ahead and go around the room and get

13   appearances from everyone, if we can.  And, again,

14   Mr. Gomez has -- let me know that he's running a little

15   bit late.  He will be about ten minutes late, so he

16   should be joining us shortly.

17          Let's have Mr. Fear and his client make the

18   appearance, please.

19          MR. FEAR:  Good afternoon.  Peter Fear on behalf

20   of the debtor in possession in this matter, and Shawn

21   Gill is here as the representative of the debtor.

22          MR. GILL:  Good afternoon.

23          MS. TSANG:  Good afternoon.  Thank you, Mr.

24   Gill.

25          Mr. Almaraz, your appearance for the record?
```

1          MR. ALMARAZ:  Good afternoon, everybody.

2     Fernando Almaraz on behalf of Rabo AgriFinance, LLC.

3          MS. TSANG:  All right.  Thank you.  And,

4     Mr. Sackett?

5          MR. SACKETT:  Good afternoon.  Scott Sackett,

6     Chief Restructuring Officer.

7          MS. TSANG:  All right.  Thank you.  And I have a

8     Ms. Heather Canning, I guess, appearing for Tech Ag.

9          MS. CANNING:  Yes, good afternoon.  I'm on

10     Mike's team.  I'm here hoping he'll get here, but I'm on

11     behalf of Tech Ag.

12          MS. TSANG:  All right.  Thank you.

13          Okay.  The purpose of today's meeting is really

14     just to talk about the plan.  But just in case we have

15     any questions for Mr. Gill, I'm going to go ahead and

16     swear you in.  Okay?  Mr. Gill, can I have you raise

17     your right hand for me?  And I do see you on the monitor

18     there.  We did check your identification previously, and

19     I'm just stating this for the record.  So, Mr. Gill, do

20     you solemnly swear or do you so affirm that under the

21     penalty of perjury the testimony that you are about to

22     give is the truth, the whole truth, and nothing but the

23     truth?

24          MR. GILL:  I do.

25          MS. TSANG:  All right.  Thank you.  Can you

1  state your full name for the record and what is your

2  role -- your role in Capital Farms, Inc.

3          MR. GILL:  Sikhwant Gill.  I'm an appraiser of

4  Capital Farms.

5          MS. TSANG:  All right.  Thank you.

6          Mr. Almaraz, have you had a chance to review the

7  Chapter 12 plan filed in this case, the most recent one?

8  And if you have any questions or any issues to raise and

9  to discuss with Mr. Fear and his client.

10          MR. ALMARAZ:  I have reviewed the plan dated

11  July 29th, 2025.  And as of now, do not have any

12  questions.

13          MS. TSANG:  All right.  Mr. -- Ms. Canning, did

14  you have any questions that you would like to ask or

15  would you like to just wait, I guess, for Mr. Gomez

16  joining us?

17          MS. CANNING:  I'll wait for Mr. Gomez.  We do

18  have some questions, but hopefully he'll get the

19  opportunity to ask them.  If not, then I certainly will.

20          MS. TSANG:  Okay.  That sounds great.  I'm just

21  trying to pull up the plan here.  Give me one second

22  here.

23          First and foremost, Mr. Sackett, I saw the

24  e-mail exchanges between, I think, Mr. Gomez and

25  yourself as to the -- is it the -- the summary regarding

1    the entire post petition period.

2         MR. SACKETT:  I -- I -- yes, I -- I'm told I

3    should have that in about 30 minutes.  So that's --

4         MS. TSANG:  Okay.

5         MR. SACKETT:  We'll have it definitely done.  I

6    was trying to get it before the hear -- this 341, but

7    there's a little more to it.  So anyway, I will have it.

8    I will have it today, probably about 30 minutes.

9         MS. TSANG:  Okay.  Got it.  Okay.

10        And, Mr. Fear, I wanted to ask you about the pay

11   in full in 42 months portion of, I guess, Class 6 as

12   well as Class 7.  And it looks like the intent -- is

13   that for a refinance or is that for sale?

14        MR. FEAR:  It would have to -- well, it could be

15   either one, but I think that it would probably end up

16   being a refinance.

17        MS. TSANG:  Okay.  And why 42 months?

18        MR. FEAR:  To give them about six months after

19   the bankruptcy is over to try and find somebody who'll

20   finance them.

21        MS. TSANG:  Okay.  So -- but not now, but after

22   three years?

23        MR. FEAR:  Well, so right -- right now is

24   probably one of the -- I mean, the Ag values right now

25   are so low that -- and this current market for Ag is

1    just -- it'd be a very difficult time to try and

2    refinance.  And so I think the idea is demonstrate the

3    ability to pay and that the farm is producing well.

4    Hopefully it'll -- it'll continue to increase as a

5    projected.  And that should demonstrate a track record

6    that a lender, hopefully in a more favorable environment

7    in three and a half years would be -- would look at and

8    say that seems like that makes sense to refinance that

9    operation.

10          MS. TSANG:  Okay.  Let's see here.  And I did

11   review your liquidation as well.  Okay.  Okay.  I think

12   I have Mr. Gomez here.  Give me one second.  I'll have

13   him join.

14          All right.  Mr. Gomez, are you there?

15          MR. GOMEZ:  Yes, somewhere.

16          MS. TSANG:  Okay.  All right.  Mr. Gomez, can

17   you state your appearance for the record?

18          MR. GOMEZ:  Sure.  Michael Gomez for Tech Ag

19   Financial Group, Inc.

20          MS. TSANG:  Okay.  We were just going about --

21   just starting our conversation, actually, about the plan

22   that was filed dated July 29th, 2025.  And I -- just to

23   bring you up to date, we discussed the 42 months

24   proposal of paying off your clients, the Class 6 and

25   also Class 7 at the 42nd month, I guess, six months

1  beyond.

2          MR. ALMARAZ:  Just being off Rabo, so all the

3  other claims would be discharged at the end of 36

4  months.  Just Robo would be the only claim that would go

5  past the end of the plan.

6          MS. TSANG:  Right.  And the intent is to do a

7  refinance if the debtor can at that point in time.

8          Mr. Gomez, did you have any comments or issues

9  or questions about the plan that's been filed dated

10  July 29th?

11          MR. GOMEZ:  We do.

12          MS. TSANG:  Go ahead.  The floor is all yours.

13          MR. GOMEZ:  That's fine.  I was just going to

14  defer to my colleague, Mr. Almaraz in case you have any

15  further questions.  If not, I'll just proceed.  No?

16  Okay.  Fantastic.

17          So I want to turn to Mr. Sing's -- Mr. Gill's

18  declaration.  It's Docket Number 265 and in Docket

19  Number 265.  Let me authenticate an exhibit.  I believe

20  it's called Exhibit A, any liquidation analysis.

21          MS. TSANG:  Uh-huh.  I think it's 254.  Is that

22  what you're looking at?

23          MR. ALMARAZ:  Actually he's looking at the

24  motion to value collateral.

25          MS. TSANG:  Okay.

1          MR. ALMARAZ:  And so the liquidation -- go

2     ahead.

3          MR. GOMEZ:  Go ahead.

4          MR. ALMARAZ:  I was just going to say the

5     Exhibit A is the same as the Exhibit A filed with the

6     plan.

7          MS. TSANG:  Okay.

8          MR. GOMEZ:  Yes.  And I believe it's Docket

9     Number 266, which is the liquidation analysis that's

10    authenticated by the declaration.  Let me know when

11    you're ready.

12         MR. ALMARAZ:  I think we're ready.

13         MR. GOMEZ:  Fantastic.  So there are a number of

14    assets listed in this Exhibit A.  Mr. Gill, do you see

15    them?  There's a Laramie.  There's a tradesman.  There's

16    a crew cab, high country.  Do you see on the left?

17         MR. GILL:  On this side here?

18         MR. FEAR:  Assets listed on the left right here.

19    Let's see.  Right -- I'm sorry.  Where are you looking?

20         MR. GOMEZ:  Exhibit A is Page -- Page 3.  It's

21    -- it's only one page long, and it is Docket 266.

22         MR. FEAR:  Okay.  Which -- which one are you

23    looking at?  I think we're looking at it -- the --

24         MR. GOMEZ:  Filed August 7, Docket Number 266.

25         MR. FEAR:  I'm sorry.  Which -- which items?

1    You said some line items you're looking at.

2         MR. GOMEZ:  We're going to go through all of

3    them, but I just wanted to make sure he's on the right

4    page I'm looking at, which is the one page that

5    summarizes all the items.  They're values.  They're

6    equity.  That kind of stuff.

7         MR. FEAR:  Okay.

8         MR. GOMEZ:  So do you see what page I'm

9    referring to, Mr. Gill?

10        MR. GILL:  Correct.  Yes.  Uh-huh.

11        MR. GOMEZ:  Excellent.  Thank you very much.

12   All right.  So do you see the first column lists various

13   assets, the second column lists values associated with

14   those assets?

15        MR. GILL:  Yes.

16        MR. GOMEZ:  Okay.  And where I want to start is

17   the second column where it lists values.  How did you

18   determine the values associated with each asset listed

19   here?

20        MR. FEAR:  So you want him just to go through

21   each item?

22        MR. GOMEZ:  I want to ask generic -- well, I'm

23   asking generically how he determined the values.

24        MR. FEAR:  Okay.  So all these items, he's

25   wondering how did you come up with these values?

1          MR. GILL:  Probably a Blue Book or some items

2    that were listed on the -- either Facebook Marketplace.

3    So basically just around that idea.

4          MR. GOMEZ:  Are you -- the Facebook Marketplace

5    for a tradesmen?

6          MR. GILL:  No. Just the maybe auto traders.  I

7    was talking about the equipment.  But, I mean, it's got

8    250,000 miles on it.  And then from here, I'm going to

9    the dealership.  It's going to cost me another $2,500 to

10   fix it.  So, I mean, there's no hindsight about it.  I

11   mean, it's just a rough idea.  It's $7,400, but it may

12   not be worth 8,400.  Like I said, now I got to go and

13   spend another three grad on it to fix it so my mechanic

14   can drive it.

15         MR. GOMEZ:  All right.  So for each of these, as

16   I understand your testimony, you looked at various

17   sources; is that correct?

18         MR. GILL:  Yes.

19         MR. GOMEZ:  Okay.  And can you identify by asset

20   what source you reviewed?

21         MR. GILL:  Okay.  Which one do you want to talk

22   about?

23         MR. GOMEZ:  All of them.

24         MR. FEAR:  So do you -- do you remember

25   specifically which thing you looked at?

1        MR. GILL:  Yeah.  We looked at -- like, for

2  example, the High Country, we looked on about Kelly's

3  Blue Book.  That's what roughly it's coming around.

4  It's $23,000 is what it's coming at.

5        MR. GOMEZ:  And which value did you use on the

6  Kelly's Blue Book?  The trade-in value, the private

7  party?

8        MR. GILL:  Private party.

9        MR. GOMEZ:  All right.  And what about for the

10  Laramie?

11        MR. GILL:  Same thing.  Private party.

12        MR. GOMEZ:  Okay.  And do you have a list

13  somewhere that tells you where you looked up these

14  values by asset?

15        MR. GILL:  Kelly Blue Book or auto traders.

16        MR. FEAR:  I think he's asking did you write

17  down --

18        MR. GILL:  No, I didn't write it down.  No.

19        MR. GOMEZ:  Okay.  And when did you look at

20  these sources for these values?

21        MR. GILL:  Usually probably before we put these

22  values in.

23        MR. GOMEZ:  Okay.  And when did that occur that

24  you put these values in?

25        MR. GILL:  I don't know.

```
 1            MR. FEAR:  When did you do -- did you look at
 2   them -- like, we looked -- I think you probably did it
 3   before we filed the case.  It was before we filed the
 4   schedules, but did you look at it after that or was
 5   it --
 6            MR. GILL:  No, it was before that.  I didn't
 7   look after this.  It was before that.  Maybe a month
 8   before or two weeks as we were doing the paperwork.
 9   That's when we looked at it.
10            MR. GOMEZ:  Okay.  And did you keep copies of
11   all those sources that you reviewed?
12            MR. GILL:  No. No.
13            MR. GOMEZ:  Okay.  And to be clear, you don't
14   have a list, correct, of --
15            MR. GILL:  No, I do not.
16            MR. GOMEZ:  -- what it was that you looked at
17   per asset, right?
18            MR. GILL:  Right.  I do not have a book on me,
19   but I did -- each one of my -- some were a guess.  Some
20   I looked on, like I said, Kelly Blue Book or the auto
21   traders.  And as far as the farming equipment goes, like
22   you saying, there's no company that does this.  So
23   basically sometimes I look on the market -- Facebook
24   Marketplace or Ag Source.  So kind of it's -- it's a
25   rough guess.
```

1           MR. GOMEZ:  All right.  And previously we talked

2      about the fact that you were going to include as part of

3      this bankruptcy at some point the assets of United Farm

4      -- I'm sorry -- United Farms and Sutter Enterprises.  Do

5      you recall that?

6           MR. GILL:  Yes.

7           MR. GOMEZ:  Okay.  And those assets aren't

8      listed here on Exhibit A, are they?

9           MR. GILL:  I don't believe so, right?  I don't

10     see it.

11          MR. FEAR:  Those are --I thought those were

12     included in farming equipment.  Were those not?

13          MR. GILL:  It's in the farming equipment, yes,

14     but --

15          MR. FEAR:  Not Sutter Enterprises.  I don't

16     think Sutter Enterprises is because we haven't yet -- we

17     haven't done anything with that yet.  How much do you

18     think the value of the Sutter Enterprises equipment is?

19          MR. GILL:  Probably not much.  Maybe 100,

20     150,000.  Rough guessing it, but right now --

21          MR. FEAR:  And those are all subject to the Rabo

22     lien; is that right?

23          MR. GILL:  No, but they also -- what's it

24     called -- Ag Direct has a loan on the Sutter Enterprise

25     equipment as well.

1          MR. GOMEZ:  All right.  When you say Ag Direct,

2     is that also SCS of America, which I see here listed on

3     the grape harvester?

4          MR. GILL:  No, that -- Yeah.  That's a different

5     one.  We were talking about the harvester for the Sutter

6     Enterprises.  That's also Ag Direct as well.

7          MR. GOMEZ:  So it's a different loan?

8          MR. GILL:  It's a different loan, yes.  It's a

9     different piece of equipment, so it's a different loan.

10          MR. GOMEZ:  How much is owed to Ag Direct on

11     that piece of equipment?

12          MR. GILL:  I would roughly think it's about

13     $45,000.

14          MR. GOMEZ:  Okay.  And has Ag Direct recovered

15     or seized that piece of equipment yet?

16          MR. GILL:  No. We're current on paying it, so

17     why would they seize that?

18          MR. GOMEZ:  I don't know its status.  That's why

19     I ask.

20          MR. GILL:  Yeah.

21          MR. GOMEZ:  Okay.  And the piece of equipment

22     that's subject to the Ag Direct lien, what's the value

23     of that piece alone?

24          MR. GILL:  Probably about the same.

25          MR. FEAR:  And just to be clear, we're talking

1   about the Sutter Enterprise?

2           MR. GOMEZ:  Yes.  Correct.

3           The same as the --

4           MR. GILL:  The loan.

5           MR. GOMEZ:  Oh, all right.  So it's worth about

6   45,000 and you owe Ag Direct about $45,000?

7           MR. GILL:  Somewhere in the neighborhood, yes.

8           MR. GOMEZ:  Okay.  And your basis for valuation

9   is just a guess, correct, without looking at any --

10          MR. GILL:  Yes.  I mean, based on what people

11  are selling and buying for the market -- for the

12  equipment, yes.

13          MR. GOMEZ:  Okay.  And you don't buy equipment

14  every year, do you?

15          MR. GILL:  No. Thank God.  I mean, we're almost

16  done with it.  We're not buying anything anymore.  No.

17          MR. GOMEZ:  Okay.  So of the $150,000 that you

18  estimated for the Sutter Enterprise's equipment and you

19  think about 45,000 of that goes to the Ag Direct

20  equipment that's owned by Sutter Enterprises; is that

21  correct?

22          MR. GILL:  Uh-huh.

23          MR. GOMEZ:  Okay.  So I want to keep going down

24  the list.

25          MR. FEAR:  Can I ask one more follow-up question

1   because I had asked something a minute ago.  I couldn't

2   -- I couldn't tell if he answered the question.  But

3   does Rabo have a blanket security interest on this same

4   loan covering all the Sutter Enterprise's debt, do you

5   know?

6           MR. GILL:  I -- I believe so. I don't -- I don't

7   remember signing anything on it, but I don't think.

8           MR. FEAR:  That's something we need to double

9   check.

10          MR. GILL:  Okay.

11          MR. FEAR:  Thank you.

12          MR. GOMEZ:  All right.  My next question to you

13  is you have a line item entry here for a FSA grant.

14  Value is currently unknown.  Do you see that?

15          MR. GILL:  Yes.

16          MR. GOMEZ:  All right.  And you have collected

17  some FSA monies so far; is that right, so far this year?

18          MR. GILL:  Uh-huh.  Right.

19          MR. GOMEZ:  Are any further FSA monies due and

20  owing or have you collected all of it so far?

21          MR. GILL:  No, it's still coming.

22          MR. GOMEZ:  It's still coming?  Okay.  And how

23  much have you collected this year?

24          MR. FEAR:  So for the '23 or '24 crops?

25          MR. GILL:  For the '23, '24.

1          MR. FEAR:  There's still money coming in?

2          MR. GILL:  Yeah.  They're a couple of years

3    behind coming in, so --

4          MR. FEAR:  I'm sorry.  Go ahead, Mike.

5          MR. GOMEZ:  Sure.  Let me repeat my question.

6          So of the FSA grant that you estimated here, how

7    much have you collected this year so far?

8          MR. GILL:  I don't know.  I would have to go

9    back and look at my notes to look at it to see how much

10   we have collected.

11         MR. GOMEZ:  Okay.  And how much would you

12   estimate you still have to collect that you haven't

13   collected yet?

14         MR. GILL:  There's -- I think I passed a number

15   to Scott.  I think it's -- Scott, if you have the

16   numbers -- number you can give to Mike, but I think it's

17   close -- could be close to 140 to $250,000.  That's --

18   that's still to come.

19         MR. FEAR:  Yeah.  We were close to -- I think

20   the total amount coming in from that last batch was

21   about 460 --

22         MR. GILL:  No, 490.

23         MR. FEAR:  Yeah.

24         MR. GILL:  And then we already got 109,000 for

25   the Capitol Farm, but we haven't received the rest of

1     them yet.

2              MR. FEAR:  Yeah.

3              MR. GOMEZ:  So let me restate that just to make

4     sure I have it correct because I think I misheard you.

5              And you adopt Mr. Sackett's testimony as your

6     own, correct?

7              MR. GILL:  Yes.  Yes.  I'm the one that provided

8     the numbers to him, yes.

9              MR. GOMEZ:  All right.  So I think what I heard

10    is that 109,000 of FSA money was collected already; is

11    that right?

12             MR. GILL:  Correct.  Some change.  109,000 and

13    some change came in to Capital Farms already, correct.

14             MR. GOMEZ:  Okay.  And I think I heard that

15    another 400,000 or so has --

16             MR. GILL:  Well, you minus the 498 minus the

17    109, that's the balance that's still coming in.

18             MR. GOMEZ:  I see.  So the total FSA monies are

19    about $498,000?

20             MR. GILL:  Correct.

21             MR. GOMEZ:  And 109,000 of that has come in so

22    far?

23             MR. GILL:  And some change has came in, yes.

24             MR. FEAR:  Okay.  Those are just rough numbers,

25    right?

1          MR. GILL:  Correct.

2          MR. FEAR:  And is that based on the new bill

3     that just passed?

4          MR. GILL:  Big Beautiful Bill, yes.

5          MR. FEAR:  So that wasn't something that existed

6     at the time of the --

7          MR. GILL:  No.

8          MR. GOMEZ:  Okay.  Next item is it says right

9     below the FSA, and it says "outstanding crop insurance

10    claim based on guaranteed versus actual production.

11    Funds should be available by the end of January 2025."

12    So this is a crop insurance claim for about $209,000.

13    Do you see that there?

14         MR. GILL:  Yes.  Yes.

15         MR. GOMEZ:  Is that how much you've collected?

16         MR. GILL:  I don't have the exact number, but

17    whatever was submitted to the Court, we have collected

18    everything.  Yes, there's nothing -- no more money

19    coming in right from the crop insurance.  Everything

20    that came in was already transferred to Capital Farms.

21         MR. GOMEZ:  All right.  So there's no other crop

22    insurance under -- sorry.  There's no other crop

23    insurance claim under this line item; is that correct?

24         MR. GILL:  Correct.

25         MR. GOMEZ:  And you don't know off the top of

1   your head approximately how much was collected; is that

2   fair to say?

3          MR. GILL:  Yes, it is fair to say, but

4   everything is in writing.  Everything is transferred

5   through Capital Farms, whatever came in.  Exact to the

6   penny was transferred to Capital Farm.  And Scott has

7   all the paperwork or Court should have all paperwork

8   because it was submitted in each various support when

9   the money came in.

10          MR. GOMEZ:  Okay.  Right below that it

11   references "to crop insurance claims with Pro Ag

12   insurance for about $307,000.  "Do you see that?

13          MR. GILL:  Yes.

14          MR. GOMEZ:  Have all those funds been collected?

15          MR. GILL:  Again, same scenario you apply to

16   that, yes.  Everything has been collected and

17   transferred to Capital Farms.

18          MR. GOMEZ:  And just to make the record, clear,

19   are you aware of how much was collected on of those

20   claims?

21          MR. GILL:  I would have to look back, but every

22   penny that was submitted to it has been received.

23          MR. GOMEZ:  All right.  So I want to talk to you

24   about the couple of items down below that, the 2024

25   almond crop.

1          MR. GILL:  Okay.

2          MR. GOMEZ:  And it says there including -- it

3     says there that it's about 2.7 million.  Do you see

4     that?

5          MR. GILL:  Yes.

6          MR. GOMEZ:  All right.  And so how much of that

7     has been collected?

8          MR. GILL:  Every -- well, I'll take it back.

9     Most of it has been collected.  I think we're only

10    waiting for one last payment from Van Brothers.  It's

11    probably due September 15th.  I don't know.  That could

12    be around 60 to $70,000.  That's about the only payment

13    that we're waiting for.

14         MR. GOMEZ:  All right.  And approximately how

15    much have you collected to date of the 2024 crop

16    proceeds?

17         MR. GILL:  Like I said, every penny except the

18    last payment for the seasonal pool from Van Brothers,

19    which is -- could be around 70 -- close to about

20    $70,000, give or take.

21         MR. GOMEZ:  All right.  And do you see where it

22    says -- there's a parenthetical at the end.  It says

23    "estimated 50 percent costs of liquidation"?

24         MR. GILL:  Uh-huh.

25         MR. FEAR:  Yeah, that was actually pulled over

1    from the schedules because I don't think we used that

2    number.  So that was what it was at the time of the

3    filing of the case.

4        MR. GOMEZ:  Okay.  So I guess my question is

5    what's the total amount of the almond crop that's been

6    collected this year absent that 60,000 that's still

7    outstanding?

8        MR. GILL:  I believe Scott will e-mail you to

9    the pending that we have received so far in Excel sheet.

10   If not, we could provide it to you again.  But

11   whatever -- I think it was more than would you expected,

12   but I don't have that information in front of me, but I

13   can provide that to you later.

14       MR. GOMEZ:  Okay.  Would you say it's less than

15   2.7 million or higher than 2.7?

16       MR. GILL:  I would say it's very close to 2.7.

17       MR. GOMEZ:  Okay.  And in terms of the 2025 crop

18   which you're working on right now, I'm sure you're

19   probably harvesting at the moment.

20       MR. GILL:  Very busy, yes.

21       MR. GOMEZ:  Yeah.  Approximately how much do you

22   think that crop is worth?

23       MR. GILL:  Whatever we projected.  I think it's

24   going to be very close to the same numbers that we

25   projected.  It's probably more than last year, for sure.

1          MR. GOMEZ:  Okay.  And roughly how much did you

2     project?

3          MR. GILL:  I don't have the sheet in front me.

4     I don't -- I have no idea unless we have --

5          MR. FEAR:  The budget.  Do you under just go to

6     the budget?

7          MR. GOMEZ:  Let's do that real briefly, and then

8     we'll come back to this liquidation analysis.

9          MR. FEAR:  I think on the budget -- yeah, I

10    think this is the budget.

11         MR. GILL:  Do you have the pounds or there's no

12    -- it was the Excel sheet that we had projected the

13    pounds and then the 25 -- Scott, do you have the Excel

14    sheet that we have the projections for 20 --

15         MR. SACKETT:  Michael, it was -- the -- the

16    connection was breaking up on me, so I didn't hear the

17    question.  Can you repeat it for me or --

18         MR. GOMEZ:  Yes.  I simply wanted to know what

19    it -- how much he was estimating for the 2025 crop

20    proceeds.

21         MR. SACKETT:  Oh, okay.

22         MR. FEAR:  And this is the -- in the -- I think,

23    Scott, looking at the budget, you have some assumptions

24    in -- under December 2025.

25         MR. SACKETT:  Yeah.

1          MR. FEAR:  That is for the 2025 crop year,

2     right?

3          MR. SACKETT:  That -- that is correct.

4          MR. FEAR:  Okay.  And so I think this is -- I

5     think what he's asking -- he's asking about your numbers

6     for crop production.

7          MR. GILL:  Okay.  So I think this is the pounds

8     and these are the dollar amount.

9          MR. FEAR:  Right.  Okay.  Do you think that the

10    pounds are pretty close to what you're looking at as far

11    as your crop pounds per acre, and --

12         MR. GILL:  Yes, it's going to be very close to

13    it.  Yes.

14         MR. GOMEZ:  And I'm sorry, I'm looking at Docket

15    Number 254, Exhibit D, which is the plant projection.  I

16    don't recall that it lists out pounds or the almonds.

17    Are you looking at a different version of that sheet?

18         MR. FEAR:  If you look down at Page 4.

19         MR. GOMEZ:  Four.

20         MR. FEAR:  It's at the bottom.  3 and 4.

21         MR. GILL:  Yeah.

22         MR. FEAR:  It has the -- it has the assumptions.

23    And, you know, the first one is production pound per

24    acre.  The next one is total crop production, and then

25    the crop revenue is after that.

1          MR. GILL:  Can you just go up a little bit.

2          MR. FEAR:  Sure.

3          MR. GILL:  There we go.  So 1,800 against a

4     thousand.

5          MR. GOMEZ:  So to confirm, you're expecting this

6     year's total crop revenue to be $4.6 million; is that

7     right?

8          MR. GILL:  Yes.  Yes.  And that's based on 20 to

9     25 cents a pound.  I think, you know, crop is not a

10    heavy as the USED projected 3 billion pounds.  So prices

11    should come up, you know, as the sheets start come in

12    maybe down in October.  So I prices -- I believe the

13    price is going to be way higher than 225.

14         MR. GOMEZ:  Okay.  All right.  So you believe

15    this year's 2025 crop is worth at least 4.67 million?

16         MR. GILL:  Correct.

17         MR. GOMEZ:  It'd be higher?

18         MR. GILL:  Yes.

19         MR. GOMEZ:  All right.  So I want to go back to

20    that liquidation analysis, and I want to ask you some

21    questions about the line items for liens, equity and

22    notes.  I also want to ask you a couple of questions

23    about the cost of liquidation, just so I understand how

24    those figures were determined.  Let me know when you're

25    ready.

1          MR. SACKETT:  Yeah.  And as far as the cost of

2     liquidation, those are just estimates that I put in.  So

3     I'm not sure that I can testify about that, but I can

4     explain where those numbers came from as far as

5     estimates are concerned.

6          MR. GOMEZ:  That'd be great.  No, I'll go

7     quickly through that.  We'll turn to liens, equity, and

8     notes.

9          All right.  So let me know when you're ready.

10    This is, again, Docket 266, Exhibit A, Page 3.

11         MR. SACKETT:  Okay.  Go ahead.

12         MR. GOMEZ:  All right.  So do you see there,

13    Mr. Gill, it says in the third column costs of

14    liquidation?

15         MR. FEAR:  This is right here.

16         MR. GILL:  Okay.  Uh-huh.

17         MR. GOMEZ:  So how did you determine by asset

18    the cost of liquidation?  Was it a formula?  Was it just

19    a fixed percentage based on the asset value?

20         MR. GILL:  What item are you particularly

21    talking about, do you know?

22         MR. GOMEZ:  I'm sorry.  I misheard you.  Can

23    repeat what your response --

24         MR. GILL:  Yeah.  What -- are you referring to a

25    particular item, line item, or are you just generally

1    asking the question?

2         MR. GOMEZ:  Generally.  I'm kind of curious how

3    it was determined per asset.

4         MR. GILL:  Again, I mean, it's just a rough

5    guess so based on what the market is going for right

6    now, based on the past sales.  So are we talking about

7    the land, right, Peter?  Are we talking about the land?

8         MR. FEAR:  Several different things.  So there's

9    -- there's -- there's equipment.  There is -- there are

10   vehicles.  And I think the -- at least for the vehicles

11   and the equipment, what usually happens is there's kind

12   of an assumption based on what -- what happens -- you

13   see it happening commonly in Chapter 7 cases as far as

14   how much those things -- you know, the cost of

15   liquidating them, as far as usually you're talking about

16   moving them, and then you're talking about the -- the

17   auction costs, auctioneer costs.  That kind of stuff.

18   For the -- so I think that's the general cost.  I mean,

19   is that basically correct, as far as your understanding?

20        MR. GILL:  Yeah, 100 percent.  Yeah.

21        MR. FEAR:  The -- the almond crop was a little

22   bit different.  And where that -- the issue with that is

23   that there are expenses to continue to collect it.  Now,

24   this was the 2024 crop.  Now we have the 2025 crop.  And

25   so there are -- I think that in looking at that we

1   thought if you actually had to liquidate whatever is

2   left of the entirety of the crops, you'd probably end up

3   with about that number at the end of the day after you

4   take care of all the expenses you have to -- to actually

5   deal with it.

6          MR. GOMEZ:  Let me ask a couple of -- let me ask

7   a couple more pointed questions.

8          MR. GEAR:  Sure.

9          MR. GOMEZ:  So, Mr. Gill, you didn't come up

10  with the cost of liquidation values in this column, did

11  you?

12         MR. GILL:  Which column?

13         MR. FEAR:  This column right here.

14         MR. GILL:  These -- yeah, these I did right

15  here, that -- there was --

16         MR. FEAR:  I think there was collaboration.

17         MR. GILL:  Yeah.

18         MR. FEAR:  Probably the best we you could --

19         MR. GOMEZ:  All right.  And did you use any

20  third party sources such as Kelly Blue Book,      Auto

21  Trader or anything like that to come up these costs?

22         MR. GILL:  No.  No.

23         MR. GOMEZ:  All right.  Let's turn to the 2024

24  almond crop.  I want to focus on that because of that

25  parenthetical at the end of the line item, which says,

1    estimated 50 percent costs of liquidation.  So was the

2    gross number, the 2.7 million dollar value number,

3    already decreased by 50 percent?  In other words, should

4    be --

5         MR. GILL:  No.

6         MR. FEAR:  He's asking -- so he's asking is the

7    2.7 the gross that you actually received for the 2024

8    crop or did you get double that and reduce it by 50?

9         MR. GILL:  No, that's the amount that we

10   received, that $2.7 million -- the income from the crop.

11   It wasn't reduced by 50 percent, no, If that's what

12   you're asking me.

13        MR. FEAR:  And just to be clear, I think that

14   estimated 50 percent cost of liquidation, I think that

15   came from the schedules.  I think it might have been on

16   the schedules and that -- maybe where that came from.

17        MR. GOMEZ:  All right.  So that's just a stray

18   parenthetical it shouldn't be there mistake; is that

19   fair to say?

20        MR. FEAR:  I think that's correct.

21        MR. GOMEZ:  All right.  Let's turn to the actual

22   cost of liquidation of about $542,000.  Now, how was

23   that determined?

24        MR. GILL:  Do you know which one?

25        MR. FEAR:  You're back to this one right here,

1    542 or 34, 37.

2              MR. GILL:  No, I don't remember.  Is that for

3    the crop or --

4              MR. FEAR:  For the crop.

5              MR. GILL:  Yeah, I don't know how that number

6    got there.  I have no clue.  Because that's probably

7    based on expenses.  Like you're saying, it could be

8    based on expenses.

9              MR. FEAR:  Right.

10             MR. GOMEZ:  All right.  Let's turn to the liens

11   column.  So the first entry on the liens column is

12   $15,801.85.  What's that for?

13             MR. FEAR:  This is under the -- this is the Crew

14   Cab High Country.

15             MR. GILL:  Uh-huh.  The pickup, yeah.

16             MR. FEAR:  So he's asking what is that for?

17   What is that?

18             MR. GILL:  I -- I don't know how the number was

19   -- the number is for.

20             MR. FEAR:  Is there a loan on the --

21             MR. GILL:  Yes.  There might have been the loan.

22   The $15,000 might have been the loan at the time we did

23   the -- the filings.  Yes, that's probably what it is.

24   That's the loan amount.

25             MR. GOMEZ:  Okay.  And the a loan to whom?

1          MR. GILL:  Chase.  Chase Bank.

2          MR. GOMEZ:  And is that debt still owed to

3   Chase?

4          MR. GILL:  Yeah.  Right now, it -- I think it's

5   down to 10,000, maybe, or 9,000.  But they already, I

6   think, took off the assistance since my brother already

7   filed for the bankruptcy, Chapter 7.  So I think right

8   now -- you know, I don't know what that's going to

9   happen to the debt.

10         MR. GOMEZ:  All right.  I'm sorry.  Can you

11   restate what you just said about your brother and the

12   bankruptcy.

13         MR. GILL:  My brother already filed for Chapter

14   7 already, so that -- I don't know what's going to

15   happen to that debt, but it doesn't show up online

16   anymore on the -- on the Chase.

17         MR. FEAR:  So you're talking about, like, his

18   Chase accounts?

19         MR. GILL:  All right.

20         MR. FEAR:  You can't actually see the precise

21   amount that.

22         MR. GILL:  I can't see it right now because they

23   took it off. It says zero right now.

24         MR. GOMEZ:  Okay.  Is he using it or are you

25   using it or is the debtor using the truck?

1          MR. GILL:  No, the company is using it.  He's

2     using it.

3          MR. GOMEZ:  Okay.  Let's turn to the -- there's

4     an entry for tires.  Well, let me ask this.  On the

5     grape harvester it shows that the equity is zero and FCS

6     of America, is it accurate to say that FCS of America

7     has already seized that piece of equipment?

8          MR. GILL:  They have, and they already sold it

9     to somebody else, correct.

10         MR. GOMEZ:  All right.  Let's turn to the line

11    item for tires, I think.

12         MR. FEAR:  I think it's actually -- it's two

13    lines.  It starts with a Kubota and ends with tire slash

14    liner.

15         MR. GOMEZ:  Got it.  Thank you.  All right.

16         So it says the liens on it are 9,600.  Who is

17    that in favor of?

18         MR. GILL:  That-- it was a Kubota Corporation,

19    but that's -- the payment's already been paid for, so

20    there's -- there's no money on -- on the -- owed to the

21    Kubota Corporation.  The last payment was made in, I

22    believe, May.

23         MR. GOMEZ:  Is this a certificated vehicle?

24         MR. GILL:  I'm sorry?

25         MR. GOMEZ:  Is this a certificated vehicle?

```
 1              MR. GILL:  As meaning -- I don't know what you
 2    mean.
 3              MR. FEAR:  So what he means is is it -- do you
 4    have to register with the DMV --
 5              MR. GILL:  Oh, yeah.
 6              MR. FEAR:  -- the title so you can --
 7              MR. GILL:  Yes.
 8              MR. FEAR:  -- go on the road?
 9              MR. GILL:  Yeah.  You have to pay the DMV fee on
10    it, correct, yes.
11              MR. GOMEZ:  All right.  And then next to that,
12    you have -- in the equity column you have zero, and then
13    the notes say Rabo Blanket lien.  Do you see that?
14              MR. GILL:  Okay.  But is that -- is that next to
15    for that or is it a Capital lane?
16              MR. FEAR:  No, it's for -- this is for this one,
17    so it's a --
18              MR. GILL:  Okay.  So it's a Kubota, so I don't
19    know.  Oh, but they say the Rabo blanket lien so I don't
20    know if they have a lien or not.  I have no clue.
21              MR. FEAR:  So if it's a certificated vehicle --
22    actually, I don't think Rabo's blanket lien would attach
23    to that.
24              MR. GOMEZ:  All right.  So I guess what I'm
25    trying to understand is the next item under the lien
```

1     column says it's zero.  You know, when I go to the right

2     of it it says zero Rabo blanket lien.  And this is on

3     the FSA grant.

4          MR. FEAR:  Here.  Yeah, so the equity would say

5     zero if Rabo's blanket lien attached to it because their

6     lien would take up whatever equity was there.  That was

7     the -- I think that's what that was saying.  If Rabo's

8     lien attached to it because their lien would not attach

9     to the vehicles that are -- have a special DMV

10    requirements as far as protecting the security interest,

11    but it would attach to anything that you can -- you can

12    protect your security interest with the UCC one.

13         MR. GOMEZ:  All right.  So let's go to the next

14    one, the crop insurance.

15         MR. FEAR:  It's right there.

16         MR. GILL:  Okay.

17         MR. GOMEZ:  Well, I guess what I'm getting at,

18    before I go to that one, on the FSA grant are you saying

19    that the value is zero or are you saying that no lien

20    attaches to it?

21         MR. FEAR:  I think that this just was pulling

22    over whatever the value is.  If the value was zero,

23    that's the amount that was left, then the amount of the

24    lien would be zero.  But if the lien amount was -- if

25    the lien amount was -- or if the dollar amount of the

1  value was higher than Rabo's lien, I think would attach

2  to anything that it attaches to up to the full amount of

3  the -- of their lien.  Now, the FSA grant, the one he

4  was talking about, came into being, I think, with this

5  bill that was passed like a month ago.

6       MR. GILL:  Yeah, known as a Big Beautiful Bill

7  that's, you know, initiated by Trump.  I was signed into

8  law, and that's what we're talking about.  That 498,000,

9  that's what -- it is part of the money.

10      MR. FEAR:  So I think that the replacement lien

11  would probably attach to that, I think.  I'm not certain

12  about that, but I think it would.  And so if that's the

13  case, then -- then that would -- that replacement lien

14  would attach to that, and that would be -- would

15  additionally apply to Rabo's lien.

16      MR. GOMEZ:  One moment.  All right.  So I want

17  to walk through the equity line item, the interplay

18  between the zeros and the Rabo blanket lien.

19      MR. FEAR:  Okay.

20      MR. GOMEZ:  So, for instance, if I take --

21  assuming it is subject to the Rabo lien, the Kubota.  So

22  if I understand it correctly, whatever value is there

23  after the liens and the cost of liquidation, you're

24  saying it's eaten up by the Rabo blanket lien?

25      MR. FEAR:  Right.

```
 1          MR. GOMEZ:  Same thing with the next line item

 2    on the bank accounts and so forth down the road?

 3          MR. FEAR:  Right.

 4          MR. GOMEZ:  Do you have a summary of what those

 5    totals are?

 6          MR. FEAR:  I'm sorry.  A summary of what?

 7          MR. GOMEZ:  The totals that's being swallowed by

 8    the Rabo blanket lien.

 9          MR. FEAR:  That's what the -- that's what the

10    line item that says Rabo blanket lien down a little bit

11    lower.  That is the total of all the items that are

12    swallowed up.

13          MR. GOMEZ:  That's the 3.46 million?

14          MR. FEAR:  Right.  That's right.

15          MR. GOMEZ:  Okay.  All right.  My next question

16    is we've had some dealings with MetLife in this case.

17    Can you please remind me of what Met Life's involvement

18    is?  Are they a creditor secured by certain assets of

19    Sutter Land that's rented or used by the debtor or are

20    they a secured creditor of other assets by third parties

21    that's rented by the debtor?

22          MR. GILL:  They're still creditors on -- on

23    other properties such as Sinkie Ranch.  They have the

24    first deed of trust on Sinkie Ranch.

25          MR. FEAR:  And --
```

1          MR. GILL:  On the baseline.

2          MR. FEAR:  On the Baseline.  And Baseline is

3    owned by a third party but is leased to Sutter -- well,

4    it's not leased.  It has a -- there's a purchase

5    agreement that Sutter Land has that allows them to

6    operate that and -- and then it's -- that purchase

7    agreement is essentially the -- their rights under the

8    purchase agreement have been subleased to Capital Farm.

9    And so that's how -- that's Met Life's involvement is

10   they are -- they're the secured creditor on those two

11   properties.

12         MR. GOMEZ:  Okay.  And just to clarify, none of

13   the Gill family or Sutter Enterprises or United Farms or

14   Sutter Land are obligated to pay that debt to MetLife,

15   correct?

16         MR. GILL:  It is.  Sutter Land is obligated to

17   pay the debt to MetLife because MetLife has the first

18   deed of trust on Sutter Land.

19         MR. FEAR:  So on the -- which property then?

20         MR. GILL:  On the -- on Sinkie Ranch.

21         MR. GOMEZ:  Sinkie Ranch?

22         MR. GILL:  Yeah.

23         MR. GOMEZ:  Okay.  Is anyone else obligated to

24   that debt to MetLife?

25         MR. GILL:  I don't follow.

1    MR. GOMEZ:  Did anybody guarantee -- who

2 guarantee --

3    MR. GILL:  Oh, yeah.  Baljeep, me and his wife.

4    MR. FEAR:  Baljeep the debt to?

5    MR. GILL:  Metlife.

6    MR. GOMEZ:  Okay.  And approximately how much

7 total debt is owed to Metlife?

8    MR. GILL:  I believe it's close to 4 million.

9    MR. GOMEZ:  Okay.  That's just on Sinkie?

10    MR. GILL:  Sinkie Ranch, yes.

11    MR. GOMEZ:  And on the other property that's

12 leased through some purchase agreement from a third

13 party, approximately how much is owed to Metlife on that

14 one?

15    MR. GILL:  I believe it's close to 2.4 million.

16    MR. GOMEZ:  All right.  And just to be clear,

17 for the $2.4 million debt owed to MetLife, none of the

18 Gil family or their companies such as Sutter

19 Enterprises, United Farms, Sutter Land or Capital Farms

20 are directly obligated on that debt, correct?

21    MR. GILL:  No. No.

22    MR. GOMEZ:  And for the Sinkie property, how

23 much would you estimate that property is worth?

24    MR. GILL:  Probably not much more than what the

25 loan is because it's got a single source of water, and

1    there's really -- the crops aren't that great, so I

2    don't know.  I mean, again, it would be a guess, but I

3    think it's worth the same amount of what the loan is on

4    it.

5         MR. GOMEZ:  Okay.  And so for the MetLife debt

6    that's secured by the Sinkie property, none of the Gills

7    or Sutter Land have really paid that debt, any portion

8    of that obligation, have they?

9         MR. GILL:  I didn't follow your question.

10        MR. GOMEZ:  Sure.  For the -- for the loans

11   secured by the Sinkie property --

12        MR. GILL:  Uh-huh.

13        MR. GOMEZ:  -- Capital Farms is paying that

14   debt, right?

15        MR. GILL:  Capital Farm is paying the debt, yes.

16   That's correct.

17        MR. GOMEZ:  And so no one else who's obligated

18   on that debt has made a single payment on that debt,

19   have they?

20        MR. GILL:  No. Just Capital Farms has been

21   paying for it.

22        MR. GOMEZ:  Okay.  And for Rabo who's here,

23   Rabo's owed certain significant claims in this case.

24   And it's fair to say that a number of the Gill family

25   and various things that we've covered, such as Sutter

1    Enterprises, United Farm, Sutter Land, they're obligated

2    on various debts owed to Rabo; is that correct?

3           MR. GILL:  Correct.

4           MR. GOMEZ:  Okay.  And roughly what would you

5    estimate off the top of your head the total debt amount

6    is?

7           MR. FEAR:  I'm sorry.  The total debt of --

8           MR. GOMEZ:  Owed to Rabo.

9           MR. FEAR:  And just by Capital Farms or

10   including Sutter Land?

11          MR. GOMEZ:  Everything.  Across the board.

12          MR. GILL:  Well, the original loan was before

13   the penalties, (inaudible) and default.  I think we were

14   close to 8 million or something roughly.  If I were to

15   guess, it'd be about 8 and a half.  I don't know what it

16   is now or all the penalties and default rate and all

17   that stuff.  I don't know what sort --

18          MR. FEAR:  Including all the loans even the

19   Sutter Land loans?

20          MR. GILL:  Sutter Land, yeah.

21          MR. FEAR:  Or just --

22          MR. GILL:  I'm sorry.  Yes, That's correct.

23   Uh-huh.  But close to 9 million.

24          MR. GOMEZ:  Okay.  And is it fair to say that of

25   all the -- let me restate that.

1          Has Sutter Land or any of the Gills or their

2    companies other than Captial Farms, have they been

3    paying anything towards that debt recently since Capital

4    Farms filed for bankruptcy?

5          MR. GILL:  Nobody's -- no, nothing -- not to

6    Rabo, no.

7          MR. GOMEZ:  All right.  So is it fair to say

8    that only Capital Farms is paying these debts to Rabo?

9          MR. GILL:  Correct.

10          MR. GOMEZ:  Okay.

11          MR. FEAR:  It's kind of interesting to try and

12    figure out exactly how you phrased that because the

13    Sutter Land is leasing the property to Capital Farms.

14    So -- I mean, I guess Sutter Land is kind of generating

15    the revenue to pay it through Capital Farms operating

16    it.  So it's like the land is generating the money to be

17    able to pay the mortgage.  So there's sort of -- Sutter

18    Land is sort of paying for it.  But just by leasing it

19    to Capitol Farm, that does the work, operates the farm,

20    and then pays it.  So just to make sure we're clear on

21    that.

22          MR. GOMEZ:  All right.  And without going

23    through the Rabo loan documents document by document, is

24    it fair to say that for a number of these debts owed to

25    Rabo, Capital Farms is either a co-borrower or it's a

1    guarantor of those debts?

2          MR. GILL:  Yes.  Yeah, co-borrower and guarantor

3    on the debt.

4          MR. FEAR:  So on the Sutter Land debt, though,

5    those -- Capital Farms is not a --

6          MR. GILL:  Not a guarantor.  No, not on MetLife.

7    Capital Farm is not a guarantor on the MetLife loan, no.

8          MR. FEAR:  It is on -- it is on the Rabo, but

9    not on the --

10          MR. GILL:  Right.

11          MR. GOMEZ:  I'm sorry.  And so did you say that

12    on the MetLife loan that's secured by the Sinkie

13    property, Capital Farms is not a guarantor or a

14    co-borrower of that?

15          MR. GILL:  Correct.  They're not.

16          MR. GOMEZ:  Okay.  But for various debts owed to

17    Rabo, Capital Farms is a guarantor or a co-borrower,

18    right?

19          MR. GILL:  Correct.

20          MR. GOMEZ:  Okay.  All right.  And has Capital

21    Farms made any request or demand on any of the other

22    co-borrowers or co-guarantors on the debts owed to Rabo

23    to make payments to Rabo?

24          MR. GILL:  You mean Capital Farm demanded to

25    Gills?

1          MR. GOMEZ:  Either the Gills or their own

2     companies.

3          MR. GILL:  No. Other companies don't have any

4     money or Gills don't have any money because we put every

5     penny we had into this operation.  So nobody has any

6     money to -- even if they request it, there wouldn't be

7     any money to pay.

8          MR. GILL:  I think if you were kind of

9     characterizing it, you would say something like this.

10    "I don't know if there was, like, a formal legal demand,

11    but it was kind of like, hey, can anyone pay this.

12         MR. GILL:  Right.

13         MR. GOMEZ:  Okay.  And what would you estimate

14    Sutter Land's real property is worth that's secured by

15    the Rabo's debt?

16         MR. GILL:  The one that's secured by Rabo?  It's

17    probably not worth half of what it was worth in December

18    when they had the opportunity to sell the property.

19    They didn't, and it's probably not even worth half of it

20    right now.

21         MR. GOMEZ:  Okay.  And what would you estimate

22    it's worth today?

23         MR. GILL:  Right now -- it's probably 9,000 an

24    acre times, what is it, 280 acres?  Probably 2.7.  I

25    would guess it would be 2.7, 2.8.

1          MR. GOMEZ:  You get that by multiplying 9,000 an

2     acre times --

3          MR. GILL:  277, yeah, the acreage.

4          MR. GOMEZ:  One moment.  All right.  So earlier

5     we were talking about certain FSA grants, and there's a

6     reference to the Big Beautiful Bill and that kind of

7     thing.  And you have a budget, I think, with your plan.

8     It shows about $500,000 coming in under FSA grants in

9     September.

10          MR. GILL:  Correct.  There has to be another

11     round.  They're saying September, October, so that plan

12     hasn't been finalized yet.  But they're saying there is

13     a second round.  We don't know how much that will be or

14     -- there's no formula yet, but there is second round

15     coming part of that.  The $498,000 is not part of that.

16     This is separate from 498 that might be coming in

17     September, October, you know, addition to the 498.

18          MR. GOMEZ:  So let me restate that to make sure

19     I have it correctly.  You estimate that about $498,000

20     is coming in in FSA grants sometime in September,

21     possibly October.  But other than that, there should be

22     some more FSA grant money under that legislation that's

23     going to come in afterwards; is that correct?

24          MR. GILL:  Correct.  That's what they're saying,

25     that there is a second round of that money coming in in

1    probably October or November.  But what they're saying
2    is in October, there should be a second round coming.
3           MR. GOMEZ:  Are you saying in addition to the
4    498?
5           MR. GILL:  Correct.
6           MR. SACKETT:  I didn't budget that, so --
7           MR. GILL:  Right.  Right.  But there is
8    additional money coming in. We don't have a formula yet,
9    but they're saying it could be a similar amount that's
10   coming in in October addition to the 498 that we're
11   getting.
12          MR. GOMEZ:  All right.  That's all I have in
13   terms of questions for now.
14          MS. TSANG:  Okay.  All right.
15          Mr. Almaraz, do you have any questions on behalf
16   of Rabo?
17          MR. ALMARAZ:  I'm just checking my notes here.
18   No follow-up questions at this time.  Thank you.
19          MS. TSANG:  Okay.  All right.  I think all my
20   questions were asked by Mr. Gomez, so thank you for
21   doing all the heavy lifting on the liquidation.  I just
22   got to that page when you joined us, so it was perfect
23   timing.  All right.  Let's do this.
24          I think the date to object to the plan is the
25   21st of August.  Do we believe that we need another

1　round of meetings or are we ready to go ahead and

2　conclude today's meeting?  I know that we are still

3　waiting for the final numbers that was requested of

4　Mr. Sackett, and Mr. Sackett did communicate to us that

5　he'll have that report to us shortly.  Do the parties

6　believe that we need another round of discussions or are

7　we ready to conclude?  I'm open to suggestions.

8　　　　　All right.  There being no suggestions, I will

9　go ahead and conclude today's meeting, and we will go

10　ahead and thank you, Mr. Gill, for attending today and

11　answering all the questions.  But we don't believe that

12　another continuum meeting is needed.  I believe all the

13　questions about the plan has been asked, and we will

14　proceed accordingly.

15　　　　　Okay.  So thank you, everyone.  And this

16　concludes our meeting, and the time now it is 3:01 P.M.

17　I will go ahead and go off the record in the event that

18　any informal conversations are need.  Thank you.  Thank

19　you, everyone.

20

21　　　　　　　　　　　　* * *

22　　　　　　　　　　End of Audio

23　　　　　　　　　　　　* * *

24

25

```
 1                REPORTER'S CERTIFICATION

 2

 3

 4       I, Josie C. Gonzalez, a Certified Shorthand

 5  Reporter in and for the State of California, do hereby

 6  certify:

 7

 8       That the foregoing audio file was reported by me

 9  stenographically to the best of my ability and later

10  transcribed into typewriting under my direction; that

11  the foregoing is a true record of the audio file.

12

13       IN WITNESS WHEREOF, I have subscribed my name

14  this 19th day of August, 2025.

15

16

17                    _____
                           JOSIE C. GONZALEZ
18

19

20

21

22

23

24

25
```

EXHIBIT 3

1

FEAR WADDELL, P.C.
Peter L. Fear, No. 207238
pfear@fearlaw.com
Gabriel J. Waddell, No. 256289
gwaddell@fearlaw.com
Peter A. Sauer, No. 255957
psauer@fearlaw.com
7650 North Palm Avenue, Suite 101
Fresno, California 93711
(559) 436-6575
(559) 436-6580 (fax)

Counsel for CAPITAL FARMS, INC.
 Debtor in Possession

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

| | |
|---|---|
| In re: | Case No. 25-10074-A-12 |
| CAPITAL FARMS, INC., | Chapter 12 |
| | D.C. No. FW-17 |
| Debtor and Debtor-in-Possession. | Date:  September 4, 2025<br>Time:  10:30 a.m.<br>Place:  Dept. A,<br>       United States Courthouse<br>       510 19th Street, Bakersfield, California<br>Judge: Hon. Jennifer E. Niemann |

**EXHIBITS FOR CHAPTER 12 PLAN DATED JULY 29, 2025**

**<u>INDEX OF EXHIBITS</u>**

| Exhibit | Title | Page No. |
|:---:|---|:---:|
| A | Liquidation Analysis | 2 |
| B | Projected Budget | 4 |

EXHIBIT - 1

# Exhibit A

### LIQUIDATION ANALYSIS
### Capital Farms, Inc.
**Exhibit "A"**

| Asset | Value | Costs of Liq. | Liens | Equity | Notes |
|---|---|---|---|---|---|
| Laramie | $8,471.00 | $2,541.30 | | $5,929.70 | Est. 30% costs of liquidation |
| Tradesman | $13,487.00 | $4,046.10 | | $9,440.90 | Est. 30% costs of liquidation |
| 1500 Crew Cab High County | $23,880.00 | $7,164.00 | $15,801.85 | $914.15 | |
| Grape Harvester | $55,000.00 | $16,500.00 | $55,000.00 | $0.00 | FCS of America lien |
| KUBOTA RTV-X900RL-A, UV Camo w/ATV Tires/Linrer | $12,000.00 | $2,400.00 | $9,600.00 | $0.00 | Rabo blanket lien |
| Citizens Business Bank. | $58.58 | $58.58 | | $0.00 | Rabo blanket lien |
| Five Star Bank. | $798.35 | $798.35 | | $0.00 | Rabo blanket lien |
| Five Star Bank. | $395.00 | $395.00 | | $0.00 | Rabo blanket lien |
| FSA grant. Value is currently unknown. However, it is based on the higher of 2023 or 2024 gross receipts. No liq value because requires farming to continue | $0.00 | $0.00 | $0.00 | $0.00 | Rabo blanket lien |
| Outstanding crop insurance claim based on the guaranteed vs actual production. Funds should be available the end of January 2025. | $209,998.50 | $0.00 | $209,998.50 | $0.00 | Rabo blanket lien |
| Two crop insurance claims with Pro Ag Insurance. | $307,970.00 | $0.00 | $307,970.00 | $0.00 | Rabo blanket lien |
| KUBOTA RTV-X900WL-A, UV worksite w/ATV Tries/Liner | $12,000.00 | $3,600.00 | $8,400.00 | $0.00 | Rabo blanket lien |
| 2024 Almond Crop (including Capital Farms and United Farms) (est. 50% costs of liq.) | $2,710,171.84 | $542,034.37 | $2,168,137.47 | $0.00 | Rabo blanket lien |
| Farming equipment | $1,081,000.00 | $324,300.00 | $756,700.00 | $0.00 | Rabo blanket lien |
| TOTAL | $4,435,230.27 | $903,837.70 | | $16,284.75 | |

| | |
|---|---|
| **Gross Assets Avail. For Chapter 7 Liquidation** | $4,435,230.27 |
| **Rabo Blanket Lien** | $3,460,805.97 |
| **Equity Avail. To Chapter 7 Estate** | $16,284.75 |

    $16,284.75

**Admin Claims**

| | |
|---|---|
| Chapter 7 Trustee fees (est.) | $156,306.91 |
| Chapter 7 Trustee professionals (est.) | $100,000.00 |
| Chapter 12 CRO Fees | $100,000.00 |
| Chapter 12 Counsel Fees | $200,000.00 |
| **Amount Avail. To Priority Claims** | **-$340,022.16** |
| Priority Claims | $57,620.55     (est.) |
| **Amount Avail. To Unsecured Claims** | **-$397,642.71** |

The liquidation analysis thus demonstrates that if this case was converted to Chapter 7, no funds would be available for unsecured creditors.

# Exhibit B

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING INCOME** | | | | | | | | | | | |
| Crop Sales and Crop Insurance | 0.00 | 65,000.00 | 0.00 | 0.00 | 100,000.00 | 749,000.00 | 400,000.00 | 350,000.00 | 793,293.00 | 0.00 | 329,666.00 |
| *FSA Grant Payments* | | 498,015.70 | | | | | 40,000.00 | | | 40,000.00 | |
| *Custom Harvesting Work* | | | | | 114,500.00 | | | | | | |
| *Other/ Interest* | | | | | | | | | | | |
| Processor Advance | 400,000.00 | 375,000.00 | 500,000.00 | | | | | | | | |
| **Total Gross Income** | **400,000.00** | **938,015.70** | **500,000.00** | **0.00** | **214,500.00** | **749,000.00** | **440,000.00** | **350,000.00** | **793,293.00** | **40,000.00** | **329,666.00** |
| | | | | | | | | | | | |
| **Cost of Goods Farming** | | | | | | | | | | | |
| Farm Management | | | | | | | | | | | |
| PCA & Analysis, Tech Lab | | 3,062.50 | | | | 7,200.00 | | | 7,200.00 | | |
| Contractor Labor (Fresno) | 71,000.00 | 71,000.00 | 40,500.00 | 8,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 6,000.00 | 11,500.00 | 11,500.00 | 11,500.00 |
| Labor - General (Sacramento Valley) | 61,820.00 | 61,820.00 | 25,910.00 | 5,000.00 | 5,000.00 | 5,000.00 | 7,000.00 | 7,000.00 | 13,200.00 | 13,200.00 | 13,200.00 |
| Tree Removal/Replant | | | | | | | | | 4,000.00 | | |
| Farm Equipment Payments | | 7,091.46 | | | | 9,710.31 | 43,908.59 | | 37,559.98 | | |
| Car & Truck Payments | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 |
| Parts & Supplies (In-House Repairs) | 6,000.00 | 6,000.00 | 1,000.00 | 1,000.00 | 375.00 | 375.00 | 2,000.00 | 1,000.00 | 1,500.00 | 2,000.00 | 2,000.00 |
| Machine Hire | 1,100.00 | 1,100.00 | | | | | | | | | |
| Diesel & Fuel | 20,000.00 | 15,000.00 | 6,000.00 | 4,000.00 | 1,000.00 | 1,000.00 | 1,500.00 | 4,000.00 | 5,500.00 | 5,500.00 | 4,000.00 |
| Repairs & Maint (Outsourced Repairs) | 10,000.00 | 5,000.00 | 4,000.00 | 1,000.00 | 1,000.00 | | 500.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Farm Maintenance Building | | | | | | | | | | | |
| Road Maintenance | | | | | | | | | | | |
| Irrigation Repairs (Well, Outsourced etc.) | | | | | | | | | 10,000.00 | | |
| *Irrigation Parts / Materials* | 2,500.00 | *1,000.00* | *1,000.00* | | | | | | 1,500.00 | | 1,000.00 |
| Irrigation Utilities | 50,000.00 | 50,000.00 | 27,600.00 | 12,000.00 | 0.00 | 0.00 | 0.00 | 9,700.00 | 20,400.00 | 27,500.00 | 40,000.00 |
| Irrigation District Fees | | | | | | | | | | | |
| Water Coalition Permit Fees | | | *2,000.00* | | | | | | | | 2,000.00 |
| District Surface Water Purchases | | | | | | | | | | | 8,000.00 |
| Pollination | | | | | | | | 165,575.00 | | | |
| Fertilizer & Applications | 0.00 | 0.00 | 26,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14,967.38 | 61,419.99 | 25,940.00 | 51,880.00 |
| Soil Amend & Applications | | | | | | | | | | | |
| Herbicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28,840.00 | 0.00 | 28,840.00 | 0.00 | 0.00 |
| Hand Weeding | | | | | | | | | | | |
| Fungicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 51,880.00 | 0.00 | 0.00 | 0.00 |
| Pesticide Material & Applications | 25,740.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 95,020.00 | 59,820.00 | 0.00 |
| Pest Control Services | | | | | | | | | | | |
| Ant Control | | | | | | | | | | | |
| Rodent Control | | | | | | | | | | | |
| Winter Sanitation | | | | | | | | | | | |
| Cultivation Services / mowing | | | | | | | | | | | |
| Other Costs | | | | | | | | | | | |
| **Total Farming** | **250,959.00** | **223,872.96** | **136,809.00** | **33,799.00** | **15,174.00** | **31,084.31** | **257,122.59** | **99,346.38** | **302,438.97** | **150,259.00** | **138,379.00** |
| | | | | | | | | | | | |
| **Harvest** | | | | | | | | | | | |
| Harvest | | | | | | | | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Harvest Hauling | 0.00 | 19,455.00 | 19,455.00 | 19,455.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Harvest Hulling | 0.00 | 38,910.00 | 38,910.00 | 38,910.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Harvest** | **0.00** | **58,365.00** | **58,365.00** | **58,365.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** |
| **Total Cost of Goods** | **250,959.00** | **282,237.96** | **195,174.00** | **92,164.00** | **15,174.00** | **31,084.31** | **257,122.59** | **99,346.38** | **302,438.97** | **150,259.00** | **138,379.00** |
| **Annual Expense Increase** | | | | | | **932.53** | **7,713.68** | **2,980.39** | **9,073.71** | **4,507.77** | **4,151.37** |
| | | | | | | | | | | | |
| **GROSS PROFIT** | **149,041.00** | **655,777.74** | **304,826.00** | **-92,164.00** | **199,326.00** | **716,983.16** | **175,163.73** | **247,673.23** | **481,780.86** | **-114,766.77** | **187,135.63** |

**Operating Expenses**
**Administrative**

| | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounting | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Advertising / Marketing | | | | | | | | | | | |
| Permits, Fees, Licenses | | | | 500.00 | | | | 120.00 | | | 500.00 |
| Dues & Subscriptions | | | 1,000.00 | | | | | | | | |
| Office Supplies & Software | 500.00 | | | | | | | | 500.00 | | |
| DMV Fees | | | 500.00 | 500.00 | | | | | 446.00 | | |
| Bank Fees | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 55.00 | 15.00 | 20.00 | 20.00 | 20.00 | 20.00 |
| Non BK Professional Fees | | | | | | | | | | | |
| Consulting Fees CRO | 5,000.00 | 5,000.00 | 5,000.00 | 2,000.00 | 2,000.00 | 500.00 | 500.00 | 1,000.00 | 1,000.00 | 1,000.00 | 5,000.00 |
| Insurance Property Casualty | 0.00 | 7,589.90 | 6,000.00 | 5,250.00 | 0.00 | | 363.40 | 7,500.00 | | 0.00 | 7,395.35 |
| Insurance Workers Comp | 8,654.80 | 8,654.80 | 3,627.40 | 700.00 | 700.00 | 700.00 | 980.00 | 980.00 | 1,848.00 | 1,848.00 | 1,848.00 |
| Payroll Admin Office | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| Payroll Processing Fee | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| Payroll Tax Expense | 6,982.00 | 6,982.00 | 3,391.00 | 1,300.00 | 1,300.00 | 1,500.00 | 1,700.00 | 1,700.00 | 2,320.00 | 2,320.00 | 2,320.00 |
| Security | | | | | | | | | | | |
| Telephone / Internet | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 |
| Insurance Crop | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29,941.20 | 29,941.20 | 29,941.20 | 29,941.20 | 29,941.20 | 0.00 |
| *Lease / Loan / Protection Payments* | | | | | | | | | | | |
| Brewer | | | | | | 132,335.23 | | | | | |
| Brewer Improvemen | 109,060.94 | | | | | | | 109,060.94 | | | |
| Senky (MetLife) | | 145,749.64 | | | | | | | 144,976.44 | | |
| Baseline (MetLife) | | | | | | 80,258.13 | | | | | |
| Brawley | | | | | | 130,067.15 | | | | | |
| Brawley Improvements 1 | | | | | | 11,311.74 | | | | | |
| Brawley Improvemen | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Jameson | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 |
| Natomas | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 |
| Jameson (Tech Ag) | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| Yard Rental | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| Taxes | | | | | | | | | | | |
| *Property Taxes* | | | | | | | | | | | |
| Brewer | | | | | 11,560.67 | | | | 11,560.67 | | |
| Senky | | | | | 21,722.78 | | | | 21,722.78 | | |
| Baseline | | | | | 10,188.27 | | | | 10,188.27 | | |
| Brawley | | | | | 18,466.71 | | | | 18,466.71 | | |
| Jameson | | | | | 9,730.97 | | | | 9,730.97 | | |
| Natomas | | | | | 17,870.89 | | | | 17,870.89 | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Expense | 179,961.49 | 223,740.09 | 68,282.15 | 61,013.75 | 143,304.04 | 438,412.20 | 194,424.29 | 237,861.39 | 177,359.24 | 86,872.95 | 68,827.10 |
| Annual Expense Increase | | | | | | 13,152.37 | 5,832.73 | 7,135.84 | 5,320.78 | 2,606.19 | 2,064.81 |
| | | | | | | | | | | | |
| NET OPERATING INCOME | -30,920.49 | 432,037.65 | 236,543.85 | -153,177.75 | 56,021.96 | 265,418.59 | -25,093.29 | 2,676.00 | 299,100.84 | -204,245.91 | 116,243.72 |
| Est. Reserve Account Increase (Decrease) | -30,920.49 | 432,037.65 | 236,543.85 | -153,177.75 | 56,021.96 | 265,418.59 | -25,093.29 | 2,676.00 | 299,100.84 | -204,245.91 | 116,243.72 |
| Est. Pre Plan Payment Reserve Balance | 109,354.16 | 541,391.81 | 777,935.66 | 624,757.91 | 680,779.87 | 946,198.47 | 921,105.18 | 923,781.18 | 1,222,882.02 | 1,018,636.11 | 1,134,879.83 |
| Est. Monthly Debt Payment | 0.00 | 0.00 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 65,182.80 | 65,182.80 |
| Est. Balance of Reserve Account | 109,354.16 | 541,391.81 | 709,210.32 | 487,307.23 | 474,603.86 | 671,297.11 | 577,478.48 | 511,429.14 | 741,804.65 | 472,375.94 | 523,436.86 |

**PLAN DISTRIBUTIONS**

Secured Classes

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 3 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 5 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 6 | 0.00 | 0.00 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 |
| Class 7 | 0.00 | 0.00 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 |
| Class 8 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Paid on Secured Claims | 0.00 | 0.00 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 |
| Net Available for Unsecured Payments | 0.00 | 0.00 | 15,431.93 | 15,431.93 | 15,431.93 | 15,431.93 | 15,431.93 | 15,431.93 | 15,431.93 | 11,889.39 | 11,889.39 |

Principal Payments

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class 2 | | | | | | | | | | | |
| Class 5 | | | | | | | | | | | |
| Class 6 | | | | | | | | | | | |
| Class 7 | | | | | | | | | | | |
| Class 8 | | | | | | | | | | | |
| Total Principal Payments | | | | | | | | | | | |

Unsecured Priority

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Admintrative Claims | 0.00 | 0.00 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 |
| Priority Tax Claims | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 11 - Non-Tax Priority | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 12 - General Unsecured | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Chapter 12 Trustee Comp | 0.00 | 0.00 | 5,498.03 | 5,498.03 | 5,498.03 | 5,498.03 | 5,498.03 | 5,498.03 | 5,498.03 | 1,955.48 | 1,955.48 |
| TOTAL PLAN PAYMENTS (incl. Ch. 12 Ttee) | 0.00 | 0.00 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 68,725.34 | 65,182.80 | 65,182.80 |

Assumptions

| | | |
|---|---|---|
| PRODUCTION PRICE PER LB | | 2.25 |
| PRODUCTION LB PER ACRE | | |
| Brewer | | 2,000.00 |
| Senky | | 1,500.00 |
| Baseline | | 1,500.00 |
| Natomas | | 1,300.00 |

Exhibit B, Page 3 of 16

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brawley | | | | | 1,800.00 | | | | | | |
| Jameson | | | | | 1,000.00 | | | | | | |
| | | | | | | | | | | | |
| **TOTAL CROP PRODUCTION** | | | | | | | | | | | |
| Brewer | | | | | 630,000.00 | | | | | | |
| Senky | | | | | 357,000.00 | | | | | | |
| Baseline | | | | | 235,500.00 | | | | | | |
| Natomas | | | | | 205,400.00 | | | | | | |
| Brawley | | | | | 498,600.00 | | | | | | |
| Jameson | | | | | 152,000.00 | | | | | | |
| | | | | | | | | | | | |
| **CROP REVENUE** | | | | | | | | | | | |
| Brewer | | | | | 1,417,500.00 | | | | | | |
| Senky | | | | | 803,250.00 | | | | | | |
| Baseline | | | | | 529,875.00 | | | | | | |
| Natomas | | | | | 462,150.00 | | | | | | |
| Brawley | | | | | 1,121,850.00 | | | | | | |
| Jameson | | | | | 342,000.00 | | | | | | |
| TOTAL CROP REVENUE | | | | | 4,676,625.00 | | | | | | |
| | | | | | | | | | | | |
| EXPENSES ANNUAL % INCREASE | | | | | 3.00% | | | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING INCOME** | | | | | | | | | | | |
| Crop Sales and Crop Insurance | 329,666.00 | 0.00 | 0.00 | 0.00 | 0.00 | 200,000.00 | 638,250.00 | 638,250.00 | 638,250.00 | 638,250.00 | 638,250.00 |
| *FSA Grant Payments* | | | | | | | | 40,000.00 | | | 40,000.00 |
| *Custom Harvesting Work* | | | | | | 114,500.00 | | | | | |
| *Other/ Interest* | | | | | | | | | | | |
| Processor Advance | 450,000.00 | 500,000.00 | 550,000.00 | 550,000.00 | | | | | | | |
| **Total Gross Income** | **779,666.00** | **500,000.00** | **550,000.00** | **550,000.00** | **0.00** | **314,500.00** | **638,250.00** | **678,250.00** | **638,250.00** | **638,250.00** | **678,250.00** |
| **Cost of Goods Farming** | | | | | | | | | | | |
| Farm Management | | | | | | | | | | | |
| PCA & Analysis, Tech Lab | 7,200.00 | | | 7,200.00 | | | 7,200.00 | | | 7,200.00 | |
| Contractor Labor (Fresno) | 26,613.44 | 71,000.00 | 71,000.00 | 40,500.00 | 8,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 6,000.00 | 11,500.00 | 11,500.00 |
| Labor - General (Sacramento Valley) | 46,048.82 | 61,820.00 | 61,820.00 | 25,910.00 | 5,000.00 | 5,000.00 | 5,000.00 | 7,000.00 | 7,000.00 | 13,200.00 | 13,200.00 |
| Tree Removal/Replant | | | | | | | | | | 4,000.00 | |
| Farm Equipment Payments | | | 7,091.46 | | | | | | | | |
| Car & Truck Payments | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 |
| Parts & Supplies (In-House Repairs) | 7,500.00 | 6,000.00 | 6,000.00 | 1,000.00 | 1,000.00 | 375.00 | 375.00 | 2,000.00 | 1,000.00 | 1,500.00 | 2,000.00 |
| Machine Hire | | | | | | | | | | | |
| Diesel & Fuel | 10,000.00 | 20,000.00 | 15,000.00 | 6,000.00 | 4,000.00 | 1,000.00 | 1,000.00 | 1,500.00 | 4,000.00 | 5,500.00 | 5,500.00 |
| Repairs & Maint (Outsourced Repairs) | 10,000.00 | 10,000.00 | 5,000.00 | 4,000.00 | 1,000.00 | 1,000.00 | | 500.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Farm Maintenance Building | | | | | | | | | | | |
| Road Maintenance | | | | | | | | | | | |
| Irrigation Repairs (Well, Outsourced etc.) | | | | | | | | | | | |
| Irrigation Parts / Materials | 2,500.00 | 2,500.00 | *1,000.00* | *1,000.00* | | | | | | 1,500.00 | 28,000.00 |
| Irrigation Utilities | 50,000.00 | 50,000.00 | 50,000.00 | 27,600.00 | 12,000.00 | 0.00 | 0.00 | 0.00 | 9,700.00 | 20,400.00 | 27,500.00 |
| Irrigation District Fees | | | | | | | | | | | |
| Water Coalition Permit Fees | | | | *2,000.00* | | | | | | | |
| District Surface Water Purchases | | | | | | | | | | | |
| Pollination | | | | | | | | 165,575.00 | | | |
| Fertilizer & Applications | 0.00 | 0.00 | 0.00 | 26,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14,967.38 | 61,419.99 | 25,940.00 |
| Soil Amend & Applications | | | | | | | | | | | |
| Herbicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28,840.00 | 0.00 | 28,840.00 | 0.00 |
| Hand Weeding | | | | | | | | | | | |
| Fungicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 51,880.00 | 0.00 | 0.00 |
| Pesticide Material & Applications | 168,610.00 | 25,740.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 95,020.00 | 59,820.00 |
| Pest Control Services | | | | | | | | | | | |
| Ant Control | | | | | | | | | | | |
| Rodent Control | | | | | | | | | | | |
| Winter Sanitation | | | | | | | | | | | |
| Cultivation Services / mowing | | | | | | | | | | | |
| Other Costs | | | | | | | | | | | |
| **Total Farming** | **331,271.26** | **249,859.00** | **219,710.46** | **144,009.00** | **33,799.00** | **15,174.00** | **21,374.00** | **213,214.00** | **99,346.38** | **254,878.99** | **178,259.00** |
| **Harvest** | | | | | | | | | | | |
| Harvest | | | | | | | | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Harvest Hauling | 0.00 | 0.00 | 19,455.00 | 19,455.00 | 19,455.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Harvest Hulling | 0.00 | 0.00 | 38,910.00 | 38,910.00 | 38,910.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Harvest** | **0.00** | **0.00** | **58,365.00** | **58,365.00** | **58,365.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** |
| **Total Cost of Goods** | **331,271.26** | **249,859.00** | **278,075.46** | **202,374.00** | **92,164.00** | **15,174.00** | **21,374.00** | **213,214.00** | **99,346.38** | **254,878.99** | **178,259.00** |
| **Annual Expense Increase** | **9,938.14** | **7,495.77** | **8,342.26** | **6,071.22** | **2,764.92** | **455.22** | **660.46** | **6,588.31** | **3,069.80** | **7,875.76** | **5,508.20** |
| **GROSS PROFIT** | **438,456.60** | **242,645.23** | **263,582.28** | **341,554.78** | **-94,928.92** | **298,870.78** | **616,215.54** | **458,447.69** | **535,833.82** | **375,495.25** | **494,482.80** |

**Operating Expenses**
**Administrative**

| | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounting | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Advertising / Marketing | | | | | | | | | | | |
| Permits, Fees, Licenses | 500.00 | | | | 500.00 | | | 120.00 | | | |
| Dues & Subscriptions | | | | | 1,000.00 | | | | | | |
| Office Supplies & Software | | 500.00 | | | | | | | | 500.00 | |
| DMV Fees | | | | 500.00 | 500.00 | | | | | 446.00 | |
| Bank Fees | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 55.00 | 15.00 | 20.00 | 20.00 | 20.00 |
| Non BK Professional Fees | | | | | | | | | | | |
| Consulting Fees CRO | 1,000.00 | 1,000.00 | 5,000.00 | 3,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Insurance Property Casualty | 925.00 | 0.00 | 7,589.90 | 925.00 | 5,250.00 | 0.00 | | 363.40 | 7,500.00 | | 0.00 |
| Insurance Workers Comp | 6,446.83 | 8,654.80 | 8,654.80 | 3,627.40 | 700.00 | 700.00 | 700.00 | 980.00 | 980.00 | 1,848.00 | 1,848.00 |
| Payroll Admin Office | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| Payroll Processing Fee | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| Payroll Tax Expense | 5,604.88 | 7,182.00 | 7,182.00 | 3,591.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,700.00 | 1,700.00 | 2,320.00 | 2,320.00 |
| Security | | | | | | | | | | | |
| Telephone / Internet | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 |
| Insurance Crop | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29,941.20 | 29,941.20 | 29,941.20 | 29,941.20 | 29,941.20 |
| *Lease / Loan / Protection Payments* | | | | | | | | | | | |
| Brewer | 132,335.23 | | | | | | 133,628.38 | | | | |
| Brewer Improvemen | | 109,060.94 | | | | | | | 109,060.94 | | |
| Senky (MetLife) | | | 145,749.64 | | | | | | 144,976.44 | | |
| Baseline (MetLife) | 80,686.18 | | | | | | 80,258.13 | | | | |
| Brawley | 130,067.15 | | | | | | 130,067.15 | | | | |
| Brawley Improvemen | 11,311.74 | | | | | | 11,311.74 | | | | |
| Brawley Improvemen | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Jameson | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 |
| Natomas | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 |
| Jameson (Tech Ag) | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| Yard Rental | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| Taxes | | | | | | | | | | | |
| *Property Taxes* | | | | | | | | | | | |
| Brewer | | | | | | 11,560.67 | | | | 11,560.67 | |
| Senky | | | | | | 21,722.78 | | | | 21,722.78 | |
| Baseline | | | | | | 10,188.27 | | | | 10,188.27 | |
| Brawley | | | | | | 18,466.71 | | | | 18,466.71 | |
| Jameson | | | | | | 9,730.97 | | | | 9,730.97 | |
| Natomas | | | | | | 17,870.89 | | | | 17,870.89 | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Expense | 420,640.77 | 178,161.49 | 225,940.09 | 63,407.15 | 62,213.75 | 144,504.04 | 440,205.35 | 194,924.29 | 237,861.39 | 177,359.24 | 86,872.95 |
| Annual Expense Increase | 12,619.22 | 5,344.84 | 6,778.20 | 1,902.21 | 1,866.41 | 4,335.12 | 13,602.35 | 6,023.16 | 7,349.92 | 5,480.40 | 2,684.37 |
| | | | | | | | | | | | |
| NET OPERATING INCOME | 5,196.61 | 59,138.90 | 30,863.98 | 276,245.42 | -159,009.08 | 150,031.62 | 162,407.85 | 257,500.24 | 290,622.51 | 192,655.61 | 404,925.47 |
| Est. Reserve Account Increase (Decrease) | 5,196.61 | 59,138.90 | 30,863.98 | 276,245.42 | -159,009.08 | 150,031.62 | 162,407.85 | 257,500.24 | 290,622.51 | 192,655.61 | 404,925.47 |
| Est. Pre Plan Payment Reserve Balance | 1,140,076.44 | 1,199,215.34 | 1,230,079.32 | 1,506,324.74 | 1,347,315.65 | 1,497,347.27 | 1,659,755.12 | 1,917,255.36 | 2,207,877.87 | 2,400,533.48 | 2,805,458.95 |
| Est. Monthly Debt Payment | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 |
| Est. Balance of Reserve Account | 463,450.68 | 457,406.78 | 423,087.01 | 634,150.58 | 409,958.71 | 494,807.53 | 592,032.58 | 784,350.02 | 1,009,789.74 | 1,137,262.55 | 1,477,005.22 |

**PLAN DISTRIBUTIONS**

Secured Classes

| | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 3 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 5 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 6 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 |
| Class 7 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 |
| Class 8 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Paid on Secured Claims | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 |
| Net Available for Unsecured Payments | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 |

Principal Payments

Class 2
Class 5
Class 6
Class 7
Class 8

Total Principal Payments

Unsecured Priority

| | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adminitrative Claims | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 |
| Priority Tax Claims | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 11 - Non-Tax Priority | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Class 12 - General Unsecured | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Chapter 12 Trustee Comp | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 |
| **TOTAL PLAN PAYMENTS (incl. Ch. 12 Ttee)** | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 |

Assumptions

| | | |
|---|---|---|
| PRODUCTION PRICE PER LB | | 2.25 |
| PRODUCTION LB PER ACRE | | |
| Brewer | | 2,300.00 |
| Senky | | 2,000.00 |
| Baseline | | 1,800.00 |
| Natomas | | 1,600.00 |

Exhibit B, Page 7 of 16

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brawley | | | | | | 2,500.00 | | | | | |
| Jameson | | | | | | 1,800.00 | | | | | |
| | | | | | | | | | | | |
| **TOTAL CROP PRODUCTION** | | | | | | | | | | | |
| Brewer | | | | | | 724,500.00 | | | | | |
| Senky | | | | | | 476,000.00 | | | | | |
| Baseline | | | | | | 282,600.00 | | | | | |
| Natomas | | | | | | 252,800.00 | | | | | |
| Brawley | | | | | | 692,500.00 | | | | | |
| Jameson | | | | | | 273,600.00 | | | | | |
| | | | | | | | | | | | |
| **CROP REVENUE** | | | | | | | | | | | |
| Brewer | | | | | | 1,630,125.00 | | | | | |
| Senky | | | | | | 1,071,000.00 | | | | | |
| Baseline | | | | | | 635,850.00 | | | | | |
| Natomas | | | | | | 568,800.00 | | | | | |
| Brawley | | | | | | 1,558,125.00 | | | | | |
| Jameson | | | | | | 615,600.00 | | | | | |
| **TOTAL CROP REVENUE** | | | | | | 6,079,500.00 | | | | | |
| | | | | | | | | | | | |
| **EXPENSES ANNUAL % INCREASE** | | | | | | 3.00% | | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING INCOME** | | | | | | | | | | | |
| Crop Sales and Crop Insurance | 638,250.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 200,000.00 | 903,566.67 | 903,566.67 | 903,566.67 | 903,566.67 |
| *FSA Grant Payments* | | | | | | | | | 40,000.00 | | |
| *Custom Harvesting Work* | | | | | | | 114,500.00 | | | | |
| *Other/ Interest* | | | | | | | | | | | |
| Processor Advance | | | 400,000.00 | 300,000.00 | 200,000.00 | | | | | | |
| **Total Gross Income** | **638,250.00** | **0.00** | **400,000.00** | **300,000.00** | **200,000.00** | **0.00** | **314,500.00** | **903,566.67** | **943,566.67** | **903,566.67** | **903,566.67** |
| **Cost of Goods Farming** | | | | | | | | | | | |
| Farm Management | | | | | | | | | | | |
| PCA & Analysis, Tech Lab | | 7,200.00 | | | 7,200.00 | | | 7,200.00 | | | 7,200.00 |
| Contractor Labor (Fresno) | 11,500.00 | 26,613.44 | 71,000.00 | 71,000.00 | 40,500.00 | 8,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 6,000.00 | 11,500.00 |
| Labor - General (Sacramento Valley) | 13,200.00 | 46,048.82 | 61,820.00 | 61,820.00 | 25,910.00 | 5,000.00 | 5,000.00 | 5,000.00 | 7,000.00 | 7,000.00 | 13,200.00 |
| Tree Removal/Replant | | | | | | | | | | | 5,000.00 |
| Farm Equipment Payments | | | | 7,091.46 | | | | | | | |
| Car & Truck Payments | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 |
| Parts & Supplies (In-House Repairs) | 2,000.00 | 7,500.00 | 6,000.00 | 6,000.00 | 1,000.00 | 1,000.00 | 375.00 | 375.00 | 2,000.00 | 1,000.00 | 1,500.00 |
| Machine Hire | | | | | | | | | | | |
| Diesel & Fuel | 4,000.00 | 10,000.00 | 20,000.00 | 15,000.00 | 6,000.00 | 4,000.00 | 1,000.00 | 1,000.00 | 1,500.00 | 4,000.00 | 5,500.00 |
| Repairs & Maint (Outsourced Repairs) | 2,000.00 | 10,000.00 | 10,000.00 | 5,000.00 | 4,000.00 | 1,000.00 | 1,000.00 | | 500.00 | 2,000.00 | 2,000.00 |
| Farm Maintenance Building | | | | | | | | | | | |
| Road Maintenance | | | | | | | | | | | |
| Irrigation Repairs (Well, Outsourced etc.) | | | | | | | | | | | |
| Irrigation Parts / Materials | 1,000.00 | 2,500.00 | 2,500.00 | *1,000.00* | *1,000.00* | | | | | | 1,500.00 |
| Irrigation Utilities | 40,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 27,600.00 | 12,000.00 | 0.00 | 0.00 | 0.00 | 9,700.00 | 20,400.00 |
| Irrigation District Fees | | | | | | | | | | | |
| Water Coalition Permit Fees | 2,000.00 | | | | *2,000.00* | | | | | | |
| District Surface Water Purchases | 8,000.00 | | | | | | | | | | |
| Pollination | | | | | | | | | 165,575.00 | | |
| Fertilizer & Applications | 51,880.00 | 0.00 | 0.00 | 0.00 | 26,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,940.00 | 61,419.99 |
| Soil Amend & Applications | | | | | | | | | | | |
| Herbicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28,840.00 | 0.00 | 28,840.00 |
| Hand Weeding | | | | | | | | | | | |
| Fungicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 51,880.00 | 0.00 |
| Pesticide Material & Applications | 0.00 | 168,610.00 | 25,740.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 95,020.00 |
| Pest Control Services | | | | | | | | | | | |
| Ant Control | | | | | | | | | | | |
| Rodent Control | | | | | | | | | | | |
| Winter Sanitation | | | | | | | | | | | |
| Cultivation Services / mowing | | | | | | | | | | | |
| Other Costs | | | | | | | | | | | |
| **Total Farming** | **138,379.00** | **331,271.26** | **249,859.00** | **219,710.46** | **144,009.00** | **33,799.00** | **15,174.00** | **21,374.00** | **213,214.00** | **110,319.00** | **255,878.99** |
| **Harvest** | | | | | | | | | | | |
| Harvest | | | | | | | | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Harvest Hauling | 0.00 | 0.00 | 0.00 | 19,455.00 | 19,455.00 | 19,455.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Harvest Hulling | 0.00 | 0.00 | 0.00 | 38,910.00 | 38,910.00 | 38,910.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Harvest** | **0.00** | **0.00** | **0.00** | **58,365.00** | **58,365.00** | **58,365.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** |
| **Total Cost of Goods** | **138,379.00** | **331,271.26** | **249,859.00** | **278,075.46** | **202,374.00** | **92,164.00** | **15,174.00** | **21,374.00** | **213,214.00** | **110,319.00** | **255,878.99** |
| **Annual Expense Increase** | 4,275.91 | 10,236.28 | 7,720.64 | 8,592.53 | 6,253.36 | 2,847.87 | 468.88 | 680.27 | 6,785.96 | 3,511.12 | 8,143.86 |
| | | | | | | | | | | | |
| **GROSS PROFIT** | **495,595.09** | **-341,507.54** | **142,420.36** | **13,332.01** | **-8,627.36** | **-95,011.87** | **298,857.12** | **881,512.40** | **723,566.70** | **789,736.54** | **639,543.82** |

**Operating Expenses**
**Administrative**

| | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounting | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Advertising / Marketing | | | | | | | | | | | |
| Permits, Fees, Licenses | 500.00 | 500.00 | | | | 500.00 | | | 120.00 | | |
| Dues & Subscriptions | | | | | | | 1,000.00 | | | | |
| Office Supplies & Software | | | 500.00 | | | | | | | | 500.00 |
| DMV Fees | | | | | 500.00 | 500.00 | | | | | 446.00 |
| Bank Fees | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 | 55.00 | 15.00 | 20.00 | 20.00 |
| Non BK Professional Fees | | | | | | | | | | | |
| Consulting Fees CRO | 5,000.00 | 1,000.00 | 1,000.00 | 5,000.00 | 3,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Insurance Property Casualty | 7,395.35 | 925.00 | 0.00 | 7,589.90 | 925.00 | 5,250.00 | 0.00 | | 363.40 | 7,500.00 | |
| Insurance Workers Comp | 1,848.00 | 6,446.83 | 8,654.80 | 8,654.80 | 3,627.40 | 700.00 | 700.00 | 700.00 | 980.00 | 980.00 | 1,848.00 |
| Payroll Admin Office | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| Payroll Processing Fee | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| Payroll Tax Expense | 2,320.00 | 5,604.88 | 7,182.00 | 7,182.00 | 3,591.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,700.00 | 1,700.00 | 2,320.00 |
| Security | | | | | | | | | | | |
| Telephone / Internet | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 |
| Insurance Crop | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29,941.20 | 29,941.20 | 29,941.20 | 29,941.20 |
| *Lease / Loan / Protection Payments* | | | | | | | | | | | |
| Brewer | | 130,608.38 | | | | | | 134,934.46 | | | |
| Brewer Improvemen | | | 109,060.94 | | | | | | 109,060.94 | | |
| Senky (MetLife) | | | | 145,749.64 | | | | | | 144,976.44 | |
| Baseline (MetLife) | | 80,686.18 | | | | | | 80,258.13 | | | |
| Brawley | | 130,067.15 | | | | | | 130,067.15 | | | |
| Brawley Improvemen | | 11,311.74 | | | | | | 11,311.74 | | | |
| Brawley Improvemen | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Jameson | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 |
| Natomas | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 |
| Jameson (Tech Ag) | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| Yard Rental | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| Taxes | | | | | | | | | | | |
| *Property Taxes* | | | | | | | | | | | |
| Brewer | | | | | | | 11,560.67 | | | | 11,560.67 |
| Senky | | | | | | | 21,722.78 | | | | 21,722.78 |
| Baseline | | | | | | | 10,188.27 | | | | 10,188.27 |
| Brawley | | | | | | | 18,466.71 | | | | 18,466.71 |
| Jameson | | | | | | | 9,730.97 | | | | 9,730.97 |
| Natomas | | | | | | | 17,870.89 | | | | 17,870.89 |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Expense | 68,827.10 | 418,913.92 | 178,161.49 | 225,940.09 | 63,407.15 | 62,213.75 | 144,504.04 | 441,511.43 | 194,924.29 | 237,861.39 | 177,359.24 |
| Annual Expense Increase | 2,126.76 | 12,944.44 | 5,505.19 | 6,981.55 | 1,959.28 | 1,922.40 | 4,465.17 | 14,051.98 | 6,203.86 | 7,570.41 | 5,644.81 |
| | | | | | | | | | | | |
| NET OPERATING INCOME | 424,641.23 | -773,365.90 | -41,246.32 | -219,589.63 | -73,993.79 | -159,148.02 | 149,887.91 | 425,948.98 | 522,438.56 | 544,304.74 | 456,539.76 |
| Est. Reserve Account Increase (Decrease) | 424,641.23 | -773,365.90 | -41,246.32 | -219,589.63 | -73,993.79 | -159,148.02 | 149,887.91 | 425,948.98 | 522,438.56 | 544,304.74 | 456,539.76 |
| Est. Pre Plan Payment Reserve Balance | 3,230,100.18 | 2,456,734.28 | 2,415,487.96 | 2,195,898.33 | 2,121,904.54 | 1,962,756.52 | 2,112,644.43 | 2,538,593.41 | 3,061,031.97 | 3,605,336.71 | 4,061,876.47 |
| Est. Monthly Debt Payment | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 |
| Est. Balance of Reserve Account | 1,836,463.66 | 997,914.97 | 891,485.80 | 606,713.42 | 467,536.84 | 243,206.02 | 327,911.13 | 688,677.32 | 1,145,933.08 | 1,625,055.02 | 2,016,411.99 |

**PLAN DISTRIBUTIONS**

| | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Secured Classes | | | | | | | | | | | |
|   Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|   Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|   Class 3 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|   Class 5 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|   Class 6 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 |
|   Class 7 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 |
|   Class 8 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|   Total Paid on Secured Claims | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 |
| Net Available for Unsecured Payments | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 |
|   Principal Payments | | | | | | | | | | | |
|     Class 2 | | | | | | | | | | | |
|     Class 5 | | | | | | | | | | | |
|     Class 6 | | | | | | | | | | | |
|     Class 7 | | | | | | | | | | | |
|     Class 8 | | | | | | | | | | | |
|   Total Principal Payments | | | | | | | | | | | |
| | | | | | | | | | | | |
| Unsecured Priority | | | | | | | | | | | |
|   Admnitrative Claims | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 1,982.87 |
|   Priority Tax Claims | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,951.03 |
|   Class 11 - Non-Tax Priority | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|   Class 12 - General Unsecured | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|   Chapter 12 Trustee Comp | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 |
| TOTAL PLAN PAYMENTS (incl. Ch. 12 Ttee) | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 |

Assumptions

| | | |
|---|---|---|
| PRODUCTION PRICE PER LB | | 2.25 |
| PRODUCTION LB PER ACRE | | |
|   Brewer | | 2,300.00 |
|   Senky | | 2,300.00 |
|   Baseline | | 2,000.00 |
|   Natomas | | 2,000.00 |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 | Feb-28 | Mar-28 | Apr-28 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brawley | | | | | | | 2,500.00 | | | | |
| Jameson | | | | | | | 2,000.00 | | | | |
| **TOTAL CROP PRODUCTION** | | | | | | | | | | | |
| Brewer | | | | | | | 724,500.00 | | | | |
| Senky | | | | | | | 547,400.00 | | | | |
| Baseline | | | | | | | 314,000.00 | | | | |
| Natomas | | | | | | | 316,000.00 | | | | |
| Brawley | | | | | | | 692,500.00 | | | | |
| Jameson | | | | | | | 304,000.00 | | | | |
| **CROP REVENUE** | | | | | | | | | | | |
| Brewer | | | | | | | 1,630,125.00 | | | | |
| Senky | | | | | | | 1,231,650.00 | | | | |
| Baseline | | | | | | | 706,500.00 | | | | |
| Natomas | | | | | | | 711,000.00 | | | | |
| Brawley | | | | | | | 1,558,125.00 | | | | |
| Jameson | | | | | | | 684,000.00 | | | | |
| **TOTAL CROP REVENUE** | | | | | | | 6,521,400.00 | | | | |
| **EXPENSES ANNUAL % INCREASE** | | | | | | | 3.00% | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 |
|---|---|---|---|---|---|
| **OPERATING INCOME** | | | | | |
| Crop Sales and Crop Insurance | 903,566.67 | 903,566.67 | 0.00 | 0.00 | 0.00 |
| *FSA Grant Payments* | 40,000.00 | | | | |
| *Custom Harvesting Work* | | | | | |
| *Other/ Interest* | | | | | |
| Processor Advance | | | | 250,000.00 | 250,000.00 |
| **Total Gross Income** | **943,566.67** | **903,566.67** | **0.00** | **250,000.00** | **250,000.00** |
| | | | | | |
| **Cost of Goods Farming** | | | | | |
| Farm Management | | | | | |
| PCA & Analysis, Tech Lab | | | 7,200.00 | | |
| Contractor Labor (Fresno) | 11,500.00 | 11,500.00 | 26,613.44 | 71,000.00 | 71,000.00 |
| Labor - General (Sacramento Valley) | 13,200.00 | 13,200.00 | 46,048.82 | 61,820.00 | 61,820.00 |
| Tree Removal/Replant | | | | | |
| Farm Equipment Payments | | | | | |
| Car & Truck Payments | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 | 2,799.00 |
| Parts & Supplies (In-House Repairs) | 2,000.00 | 2,000.00 | 7,500.00 | 6,000.00 | 6,000.00 |
| Machine Hire | | | | | |
| Diesel & Fuel | 5,500.00 | 4,000.00 | 10,000.00 | 20,000.00 | 15,000.00 |
| Repairs & Maint (Outsourced Repairs) | 2,000.00 | 2,000.00 | 10,000.00 | 10,000.00 | 5,000.00 |
| Farm Maintenance Building | | | | | |
| Road Maintenance | | | | | |
| Irrigation Repairs (Well, Outsourced etc.) | | | | | |
| Irrigation Parts / Materials | | 1,000.00 | 2,500.00 | 2,500.00 | *1,000.00* |
| Irrigation Utilities | 27,500.00 | 40,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |
| Irrigation District Fees | | | | | |
| Water Coalition Permit Fees | | 2,000.00 | | | |
| District Surface Water Purchases | | 8,000.00 | | | |
| Pollination | | | | | |
| Fertilizer & Applications | 25,940.00 | 51,880.00 | 0.00 | 0.00 | 0.00 |
| Soil Amend & Applications | | | | | |
| Herbicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Hand Weeding | | | | | |
| Fungicide Material & Applications | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Pesticide Material & Applications | 59,820.00 | 0.00 | 168,610.00 | 25,740.00 | 0.00 |
| Pest Control Services | | | | | |
| Ant Control | | | | | |
| Rodent Control | | | | | |
| Winter Sanitation | | | | | |
| Cultivation Services / mowing | | | | | |
| Other Costs | | | | | |
| **Total Farming** | **150,259.00** | **138,379.00** | **331,271.26** | **249,859.00** | **212,619.00** |
| | | | | | |
| **Harvest** | | | | | |
| Harvest | | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 |
|---|---|---|---|---|---|---|
| | Harvest Hauling | 0.00 | 0.00 | 0.00 | 0.00 | 19,455.00 |
| | Harvest Hulling | 0.00 | 0.00 | 0.00 | 0.00 | 38,910.00 |
| **Total Harvest** | | **0.00** | **0.00** | **0.00** | **0.00** | **58,365.00** |
| **Total Cost of Goods** | | 150,259.00 | 138,379.00 | 331,271.26 | 249,859.00 | 270,984.00 |
| **Annual Expense Increase** | | 4,782.29 | 4,404.19 | 10,543.37 | 7,952.26 | 8,624.61 |
| | | | | | | |
| **GROSS PROFIT** | | 788,525.37 | 760,783.48 | -341,814.63 | -7,811.26 | -29,608.61 |
| | | | | | | |
| **Operating Expenses** | | | | | | |
| **Administrative** | | | | | | |
| | Accounting | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| | Advertising / Marketing | | | | | |
| | Permits, Fees, Licenses | | 500.00 | 500.00 | | |
| | Dues & Subscriptions | | | | | |
| | Office Supplies & Software | | | | 500.00 | |
| | DMV Fees | | | | | |
| | Bank Fees | 20.00 | 20.00 | 20.00 | 20.00 | 20.00 |
| | Non BK Professional Fees | | | | | |
| | Consulting Fees CRO | 1,000.00 | 5,000.00 | 1,000.00 | 1,000.00 | 5,000.00 |
| | Insurance Property Casualty | 0.00 | 7,395.35 | 925.00 | 0.00 | 7,589.90 |
| | Insurance Workers Comp | 1,848.00 | 1,848.00 | 6,446.83 | 8,654.80 | 8,654.80 |
| | Payroll Admin Office | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| | Payroll Processing Fee | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| | Payroll Tax Expense | 2,320.00 | 2,320.00 | 5,604.88 | 7,182.00 | 7,182.00 |
| | Security | | | | | |
| | Telephone / Internet | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 |
| | Insurance Crop | 29,941.20 | 0.00 | 0.00 | 0.00 | 0.00 |
| *Lease / Loan / Protection Payments* | | | | | | |
| | Brewer | | | 131,914.46 | | |
| | Brewer Improvemen | | | | 109,060.94 | |
| | Senky (MetLife) | | | | | 145,749.64 |
| | Baseline (MetLife) | | | 80,686.18 | | |
| | Brawley | | | 130,067.15 | | |
| | Brawley Improvemen | | | 11,311.74 | | |
| | Brawley Improvemen | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| | Jameson | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 | 7,493.75 |
| | Natomas | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 |
| | Jameson (Tech Ag) | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| | Yard Rental | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| | Taxes | | | | | |
| *Property Taxes* | | | | | | |
| | Brewer | | | | | |
| | Senky | | | | | |
| | Baseline | | | | | |
| | Brawley | | | | | |
| | Jameson | | | | | |
| | Natomas | | | | | |

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 |
|---|---|---|---|---|---|
| Total Expense | 86,872.95 | 68,827.10 | 420,220.00 | 178,161.49 | 225,940.09 |
| Annual Expense Increase | 2,764.91 | 2,190.56 | 13,374.34 | 5,670.35 | 7,191.00 |
| | | | | | |
| NET OPERATING INCOME | 698,887.52 | 689,765.82 | -775,408.97 | -191,643.10 | -262,739.69 |
| Est. Reserve Account Increase (Decrease) | 698,887.52 | 689,765.82 | -775,408.97 | -191,643.10 | -262,739.69 |
| Est. Pre Plan Payment Reserve Balance | 4,760,763.99 | 5,450,529.81 | 4,675,120.84 | 4,483,477.74 | 4,220,738.05 |
| Est. Monthly Debt Payment | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 |
| Est. Balance of Reserve Account | 2,650,116.71 | 3,274,699.73 | 2,434,107.97 | 2,177,282.07 | 1,849,359.58 |

**PLAN DISTRIBUTIONS**

| | | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 |
|---|---|---|---|---|---|---|
| Secured Classes | | | | | | |
| | Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Class 2 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Class 3 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Class 5 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Class 6 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 | 11,919.33 |
| | Class 7 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 | 41,374.08 |
| | Class 8 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Paid on Secured Claims | | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 | 53,293.41 |
| Net Available for Unsecured Payments | | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 | 11,889.39 |
| Principal Payments | | | | | | |
| | Class 2 | | | | | |
| | Class 5 | | | | | |
| | Class 6 | | | | | |
| | Class 7 | | | | | |
| | Class 8 | | | | | |
| Total Principal Payments | | | | | | |
| | | | | | | |
| Unsecured Priority | | | | | | |
| | Adminitrative Claims | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Priority Tax Claims | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 | 9,933.90 |
| | Class 11 - Non-Tax Priority | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Class 12 - General Unsecured | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Chapter 12 Trustee Comp | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 | 1,955.48 |
| TOTAL PLAN PAYMENTS (incl. Ch. 12 Ttee) | | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 | 65,182.80 |

Assumptions

PRODUCTION PRICE PER LB
PRODUCTION LB PER ACRE
    Brewer
    Senky
    Baseline
    Natomas

**Capital Farms Inc.**
**Projected Budget for Plan Payments**

| | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 |
|---|---|---|---|---|---|
| Brawley | | | | | |
| Jameson | | | | | |
| | | | | | |
| TOTAL CROP PRODUCTION | | | | | |
| Brewer | | | | | |
| Senky | | | | | |
| Baseline | | | | | |
| Natomas | | | | | |
| Brawley | | | | | |
| Jameson | | | | | |
| | | | | | |
| CROP REVENUE | | | | | |
| Brewer | | | | | |
| Senky | | | | | |
| Baseline | | | | | |
| Natomas | | | | | |
| Brawley | | | | | |
| Jameson | | | | | |
| TOTAL CROP REVENUE | | | | | |
| | | | | | |
| EXPENSES ANNUAL % INCREASE | | | | | |

EXHIBIT 4

**Fill in this information to identify the case:**

Debtor 1　CAPITAL FARMS, INC.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:　Eastern District of California

Case number　25-10074-A-12

Official Form 410

# Proof of Claim

12/24

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Rabo AgriFinance LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☐ No
☑ Yes.　From whom?　Rabobank, N.A.

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Rabo AgriFinance LLC c/o Brad Bakker
Name

14767 N. Outer 40 Rd., Ste. 400
Number　Street

Chesterfield　　　MO　　　63017
City　　　　State　　　ZIP Code

Contact phone　636-746-1482

Contact email　Brad.Bakker@RaboAg.com

Where should payments to the creditor be sent? (if different)

Rabo AgriFinance LLC
Name

P.O. Box 790077
Number　Street

St Louis　　　MO　　　63179
City　　　　State　　　ZIP Code

Contact phone　855-722-7766

Contact email　CustomerConnect@RaboAg.com

Uniform claim identifier (if you use one): _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.　Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.　Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  8  4  4  2

**7. How much is the claim?**

$ Not less than $1,210,404.27
See attachment.

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money loaned

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☑ Other. Describe:  Personal Property

**Basis for perfection:**  Deed of Trust, UCC-1 and Financing Statements

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $  TBD

**Amount of the claim that is secured:**  $  1,210,404.27

**Amount of the claim that is unsecured:**  $  0.00  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ _____

**Annual Interest Rate** (when case was filed)  7.55 %

☐ Fixed

☑ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   19/03/2025
                 MM / DD / YYYY

Signed by:
*Ryan Popwell*
155FC3FF6D70425...
Signature

Print the name of the person who is completing and signing this claim:

| Name | R. | Ryan | Popwell |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    VP-SR Financial Restructuring Manager

Company    Rabo AgriFinance LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    14767 N. Outer 40 Rd., Ste. 400
            Number      Street

| Chesterfield | MO | 63017 |
|---|---|---|
| City | State | ZIP Code |

Contact phone    229-551-4005        Email   Ryan.Popwell@RaboAg.com

## ATTACHMENT TO PROOF OF CLAIM
### (Official Form 410, Item 7)

7.    Explanation of Amount Due and Interest Calculation

The total amount claimed in Item 7 of the Proof of Claim, as of January 10, 2025, consists of the principal balance, accrued interest, and any additional allowable charges as follows:

| | |
|---|---|
| Principal Balance | $ 910,000.000 |
| Legal Fees | $ 2,006.27 |
| Maintenance of Assets | $ 126,767.20 |
| Interest on Principal | $ 73,840.21 |
| Interest on Legal Fees | $ 91.77 |
| Interest in Maintenance of Assets | $ 4,424.34 |
| Default Interest | $ 64,205.56 |
| Late Charges | $ 29,068.92 |

**Total Amount Due:**   $ 1,210,404.27

### List of Exhibits
The following documents are attached as exhibits to substantiate the claim:
- Exhibit A: Payoff Statement as of 01/10/2025
- Exhibit B: Master Credit Agreement
- Exhibit C: Facility Sheet – Term Loan 2
- Exhibit D: Placer Deed of Trust
- Exhibit E: Placer Real Property UCC

### Reservation of Rights
The Claimant hereby expressly reserves all rights, claims, causes of action, defenses, and remedies, whether in law or in equity, including without limitation the right to amend, modify, supplement, restate, or withdraw this Proof of Claim, in whole or in part, at any time and from time to time, for any reason or purpose; the right to file additional proofs of claim for additional claims that may arise based on the Claimant's rights and obligations arising from or related to the matters described herein; the right to assert all available defenses, counterclaims, rights of setoff or recoupment, and other rights under applicable law against the Debtor or any other party; the right to seek administrative expense priority for any portion of the Claim; the right to seek relief from any automatic stay in effect in this bankruptcy case; the right to assert the inapplicability of any statute of limitations or other time-based defense to the Claim; and the right to dispute the Debtor's characterization or treatment of the Claim in any plan of reorganization or liquidation. The filing of this Proof of Claim is not intended to be and shall not be construed as a waiver or release of the Claimant's rights against any person, entity, or property, including any guarantor or co-obligor; a waiver of the Claimant's right to trial by jury in any proceeding involving the Claim or any related matter; a waiver of the Claimant's right to have final orders in non-core matters entered only after de novo review by a District Court judge; or an election of remedies or waiver of any other rights or remedies of the Claimant. This Reservation of Rights and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of California, without giving effect to any choice of law or conflict of law rules or provisions.

3679780v1 / 22061.0195

Exhibit A

Payoff Statement as of 01/10/2025



**Rabo AgriFinance**

A member of the Rabobank Group
PO Box 411995 - Saint Louis - MO - 63141
Telephone (314) 317 8000 - Facsimile (877) 655 9514
www.RaboAg.com

03/10/2025

CAPITAL FARMS, INC.
C/O Ryan Popwell

Obligation No. 26586001 - CAPITAL FARMS, INC. 18442

Dear Client:

The following statement is the estimated amount required to repay the above loan as of 01/10/2025. Please note that interest accrues until funds are received in our National Servicing Center.

| | | |
|---|---|---|
| Principal Balance | as of 01/10/2025 | 910,000.00 USD |
| Legal Fees | to 01/10/2025 | 2,006.27 USD |
| Maintenance of Assets | | 126,767.20 USD |
| Interest on Principal | | 73,840.21 USD |
| Interest on Legal Fees | | 91.77 USD |
| Interest in Maintenance of Assets | | 4,424.34 USD |
| Default Interest | | 64,205.56 USD |
| Late Charges | | 29,068.92 USD |
| Total Due | | 1,210,404.27 USD |

These repayment figures will not be valid after 01/10/2025. This loan is tied to a monthly rate change.

The documents will be available for delivery following receipt of certified funds. There will be a delay in forwarding documents for other than certified funds.

Questions regarding the repayment of your loan should be directed to Customer Connect toll free at (855) 722-7766 or at CustomerConnect@RaboAg.com.

Please return your payment with a copy of this letter. To ensure timely delivery of funds, we suggest wired funds. Please contact your Relationship Manager, listed above for instructions. Checks should be mailed to Rabo AgriFinance, PO Box 790077, St Louis, MO 63179-0077.

Sincerely,

Rabo AgriFinance
National Servicing Center

***IMPORTANT***

These figures may be estimates and are subject to reconciliation and/or final verification upon actual receipt of funds by the Note Holder. Note Holder reserves the right to adjust these figures and (a) negotiate funds as received and request additional funds, (b) refund excess funds remitted or (c) refuse funds as appropriate to the circumstances thereof. These circumstances may be, but are not limited to, reconciliation of estimates used to prepare this statement, an error in the calculation of the payment amount, previously dishonored remittances or additional disbursements made by this Note Holder between the date of this statement and the actual receipt of funds.

Exhibit B

Mater Credit Agreement

## MASTER CREDIT AGREEMENT

This Master Credit Agreement (referred to herein as this "Agreement" or the "MCA") is dated as of May 19, 2023 between CAPITAL FARMS, INC., a California corporation ("Capital Farms, Inc."); SUTTER ENTERPRISES, LLC, a California limited liability company ("Sutter Enterprises, LLC"); SUTTER LAND LLC, a California limited liability company ("Sutter Land LLC"); and UNITED FARM LLC, a California limited liability company ("United Farm LLC") (Capital Farms, Inc.; Sutter Enterprises, LLC; Sutter Land LLC; and United Farm LLC are herein individually and collectively, "Party") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender").

This Master Credit Agreement is an amendment and restatement of the terms and conditions of Lender's loan or credit facility as evidenced by the Credit Agreements dated March 24, 2014, June 17, 2016, May 30, 2020, and August 20, 2021 as amended to the date hereof (the "Existing Loan"). This Credit Agreement does not release or extinguish the Indebtedness, liabilities and Obligations of the Borrower under the Existing Loan(s). All Liens and security interests in any real or personal property granted to or for the benefit of Lender for purposes of securing the Existing Loan(s) also secure the Obligations; and Borrower reaffirms the terms and provisions of any mortgage, deed of trust, security agreement or other instrument or agreement under which any such Lien or security interest has been granted to Lender. BORROWER RELEASES LENDER, AND LENDER'S SUBSIDIARIES, AFFILIATES, OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, SERVANTS, ATTORNEYS, AND REPRESENTATIVES (COLLECTIVELY, THE "RELEASED LENDER PARTIES") FROM ANY AND ALL LOSSES, DEFENSES, OR OFFSETS WHICH BORROWER EVER HAD, OR NOW HAS AGAINST THE RELEASED LENDER PARTIES, JOINTLY OR SEVERALLY, FOR OR BY REASON OF ANY MATTER, CAUSE, OR THING WHATSOEVER, WHICH RELATES TO, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY TO THE EXISTING LOAN(S).

## ARTICLE 1 - THE FACILITY SHEETS

1.01      **Facility Sheets.** Lender has agreed, subject to the terms of this Agreement, to make one or more credit facility(ies) available to Party under the terms and conditions of one or more Facility Sheet(s), which are incorporated herein. Lender may in the future and at its sole option make additional credit facilities available to Party which by their terms will be governed by this Agreement and a separate Facility Sheet(s). Upon and in the event Lender enters into any Facility Sheet with any Party that specifically references this MCA, the term "Agreement" as used in the Facility Sheet or any exhibit or schedule in connection therewith, shall be deemed to include this MCA as well as such Facility Sheet.

## ARTICLE 2 – SCHEDULE OF DEFINITIONS AND COVENANTS

2.01      **Schedule of Definitions and Covenants.** This Agreement is also entered with reference to a Schedule of Definitions and Covenants. Party hereby acknowledges Party has received and reviewed the Schedule of Definitions marked as Exhibit A via paper copy, electronic copy, electronic mail, or by accessing the Schedule of Definitions with the version number that matches the version number shown in the footer of this Agreement at https://www.raboag.com/about-us/scheduledefinitions-167. Lender and Party agree the Schedule of Definitions is hereby incorporated by reference. The Applicable Obligor Covenants Schedule is attached hereto and incorporated herein by reference as Exhibit B. Party agrees to the Schedule of Definitions and Covenants and the Applicable Obligor Covenants Schedule. Capitalized terms contained in this Agreement are used as defined in the Schedule of Definitions and Covenants. Some of or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Agreement, the Applicable Obligor Covenants Schedule and the Facility Sheet(s). To the extent any term is defined in the Schedule of Definitions and Covenants but is not used in this Agreement, the Applicable Obligor Covenants Schedule, any Facility Sheet, or any amendment, modification or supplement to this Agreement, such term shall be deemed to be disregarded, of no meaning and without any effect. Except as otherwise defined in this Agreement or in the Schedule of Definitions and Covenants, or unless the context otherwise requires, each term that is used in this Agreement which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC. If a term is defined in an Applicable Obligor Covenants Schedule, Facility Sheet, Schedule of Covenants, or Other Schedule differently than in the Schedule of Definitions and Covenants, then the definition in each such Facility Sheet, Schedule of Covenants, or Other Schedule will control for the purposes of that schedule and that schedule only.

## ARTICLE 3 - COVENANTS UNDER THE FACILITY SHEETS

3.01      **Computation of Interest.** All computations of accrued interest under all Loan Documents other than interest at the Maximum Rate, and all fees under all Loan Documents, will be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed. Except as set forth in a Facility Sheet, there is no limit on the amount that an Interest Rate subject to Adjustment by Lender may increase at any one time, or in the aggregate. Lender's determination of an Interest Rate will be conclusive, absent manifest error.

3.02      **Adjustment of Long Term Adjustable Rate.** Lender shall notify Party of any Adjustment of a Long Term Adjustable Rate not less than 30 days before the Long Term Adjustable Rate Adjustment Date. At any time prior to that Long Term Adjustable Rate Adjustment Date, Party may deliver a Notice of Election to Prepay. If Lender receives an Election to Prepay, the entire amount of the principal Indebtedness accruing interest at the Long Term Adjustable Rate shall be Prepaid without Prepayment Fee on or before that date which is 90 days after the Long Term Adjustable Rate Adjustment Date. If Lender does not receive a Notice of Election to Prepay, then Party may, but is not obligated to Prepay all or any part of the principal Indebtedness accruing interest at the Long Term Adjustable Rate without Prepayment Fee, on or before the Long Term Adjustable Rate Adjustment Date.

3.03      **Late Fee.** At Lender's option in each instance, to the extent permitted by Applicable Law, Party shall pay on demand a late fee in the amount of 5.000% of the amount of any scheduled payment due prior to the Maturity Date, which is not paid in full when due. The imposition and payment of a late fee will not constitute a waiver of Lender's rights with respect to an Event of Default as a result of that late payment.

3.04      **Default Rate.** Upon the occurrence of an Event of Default, the principal balance of Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Default Rate, subject to the provisions of the Schedule of Definitions and Covenants, the Applicable Obligor Covenants Schedule and the applicable Facility Sheet. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

3.05      **Maximum Rate.** Notwithstanding any provision of this Agreement to the contrary, (a) no interest will be due on any amount due under this Agreement if, under Applicable Law, Lender is not permitted to charge interest on that amount, and (b) in all other cases interest due under this Agreement will be calculated at a rate not to exceed the Maximum Rate. If Party is requested by Lender to pay interest on any amount due under this Agreement at a rate greater than the Maximum Rate, the amount of interest due on that amount will be deemed the Maximum Rate and all payments in excess of the Maximum Rate will be deemed to have been Prepayments without Prepayment Fee or penalty, and not interest. All amounts other than interest which are paid or agreed to be paid to Lender for the use, forbearance, or detention of Party's indebtedness to Lender under this Agreement shall, to the extent permitted by Applicable Law, be amortized over the full stated term of the Indebtedness, so that the rate of interest on account of that Indebtedness does not exceed the Maximum Rate for so long as the Indebtedness is outstanding.

3.06     **Method and Application of Payments.** All payments of principal, interest, and other amounts to be made under any Loan Documents shall be made to Lender in U.S. dollars and in immediately available funds, without set-off, deduction, or counterclaim, not later than 2:00 pm (St. Louis, Missouri time) on the Payment Date or the Interest Payment Date, as applicable, (any such payment made after that time on the Payment Date or Interest Payment Date, as applicable, will be deemed to have been made on the next succeeding Business Day). All payments received by Lender (including, to the extent permitted by Applicable Law, all proceeds received from the sale or other liquidation of the Collateral) will be applied to the Obligations in any order determined by Lender. The early or late date of making a regularly scheduled payment will be disregarded for purposes of allocating the payment between principal and interest. For this purpose, the payment will be treated as though made on the date due. In any legal action or proceeding, the entries made by Lender in an account or accounts maintained by Lender or Banking Counterparty or any of their Affiliates in accordance with its usual practice and evidencing the Obligations, will be prima facie evidence of the existence and amounts of those Obligations.

3.07     **Prepayments Generally.** The Prepayment of principal on any Loan shall be subject to the Prepayment Options that are set forth in the Facility Sheet applicable to such Loan. Lender may refuse to accept any Prepayment not expressly permitted in the Loan Documents. If a Prepayment is conditioned upon a Notice of Election to Prepay or other prior notice to Lender, at the option of Lender, (a) that Notice of Election to Prepay or notice will be irrevocable; (b) Prepayment will be due in the amount and on the date specified in that Notice of Election to Prepay or notice; and (c) that Notice of Election to Prepay or notice will not affect Parties obligation to make all other payments required under the Loan Documents on the date when due. If Lender receives any Prepayment which it is permitted to refuse, Lender may accept Prepayment; except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due whichever is earlier. Each Prepayment of a portion of a Loan will be applied to the most remote payment of the principal due under a Facility Sheet for which such Prepayment is designated and as may be permitted under such Facility Sheet.

3.08     **Reporting Requirements.** Lender may, from time to time, ask for various reporting and other such documentation from each Party to the Agreement regarding the operations, business, corporate affairs and financial condition, including without limitation financial, tax, and other corporate records reporting. Said reporting and/or documentation requests will be made by Lender in its sole and absolute discretion. Except where such reports shall be delivered within a different time period, each Party will be required to provide Lender with the requested reporting within 30 days of the receipt of written notice from Lender. Financial reporting, if any, will be at least of the quality specified in the notice and may be (i) tax returns, (ii) self-prepared financial statements, (iii) CPA Compiled statements, (iv) CPA Reviewed statements and/or (v) CPA Audited statements each based upon either US GAAP or FFSC reporting as also specified in the notice.

3.09     **Mandatory Repayments.** If at any time the unpaid principal balance of any Loan exceeds the Maximum Amount thereof under the terms of this Agreement, then, subject to a Permitted Over-Advance for such Loan, upon demand by Lender, Party shall repay that portion of the principal balance thereof in excess of that Maximum Amount, along with all unpaid accrued interest on that portion.

3.10     **Aggregate Borrowing Base.** In no event shall any Borrowing Base Certificate submitted hereunder, include any Eligible Collateral (as such term is defined in a Facility Sheet) that is also included in another Facility Sheet Borrowing Base.

## ARTICLE 4 - COLLATERAL

4.01     **Collateral Documents.** The payment and performance of the Obligations are secured by those Liens in favor of Collateral Agent as agent for the Lender pursuant to the Collateral Agency Agreement created under (i) any Security Instrument now or hereafter entered into by Party in favor of Collateral Agent, which states that it secures all or any of the Obligations; (ii) any other instrument or agreement now or hereafter delivered to Lender and/or Collateral Agent in conjunction with this Agreement, which states that it secures all or any of the Obligations; and (iii) any Cross Collateralized Loan Documents, if applicable.

4.02     **Due on Sale or Encumbrance Provisions.** Each Mortgage shall include a provision similar to the following, with applicable terms to be revised as the context requires: Parties shall not make or permit any Prohibited Transfer. Upon Lender's or Beneficiary's election, whichever is applicable, any Prohibited Transfer shall be an Event of Default, permitting Lender/Beneficiary and/or Collateral Agent to declare all of the Secured Obligations to be due and payable immediately.

## ARTICLE 5 - LOAN OPENING AND FUNDING CONDITIONS

5.01     **Loan Opening Conditions.** Lender's obligation to make a Loan is subject to satisfaction of the following Loan Opening Conditions and receipt by Lender of the following items, each as determined by Lender in Lender's sole and absolute discretion:

(a)     **No Event of Default.** No Event of Default or condition which with the giving of notice or passage of time would be an Event of Default exists under this Agreement;

(b)     **Fully Executed Agreement.** Lender shall have received a completed and executed Agreement;

(c)     **Fully Executed Facility Sheet.** Lender shall have received a completed and executed Facility Sheet.

(d)     **Fully Executed Loan Documents.** Loan Documents applicable to the Loan Type and executed by Party and any other Parties, all as set forth in this Agreement or the Facility Sheet applicable to the Loan Type;

(e)     **Amendments to Cross Collateralized Loan Documents.** Amendments to Cross Collateralized Loan Documents to the extent, if any, required by Lender for purposes of securing the Loan Obligations;

(f)     **Organizational Evidence.** Evidence (i) of the formation, existence and good standing of all Parties to the Transaction Documents other than Lender which are anything other than an individual, if any, and authorization of the individuals executing the Transaction Documents on behalf of those Parties, (ii) to the extent required by Lender or by Applicable Law such information that Lender may require to determine who the ultimate beneficial owner of any or all the Parties; (iii) that there has been no material change in the management and/or ownership structure of any Party since the date on which the application for the applicable Loan was submitted;

(g)     **Financial Evidence.** Evidence there has been no Material Adverse Effect as to any Party since the effective date of the Financial Information provided to Lender.

(h)     **Appraisals and Reports.** All Appraisals and Inspection reports required by Lender;

(i)      Environmental Information. Environmental Information establishing compliance with all applicable Environmental Laws;

(j)      Regulatory Compliance. Evidence that all regulatory approvals, Permits and licenses required under Applicable Law for Party's business operations have been issued and are in full force and effect;

(k)      Validity of Liens. Evidence that the Liens granted to Lender under the Collateral Documents are valid, enforceable, properly perfected, and prior to the rights and interests of all other Persons, except those rights and interests acceptable to Lender;

(l)      Title Evidence. Evidence that all policies of title insurance, opinions of title and endorsements required by Lender or under the Loan Documents have been issued and are in full force and all premiums and charges for those policies, opinions and endorsements have been paid;

(m)      Representations and Warranties. All representations and warranties of all Parties in the Transaction Documents are true and correct;

(n)      Legal Opinion. To the extent required by Lender, a written opinion from Parties' and Guarantor's (if any) legal counsel acceptable to Lender, covering all issues required by Lender;

(o)      Payment of Fees and Costs. Payment to Lender of all fees and costs set forth in this Agreement;

(p)      Reimbursement of Appraisal Expenses. Reimbursement of Lender's Appraisal Expenses;

(q)      Reimbursement of Closing Expenses. Reimbursement of Closing Expenses;

(r)      Collateral Ownership. If any Collateral is not owned by the Party, Party must cause all individuals or entities who own such Collateral to enter into this Agreement; and

(s)      Preconditions. All other documents, information and other preconditions required by Lender, including, but not limited to, confirmation that Party is in compliance with all covenants set forth in this Agreement.

5.02      Loan Funding Conditions. Lender's obligation to disburse funds under a Loan is subject to satisfaction of all other requirements and conditions set forth in this Agreement, the Applicable Obligor Covenants Schedule and in the Facility Sheet in connection with the Loan, as determined by Lender in Lender's sole and absolute discretion.

## ARTICLE 6 – PARTY REPRESENTATIONS

6.01      Representations. Party represents (collectively, the "Party Representations") to Lender that:

(a)      Good Standing. If Party is anything other than an individual, Party was duly formed, is validly existing and in good standing and qualified to do business in its state of organization and each state in which it conducts its business;

(b)      Due Power and Authority. The execution, delivery and performance by Party of each Transaction Document to which it is a Party, is within the powers and authority of Party and has been duly authorized;

(c)      No Conflict with Applicable Law. To Party's knowledge, the Transaction Documents do not conflict with any Applicable Law;

(d)      Enforceability. Each Transaction Document is a legal, valid and binding obligation of Party, enforceable against Party in accordance with its terms, and any Transaction Document, instrument or agreement required thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable;

(e)      Financial Information. All Financial Information delivered to Lender in connection with Party's application for a Loan, Lender's underwriting and approval of the Loan, or this Agreement and the other Loan Documents, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities;

(f)      Utilities. All Utilities necessary and appropriate for the conduct of the business of Party are available or Party has taken all steps necessary to assure that all utility services so required will be available upon commencement of the business of Party;

(g)      Roads. All Roads necessary for the completion, occupancy and operation of Party's business have either been completed or the necessary easements or rights-of-way therefor have been acquired or dedicated to public use, and all necessary steps have been taken by Party to ensure their completion no later than the date they will be needed for operation of Party's business or any earlier date required by any Governmental Authority or Applicable Law;

(h)      Permits. All Permits have been obtained, or, to the extent not obtained, no information or fact exists that would reasonably cause Party to believe that all Permits required to construct, occupy, and operate Party's business will not be readily obtainable prior to the commencement of Party's applicable business;

(i)      No Material Adverse Effect. There has been no Material Adverse Effect as to Party since the effective date of the Financial Information provided to Lender;

(j)      No Judgment. Party is not the subject of any Judgment; and there is no lawsuit, tax claim or other dispute pending or to Party's knowledge threatened against Party that, if determined adverse to Party, is reasonably likely to have a Material Adverse Effect;

(k)      No Conflicts. The Transaction Documents do not conflict with, nor is Party in default under any agreement or arrangement in effect providing for or relating to extensions of credit in respect of which Party is in any manner directly or contingently obligated;

(l)      Tax Returns. Party has filed all tax returns (federal, state, and local) required to be filed by Party and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(m)    <u>Applicable Laws Compliance</u>. Party is in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim, action, proceeding or investigation pending or to Party's knowledge threatened against Party with respect to a violation of Applicable Law by Party;

(n)    <u>Non-Foreign Person</u>. Party is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1986; and

(o)    <u>No Event of Default</u>. There is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

6.02    <u>Information Accurate and Complete</u>. Party's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Party, from time to time, whether or not required under this Agreement, will be deemed accompanied by a representation by Party that the report, record or information is complete and accurate in all material respects as to the condition or operations of Party (and, if applicable, Party's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities.

<div align="center">ARTICLE 7 – PARTY COVENANTS</div>

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under any Loan (if applicable), Party (or the Person or Persons as may be specifically named in any of the Covenants or Reporting Requirements) agrees to and makes the Covenants set forth in this MCA:

7.01    <u>Books and Records</u>. Party shall maintain and cause each of its Subsidiaries to maintain proper books of record and account including full, true, and correct entries of all dealings and transactions relating to its and their business and activities, in all material respects in conformity with GAAP.

7.02    <u>Change in Accounting</u>. Party shall not make any material change or modification of Party's manner and method of accounting except as required by the applicable accounting standard.

7.03    <u>Maintenance of Assets</u>. Party shall maintain and preserve all rights, privileges, and franchises Party now has; and make any repairs, renewals, or replacements to keep Party's properties in good working condition.

7.04    <u>Landlord Agreement</u>. Upon request by Lender, for any personal property Collateral located on real property which is not owned by Party (or the grantor of the security interest in favor of Lender), Party shall obtain an agreement in favor of Lender signed by the owner of the real property and the holder of any mortgage or deed of trust on the real property, waiving any of their rights in the Collateral and permitting Lender's removal thereof from the real property.

7.05    <u>Mortgage Agreement</u>. Upon request by Lender, for any personal property Collateral located on real property which is subject to a mortgage or deed of trust in favor of a Person other than Lender, Party shall obtain an agreement in favor of Lender signed by the holder of the mortgage or deed of trust on the real property, waiving any of their rights in the Collateral and permitting Lender's removal thereof from the real property.

7.06    <u>Existence and Good Standing</u>. If Party is anything other than an individual, Party shall preserve and maintain its existence and good standing in the jurisdiction of its formation, and qualify and remain qualified to conduct its business in each jurisdiction in which such qualification is required;

7.07    <u>Change in Business or Organizational Structure</u>. Party shall not engage in any material line of business substantially different from, or unrelated to, those lines of business conducted by Party and its Subsidiaries on the date hereof. If Party is anything other than an individual, Party shall not (a) form or otherwise acquire any Subsidiary, unless that Subsidiary executes and delivers to Lender a Guaranty of all of the Obligations and all other instruments and agreements required by Lender; (b) merge, dissolve, liquidate, consolidate with or into another Person, or dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; or (c) change its name, identity or business structure or the location(s) of (A) Party's place of business or Party's chief executive office if Party has more than one place of business, (B) Party's state of organization. Without diminishing Party's reporting obligations under this Article, for all purposes under the Transaction Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Party or Person becomes the asset, right, obligation or liability of a different Person, then any such asset, right, obligation or liability shall be deemed to have been transferred from the original Party or Person to the subsequent Person, which subsequent Person shall become a Party to each of the relevant Transaction Documents by operation of the division and transfer and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

7.08    <u>Compliance with Laws</u>. Party shall comply in all respects with all Applicable Laws and pay before delinquency, all taxes, assessments, and governmental charges imposed upon Party or its property.

7.09    <u>Inspections</u>. Party shall, at any reasonable time and from time to time, permit Lender or any of its agents or representatives to examine and make copies of and abstracts from the records and books of, and visit the properties of, Party and to discuss the affairs, finances, and accounts of Party with (if Party is other than an individual) officers, directors, partners, or managers or Party, as applicable; Party's independent accountants; and any other Person dealing with Party.

7.10    <u>Insurance</u>. Party shall maintain, or cause to be maintained, all insurance policies and any such additional insurance as required by Lender or any Swap Counterparty from time to time. All policies of insurance required must be issued by companies approved by Lender and the Swap Counterparties, and must be acceptable to Lender and the Swap Counterparties as to amounts, forms, risk coverages, deductibles, expiration dates, and loss payable and cancellation provisions. In addition, each required policy must contain such endorsements as Lender or the Swap Counterparties may require and must provide that all proceeds be payable to Lender and the Swap Counterparties to the extent of their respective interests. If and whenever Lender or a Swap Counterparty believes that any required insurance is not in effect, Lender or that Swap Counterparty may (but will not be obligated to) procure that insurance at Party's expense. Party shall reimburse Lender and the Swap Counterparties, on demand, for all premiums on that insurance paid by Lender or the Swap Counterparties, respectively. If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the

Capital Farms et al MCA 2023
Master Credit Agreement
v.009.20220131

<div align="center">4</div>

full unpaid principal balance of the Loan, plus Swap Counterparties' derivative exposure under the Hedging Agreements as calculated by Swap Counterparties, plus any prior Lien on the property securing the Loan, 2) the total replacement value of any structure located in the flood hazard area, or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

7.11     Arms' Length Dealing. Except for *de minimis* transactions, Party shall not enter into any transaction of any kind with any family member, Subsidiary or Affiliate of Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Party as would be obtainable by any Party at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary or Affiliate of Party.

7.12     Use of the Loan. Party shall not use the Loan (a) for personal, family or household purposes, or (b) to purchase or carry margin stock or to invest in other Persons for the purpose of carrying any such margin stock or to reduce or retire any indebtedness incurred for that purpose or for any illegal activity.

7.13     ERISA Plans. Party shall promptly pay and cause all Subsidiaries to pay contributions adequate to meet not less than the minimum funding standards under ERISA with respect to each and every Plan; file each annual report required to be filed pursuant to ERISA in connection with each Plan for each year; and notify Lender within ten days following the occurrence of any Reportable Event that might constitute grounds for termination of any capital Plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any Plan. Capitalized terms in this section shall have the meanings defined within ERISA.

7.14     Legal Fees; Costs. Party shall pay the following: (a) costs, expenses and Legal Fees paid or incurred in connection with the collection or enforcement of the Transaction Documents, whether or not suit is filed; (b) costs and Legal Fees paid or incurred in connection with any Insolvency Proceeding involving a claim under the Transaction Documents; (c) costs, expenses and Legal Fees incurred to protect the Lien and security interests under the Collateral Documents; including but not limited to appraisals, inspections, insurance premiums, and the prevention of waste; and (d) costs of suit and such sum as the court may adjudge as Legal Fees in any action to enforce payment of the Notes or any part thereof.

7.15     Other Acts. Upon request by Lender, Party shall cooperate with Lender for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien granted under this Agreement or the Collateral Documents, or to carry out the intent of the Transaction Documents.

7.16     Reporting Requirements. Party shall furnish to Lender notice of the occurrence of any of the following, promptly, but in any event no later than five days after such occurrence: (i) any lawsuit, tax claim or other dispute if filed or threatened against Party in an amount greater than $100,000.00; (ii) any substantial dispute between Party and any Governmental Authority; (iii) the failure by Party to comply with the terms and provisions of this Agreement; (iv) any Material Adverse Effect as to Party; or (vi) any change in Party's name, legal structure, place of business, or executive office, including any change from Party's previous reports of: (x) any individual who owns, directly or indirectly, 25 percent or more of the equity interest of the legal entity that is a Party to this Agreement (e.g., each individual who owns 25 percent or more of the shares of a corporation), and (y) any single individual with significant responsibility for managing the legal entity that is a Party to this agreement (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer), and, as to both (x) and (y), such new individual's name, address, date of birth, and Social Security number (or passport number or other similar information, where applicable).

## ARTICLE 8 - REMEDIES

Upon the occurrence of an Event of Default, Lender may: (a) without notice to Party, decline any Request for Advance; (b) declare all Loan Obligations immediately due and payable, without presentment, notice of intent to accelerate or notice of acceleration, demand, protest or further notice of any kind, all of which are expressly waived by Party; and (c) exercise all other rights and remedies afforded to Lender under any or all Loan Document or Applicable Law or in equity; except that upon an actual or deemed entry of an order for relief with respect to Party or any of its Subsidiaries in any Insolvency Proceeding, (i) any obligation of Lender to make any additional advance under any Loan, other than all or any portion of any Loan already advanced by Lender pursuant to the terms and conditions herein, shall automatically be terminated and (ii) all Loan Obligations shall automatically become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by Party.

## ARTICLE 9 - NOTICES

All Notices between the Parties must be in writing and mailed or delivered to the address specified in that Loan Document, or to the address designated by any Party in a notice to the other Parties; and in the case of any other Person, to the address designated by that Person in a notice to Party and Lender. All Notices will be deemed to be given or made upon the earlier to occur of (a) actual receipt by the intended recipient or (b) (i) if delivered by hand or by courier, upon delivery; or (ii) if delivered by mail, four Business Days after deposit in the mails, properly addressed, postage prepaid; except that Notices and other communications to Lender shall not be effective until actually received by Lender. Party requests that Lender accept, and Lender may, at its option, accept and is entitled to rely and act upon any Notices purportedly given by or on behalf of Party, even if not made in a manner specified herein (including Notices made verbally, by telephone, facsimile, email, or other electronic means of communication), were incomplete or were not preceded or followed by any other form of Notice specified herein, or the terms thereof, as understood by the recipient, varied from any confirmation thereof. All telephonic Notices to and other telephonic communications with Lender may be recorded by Lender, and each Party consents to such recording.

## ARTICLE 10 - ACCOUNTING MATTERS AND DRAFTING CONVENTIONS

10.01     Accounting Matters. All accounting terms not specifically defined herein or in the Schedule of Definitions and Covenants will be construed in accordance with GAAP or FFSC, at Party's option. All financial covenants applicable to an individual will be calculated based on that individual's business, excluding personal assets and liabilities. Party will not change (a) the accounting standards used to prepare Party's financial statements or (b) the manner in which either the last day of its fiscal year or the last days of the first three fiscal quarters of its fiscal years is calculated. If at any time any change in GAAP or FFSC would affect the computation of any financial ratio or requirement set forth in any Loan Document, Lender may amend that ratio or requirement to preserve the original intent thereof in light of that change.

10.02     Drafting Conventions. Unless expressly stated therein or the context otherwise requires, all Loan Documents will be interpreted in accordance with the Drafting Conventions.

Capital Farms et al MCA 2023
Master Credit Agreement
v.009.20220131

## ARTICLE 11 – GENERAL TERMS AND CONDITIONS APPLICABLE TO ANY LOAN AND LOAN TYPE

**11.01**    **Loan Documents.** Each Loan shall be evidenced by a Note and any other Loan Documents Lender so requires. The form, substance and enforceability (substantiated by an opinion of Party's counsel, if requested) of all Loan Documents required by Lender must also be satisfactory to Lender's counsel and all Loan Documents will contain terms and conditions not set forth in this Agreement and required by Lender for the Loan Type contemplated by this Agreement and the applicable Facility Sheet.

**11.02**    **Compliance With Conditions.** Lender shall have received such evidence of compliance with the Loan Opening Conditions and such other due diligence items as Lender or its counsel may reasonably require.

**11.03**    **Obligation to Borrow and Lend.** Party's obligation to borrow and Lender's obligation to lend any Loan hereunder shall be conditioned upon the execution and delivery by Party and Lender of this Agreement, a Facility Sheet and the satisfaction of all Loan Opening Conditions set forth in this Agreement. Lender shall be under no obligation to lend and Party shall be under no obligation to borrow unless and until both this Agreement and a Facility Sheet are approved by Lender in Lender's sole and absolute discretion and executed by both Lender and Party.

**11.04**    **Balloon Payment.** THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS PROVIDE FOR BALLOON PAYMENTS. BORROWER ACKNOWLEDGES THAT LENDER HAS NOT AGREED TO REFINANCE THOSE PAYMENTS.

**11.05**    **Requests for Advances.** Each Request for Advance will be irrevocable and is a representation by Party to Lender that, if applicable, the unpaid principal balance of that Loan after disbursement of the requested Loan will not exceed the Maximum Amount of such Loan under this Agreement. Each time Party makes a Request for Advance, Party reaffirms and re-makes all of the Party Representations and acknowledges and agrees to all of the Covenants and Reporting Requirements set forth in the Applicable Obligor Covenants Schedule, any Facility Sheet as of the date of the Request for Advance by Party. Lender may postpone making any advance on any Loan to the extent Lender is delayed by fire, earthquake or another circumstance outside Lender's reasonable control.

**11.06**    **Optional Rates.** If Party is granted such an option hereunder, Party may from time to time elect (i) a Rate Conversion, or (ii) a LIBOR Rate Continuation or SOFR Rate Continuation, subject to the Optional Rate Conditions. Unless a Facility Sheet provides otherwise, (i) upon any Daily Compounded SOFR Rate Continuation, the Daily Compounded SOFR Rate Loan shall be continued as a Daily Compounded SOFR Rate Loan based on the same Interest Period and (ii) Daily Simple SOFR Rate Loans shall automatically continue as a Daily Simple SOFR Rate Loans with the same Interest Payment Dates.

**11.07**    **Designated Account.** So long as Lender has any obligation to make any advance on any Loan or any Loan Obligations or any portion of any Loan remains unpaid or unsatisfied, upon the request of Lender, Party shall maintain a Designated Account demand deposit account with a Banking Counterparty. If all of the applicable conditions to a Loan have been fulfilled, Lender shall make the Loan available to Party as set forth herein by, at the option of Lender, (a) depositing the proceeds in the Designated Account; (b) if applicable, transferring the proceeds to an agent designated for purposes of an escrowed Closing of this transaction by wire or ACH transfer; or (c) paying or applying the proceeds as otherwise permitted under this Agreement, by any means appropriate under the circumstances.

**11.08**    **ACH Payments.** Party authorizes Lender to, at Lender's option in each instance, initiate ACH Payments from the Designated Account. If Lender elects to initiate ACH Payments, Party will thereafter maintain sufficient funds in the Designated Account on the dates Lender enters debits for ACH Payment regularly scheduled payments of interest, principal, and fees, if any. If there are insufficient funds in the Designated Account on the date Lender enters any debit authorized by this Agreement, Lender may reverse the debit or may accept the partial payment without prejudice to Lender's right to receive all amounts due and owing. Party agrees to upon request by Lender, execute and deliver to Lender an ACH Payment authorization in form and content satisfactory to Lender.

**11.09**    **Prepayment Conditions.** The Prepayment of principal on any Loan shall be subject to the Prepayment Conditions.

**11.10**    **SOFR and LIBOR Rate Loan Indemnification.** Upon Lender's commitment or funding of any LIBOR Rate Loan or SOFR Rate Loan to Party, Party agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender may sustain or incur as a consequence of (a) failure by Party to borrow pursuant to any such LIBOR Rate Loan or SOFR Rate Loan, or to execute a LIBOR Rate Conversion, LIBOR Rate Continuation, SOFR Rate Conversion or a SOFR Rate Continuation after Party has requested any of the same in accordance with the provisions of this Agreement, (b) default by Party in a borrowing of a LIBOR Rate Loan, SOFR Rate Loan, LIBOR Rate Conversion, a LIBOR Rate Continuation, SOFR Rate Conversion or SOFR Rate Continuation, (c) default by Party in making any Prepayment of a LIBOR Rate Loan or SOFR Rate Loan after Party has given a notice thereof in accordance with the provisions of this Agreement or (d) the making of a Prepayment of a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan on a day which is not the last day of an Interest Period with respect thereto. For any LIBOR Rate Loan, such indemnification may encompass an amount equal to the excess, if any, of (i) the amount of interest which would have accrued on the amount so Prepaid, or borrowed, converted or continued, for the period from the time of such Prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of the failure to borrow, convert or continue, the Interest Period which would have commenced on the date of such failure) in each case the applicable rate of interest for such Loan provided herein over (ii) the amount of interest (as reasonably defined by the Lender) which would have accrued to the Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank LIBOR market. This covenant shall survive the termination of this Agreement and the payment of all Loans and all other Obligations due under this Agreement. Amounts payable pursuant to this subsection shall be paid to Lender upon demand. A determination of Lender as to the amounts payable pursuant to this subsection shall be conclusive absent manifest error.

**11.11**    **Inability to Determine Rates.** If the Lender determines, in its sole discretion (which shall be conclusive absent manifest error), that (i) an index rate or any tenor(s) of such index rate used in connection with the calculation of interest under this Agreement is no longer appropriate for the purposes of calculating interest; (ii) adequate and reasonable means do not exist for ascertaining such index rate; (iii) such index rate ceases to be adopted or used for calculation of interest in customary market usage in the relevant markets; or (iv) it is announced by the applicable administrator of such index rate, a governmental or regulatory authority or insolvency court having jurisdiction over such administrator, or a governmental authority having jurisdiction over the Lender that such index rate will no longer be made available, or no longer be representative or otherwise should not be used, then (A) the obligation of Lender to make or maintain any Loan bearing interest at such index rate or calculated based on such interest rate shall be suspended, and any Loan which would otherwise bear interest at such index rate or calculated based on such interest rate shall accrue interest at that rate, per annum, equal to a rate as determined by Lender in (B), and (B) Lender may, in its sole discretion, upon delivery of notice to and without any further action or consent of the Borrower, amend this Agreement effective as of the date specified in such notice to replace such index rate so that interest will be calculated based on an alternative index rate (or rates), which, if it is not the current index rate being replaced, may include a daily index

Capital Farms et al MCA 2023
Master Credit Agreement
v.009.20220131

rate, a term index rate or a compounded index rate referencing the secured overnight financing rate ("SOFR"), a measure of the cost of borrowing cash overnight collateralized by Treasury securities, and may include a corresponding spread adjustment (or adjustments) which may be different to the previously specified interest rate, and any spread adjustment is separate from, and in addition to, the Interest Rate Margin, and such alternative rate and any such spread adjustments shall, in Lender's discretion (which shall be conclusive absent manifest error), take into account benchmark rates and means of calculating spread adjustments that are being generally accepted in the commercial markets; provided that the Lender shall be permitted by notice to the Borrower to make any other technical, administrative, operational or consequential changes from time to time to this Agreement and any other Loan Document as are necessary or desirable (in Lender's opinion, which shall be conclusive absent manifest error), in order to provide for the use of such alternative rate (or rates) including any corresponding spread adjustment (or adjustments). The Lender shall notify the Borrower of any such technical, administrative, operational or consequential changes to this Agreement and/or any other Loan Document, which, in each case, shall become effective on the date specified or described in such notice to the Borrower.

    11.12    **Disclaimer**. The Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, the continuation of, administration of, submission of, calculation of, or any other matter related to any index rate used to calculate interest hereunder, including a LIBOR Rate, Base Rate or SOFR Rate, any component definition thereof or rates referenced in the definition thereof or any alternative or successor rate thereto, or replacement rate thereof, including, without limitation, (A) any technical, administrative, operational or consequential changes made pursuant to Section 11.11, (B) whether the composition or characteristics of any alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as a predecessor index rate, and (C) the impact or effect of any alternative, successor or replacement reference rate or any technical, administrative, operational or consequential changes pursuant to Section 11.11 on any other financial products or agreements in effect or offered by or to Borrower or Lender or any of their respective Affiliates, including, without limitation, any Hedging Agreement. The Lender may select information sources or services in its reasonable discretion to ascertain any index rate, in each case pursuant to the terms of this Agreement or any Loan Document, and shall have no liability to the Borrowers or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service. The Lender and its affiliates or other related entities may engage in transactions that affect the calculation of an index rate, any alternative, successor or replacement rate and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.

<div align="center">ARTICLE 12 - MISCELLANEOUS</div>

    12.01    **Entire Agreement**. This Agreement and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Party concerning this credit; (ii) replace any prior oral or written agreements between Lender and Party concerning this credit; and (iii) are intended by Lender and Party as the final, complete and exclusive statement of the terms agreed to by them. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

    12.02    **Joint and Several Obligations**. If Borrower consists of more than one Person on a Facility Sheet, each Borrower on such Facility Sheet (a) expressly acknowledges that it has benefited and will benefit, directly and indirectly, from each Loan contained in such Facility Sheet and acknowledges and undertakes, together with the other Borrowers on such Facility Sheet, joint and several liability for the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of such Facility Sheet; (b) acknowledges that this agreement is the independent and several obligation of each Borrower and may be enforced against each Borrower on such Facility Sheet, separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Borrower on such Facility Sheet; and (c) agrees that its liability hereunder and under any other Loan Document is absolute, unconditional, continuing and irrevocable. BORROWER EXPRESSLY WAIVES ANY REQUIREMENT THAT LENDER EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER BORROWERS UNDER THIS AGREEMENT, OR ANY OTHER LOAN DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE OBLIGATIONS.

    12.03    **Authority to Bind Party**. If Party is comprised of multiple Persons, any Person comprising Party is authorized to bind all Parties comprising Party. Without limitation of the foregoing, Lender may require any Request for Advance or other request, authorization, or other action by or on behalf of Party be by one or more Designated Person. Lender may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

    12.04    **Binding Effect; Successors and Assigns**. All Loan Documents will inure to the benefit of and be binding upon the Parties and their respective successors and assigns.

    12.05    **Assignment; Participations**. Party shall not assign its rights or Obligations hereunder without Lender's consent in Lender's sole and absolute discretion. Lender may assign or sell participations in all or any portion of its interest in any Loan or under any Loan Documents to any Person. Lender may disclose to any actual or potential assignee or participant any information that Party has delivered to Lender in connection with any Loan Documents; and Party shall cooperate fully with Lender in providing that information. If Lender assigns or sells a participation in any Loan or any Loan Documents, the purchaser will have a right of set-off against Party.

    12.06    **Severability**. Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Loan Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Lender may, at its option, declare all Loan Obligations immediately due and payable.

    12.07    **Amendments in Writing**. The Loan Documents may not be amended, changed, modified, altered or terminated without the prior written consent of all Parties to the respective Loan Document.

    12.08    **Governing Law**. (A) THIS MCA AND ALL LOAN DOCUMENTS HAVE BEEN NEGOTIATED, EXECUTED AND DELIVERED IN VARIOUS JURISDICTIONS. IN ORDER TO PROVIDE FOR A UNIFORM AND WELL ESTABLISHED BODY OF COMMERCIAL AND OTHER LAW TO DEFINE AND GOVERN THE RIGHTS AND DUTIES OF THE PARTIES, THE PARTIES AGREE THAT THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL SUBSTANTIVE LAWS OF THE GOVERNING LAW STATE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULES THEREOF; PROVIDED, HOWEVER, THAT (I) IF ANY OF THE COLLATERAL SHALL BE LOCATED IN ANY JURISDICTION OTHER THAN GOVERNING LAW STATE, THE LAWS OF SUCH JURISDICTION SHALL GOVERN THE CREATION, PERFECTION AND/OR ENFORCEMENT OF THE LIENS, ASSIGNMENTS AND/OR SECURITY INTERESTS CREATED HEREIN OR IN ANY LOAN DOCUMENT IN CONNECTION HEREWITH AND TO THE ENFORCEMENT OF LENDER'S RIGHTS AND REMEDIES AGAINST THE COLLATERAL, WHICH MATTERS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH

THE COLLATERAL IS LOCATED AND (II) IN THE EVENT THE LAWS OF THE UNITED STATES OF AMERICA AND ANY RULES, REGULATIONS, OR ORDERS ISSUED OR PROMULGATED THEREUNDER APPLICABLE TO THE AFFAIRS AND TRANSACTIONS OF LENDER AND/OR PARTY OTHERWISE PREEMPT GOVERNING LAW STATE LAW, SUCH FEDERAL LAW SHALL CONTROL. IN PARTICULAR, THE PARTIES HERETO AGREE THAT ALL ISSUES RELATING TO USURY, LIMITATIONS ON INTEREST, LOAN CHARGES AND COMMITMENT FEES PAYABLE UNDER THE OBLIGATIONS AND THE LOAN AGREEMENT SHALL BE GOVERNED BY THE LAWS OF GOVERNING LAW STATE. TO THE FULLEST EXTENT PERMITTED BY LAW, PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT AND/OR THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF GOVERNING LAW STATE. PARTY UNDERSTANDS, AGREES AND ACKNOWLEDGES THAT (A) THIS AGREEMENT AND THE TRANSACTION EVIDENCED HEREBY HAVE SIGNIFICANT AND SUBSTANTIAL CONTACTS WITH THE GOVERNING LAW STATE, (B) IT IS CONVENIENT TO PARTY AND LENDER TO SELECT THE LAW OF THE GOVERNING LAW STATE TO GOVERN THIS AGREEMENT AND THE TRANSACTIONS EVIDENCED HEREBY, (C) THE TRANSACTIONS EVIDENCED BY THIS AGREEMENT BEAR A REASONABLE CONNECTION TO THE LAWS OF THE GOVERNING LAW STATE, (D) THE CHOICE OF THE INTERNAL LAWS OF THE GOVERNING LAW STATE WAS MADE FOR GOOD AND VALID REASONS, AND (E) THE CHOICE OF THE GOVERNING LAW STATE CONSTITUTES GOOD AND VALUABLE CONSIDERATION FOR LENDER TO ENTER INTO THIS AGREEMENT AND LENDER HAS ENTERED INTO THIS AGREEMENT IN RELIANCE ON THIS CHOICE.

12.09    Governing Law State. The Governing Law State is Iowa.

12.10    Jurisdiction and Venue. PARTY HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY PARTY AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN ANY STATE TRIAL COURT OR UNITED STATES DISTRICT COURT OF THE GOVERNING LAW STATE, OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION. PARTY HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO PARTY AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT. PARTY WAIVES ANY CLAIM THAT THE GOVERNING LAW STATE IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. SHOULD PARTY, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, PARTY SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST PARTY AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR PARTY SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND PARTY HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

12.11    Counterpart Execution and Signatures. All Loan Documents may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. The counterparts of the Loan Documents may be executed by electronic signature and delivered by email or facsimile, so long as such method of execution and delivery is acceptable to Lender in Lender's sole discretion.

12.12    Necessary Action. Lender is authorized to execute any other documents or take any other actions necessary to effectuate any Loan Documents and the consummation of the transactions contemplated therein.

12.13    Credit Report. Lender is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Party. Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Lender shall authorize third Persons to provide the information requested from time to time.

12.14    Consent to Disclosure. Party agrees and consents to the communication and disclosure of all information in respect of the transactions governed by this Agreement and all matters incidental hereto and thereto by Lender: (i) to the head office and all other branches and Affiliates of Lender, provided such communication and disclosure is for risk management, marketing or administrative purposes; and (ii) as required by any Applicable Law or regulation or any court or regulatory or other authority of competent jurisdiction.

12.15    No Construction Against Drafter. Each Party has participated in negotiating and drafting this Agreement, so if an ambiguity or a question of intent or interpretation arises, this Agreement is to be construed as if the Parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Agreement.

12.16    Indemnification. PARTY SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES, AND RELATED EXPENSES, INCLUDING FEES, CHARGES, AND DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF : (i) THE FAILURE BY PARTY TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY PARTY OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) THE VIOLATION BY PARTY OF ANY ENVIRONMENTAL LAW; (IV) THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF PARTY; (V) ANY GUARANTY, INDEMNITY OR THE LIKE GIVEN TO A BANKING COUNTERPARTY, WITH RESPECT TO INDEMNIFIED BANKING COUNTERPARTY LIABILITIES; (VI) ANY CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS AGREEMENT; AND (VII) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO. THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON, EXCEPT THAT PARTY SHALL HAVE NO

OBLIGATION TO AN INDEMNIFIED PERSON UNDER THIS SECTION WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, PARTY SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

12.17    **Collateral Agency Agreement.** Parties hereby acknowledge Lender has entered into the Collateral Agency Agreement which, as amended, modified, or restated, permits Rabo AgriFinance LLC to act as a Collateral Agent in servicing the applicable Loan.

12.18    **Waiver of Trial By Jury.** THE PARTIES (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (i) THIS AGREEMENT; OR (II) ANY COLLATERAL DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE; AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE COLLATERAL DOCUMENTS AND THE SWAP COUNTERPARTIES ENTERING INTO THE HEDGING AGREEMENTS.

12.19    **Office of Foreign Assets Control; Patriot Act.** Without limiting the provisions of any other provision hereof above, each Party shall, and each Party shall cause each of its Subsidiaries and Affiliates to, (1) ensure that no Person who owns a controlling interest in or otherwise controls such Person shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the OFAC, the Department of the Treasury or included in any executive orders, (2) not use or permit the use of the proceeds of any Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or executive order relating thereto, (3) comply with the Bank Secrecy Act and its implementing laws and regulations, as amended, including without limitation those related to anti-money laundering; and (4) ensure that it is and each of its Subsidiaries and Affiliates are not engaged in illegal activity or are a recipient of proceeds of illegal activity,. As required by federal law and each Lender's policies and practices, each Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services.

12.20    **Optically Imaged Reproductions.** Lender may make an optically imaged reproduction of any or all Transaction Documents and, at its election, destroy the original or originals. Party consents to the destruction of the original or originals and agrees that a copy of the optically imaged reproduction of any Transaction Document will be the equivalent of and for all purposes constitute an "original" document. For purposes of this section, "for all purposes" includes use of the optically imaged reproduction (a) to prove the content of the original document at trial, mediation, arbitration or administrative hearing; (b) for any business purpose; (c) for internal or external audits and/or examination by or on behalf of any Governmental Authority; (d) in canceling or transferring any document; and (e) in conjunction with any other transaction evidenced by the original document.

The Parties have signed this Agreement effective as of the day and year first written above and certify Parties have received and agree to the provisions set forth in the Schedule of Definitions as acknowledged and incorporated above.

PARTY:

| Address for Notices: | CAPITAL FARMS, INC., a California corporation |

1973 Hardial Drive
Yuba City, California 95993

By: _____
GURMEJ SINGH GILL
President

SUTTER ENTERPRISES, LLC, a California limited liability company

Address for Notices:

251 Shrike Circle
Sacramento, California 95834

By: _____
BALJIT SINGH GILL
Managing Member

By: _____
SUKHWANT SINGH GILL
Managing Member

SUTTER LAND LLC, a California limited liability company

Address for Notices:

251 Shrike Circle
Sacramento, California 95834

By: _____
BALJIT SINGH GILL
Managing Member

Capital Farms et al MCA 2023
Master Credit Agreement
v.009.20220131

9

221

By: _____
SUKHWANT SINGH GILL
Managing Member

UNITED FARM LLC, a California limited liability company

By: _____
SUKHWANT SINGH GILL
Managing Member

LENDER:

RABO AGRIFINANCE LLC

By: _____
Name: _____
Title: _____

Address for Notices:

251 Shrike Circle
Sacramento, California 95834

Address for notices:

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention: Loan Operations

Capital Farms et al MCA 2023
Master Credit Agreement
v.009.20220131

10

## Exhibit A
## SCHEDULE OF DEFINITIONS AND COVENANTS

As further acknowledged in Section 2.01 of the Master Credit Agreement, Party has received the Schedule of Definitions via paper copy, electronic copy, electronic mail or by accessing the Schedule of Definitions with the version number that matches the version shown in the footer of this Agreement at https://www.raboag.com/about-us/scheduledefinitions-167.

The following terms shall have the following meanings in the Loan Documents:

### ARTICLE 1 - Definitions

1.01     **Accordion Increase** means an uncommitted increase in the maximum principal amount of the Line of Credit more particularly described in the MCA or any amendment, modification or supplement thereto.

1.02     **Accounts Receivable** means account(s) (as that term is defined in the UCC) which: (A) arise from the operation of Borrower's business, including without limitation, under any policy(ies) of insurance or from the sale of goods or the providing of services by Borrower, which comply with the account debtor's specifications (if any) and have been provided or delivered to, and have been accepted by, account debtor, (B) arise in the ordinary course of Borrower's business, (C) are evidenced by (1) an invoice rendered to account debtor dated not earlier than the date of the provision of services or the date of shipment or delivery of goods, if applicable, or (2) other documentation acceptable to Lender, (D) have payment terms acceptable to Lender, (E) are not over 90 days past the later of (1) the date of invoice, if any, or (2) the date of delivery of the goods or services to which they relate, (F) are not evidenced by a note, chattel paper or other instrument, (G) are not payable on an installment basis, (H) are valid, legally enforceable and unconditional obligations of the account debtor, and not subject to any account payable by Borrower to the account debtor, setoff, counterclaim, or credit, allowance or adjustment by the account debtor, or to any claim by the account debtor denying liability thereunder in whole or in part (to the extent of the amount of such setoff or counterclaim) or are restructured, extended or modified, (I) do not arise out of a contract which, by its terms, forbids, restricts or makes void or unenforceable the assignment by Borrower to Lender of the account arising with respect thereto, (J) are owing by an account debtor which (1) is not an Affiliate of Borrower, (2) is a resident or citizen of, and is located within, the United States of America, and (3) is not the subject of an Insolvency Proceeding, (K) are not accounts arising from a "sale on approval", "sale or return" or "consignment", or subject to any other repurchase or return agreement, (L) are not accounts with respect to which possession and/or control of the goods sold giving rise thereto is held, maintained or retained by Borrower, if any (or by any agent or custodian of Borrower, if any), (M) comply with all warranties, representations and covenants in the Loan Documents relating thereto, (N) if account debtor is the United States of America or any state or local governmental entity, or any department, agency or instrumentality thereof, Borrower has assigned its rights to payment of such Accounts to Lender, pursuant to the Assignment of Claims Act of 1940, as amended, or pursuant to any similar state or local law, regulation or requirement, or as otherwise acceptable to Lender and (O) are not owing by an account debtor with respect to which 20% or more of the aggregate accounts owing by such account debtor to Borrower do not meet the criteria set forth in this definition for any reason; provided, that Lender may, consistent with Lender's normal credit practices, from time to time upon 30 days prior written notice to Borrower, designate other criteria (or exclusions) for the definition of an account(s) in addition to those above; provided, also, that such designation shall be immediately effective upon the occurrence of an Event of Default or if an Event of Default is in existence at the time of such designation.

1.03     **ACH** means Automated Clearing House, an electronic funds-transfer system run by the National Automated Clearing House Association.

1.04     **ACH Payments** means Lender's initiation of debits to the Designated Account, on the due date, for all interest and principal payments, any fees and expenses, and any other amounts due and payable by Borrower with respect to the applicable Loan, by means of the automatic clearinghouse electronic funds transfer system, or by any other commercially accepted method.

1.05     **Adjust** means to increase or decrease.

1.06     **Adjusted** means increased or decreased.

1.07     **Adjustment** means an increase or decrease.

1.08     **Adjustment Date** means each date on which the Interest Rate is or may be Adjusted by Lender pursuant to the MCA or any amendment, modification or supplement thereto.

1.09     **Advance Period** means the period of time that Lender is extending credit from time to time to the Borrower from the Closing Date to the Maturity Date (that period, including extensions, if any) more particularly described in the MCA or any amendment, modification or supplement thereto.

1.10     **Affiliate** means of a Person other than an individual, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

1.11     **Amortization Period** means the period of time commencing on the date the applicable Loan is made over which equal period payments of the applicable Loan would result in the reduction of the outstanding principal balance of the applicable Loan being reduced to zero.

1.12     **Amount** means the aggregate unpaid principal balance of the applicable Loan.

1.13     **Annual Anniversary Date** means, with respect to each Loan, the annual anniversary date set forth in the MCA or any amendment, modification or supplement thereto for such Loan, or any other earlier date when, under the terms of the MCA, the entire unpaid principal amount of such Loan is due.

1.14    **Applicable Law** means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority; except that in determining the Maximum Rate, Applicable Law shall mean those laws, orders, ordinances, rules and regulations in effect as of the date hereof or if there is a change in Applicable Law which (a) permits Lender to charge interest on amounts which Lender would not otherwise be permitted to charge interest, or (b) increases the permissible rate of interest, then the new Applicable Law as of its effective date.

1.15    **Applicable Obligor Covenants Schedule** means the Applicable Obligor Covenant Schedule, as may from time to time be amended, modified, replaced or supplemented in Lender's sole discretion and as attached to the MCA as **Exhibit B**.

1.16    **Appraisal** means a third party valuation of Real Estate performed by an appraiser with significant experience in rural appraisal principles, practices and valuations who is (i) state licensed or certified in at least one state, (ii) a member of the American Society of Farm Managers and Rural Appraisers (ARA), or (iii) a member of the Appraisal Institute (MAI).

1.17    **Appraisal Expenses** means Lender's out of pocket expenses incurred in connection with obtaining any Appraisal of the Collateral.

1.18    **Appraisal Value** means the value of Collateral as determined by an Appraisal in form and content satisfactory to Lender and subject to Lender's review and Adjustment as deemed appropriate by Lender.

1.19    **Bank Secrecy Act** means the Bank Secrecy Act, 31 U.S.C. Section 5311, *et seq.*

1.20    **Banking Counterparty** means any party providing Banking Product(s) to Borrower, who has entered into an agreement with Lender to provide Banking Products to Borrower(s).

1.21    **Banking Obligations** means all indebtedness, liabilities and obligations of Borrower for or in connection with any Banking Products provided to Borrower, including, without limitation, all Obligations of Borrower to Banking Counterparty if any, as a result of: (a) deposits of credit items that are returned by the issuing bank; (b) ACH debit items originated by Borrower which settle with insufficient funds in Borrower's deposit account; (c) letters of credit issued by the Banking Counterparty for the benefit of Borrower; (d) trade finance services; and (e) all service charges and fees posted to the account, whether such amounts are now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

1.22    **Banking Products** means any deposit accounts, ACH lines of credit, sweep accounts, etc. between Borrower and a Banking Counterparty for the purpose of managing cash and related banking matters.

1.23    **Bankruptcy Code** means Title 11 of the United States Code.

1.24    **Base Rate** means with respect to each applicable Loan Type, the greater of (i) the Prime Rate plus the Interest Rate Margin per annum, Adjusted daily, or (ii) the Floor Rate per annum. The Base Rate is Adjusted daily.

1.25    **Base Rate Loan** means a Loan which bears interest at a Base Rate.

1.26    **Book Overdraft/Outstanding Pending Transactions** means uncashed checks and other outstanding debits to the Borrower's Eligible Demand Deposit Accounts and other outstanding obligations of Borrower, as determined by Lender.

1.27    **Borrower** shall be a Party that is designated in a Facility Sheet from time to time as a Borrower.

1.28    **Borrower Representations** means all representations made by Borrower to Lender under the MCA.

1.29    **Borrower's Funds Account** means an interest-bearing escrow account established by Borrower with a depository institution acceptable to Lender in connection with a Construction Loan or Line of Credit or as otherwise may be required by Lender.

1.30    **Borrowing Base** means, with respect to each applicable Loan Type, the meaning given unto such term (including any components thereof) in the MCA or any amendment, modification or supplement thereto.

1.31    **Borrowing Base Certificate** means a certificate in a form required by Lender, properly completed and certified by Borrower, for purposes of calculating the Borrowing Base for each applicable Loan, together with all supporting documentation required by Lender.

1.32    **Budget** means with respect to each applicable Loan Type, the applicable budget included in the MCA or any amendment, modification or supplement thereto, including anticipated costs of Borrower that was approved by Lender in connection with each Loan Type.

1.33    **Building Loan Agreement** means any building loan agreement between Borrower and Lender, if any.

1.34    **Business Day** means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Applicable Laws of the State of Iowa or Missouri, or are in fact closed in the State of Iowa or Missouri, provided that, when used in connection with a SOFR Rate Loan calculation, determination, prepayment or requests or notices from the Borrower involving a SOFR Rate Loan or a SOFR Rate borrowings, the term "Business Day" means any such day that is a U.S. Government Securities Business Day.

1.35    **Capital Expenditures** means expenditures for fixed or capital assets.

1.36    **Capital Lease** means any rental agreement that meets GAAP criteria for its treatment as an agreement for purchase of an asset rather than for use of the asset by way of a true (or operating) lease.

1.37    **Cash Forward Cattle Contract** means a contract for the future sale of cattle ("live cattle", "feeder cattle" or otherwise, as acceptable to Lender) which has been entered into and is enforceable by the owner and buyer of such cattle at a cash price that is fixed on the date when the contract is entered.

1.38    **Cash Forward Hog Contract** means a contract for the future sale of hogs ("isowean pigs", "feeder hogs", "lean hogs", "live hogs" or otherwise, as acceptable to Lender) which has been entered into and is enforceable by the owner and buyer of such hogs at a cash price that is fixed on the date when the contract is entered and is otherwise acceptable to Lender.

1.39    **Cattle** means any calves, heifers, steers, cows, bulls and other cattle (including without limitation, "live cattle", "feeder cattle" or otherwise, as acceptable to Lender) as may be more particularly described in the MCA or any amendment, modification or supplement thereto with respect to any Loan Type.

1.40    **Cattle Deposits Received** means cash deposits received by Borrower from a feedyard or other buyer relating to the sale of Cattle by Borrower at certain agreed upon terms acceptable to Lender.

1.41    **Cattle Finishing Costs** means the aggregate of all costs and expenses for Feed, medicine, shelter and all other items of cost or expense which are customarily or otherwise expected to be incurred to bring Eligible Cattle to a weight at which they are to be sold for slaughter.

1.42    **Cattle Futures Contract** means a contract for the future sale of Cattle which has been entered into or could have been entered into by the Cattle owner through the Chicago Board of Trade, the Chicago Mercantile Exchange, the Kansas City Board of Trade or any other United States contract market subject to the jurisdiction of the Commodity Futures Trading Commission, acceptable to Lender.

1.43    **Cattle Marketing Costs** means reasonable expenses to be incurred in the sale of the Cattle at the point for delivery.

1.44    **Closing** means (a) the acknowledgement by Lender that all conditions precedent to the applicable Loan are satisfied or waived in accordance with the MCA, or (b) the applicable Loan is made, whichever is earlier.

1.45    **Closing Date** means the date of the Closing or Conversion (as applicable) of the applicable Loan as set forth in the MCA or any Transaction Document or amendment, modification or supplement thereto for such Loan.

1.46    **Closing Expenses** means Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the applicable Loan or the Closing.

1.47    **Co-Maturity Provision** means that under the MCA, all unpaid Loan Obligations with respect to any Loan shall be paid on the earlier of the date when any Loan Obligations with respect to any other Loan are due or are Prepaid in full.

1.48    **Collateral** means any and all of the (i) real property of the Borrower pursuant to which Liens in favor of Lender and/or Collateral Agent are granted or intended to be granted pursuant to the Collateral Documents, (ii) personal property of the Borrower, of every kind and character, including all accounts, contracts, contract rights, Permits, general intangibles, payment intangibles, investment property, chattel paper, furniture, fixtures, equipment, motor vehicles (untitled or titled, whether or not Lender's lien is noted on any title), watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, frost protection apparatus, windmills, fences, fittings, appliances, inventory, instruments, inventory, farm products, including crops grown, growing or to be grown, livestock in their unmanufactured state, timber standing or to be cut, minerals or the like (including oil and gas), raw materials, intellectual property, proceeds of any crop insurance, price support payment or other government program, books and records including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory, and any hedging obligations, whether now owned and existing or hereafter acquired or arising, wherever located, together with all accessions thereto, substitutions and replacements therefor, and all proceeds thereof, pursuant to which Liens in favor of Lender and/or Collateral Agent are granted or intended to be granted pursuant to the Collateral Documents, and (iii) all other items and property pursuant to which Liens in favor of Lender and/or Collateral Agent are granted or intended to be granted pursuant to the Collateral Documents.

1.49    **Collateral Agency Agreement** means the internal collateral agency agreement between Rabo AgriFinance LLC, formerly known as Rabo Agrifinance, Inc., and Rabobank, and selected Affiliates governing their rights and obligations permitting Rabo AgriFinance LLC to act as a Collateral Agent in servicing the applicable Loan or Obligation.

1.50    **Collateral Agent** means Rabo AgriFinance LLC, and its role as set forth in the Collateral Agency Agreement.

1.51    **Collateral Assignment** means any assignment of personal property such as grazing leases, farm product purchase contracts, intellectual property, water stock, certificates and rights, membership interests, corporate stock, livestock or the like now or hereafter entered into by a Party, Borrower or other Person in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

1.52    **Collateral Documents** means any Security Instrument, Guaranty, Mortgage and any other instruments and agreements securing all or any of the Obligations.

1.53    **Committed Amount** means the principal face amount of the Note more particularly described in the MCA or any amendment, modification or supplement thereto.

1.54    **Commodity Hedge Account** means any commodity hedging or other agreement enabling a Person to limit the market risk of holding a commodity in either the cash or futures market.

1.55    **Compensation** means, as applicable, salaries and other compensation paid to shareholders, members, partners, directors, managers, and officers.

v.009.20220131

1.56      **Compliance Certificate** means a certificate setting forth (i) the information and computations (in sufficient detail) to establish compliance with all Borrower Covenants (ii) whether there exists an Event of Default or event which with the passage of time or the giving of Notice would be an Event of Default and, if any such Event of Default or other event exists, specifying the nature thereof and the action being taken or proposed to be taken with respect to that Event of Default or other event.

1.57      **Condemnation Award** means all awards made for the taking by condemnation or the power of eminent domain, or any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate.

1.58      **Consent and Waivers by Borrower and Non-Borrower Grantor** means Lender is authorized to perform any of the following acts at any time, all without Notice to Non-Borrower (whether designated in any Transaction Document as "Non-Borrower Grantor" or "Non-Borrower Pledgor") and, to the extent applicable to Borrower and the Loan Document permits an action without Notice, to Borrower, in each case to the extent permitted under any applicable law, without affecting the rights of Lender or Borrower or Non-Borrower's Obligations under the Loan Documents (and upon any such act Borrower and Non-Borrower confirms and agrees that such Non-Borrower's Obligations and any accommodations, lien or security interests in or to its properties shall not in any way be novated, discharged or otherwise impaired, and shall continue, be ratified and be affirmed and shall remain in or to its in effect): (i) alter any terms of the MCA or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Obligations; (ii) take and hold security for the Obligations, accept additional or substituted Collateral for the Obligations, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such Collateral; (iii) apply any Collateral now or later held for the Obligations in any order that Lender may choose, and direct the order and manner of any sale of all or any part of it and bid at any such sale; (iv) release Borrower of its liability for the Obligations or any of them; (v) substitute, add or release any one or more guarantors or endorsers of the Obligations; and (vi) extend other credit to Borrower, and take and hold security for the credit so extended, whether or not such security also secures the Obligations. Furthermore, Non-Borrower waives: (i) any right to require Lender to proceed against Borrower, proceed against or exhaust any Collateral held from Borrower, or pursue any other remedy in Lender's power to pursue; (ii) any defense based on any legal disability of Borrower, any discharge or limitation of the liability of Borrower to Lender, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Non-Borrower's Obligations exceed or are more burdensome than those of Borrower; (iii) all presentments, demands for performance, Notices of nonperformance, protests, Notices of protest, Notices of dishonor, Notices of acceptance of the Loan Documents and of the existence, creation, or incurring of new or additional indebtedness of Borrower, and demands and Notices of every kind; (iv) any defense based on or arising out of any defense that Borrower may have to the payment or performance of the Obligations or any of them; (v) until the Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code or any successor statute, all rights to enforce any remedy that Lender may have against Borrower, and all rights to participate in any Collateral now or later to be held by Lender for the Obligations; (vi) replace the rate with an alternative rate in accordance with the rights afforded to it under the MCA (including, without limitation, under the Section entitled "Inability to Determine Rates") and (vii) make any technical, administrative, operational or consequential changes that the Lender is permitted to make under the MCA to the Loans or Loan Documentation. Borrower and Non-Borrower waive all rights and defenses that Borrower or Non-Borrower may have because the Obligations may be secured by any particular Collateral. This means, among other things: (i) Lender may enforce the Loan Documents against Borrower or Non-Borrower without first foreclosing on any other real or personal property Collateral securing the Obligations; and (ii) if Lender forecloses on any particular Collateral securing the Obligations: (A) the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Lender may enforce the Loan Documents against Borrower or Non-Borrower even if Lender, by foreclosing on any Collateral, has destroyed any right Borrower or Non-Borrower may have to collect from the other. This is an unconditional and irrevocable waiver of any rights and defenses Borrower or Non-Borrower may have because the Obligations may be secured by any particular Collateral. Borrower and Non-Borrower waive any right or defense it may have at law or equity, to a fair market value hearing or action to determine a deficiency Judgment after a foreclosure of any Collateral granted to Lender under the Loan Documents. Borrower and Non-Borrower assume full responsibility for keeping informed of each other's financial condition and business operations and all other circumstances affecting the other's ability to pay and perform its Obligations to Lender, and agrees that Lender will have no duty to disclose to Borrower or Non-Borrower any information which Lender may receive about the other's financial condition, business operations, or any other circumstances bearing on its ability to perform. No provision or waiver in the Loan Documents shall be construed as limiting the generality of any other provision or waiver contained in this consent. Borrower and Non-Borrower each certify that as of the date hereof and after giving effect to the advance(s) contemplated by the applicable Loan and Security Instrument to which the Consent and Waiver by Non-Borrower Grantor applies, each of Borrower and Non-Borrower is and will be solvent. Borrower and Non-Borrower each represent that it has determined that the terms available to the maker of the Note are in Borrower's or Non-Borrower's best interests. Each of Borrower and Non-Borrower acknowledges that it will derive substantial direct and indirect benefit from the transactions contemplated by the Note. Each of Borrower and Non-Borrower has determined that its execution, delivery and performance of the Security Instrument to which the Consent and Waiver by Borrower or Non-Borrower Grantor applies, directly benefits, and is within the duly authorizeds purposes and in its best interests of the Borrower or Non-Borrower, respectively. Each of Borrower and Non-Borrower certifies that as of the date hereof Borrower or Non-Borrower is not engaged in business or a transaction, or about to engage in business or a transaction for which any property remaining with Borrower or Non-Borrower will result in an unreasonably small amount of capital.

1.59      **Consolidated** means, in connection with any definition, financial report or financial covenant, the combination of the applicable Persons, together with their Subsidiaries.

1.60      **Construction Line of Credit** means any credit Lender shall extend from time to time to Borrower in accordance with the MCA or any amendment, modification, or supplement thereto.

1.61      **Contractor** means, individually and collectively, any or all contractor(s) providing labor or materials for the completion of a Project under a contract with Borrower.

1.62      **Control** of a Person other than an individual means the power to direct the management and policies of that Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

1.63      **Conversion** means the conversion of any applicable Construction Line of Credit, Development Line of Credit, or Equipment Line of Credit Loan into a Term Loan provided all terms and conditions in the MCA are satisfied.

1.64      **Conversion Conditions** shall have the same meaning given unto such term in the MCA or any amendment, modification or supplement thereto.

v.009.20220131

1.65     **Conversion Date** means the date Lender acknowledges that all conditions precedent to the Conversion are satisfied or waived, more particularly described in the MCA or any amendment, modification or supplement thereto.

1.66     **Conversion Deadline** means the date by which an applicable Construction Line of Credit, Development Line of Credit, or Equipment Line of Credit may be converted to a Term Loan as set forth in the MCA or any amendment, modification or supplement thereto.

1.67     **Conversion Maturity Date** means the Maturity Date of the Conversion.

1.68     **Covenants** means all covenants made by Borrower under the MCA, which shall be in effect until such time as all Obligations have been paid in full and Lender has no obligation to make any advance on the applicable Loan.

1.69     **CPA** means an individual that has been designated Certified Public Accountant by the American Institute of Certified Public Accountants.

1.70     **CPA Audited** means audited by a CPA, including an auditor's opinion.

1.71     **CPA Compiled** means compiled by a CPA, including a compilation report.

1.72     **CPA Reviewed** means reviewed by a CPA, including a review report.

1.73     **Credit Agreement** means the MCA as may be amended, modified or supplemented from time to time.

1.74     **Cross Collateralized Loan Documents** means any and all loan, Mortgage, Security Agreement and guaranty documents entered into between Borrower, and/or any Affiliates of Borrower, and Lender and/or Collateral Agent that are Cross Collateralized with any Loan made hereunder for the purposes of securing the Loan Obligations.

1.75     **Cross Collateralized** means the Total Property shall secure to Lender the payment of the Cross Collateralized Notes and the performance of the covenants and agreements set forth in the Cross Collateralized Security Instruments and any of the other documents and instruments relating to the applicable Loan, all of which are secured to Lender without apportionment or allocation of any part or portion of the Collateral and without apportionment or allocation of any part or portion of the Total Property. In addition to the rights and remedies provided to Lender elsewhere in the MCA or the Cross Collateralized Loan Documents, upon the breach of any covenant or agreement in any Cross Collateralized Loan Document, Lender shall be allowed to enforce the payment and to exercise all of the rights, remedies and powers provided under any of the Cross Collateralized Loan Documents, or under any provision of law, in one or more proceedings, whether contemporaneous, consecutive or both, to be determined by Lender in its sole and absolute discretion. Lender may enforce its rights against any one or more portions, parts or parcels of the Total Property in such order and manner as Lender may elect in its sole and absolute discretion. The enforcement of the Cross Collateralized Loan Documents against any one or more portion, part or parcel of the Total Property, whether by court action, power of sale or otherwise, shall not constitute an election of remedies, and shall not prejudice or in any way limit or preclude the enforcement of any Cross Collateralized Loan Document through one or more additional proceedings. No Judgment obtained by Lender in any one or more enforcement proceedings shall merge the secured debt into such Judgment, and all of such debt which shall remain unpaid shall be a continuing Obligation of Borrower, not merged into any such Judgment. The Cross Collateralized Security Instruments shall secure to Lender the repayment of any amount which Borrower may owe to Lender pursuant to the Cross Collateralized Notes, including without limitation the amount of any Judgment, together with any interest thereon, which may be rendered in connection with the enforcement of any of the Cross Collateralized Loan Documents. Borrower waives and relinquishes any and all rights it may have, whether at law or equity, to require Lender to proceed to enforce or exercise any rights, powers or remedies Lender may have under any particular Cross Collateralized Loan Document in any particular manner or order or in any particular state or county. Lender may bring any action or proceeding, including without limitation foreclosure through judicial proceedings or by power of sale in state or federal courts, and such proceeding may relate to all or any part of the Total Property without regard to the fact that any one or more prior or contemporaneous proceeding has been commenced elsewhere with respect to the same or any other part of the Total Property. In the event of the enforcement or foreclosure of any Cross Collateralized Security Instrument whether by way of judicial proceedings or nonjudicial proceedings, the proceeds of such enforcement or foreclosure shall be applied to the repayment of any of the Cross Collateralized Loan Documents in any order as Lender may decide in Lender's sole discretion. Any release of any Cross Collateralized Security Instrument with respect to any one portion, part or parcel of the Total Property shall not in any event prevent or impair Lender from enforcing all of its rights and remedies with respect to any portion, part or other parcel of the Total Property. Borrower and any party who now has or may in the future have a security or other interest in any of the Total Property waives any and all right to require the marshaling of assets or to require that any of the Total Property be sold in the inverse order of alienation, or that any of the Total Property be sold in parcels, or as an entirety, or in any combination, in connection with the exercise of any of the remedies permitted by Applicable Law, or any of the Loan Documents.

1.76     **Cross Collateralized Notes** means a Note that is Cross Collateralized.

1.77     **Cross Collateralized Security Instruments** means a Security Instrument which is Cross Collateralized.

1.78     **Current Ratio** means the ratio of current assets to current liabilities.

1.79     **Daily Compounded SOFR** means Daily Compounded SOFR (With Observation Shift) and/or Daily Compounded SOFR (Without Observation Shift), as applicable.

1.80     **Daily Compounded SOFR (With Observation Shift)** means an index rate per annum calculated by the formula set forth below. Daily Compounded SOFR (With Observation Shift) shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto.

       Daily Compounded SOFR (With Observation Shift) Formula: For any Observation Period (defined below), the percentage rate per annum (rounded to the nearest one hundred thousandth of a percentage point) calculated as follows:

v.009.20220131

$$\left[ \prod_{i=1}^{d_o} \left( 1 + \frac{n_i \times FlooredSOFR_{i-[\_]Business\ Days}}{N} \right) - 1 \right] \times \frac{N}{d}$$

For purposes of calculating the rate in the above formula:

"$d_o$" is the number of U.S. Government Securities Business Days in the Observation Period;

"i" is a series of whole numbers from one to $d_o$, each representing the relevant U.S. Government Securities Business Day in chronological order from, and including, the first Business Day in the Observation Period to, but excluding, the last U.S. Government Securities Business Day in the Observation Period;

"Floored SOFR$_{i-[i]Business\ Days}$" is, for any U.S. Government Securities Business Day "i" during the Observation Period, the greater of: (a) SOFR for the U.S. Government Securities Business Day (such day, the "<u>SOFR Determination Day</u>") which is five (5) U.S. Government Securities Business Days prior to that U.S. Government Securities Business Day "i" and (b) the Floor Rate of zero. If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Day, SOFR in respect of such SOFR Determination Day has not been published on the SOFR administrator's website and the benchmark has not been replaced pursuant to the MCA, then SOFR for such SOFR Determination Day will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which SOFR was published on the SOFR administrator's website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Compounded SOFR for no more than three (3) consecutive U.S. Government Securities Business Days "i";

"$n_i$" is, for any U.S. Government Securities Business Day "i", the number of calendar days from, and including, that U.S. Government Securities Business Day "i" up to, but excluding, the following U.S. Government Securities Business Day;

"N" is 360; and

"d" is the number of calendar days in the Observation Period.

"Observation Period" means (a) for purposes of the calculation of interest for any Daily Compounded SOFR Rate Loan (or portion thereof) payable on the Interest Payment Date therefor, the period from, and including, the date that is five (5) U.S. Government Securities Business Days preceding the first date in such Interest Period to, but excluding, the date that is five (5) U.S. Government Securities Business Days preceding such Interest Payment Date and (b) for purposes of the calculation of interest for any such Daily Compounded SOFR Rate Loan (or portion thereof) that accrues on or after the Interest Payment Date therefor, the period from, and including, the date that is five (5) U.S. Government Securities Business Days preceding such Interest Payment Date and to, but excluding, the date that is five (5) U.S. Government Securities Business Days preceding the date on which such interest is actually paid to the Lender.

1.81    <u>Daily Compounded SOFR (Without Observation Shift)</u> means an index rate per annum calculated by the formula set forth below. Daily Compounded SOFR (Without Observation Shift) shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto.

Daily Compounded SOFR (Without Observation Shift) Formula: For any U.S. Government Securities Business Day during an Interest Period, the rate per annum (rounded to the nearest one hundred thousandth of a percentage point) calculated as follows:

$$(CER_m - CER_{m-1}) \times \frac{N}{n_m}$$

For purposes of the above formula:

"$CER_m$" is the Compounded Effective Rate for that U.S. Government Securities Business Day "m";

"$CER_{m-1}$" is, in relation to that U.S. Government Securities Business Day "m", the Compounded Effective Rate for the immediately preceding U.S. Government Securities Business Day (if any) during such Interest Period;

"$n_m$" is, the number of calendar days from, and including, that U.S. Government Securities Business Day "m" up to, but excluding, the following U.S. Government Securities Business Day;

"N" is 360; and

"Compounded Effective Rate" is, for any U.S. Government Securities Business Day during an Interest Period (the "Calculation Business Day"), the percentage rate per annum calculated as set out below:

$$\left[\prod_{i=1}^{d_s}\left(1 + \frac{n_i \times FlooredSOFR_{i-(5)Business Days}}{N}\right)\right] - 1$$

For purposes of calculating the Compounded Effective Rate:

"Calculation Period" means the period from the first U.S. Government Securities Business Day of that Interest Period to, and including, such Calculation Business Day;

"$d_s$" is the number of U.S. Government Securities Business Days in the Calculation Period;

"i" is a series of whole numbers from one to do, each representing the relevant U.S. Government Securities Business Day in chronological order in the Calculation Period;

"Floored SOFR$_{i-(5)Business Days}$" is, for any U.S. Government Securities Business Day "i" during the Calculation Period, the greater of: (a) SOFR for the U.S. Government Securities Business Day (such day, the "SOFR Determination Day") which is five (5) U.S. Government Securities Business Days prior to that U.S. Government Securities Business Day "i" as such SOFR is published by the SOFR administrator on their website and (b) the Floor Rate of zero. If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Day, SOFR in respect of such SOFR Determination Day has not been published on the SOFR administrator's website and the benchmark has not been replaced pursuant to the MCA, then SOFR for such SOFR Determination Day will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which SOFR was published on the SOFR administrator's website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Compounded SOFR for no more than three (3) consecutive U.S. Government Securities Business Days "i";

"$n_i$" is, the number of calendar days from, and including, that U.S. Government Securities Business Day "i" up to, but excluding, the following U.S. Government Securities Business Day; and

"N" has the same meaning as the term above.

1.82     **Daily Compounded SOFR Rate Continuation** means the continuation of the Interest Rate of any Daily Compounded SOFR Rate Loan for another Interest Period.

1.83     **Daily Compounded SOFR Rate Conversion** means a Rate Conversion of any Daily Compounded SOFR Rate Loan.

1.84     **Daily Compounded SOFR Rate Loan** means a Loan which bears an Interest Rate Indexed at Daily Compounded SOFR, as set forth in the MCA or any amendment, modification or supplement thereto.

1.85     **Daily Simple SOFR** means, for any day (a "SOFR Interest Day"), an index rate per annum equal to SOFR for the day (such day "i") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Interest Day is a U.S. Government Securities Business Day, such SOFR Interest Day or (ii) if such SOFR Interest Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Interest Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website. If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any day "i", the SOFR in respect of such day "i" has not been published on the SOFR administrator's website and Daily Simple SOFR has not been replaced pursuant to the MCA, then SOFR for such day "i" will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR administrator's website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Interest Days. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower. Daily Simple SOFR shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto..

1.86     **Daily Simple SOFR Rate Loan** means a Loan which bears an Interest Rate Indexed at Daily Simple SOFR, as set forth in the MCA or any amendment, modification or supplement thereto.

1.87     **Daily Simple SOFR Rate Conversion** means a Rate Conversion of any Daily Simple SOFR Rate Loan.

1.88     **Dairy Cattle** means milk cows, dry cows, breeding bulls, heifers, calves and other dairy cattle.

1.89     **Dairy Current Ratio** means the ratio of current assets (including Dairy Cattle) to current liabilities, plus any Funded Debt related to Dairy Cattle.

1.90     **Dairy Debt Service Coverage Ratio** means the ratio of Stabilized EBITDA (net of Herd Maintenance Expenses) minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions (net of cash contributions), and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus Capital Lease payments.

1.91     **Dairy Working Capital** means (a) current assets (including Dairy Cattle) minus (b) current liabilities plus any Funded Debt related to Dairy Cattle.

v.009.20220131

1.92    **Debt Service Coverage Ratio** means the ratio of Stabilized EBITDA minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions (net of cash contributions), and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus Capital Lease payments.

1.93    **Debt to Tangible Net Worth** means the ratio of total liabilities to Tangible Net Worth.

1.94    **Debt to Total Assets Ratio** means total liabilities divided by total assets converted to an equivalent percentage.

1.95    **Default Rate** means the rate applicable to the unpaid principal balance of the Loans plus 10.000% per annum. Interest payable at the Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

1.96    **Designated Account** means a demand deposit account with a Banking Counterparty or another bank approved by Lender in good standing, that Borrower is required to maintain, upon the request of Lender, so long as Lender has any obligation to make any advance of Loan funds or any Loan Obligations or any Loan remains unpaid or unsatisfied.

1.97    **Designated Person** means one or more individuals designated to Lender in writing by the parties comprising Borrower.

1.98    **Development Line of Credit** means any credit Lender shall extend from time to time to Borrower in accordance with the MCA or any amendment, modification or supplement thereto.

1.99    **Distributions** means, as applicable, living expenses for individuals, or dividends, distributions or other payments (whether in cash, securities or other property) with respect to any capital stock, membership interest, general or limited partnership interest, beneficial interest in a trust or other equity interest.

1.100    **Drafting Conventions** means the following described conventions which the Loan Documents shall be interpreted in accordance with, unless expressly stated therein or the context otherwise requires: (a) the words "include," "includes," and "including" are to be read as if they were followed by the phrase "without limitation"; (b) unless otherwise expressly stated, terms and provisions applicable to two or more Persons shall apply on an individual, as well as collective basis; (c) headings and captions are provided for convenience only and do not affect the meaning of the text which follows; (d) references to a parcel or tract of real estate means, without limitation, the land described, and any and all improvements located thereupon and all easements or other rights or interests benefiting that land; (e) references to an agreement or instrument means that agreement or instrument, together with all extensions, renewals, modifications, substitutions and amendments thereof, subject to any restrictions therein in that agreement or instrument or in the Loan Documents; (f) ANY REPORT OR DOCUMENT TO BE RECEIVED BY LENDER SHALL BE SATISFACTORY IN FORM AND CONTENT TO LENDER; (g) WHEREVER (I) LENDER EXERCISES ANY RIGHT GIVEN TO IT TO APPROVE OR DISAPPROVE, (II) ANY ARRANGEMENT OR TERM IS TO BE SATISFACTORY TO LENDER, OR (III) ANY OTHER DECISION OR DETERMINATION IS TO BE MADE BY LENDER, THEN EXCEPT AS MAY BE OTHERWISE EXPRESSLY AND SPECIFICALLY PROVIDED THEREIN, THE DECISION TO APPROVE OR DISAPPROVE, ALL DECISIONS THAT ARRANGEMENTS OR TERMS ARE SATISFACTORY OR NOT SATISFACTORY, AND ALL OTHER DECISIONS AND DETERMINATIONS MADE BY LENDER, SHALL BE IN THE SOLE DISCRETION OF LENDER, WITHOUT REGARD FOR THE ADEQUACY OF ANY SECURITY FOR THE OBLIGATIONS; (h) whenever by the terms of the Loan Documents, Borrower is prohibited from taking an action or permitting the occurrence of some circumstance, Borrower shall not, directly or indirectly take that action or permit that circumstance, or directly or indirectly permit any Subsidiary to take that action or permit that circumstance; (i) evidence of the occurrence or non-occurrence of any event, or the existence or nonexistence of any circumstance to be delivered to Lender must be in a form satisfactory to Lender; (j) unless specified otherwise, references to a statute or regulation means that statute or regulation as amended, modified or supplemented from time to time and any corresponding provisions of successor statutes or regulations; (k) unless otherwise specified, all references to a time of day are references to the time in St. Louis, Missouri; (l) references to "month" or "year" are references to a calendar month or calendar year, respectively; (m) if any date specified in the MCA as a date for taking action falls on a day that is not a Business Day, then that action may be taken on the next Business Day; (n) a pronoun used in referring generally to any member of a class of Persons, or Persons and things, applies to each member of that class, whether of the masculine, feminine, or neuter gender; (o) references to "articles," "sections," "subsections," "paragraphs," "exhibits," and "schedules" reference articles, sections, subsections, paragraphs, exhibits, and schedules, respectively, of the MCA unless otherwise specifically provided; (p) the words "hereof," "herein," "hereunder," and "hereby" refer to the MCA as a whole and not to any particular provision of the MCA; (q) the definitions in the Schedule of Definitions and Covenants, MCA and the Loan Documents apply equally to both singular and plural forms of the terms defined; and (r) for purposes of computing periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

1.101    **Drawdown Date** means in the case of the applicable Loan, the date on which that Loan is made, in the case of a Rate Conversion, the effective date of the Rate Conversion, and in the case of a LIBOR Rate Continuation, a Term SOFR Rate Continuation or a Daily Compounded SOFR Rate Continuation, the effective date of the LIBOR Rate Continuation, Term SOFR Rate Continuation or Daily Compounded SOFR Rate Continuation, respectively.

1.102    **EBITDA** means at any date (a) net income, excluding any extraordinary and non-operating income (unless deemed by Lender to be recurring in nature), of a Person for the preceding twelve months plus (b) any interest expense, income taxes, depreciation, amortization, and other noncash charges for that twelve months to the extent they were deducted from gross income to calculate net income.

1.103    **Election to Prepay** means Borrower's notification to Lender, which notification may be given at any time prior to the Adjustment Date, of its election to Prepay the principal indebtedness accruing interest at the Long Term Adjustable Rate.

1.104    **Eligible Accounts Receivable** means (as may be further limited by specific defined terms) Accounts Receivable which are (A) owned by Borrower, (B) subject to a first priority perfected security interest in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender, (D) neither 30 days past the original due date, nor 30 days past the later of (1) the date of invoice, if any, or (2) the date of delivery of the goods or services to which the Accounts Receivable relate, (E) not due from a single account debtor in aggregate more than 20% of all Accounts Receivable (other than as acceptable to Lender), and (F) otherwise acceptable to Lender; excluding any portion constituting advertising, finance charges, services charges, or sales or excise taxes.

v.009.20220131

1.105    **Eligible Breeding Stock** means Cattle, gilts, sows, boars, or other such livestock designated and maintained by Borrower for breeding purposes, which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

1.106    **Eligible Cash Forward Cattle Contract** means any Cash Forward Cattle Contract with respect to Eligible Cattle entered from time to time by Borrower that is acceptable to Lender in all respects.

1.107    **Eligible Cattle** means Cattle acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

1.108    **Eligible Cattle Down Payments** means down payments paid by Borrower for Cattle purchased from sellers, to be delivered to the Borrower at an agreed upon date in the future and intended to become Eligible Cattle, all as acceptable to Lender.

1.109    **Eligible Cattle Futures Contract** means any Cattle Futures Contract with respect to Eligible Cattle entered from time to time by Borrower that is acceptable to Lender in all respects.

1.110    **Eligible Cattle Value** means, with respect to Eligible Cattle, the market value determined by (A) multiplying (1) the price per hundredweight at which an Eligible Cattle Futures Contract (for delivery and cash settlement of live cattle on a delivery date nearest to the estimated date on which such cattle will be finished, or for delivery and cash settlement of feeder cattle on a delivery date nearest to the estimated data on which such cattle will meet feeder cattle contract specifications) could be entered into by the Borrower with respect to Eligible Cattle on the date the Eligible Cattle Value is determined, or (2) the price per hundredweight of an Eligible Cash Forward Cattle Contract with respect to Eligible Cattle between Borrower and a reputable counterparty acceptable to Lender, plus or minus the local basis (e.g., plus or minus the 5 year average Texas Panhandle Live Cattle Basis provided by the Texas Cattle Feeders Association) and any premiums or discounts, times (3) the number of hundredweights projected to be deliverable when such Eligible Cattle are finished, then (B) subtracting the sum of (1) Cattle Finishing Costs projected to be incurred, on the basis of existing market conditions, plus (2) Cattle Marketing Costs; provided, however, if there is no Eligible Cattle Futures Contract or Eligible Cash Forward Contract for reference, then the market value will be determined by (Y) multiplying (1) the price per hundredweight of the animal's respective weight class as determined by the CattleFax Regional Feeder price, times (2) the animal's current weight, or (Z) other means as determined by Lender.

1.111    **Eligible Commodity Hedge Accounts** means the net equity position in favor of Borrower in Commodity Hedge Accounts, as determined by brokerage statements satisfactory to Lender (A) subject to a first priority perfected security interest in favor of Lender; (B) subject to a control agreement in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender; and (D) are otherwise acceptable to Lender.

1.112    **Eligible Customer Notes Receivable** means any Cattle financing agreement, promissory note, security agreement,, UCC filing, feeding contract, contract to market and sell customer cattle and any other agreement or related document (in a form acceptable to Lender) executed by and between Borrower and any of its customers (acceptable to Lender) relating to the feeding, handling, financing or marketing (including without limitation hedging) of Eligible Customer Cattle by the Borrower that meet all of the following requirements at all times: (A) are delivered to the Lender; (B) are subject to Borrower's property perfected first priority agister's lien (or other first priority security interest or Lien) to protect Borrower's interest therein (and in the related Eligible Customer Cattle; (C) are maintained in all respects in accordance with Borrower's written policy governing the documentation of Borrower's feeding, handling, financing or marketing (including without limitation hedging) of Eligible Customer Cattle; and (D) the terms of which are not materially altered without Lender's prior consent and immediate delivery to Lender of the Lender-approved changes to such documentation.

1.113    **Eligible Customer Cattle** means Cattle acceptable to Lender (A) owned by a customer of Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Borrower, (C) not subject to any Lien in favor of a Person other than Borrower; and (D) otherwise acceptable to Lender.

1.114    **Eligible Dairy Cattle** means milk cows, dry cows, breeding bulls, heifers, calves and other dairy cattle acceptable to Lender (A) owned by Borrower, (B) located at a dairy owned or leased by Borrower; (C) subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (E) otherwise acceptable to Lender.

1.115    **Eligible Dairy Current Ratio** means the ratio of current assets (including Eligible Dairy Cattle) to current liabilities, plus any Funded Debt related to Eligible Dairy Cattle.

1.116    **Eligible Dairy Debt Service Coverage Ratio** means the ratio of Stabilized EBITDA (net of Herd Maintenance Expenses) minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions (net of cash contributions), and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus Capital Lease payments.

1.117    **Eligible Dairy Working Capital** means (a) current assets (including Eligible Dairy Cattle) minus (b) current liabilities plus any Funded Debt related to Eligible Dairy Cattle.

1.118    **Eligible Demand Deposit Accounts** means the balance of demand deposit accounts which are (A) owned by Borrower, (B) with a financial institution approved by Lender; (C) subject to an account control agreement acceptable to Lender, or otherwise subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (E) otherwise acceptable to Lender, less uncashed checks, overdrafts and other outstanding debits related thereto.

1.119    **Eligible Feed Account Receivable** means Eligible Accounts Receivable related to the sale of Feed or providing of services under a feeding agreement(s) or similar agreement(s) otherwise acceptable to Lender which are (1) subject to a first priority perfected security interest in favor of Lender, (2) not subject to any Lien in favor of a Person other than Lender, (3) secured by the Borrower's Lien on the Feed Account Receivable Related Cattle, and (4) otherwise acceptable to Lender; excluding any portion constituting advertising, finance charges, services charges, or sales or excise taxes.

1.120    **Eligible Feed and Grain Inventory** means Feed and other grain which is (A) owned by and in the possession of Borrower or in the possession of a bailee who has executed and returned a bailee letter to Lender, if required, in form and substance acceptable to Lender, (B) subject to a

v.009.20220131

first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; (D) not spoiled or otherwise in a condition unsuitable for feeding livestock; and (E) otherwise acceptable to Lender.

1.121    **Eligible Hedged Cattle** means Eligible Cattle (A) subject to (1) a commodity hedge agreement involving hedge transactions as carried under an Eligible Commodity Hedge Account, (2) an Eligible Cash Forward Cattle contract, or (3) another hedging method acceptable to Lender; and (B) at a location approved by Lender.

1.122    **Eligible Inventory** means Inventory which is (A) owned by and in the possession of Borrower at a location owned by Borrower or otherwise acceptable to Lender, (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

1.123    **Eligible Investment in Growing Crops** means the lesser of (A) actual expenses incurred in connection with the planting, growth and harvest cycle of then-currently growing annual crops, the type and timing of which are acceptable to Lender, on land owned by Borrower or land leased by Borrower and, at the option of Lender, to which Lender has been granted a right of access for purposes of harvesting those crops, not including one-time development costs in connection with Permanent Crop Plantings and expenses incurred in connection with the processing of harvested crops; or (B) 60% of the projected harvested value of those crops, as determined by Lender.

1.124    **Eligible Milk Accounts Receivable** means Accounts Receivable resulting from the sale of fluid milk (including deferred Accounts Receivable resulting from the sale of fluid milk, as approved by Lender) (A) from a creamery acceptable to Lender, (B) subject to a first priority perfected security interest in favor of Lender; and (C) are not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

1.125    **Eligible Option Protected Cattle** means Eligible Cattle subject to an Eligible Cattle Futures Contract that provides a put option for the month during which such Eligible Cattle are projected to finish, with a strike price equal to at least 95% of the corresponding Eligible Cattle Futures Contract price for such Eligible Cattle.

1.126    **Eligible Packer Account Receivable** means an Eligible Account Receivable resulting from the sale of livestock to a buyer acceptable to Lender which have been shipped, not to exceed 10 days past the shipping date when due, and (A) subject to a first priority perfected security interest in favor of Lender, (B) not subject to any Lien in favor of a Person other than Lender, and (C) otherwise acceptable to Lender.

1.127    **Eligible Pasture Cattle** means Cattle which are not located in a feedyard facility but which are otherwise acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

1.128    **Eligible Poultry** means live poultry and chickens, including broilers, layers, and live pullets, and which are (A) owned by Borrower (not including Borrower's interest in any poultry described above, if any, which are co-owned with Borrower's customers or other Persons), (B) located in poultry facilities owned or leased by Borrower; (C) subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

1.129    **Eligible Prepaid Crop Expenses** means amounts prepaid to vendors acceptable to Lender for the purchase of goods or services used in the production of crops growing on land owned by Borrower or land leased by Borrower and, at the option of Lender, to which Lender has been granted a right of access for purposes of harvesting those crops, not including one-time development costs and expenses incurred in connection with the production of crops harvested.

1.130    **Eligible Prepaid Feed and Input Expenses** means the amounts prepaid to vendors acceptable to Lender for the purchase of Feed commodities and other inputs acceptable to Lender.

1.131    **Eligible Procurement Cattle** means Cattle acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) to be resold to Borrower's customers within 30 days from the date of acquisition by Borrower; (C) subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (E) otherwise acceptable to Lender.

1.132    **Eligible Real Estate** means Real Estate which is (A) owned by and in the possession of Borrower or subject to leases acceptable to Lender which are subordinated to the interests of Lender, (B) subject to a first priority mortgage or deed of trust to or for the benefit of Lender; (C) not subject to any Lien in favor of a Person other than Lender except non-delinquent ad valorem real estate taxes and assessments; (D) not subject to any covenants, restrictions or other encumbrances except those which have been expressly approved by Lender; (E) subject to a lender's policy of title insurance approved by Lender; (F) not subject to any environmental contamination or other condition of the premises or improvements unacceptable to Lender; and; (G) otherwise acceptable to Lender.

1.133    **Eligible Swine** means isowean pigs, feeder pigs, market hogs, or other such swine acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in Favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

1.134    **Eligible Swine Value** means the market value with respect to Eligible Swine determined by (A) multiplying (1a) the price per hundredweight at which a Hog Futures Contract (dated nearest to the estimated date on which such hogs would be finished or, in the case of feeder hogs or isowean pigs, dated nearest to the estimated date on which such hogs would meet feeder hog or isowean pig contract specifications) could be entered into by the Borrower on the date the Eligible Swine Value is determined, or (1b) the price per hundredweight of a Cash Forward Hog Contract with respect to Eligible Swine between Borrower and a reputable counterparty acceptable to Lender (plus or minus the local basis and any premiums or discounts), times (2) the number of hundredweights projected to be deliverable when such hogs are finished, then (B) subtracting the sum of (1) Hog Finishing Costs projected to be incurred, on the basis of existing market conditions, plus (2) Hog Marketing Costs. Provided, however, that if there is no available Hog Futures Contract or Cash Forward Hog Contract for reference, then the market value will be determined by (Y) multiplying (1) the price per hundredweight of the animal's respective weight class as determined by Lender, times (2) the animal's current weight, or (Z) other means as determined by Lender.

**1.135**    **Eligible Veterinary Supplies** means animal medicines and health supplies normally used for the care of livestock which are (A) owned by and in the possession of Borrower, (B) subject to a first priority perfected security interest in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender; (D) not spoiled or otherwise in a condition unsuitable for use; and (E) otherwise acceptable to Lender.

**1.136**    **Energy Law** means all Applicable Laws relating to or imposing (A) rates, financial or organizational standards for (or exemptions therefrom) or (B) standards of conduct concerning (or exemptions therefrom), the source, production, generation, storage, transmission, use, distribution, sale, allocation or any other aspect of energy (including without limitation, oil, gas, natural gas, hydroelectric, electric, solar, wind, anaerobic digester).

**1.137**    **Environmental Information** means any evidence that Borrower is in compliance with all applicable Environmental Laws, including an environmental compliance audit of Borrower's operations conducted by a third party professional approved by Lender, a phase I environmental assessment of the Real Estate performed by a third party consultant approved by Lender and an asbestos survey of the Real Estate performed by a third party professional approved by Lender.

**1.138**    **Environmental Law** means all Applicable Laws relating to or imposing liability or standards of conduct concerning protection of health or the environment.

**1.139**    **EPC Agreement** means an agreement with respect to the engineering, procurement and construction (or installation) of an agricultural, commercial, renewable energy or other production facility or system, including without limitation, solar energy, anaerobic digester, livestock production or other facility or system entered by Borrower, the terms of which are acceptable to Lender.

**1.140**    **Equipment Financed** means the equipment more particularly described in the MCA or any amendment, modification or supplement thereto with respect to any applicable Loan Type.

**1.141**    **Equipment Line of Credit** means any credit Lender shall extend from time to time to Borrower in accordance with the MCA or any amendment, modification or supplement thereto.

**1.142**    **ERISA** means the Employee Retirement Income Security Act of 1974, as amended from time to time.

**1.143**    **ERISA Affiliate** means any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Internal Revenue Code).

**1.144**    **Event of Default** means, upon Lender's election, the occurrence of any of the following:

     (a)    **Non-Payment.** Any payment required under any Loan Document is not received by Lender by the first Business Day after the fourth calendar day following its scheduled due date;

     (b)    **False Representation.** The Financial Information or any Borrower Representation in any Loan Document is materially incorrect or misleading;

     (c)    **Covenant Violation.** The violation of or failure to comply with any Borrower Covenant;

     (d)    **Taxes, Insurance, Collateral Maintenance.** Borrower does not (i) pay (or cause payment of) all taxes assessed on the Collateral prior to the date when delinquent; (ii) maintain (or cause to be maintained) all policies of insurance required under the Transaction Documents and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; and (iii) maintain the Collateral (or cause the Collateral to be maintained) in good condition and repair, all in accordance with the terms and conditions of the Transaction Documents;

     (e)    **Death.** The death of (i) any Borrower or Guarantor who is an individual, (ii) if any Borrower or Guarantor is a partnership, any general partner of that partnership who is an individual, or (iii) if any Borrower or Guarantor is the trustee under a trust acting in that capacity, any individual trustor under the trust;

     (f)    **Management Change.** A change in the present executive or management personnel of any Borrower;

     (g)    **Federal Tax Lien.** The filing of any federal tax Lien against any Borrower or Guarantor, any member or general partner of any Borrower or Guarantor, or against the Collateral and same is not discharged of record within 30 days after the date filed;

     (h)    **Insolvency.** An Insolvency Proceeding is initiated by any Borrower or Guarantor; any Insolvency Proceeding initiated Borrower or Guarantor by another Person that is not discharged within 60 days after filing; or Lender, in its sole discretion, determines Borrower or Guarantor to be insolvent;

     (i)    **Adverse Judgment.** Borrower or Guarantor, if any, or any Subsidiary are or become subject to a Judgment or Judgments: (i) for the payment of money in an aggregate amount (as to all such Judgments or orders) exceeding the Judgment Threshold Amount, which are not covered by independent third-party insurance as to which the Insurer does not dispute coverage, or (ii) that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon any such Judgment, or (B) there is a period of ten consecutive days during which a stay of enforcement of any such Judgment, by reason of a pending appeal or otherwise, is not in effect;

     (j)    **Other Loan Document Default.** Any "default" or "Event of Default" as that term is defined in any Loan Document other than the MCA which is not cured within any applicable cure or grace period;

(k)     **Cross-Collateralized Loan Document Default.** Any default in the payment or performance of a term or condition of any Cross Collateralized Loan Document which is not cured within any applicable cure or grace period;

(l)     **Default Under Any Other Loan.** Any default in the payment or performance of a term or condition of any credit agreement, note, security agreement, Mortgage, deed of trust, deed to secure debt, or other agreement or instrument evidencing or securing any other Indebtedness, liabilities or Obligations of Borrower to Lender or Rabobank, or any other Affiliate of Lender, or any Swap Counterparty;

(m)     **Hedging Agreement Default.** Any default termination event or other similar event under any Hedging Agreement which is not cured within any applicable cure or grace period;

(n)     **Material Adverse Effect.** Any Material Adverse Effect as to any Borrower or Guarantor;

(o)     **Monetary Default After Notice.** For more than ten days after Notice from Lender, Borrower is in default under any term, covenant or condition of the MCA not previously described in this definition, which can be cured by the payment of a sum of money; and

(p)     **Non-Monetary Default After Notice.** For 30 days after Notice from Lender, Borrower is in default under any term, covenant or condition of the MCA not previously described in this definition; provided that if (i) it is reasonably certain that the default cannot be cured by Borrower within that 30 day period and (ii) Borrower has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period will be extended for so long as reasonably required by Borrower in the exercise of due diligence to cure that default, up to a maximum of 90 days after the Notice to Borrower of the Event of Default.

1.145     **Exceptions to Non-Recourse** means, collectively, (a) Lender's rights under any guaranty, indemnification (including any indemnity with respect to Environmental Laws or Hazardous Substances), agreement to hold harmless, master lease or similar instrument contained in or made in connection with the Loan Documents; (b) Lender's right to rents and profits, deposits, insurance proceeds or Condemnation Awards; (c) Losses incurred by Lender due to fraud or misrepresentation by or on behalf of Borrower in connection with the Loans; (d) Losses incurred by Lender due to waste or willful damage to the Collateral caused or suffered by Borrower; (e) Losses incurred by Lender due to the nonpayment real estate taxes, assessments, ground rents or other Impositions on the Collateral (including reimbursement for any such amounts paid by Lender) (f) Losses incurred by Lender due to any failure to maintain and pay premiums in connection with policies of insurance required under the terms of the Loan Documents (g) court costs, Legal Fees and other expenses of Lender incurred in connection with an Event of Default.

1.146     **Excess Payments** means any permitted Prepayments or permitted excess payments more particularly described in the MCA or any amendment, modification or supplement thereto.

1.147     **Facility Sheet** means an agreement titled "Facility Sheet" whether now or hereafter entered into with Lender setting forth the principal terms, covenants, definitions and Reporting Requirements applicable to any Note with respect to any Loan of any Loan Type entered into in connection with the MCA.

1.148     **Federal Flood Insurance** means flood insurance which has been made available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994 (as such acts may from time to time be amended).

1.149     **Feed** means grain, silage and other roughage feed, feed ingredients, and finished feed normally used for feeding livestock.

1.150     **Feed Account Receivable Related Cattle** means Cattle in the possession of the Borrower which are subject to a first Lien under common law or statutory first liens in favor of Borrower securing the Eligible Feed Accounts Receivable, as long as Borrower has taken all action required to perfect such Lien and to be entitled to the priority afforded thereby.

1.151     **FERC** means the Federal Energy Regulatory Commission (or any successor agency), as established for implementation of the laws of the United States of America, including without limitation, as amended, the Federal Power Act, the Public Utility Regulatory Policies Act of 1978, or the Public Utilities Holding Act of 2005).

1.152     **FFSC** means the Financial Guidelines for Agricultural Producers, published by the Farm Financial Standards Council.

1.153     **Financial Covenant** means any covenant contained in the Loan Documents regarding the financial status of a Person other than Lender.

1.154     **Financial Information** means all financial statements and other reports, documents, instruments, information and forms of evidence concerning Borrower, Guarantor, if any, the Collateral, or any other fact or circumstance, delivered to Lender in connection with Borrower's application for any Loan, Lender's underwriting and approval of any Loan, or the MCA and the other Loan Documents.

1.155     **Fixed Rate** means with respect to each applicable Loan Type, that rate determined by Lender and agreed to by Borrower on or before two Business Days prior to the date on which interest at that rate shall begin to accrue, fixed for the remainder of the term of the applicable Loan Type, more particularly described in the MCA or any amendment, modification or supplement thereto.

1.156     **Fixed Rate Loan** means a Loan which bears interest at a Fixed Rate.

1.157     **Fixed Rate Lockout Period** means any period of time for a Fixed Rate Loan which Prepayments are not permitted.

1.158     **Floor Rate** means the minimum per annum Interest Rate that may be charged on a Loan as stated in the MCA or any amendment, modification or supplement thereto.

v.009.20220131

1.159     **Funded Debt** means all outstanding long term liabilities for money borrowed for non-consumer purposes, other long term interest-bearing non-consumer liabilities, and Capital Leases.

1.160     **GAAP** means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied and as in effect from time to time.

1.161     **Governmental Authority** means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

1.162     **Guarantor** means any Party that is designated in a Facility Sheet from time to time as a guarantor and who from time to time enters into any Guaranty.

1.163     **Guaranty** means any guaranty (if any) from time to time entered into in connection with any Loan made hereunder for the benefit of Lender and/or Collateral Agent.

1.164     **Hard Costs** means the costs of all labor, materials, equipment, fixtures and furnishings necessary for final completion of the Project.

1.165     **Hazardous Substance** means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "caustic," "pollutant," or "contaminant" or a similar designation or regulation under any Environmental Law, and shall also include, without limitation, asbestos, polychlorinated biphenyl, petroleum, petroleum products, and natural gas.

1.166     **Hedging Agreement** means any derivatives, swaps, caps, collars or other similar agreement between Borrower and a Swap Counterparty, for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Borrower and a Swap Counterparty, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets.

1.167     **Hedging Obligations** means all indebtedness, liabilities and Obligations of Borrower under any Hedging Agreement, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

1.168     **Herd Maintenance Expenses** means the cost of self-raised dairy cows added to the dairy cattle herd, if any; plus the cost of purchased cows added to the herd; if any, less income from the sale or other disposition of cull cows, if any.

1.169     **Hog Finishing Costs** means the aggregate of all costs and expensed for Feed, medicine, shelter and all other items of cost or expense which are customarily or otherwise expected to be incurred to bring hogs to a weight at which they are to be sold for slaughter.

1.170     **Hog Futures Contract** means a contract for the future sale of hogs ("isowean pig", "feeder hogs", "live hogs" or otherwise, as acceptable to Lender) which has been entered into or could have been entered into by the owner of such hogs and priced on a lean hog futures basis through the Chicago Board of Trade, the Chicago Mercantile Exchange, the Kansas City board of Trade or any other United States contract market subject to the jurisdiction of the Commodity Futures Trading Commission, acceptable to Lender.

1.171     **Hog Marketing Costs** means reasonable expenses to be incurred in the sale of the hogs at the point for delivery under a Hog Futures Contract.

1.172     **In Balance** means that the amount of the undisbursed portion of the Maximum Amount for any Construction Line of Credit, plus any sums on deposit in Borrower's Funds Account, plus any sums Lender has agreed may be paid by Borrower as they come due, are sufficient to complete the Project.

1.173     **Indemnified Persons** means, collectively, the Lender, its officers, directors, employees, partners, agents and attorneys.

1.174     **Indemnified Banking Counterparty Liabilities** means all indebtedness, liabilities and Banking Obligations of Borrower to a Banking Counterparty, in connection with banking products and services provided by the Banking Counterparty to Borrower, if any, including all Obligations of Borrower to the Banking Counterparty as a result of: (a) deposits of credit items that are returned by the issuing bank; (b) ACH debit items originated by Borrower which settle with insufficient funds in Borrower's deposit account; (c) letters of credit issued by the Banking Counterparty for the benefit of Borrower; (d) trade finance services; and (e) all service charges and fees posted to the account.

1.175     **Index Rate** shall be as set forth with respect to each applicable Loan in the MCA, or any amendment, modification or supplement thereto.

1.176     **Individual** means in connection with any definition, financial report or financial covenant, each applicable Person, not in combination of other applicable Persons or their Subsidiaries.

1.177     **Initial Principal Payment Date** means the first date of principal payment, together with all unpaid accrued interest on the Loan, and other charges under the terms of the MCA or any amendment, modification or supplement thereto or other sources in such amounts as necessary to comply with the terms of the MCA or any amendment, modification or supplement thereto.

1.178     **Insolvency Proceeding** means the appointment of a receiver with respect to any part of Person's property, an assignment by a Person for the benefit of creditors, or the commencement of any proceeding under the Bankruptcy Code or any other bankruptcy or insolvency law, by or against a Person.

1.179    **Installment Payment** means regularly scheduled payments made during the Loan's Amortization Period more particularly described in the MCA or any amendment, modification or supplement thereto.

1.180    **Integrator** means the Person(s) who holds or has contracted with Borrower under an Integrator Contract(s) for the production of all or a portion of the poultry and/or swine grown or cared for by Borrower and located at or in connection with the Collateral.

1.181    **Integrator Contract** means the poultry and/or swine contract entered into between an Integrator(s) and the Borrower for the production of the poultry and/or swine grown or cared for by Borrower and located at or in connection with the Collateral.

1.182    **Integrator Payment** means all payments or other compensation made by and Integrator(s) to Borrower pursuant to an Integrator Contract(s).

1.183    **Interest Coverage Ratio** means the ratio of EBITDA to interest expense.

1.184    **Interest Payment Date** means a date on which regularly scheduled payments of interest are due. For the avoidance of doubt, for any SOFR Rate Loan, if any Interest Payment Date would otherwise end on a day which is not a Business Day such Interest Payment Date shall end on the next succeeding Business Day unless that Business Day falls in the next succeeding calendar month, in which case the Interest Payment Date will be the preceding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

1.185    **Interest Period** means (a) with respect to each applicable LIBOR Rate Loan, Term SOFR Rate Loan, Daily Compounded SOFR Rate Loan and Long Term Adjustable Rate Loan (to the extent applicable), each period commencing on the date that any initial LIBOR Rate Loan, Term SOFR Rate Loan, Daily Compounded SOFR Rate Loan or Long Term Adjustable Rate Loan (to the extent applicable) is made with respect to each applicable Loan Type, or the applicable rate is recalculated, until the next Adjustment Date or, if earlier, the respective Maturity Date; and (b) with respect to each applicable LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan, the period selected by Borrower or agreed to between Borrower and Lender, during which the applicable LIBOR Rate, Term SOFR Rate or Daily Compounded SOFR Rate will be effective, except that Borrower may not select any Interest Period which would extend beyond the Maturity Date of the respective Loan; each LIBOR Rate Interest Period or Term SOFR Rate Interest Period which commences on the last Business Day of a month (or on any day for which there is no numerically corresponding day in the appropriate subsequent month) shall end on the last Business Day of the appropriate subsequent month, each LIBOR Rate Interest Period or Term SOFR Rate Interest Period which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day, each Term SOFR Rate Interest Period which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day unless that Business Day falls in the next succeeding calendar month, in which case the Interest Period will end on the preceding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension, and unless otherwise determined by Lender, no Interest Period for any LIBOR Rate Loan or Term SOFR Rate Loan shall have a duration of less than one month, and, if the Interest Period would otherwise be a shorter period, the related LIBOR Rate Loan or Term SOFR Rate Loan shall not be available. Unless the MCA or any amendment, modification or supplement thereto provides otherwise, if a Daily Compounded SOFR Rate Loan is outstanding, such Daily Compounded SOFR Rate Loan shall use one Interest Period as initially set forth therein; and all Daily Compounded SOFR Rate Continuations shall automatically continue in such Interest Period.

1.186    **Interest Rate** means with respect to each applicable Loan, the applicable index rate for such Loan increased by an Interest Rate Margin, if any, and, for any SOFR Rate Loan, the Spread Adjustment, if any, all as set forth in the MCA or any amendment, modification or supplement thereto.

1.187    **Interest Rate Margin** means with respect to each applicable Loan, the percentage margin set by Lender and added to an indexrate or rate calculated based on an index rate to establish the Interest Rate set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.

1.188    **Internal Revenue Code** means the Internal Revenue Code of 1986, as amended from time to time.

1.189    **Inventory** means inventory (as that term is defined in the UCC) which: (A) is not (1) packaging or shipping materials, (2) goods used in connection with maintenance or repair of properties or assets owned by Borrower, Guarantor, or any Affiliate or Subsidiary of Borrower, (3) general supplies or (4) work-in-process; (B) complies with all standards, if any, imposed by Governmental Authorities; (C) complies with all warranties, representations and covenants in the loan documents relating thereto; (D) is not unacceptable to Lender due to age, type, category, quality and/or quantity; and (F) is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreement of any other Person that would materially restrict Lender's ability to sell or otherwise dispose of such Inventory ; provided, that Lender may, consistent with Lender's normal credit practices, from time to time upon 30 days prior written notice to Borrower, designate categories of ineligible Inventory in addition to those above; provided, also, that such designation shall be immediately effective upon the occurrence of an Event of Default or if an Event of Default is in existence at the time of such designation.

1.190    **Investment** means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor guarantees indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit; provided, that for purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without Adjustment for subsequent increases or decreases in the value of such Investment.

1.191    **Judgment** means a judgment, order, writ, injunction, decree, or rule of any court, arbitrator, or Governmental Authority.

1.192    **Judgment Threshold Amount** means the amount specified in the MCA or any amendment, modification or supplement thereto of a Judgment against any Borrower or Guarantor or any Subsidiary for the payment of money in an aggregate amount (as to all such Judgments or orders).

1.193    **Legal Fees** means any and all counsel, attorney, paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial, appellate, discretionary review, or any other level, incurred or paid by Lender in protecting and enforcing its rights and interests under the Loan Documents or the Cross Collateralized Loan Documents.

v.009.20220131

1.194    **Lender** shall have the meaning specified in the preamble of the MCA and any successors and assigns of any of its rights and Obligations under the MCA.

1.195    **Letter of Credit** and "Letters of Credit" shall mean, respectively, a letter of credit and all such letters of credit (whether direct or confirming), issued by the Lender (or caused to be issued by Lender), in its sole discretion, upon the execution and delivery by the Borrower and acceptance by the Lender of a Letter of Credit Reimbursement Agreement and a Letter of Credit Application pursuant to a Letter of Credit Facility.

1.196    **Letter of Credit Application** shall mean, with respect to any request for the issuance of a Letter of Credit, a letter of credit application in the form being used by Lender at the time of such request for the type of Letter of Credit requested.

1.197    **Letter of Credit Facility** means any loan made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto.

1.198    **Letter of Credit Reimbursement Agreement** shall mean, at any time, with respect to the issuance of Letters of Credit, a Letter of Credit Reimbursement Agreement in the form being used by Lender at such time.

1.199    **Letter of Credit Repayable on Demand** shall mean the amount of any draws made by a beneficiary under a Letter of Credit shall be payable by Borrower upon the earlier of (i) the Lender's demand for repayment, or (ii) five (5) days from the date of such draw by such beneficiary by the Lender.

1.200    **Letter of Credit Repayable over Time** shall mean the amount of any draws made by a beneficiary under a Letter of Credit shall be payable by Borrower pursuant to the terms and conditions of the Revolving Line of Credit Note pursuant to which the Letter of Credit was issued.

1.201    **LIBOR Rate** means, for any Interest Period, the rate of interest published in the "Money Rates" section of *The Wall Street Journal* (or if *The Wall Street Journal* is not available or does not publish that rate, any other authoritative source of that rate, selected by Lender from time to time for purposes of providing quotations of Interest Rates applicable to dollar deposits in an amount equal to the applicable Loan in the London interbank market at approximately 11:00 a.m., London time) on the London Banking Day immediately preceding the commencement of the Interest Period, as the rate for dollar deposits with a (30) day maturity or as the rate for dollar deposits with such other maturity to which party and Lender may agree, as set forth in the MCA or any amendment, modification or supplement thereto; provided, that the LIBOR Rate shall be increased by an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. The LIBOR Rate shall be Adjusted on the first day of the applicable LIBOR Rate Interest Period.

1.202    **LIBOR Rate Continuation** means with respect to each applicable Loan Type, the continuation of any LIBOR Rate Loan for another Interest Period.

1.203    **LIBOR Rate Conversion** means with respect to each applicable Loan Type, a Rate Conversion of any LIBOR Rate Loan.

1.204    **LIBOR Rate Interest Period** means LIBOR Rate plus the applicable Interest Period.

1.205    **LIBOR Rate Loan** means a Loan which bears interest at the LIBOR Rate set forth in the MCA or any amendment, modification or supplement thereto.

1.206    **LIBOR Rate Prepayment Costs** means that amount as determined by Lender as its loss, cost or expense incurred as a result of: (a) the Prepayment of a LIBOR Rate Loan on a day other than the last day of the Interest Period for that LIBOR Rate Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); and (b) any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain that LIBOR Rate Loan or from fees payable to terminate the deposits from which those funds were obtained. Borrower shall also pay any administrative fees charged by Lender in connection with any event described in this paragraph above. For purposes of calculating amounts payable by Borrower to Lender under the terms of this section, Lender will be deemed to have funded each LIBOR Rate Loan by a matching deposit or other borrowing in the London interbank Eurodollar market for a comparable amount and for a comparable period, whether or not that LIBOR Rate Loan was in fact so funded.

1.207    **Lien** means any Mortgage, pledge, assignment, deposit arrangement, privilege, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

1.208    **Line of Credit** means the Revolving Line of Credit, the Non-revolving Line of Credit, the RELOC, the Construction Line of Credit or the Equipment Line of Credit.

1.209    **Line of Credit Loan** means a loan made by Lender to Borrower under a Line of Credit.

1.210    **Liquid Assets** means cash, checks, drafts, accounts that can be converted to cash, investments in U.S., state or local government debt that can be convertible to cash within 5 Business Days, without negatively affecting its market price, and other similar investments and assets that can be easily, securely, and quickly exchanged for legal tender without material loss in value, all as may be acceptable to Lender with respect to any Borrower, Party or Person.

1.211    **Loan** means any advance of funds by Lender of any Loan Type.

v.009.20220131

1.212   **Loan Documents** means the MCA, the Facility Sheet(s), the Applicable Obligor Covenants Schedule, the Notes, Security Instruments, UCC-1s, any Guaranty, the Schedule of Definitions and Covenants, Other Schedule and all other agreements and instruments required by Lender for purposes of evidencing or securing any Loan, now existing or hereinafter amended, modified or supplemented between Lender and any Borrower.

1.213   **Loan Month** means, whenever the Closing Date occurs on the first day of the month, the calendar month in which the Closing Date occurs and each subsequent calendar month, and whenever the Closing Date occurs on a date other than the first of the month, means the calendar month immediately following the calendar month during which the Closing Date occurs, and each subsequent calendar month.

1.214   **Loan Obligations** means all indebtedness, liabilities and Obligations of Borrower to Lender arising pursuant to any of the Loan Documents and any Loan Type, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

1.215   **Loan Opening Conditions** shall be the conditions to Lender's obligation to make the initial Loan as set forth in the MCA.

1.216   **Loan Product Conversion** means a change in the rate of interest, required payments and any other terms and conditions under which Lender would agree to convert the Loan to a fixed or long term adjustable rate term loan more particularly described in the MCA or any amendment, modification or supplement thereto.

1.217   **Loan Request** means a request for a Loan made by Borrower or Lender.

1.218   **Loan Type** means the type of Loan being entered into between Borrower and Lender from time to time as set forth in the MCA or any amendment, modification or supplement thereto.

1.219   **Loan Year** means the one calendar year period beginning with the first calendar month following the calendar month in which the applicable Closing Date or (in the case of the Conversion only) the Conversion Date, occurs, and each subsequent one calendar year period.

1.220   **London Banking Day** means a day on which banks are open for dealings in dollar deposits in the London interbank market.

1.221   **Long Term Adjustable Rate** means with respect to each applicable Loan Type, that rate, if any, agreed to between Lender and Borrower as the rate which Borrower may select pursuant to its rights under each applicable Loan Type, effective for that period of time, if any, agreed to between Lender and Borrower with respect to each applicable Loan Type, subject to Adjustment to whatever rate of interest of which Lender notifies Borrower prior to the Adjustment Date, more particularly described in the MCA or any amendment, modification or supplement thereto.

1.222   **Long Term Adjustable Rate Adjustment Date** means each date on which the rate of interest on a Long Term Adjustable Rate Loan is or may be Adjusted by Lender pursuant to the MCA or any amendment, modification or supplement thereto.

1.223   **Long Term Adjustable Rate Loan** means a Loan which bears interest at a Long Term Adjustable Rate.

1.224   **Long Term Adjustable Rate Lockout Period** means any period of time for a Long Term Adjustable Rate Loan which Prepayments are not permitted.

1.225   **Losses** means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, Obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, Judgments, awards, amounts paid in settlement of whatever kind or nature (including Legal Fees).

1.226   **Margin Adjustment Date** means onset date and successive periods that the Interest Rate Margin will Adjust as set forth in the MCA or any amendment, modification or supplement thereto.

1.227   **Master Guaranty** means any master guaranty (if any) from time to time entered into in connection with any Loan made hereunder for the benefit of Lender and/or Collateral Agent.

1.228   **Material Adverse Effect** means any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect as to the validity or enforceability of any Transaction Document or any material term or condition therein against the applicable Person; (b) is or could reasonably be expected to be material and adverse to the financial condition, business assets, operations, or property of the applicable Person; or (c) materially impairs or could reasonably be expected to materially impair the ability of the applicable Person to perform the Obligations.

1.229   **Maturity Date** means, with respect to each Loan, the Maturity Date set forth in the MCA or any amendment, modification or supplement thereto for such Loan, or any other earlier date when, under the terms of the MCA, the entire unpaid principal amount of such Loan is due.

1.230   **Maximum Amount** means with respect to each applicable Loan Type, that amount denoted as the Maximum Amount in the MCA or any amendment, modification or supplement thereto.

1.231   **Maximum Rate** means that rate per annum which, under Applicable Law, may be charged without subjecting Lender to civil or criminal liability, or limiting Lender's rights under the Loan Documents as a result of being in excess of the maximum Interest Rate which Borrower is permitted to contract or agree to pay; except that the Maximum Rate on any amount upon which Lender is not permitted to charge interest will be zero percent.

1.232   **MCA** means the Master Credit Agreement by and between the Parties and Lender in effect from time to time as may be amended, modified or supplemented from time to time, including without limitation any Facility Sheet, schedules, addendums, exhibits or attachments thereto, as may be amended, modified or supplemented from time to time.

v.009.20220131

**1.233** **Minimum Principal Payment** means principal payments, together with all unpaid accrued interest on the Loan, and other charges under the terms of the MCA or any amendment, modification or supplement thereto or other sources in such amounts as necessary to comply the MCA or any amendment, modification or supplement thereto.

**1.234** **Mortgage** means any mortgage,/ deed of trust, deed to secure debt, trust deed, or assignment of rents now or hereafter entered into by Borrower in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

**1.235** **Non-Borrower Grantor** means any Person who executes any Loan Document or any amendment, modification or supplement thereto for purposes of granting a Lien in Collateral but is not personally liable for such Loan.

**1.236** **Non-revolving Line of Credit** means any applicable Loan made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto.

**1.237** **Note** means each promissory note entered into by Borrower in favor of Lender to evidence any Loan, and any other evidence of indebtedness delivered in connection with the MCA or any amendment, modification or supplement thereto and more particularly described in each Facility Sheet or any amendment, modification or supplement thereto.

**1.238** **Notice of Early Termination** means Lender's option to accelerate the Maturity Date by Notice to Borrower, electing to terminate the Line of Credit as of the Annual Anniversary Date.

**1.239** **Notice of Election to Prepay** means any Notice given by Borrower to Lender which informs Lender of its decision to elect to Prepay the entire unpaid principal balance of the Loan that is the subject of the Notice of Election to Prepay, together with all accrued interest and all other charges due under the Conversion.

**1.240** **Notices** means all requests, notices, approvals, consents, and other communications sent between the parties to the MCA or to any of the Loan Documents.

**1.241** **O&M Agreement** means an agreement between Borrower and any Person (acceptable to Lender) with respect to the operation and maintenance of any agricultural, commercial, renewable energy or other facility, including without limitation, in connection with an EPC Agreement, production agreement (including without limitation, livestock, food, beverage, agricultural production) or any other similar agreement, in form and substance acceptable to Lender.

**1.242** **Obligations** means the Banking Obligations, Loan Obligations and the Hedging Obligations.

**1.243** **OFAC** means the Office of Foreign Assets Control.

**1.244** **Optional Rate Conditions** shall mean the following:

    (a)     **Rate Request.** Lender must receive a Rate Request;

    (b)     **Time of Request.** At Lender's option, all Rate Requests must be received by Lender before 12:00 noon (St. Louis, Missouri time), on

        (i)     In the case of a LIBOR Rate Conversion, LIBOR Rate Continuation, , SOFR Rate Conversion or SOFR Rate Continuation, a Business Day which is not less than two Business Days prior to the date of the LIBOR Rate Conversion, LIBOR Rate Continuation, SOFR Rate Conversion or SOFR Rate Continuation (except a SOFR Rate Continuation where the SOFR Rate Loan is automatically continued pursuant to the MCA) and

        (ii)     In the case all other Rate Conversions, a Business Day which is not less than one Business Day prior to the date of that Rate Conversion; and

    (c)     **LIBOR and Term SOFR Conversion.** A Rate Conversion of a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan may take place only on the last day of the respective Interest Period.

    (d)     **No Default.** Except for any Rate Conversions into any Base Rate Loan, no Rate Conversions, LIBOR Rate Continuations or SOFR Rate Continuations will be made while there exists an Event of Default or an event which, with the passage of time or the giving of Notice would be an Event of Default, or if the Interest Rate for that Loan would exceed the Maximum Rate.

    (e)     **Irrevocable.** Each Rate Request will be irrevocable.

    (f)     **Automatic Conversion.** If there is an Event of Default, or if Borrower fails to select the Interest Rate applicable to a Loan or portion thereof or the duration of any Interest Period for any LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan within the time period and otherwise as provided in this section, that Loan (if other than a Base Rate Loan) will be if not then outstanding, made as or, if then outstanding, automatically converted to a Loan bearing interest at the applicable Base Rate on the last day of the Interest Period for a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan and immediately for a Daily Simple SOFR Rate Loan.

    (g)     **Limitations on Number and Size.** The unpaid principal amount of any Loan of any Loan Type must at no time be subject to more than five different rates of interest. The portion of any Loan of any Loan Type initially subject to each rate other than the Base Rate must be no less than $200,000.00.

1.245    **Optional Rates** means one or more of the following as selected by Borrower and approved by Lender as applicable to an advance or portions of a Loan:

    (a)    an Interest Rate based on an index rate, including without limitation

        i.    **Base Rate**. The Base Rate;

        ii.    **LIBOR**. The LIBOR Rate;

        iii.    **SOFR**. The applicable SOFR Rate;

    (b)    **Long Term Adjustable**. The Long Term Adjustable Rate; and

    (c)    **Fixed**. The Fixed Rate.

1.246    **Original Payment Dates** means the dates on which the Prepaid principal would have been paid if there had been no Prepayment. If any of the principal would have been paid later than the end of the Interest Period in effect at the time of Prepayment, then the Original Payment Date for that amount will be the last day of the Interest Period.

1.247    **Other Obligations** means all other indebtedness, liabilities and Obligations of Borrower to Lender or Rabobank or any of their Affiliates which are not Loan Obligations or Hedging Obligations.

1.248    **Other Schedule** means collectively any Facility Sheet, Applicable Obligor Covenants Schedule or other schedules incorporated by reference into the MCA or any amendment, modification or supplement thereto.

1.249    **Out of Balance** means that the amount of the undisbursed portion of the Maximum Amount of any Construction Line of Credit, plus any sums on deposit in Borrower's Funds Account, plus any sums Lender has agreed may be paid by Borrower as they come due, are insufficient to complete the Project.

1.250    **Parties** means any and all parties to the MCA or to any of the Loan Documents.

1.251    **Party** refers only to a named party to the MCA or another Loan Document, as the context requires.

1.252    **Permanent Crop Plantings** means any or all varieties of Plantings that yield fruit, nuts, produce or other crops on the Real Estate in more than one crop year.

1.253    **Permits** means all permits, licenses and approvals of any kind or nature necessary or appropriate to construct, occupy and operate Borrower's business.

1.254    **Permitted Debt** means the following if not otherwise prohibited under the Loan Documents: (a) liabilities and obligations to Lender or any of its Affiliates; (b) normal trade credit; (c) if an individual, additional debts as an individual for primarily consumer purposes.

1.255    **Permitted Investments** means the following if not otherwise prohibited under the Loan Documents: (a) investments made prior to the date of this Agreement and disclosed to Lender in writing; (b) investments in current Subsidiaries; and (c) investments in certificates of deposit, obligations of the federal government, or readily marketable securities.

1.256    **Permitted Liens** means the following if not otherwise prohibited under the Loan Documents: (a) Liens in favor of Lender or any of its Affiliates; (b) if an individual, additional Liens against the personal assets of that individual as an individual, to secure debt for primarily consumer purposes; (c) Liens for taxes not yet due.

1.257    **Permitted Loans** means the following if not otherwise prohibited under the Loan Documents: (a) extensions of credit made prior to the date of this agreement and disclosed to Lender in writing on or before the date of this agreement; (b) extensions of credit to current Subsidiaries; (c) extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to persons other than family members, Subsidiaries, and Affiliates.

1.258    **Permitted Over-Advance** means Lender approved Loan Requests which exceed the Maximum Amount thereof under the terms of the MCA or any amendment, modification or supplement thereto.

1.259    **Permitted Sales** means the following if not otherwise prohibited under the Loan Documents: (a) sales or transfers of inventory in the ordinary course of business.

1.260    **Person** means an individual, a corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or other business entity, or a government or any agency or political subdivision thereof.

1.261    **Plan** means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Borrower or, with respect to any such plan that is subject to Section 412 of the Internal Revenue Code or Title IV of ERISA, any ERISA Affiliate of any Borrower.

1.262    **Plans and Specifications** means collectively, the final plans and specifications for the Project approved by Lender, which describe and show the labor, materials, equipment, fixtures and furnishings necessary for the final completion of the Project, including all amendments and modifications thereof made by changes approved by Lender or otherwise permitted under the MCA.

1.263    **Plantings** means all bushes, groves, trees, plants, vines or other vegetation planted upon or under the Real Estate.

v.009.20220131

1.264     **Position Report** means a report in form and substance acceptable to, and for the period specified by, Lender, on which Borrower (or Party) represents to Lender the Value of Borrower (or Party) assets, Related Payables and Liabilities and all other financial matters required by Lender for the reporting period.

1.265     **Prepaid** means when a Prepayment has been made.

1.266     **Prepay** means to make a Prepayment.

1.267     **Prepayment** means a payment of all or a portion of the unpaid principal balance of any applicable Loan prior to the date when due, whether voluntary, by reason of acceleration, or otherwise.

1.268     **Prepayment Conditions** means the following:

      (a)     **Lender May Refuse.** Lender may refuse to accept any Prepayment not expressly permitted in the MCA;

      (b)     **Effect of Notice of Prepayment.** If a Prepayment is conditioned upon prior Notice to Lender, at the option of Lender,

           (i)     That Notice will be irrevocable;

           (ii)     A Prepayment will be due in the amount and on the date specified in that Notice; and

           (iii)     That Notice will not affect Borrower's obligation to make all other payments required under the Loan Documents on the date when due;

      (c)     **Accrued Interest and Fee.** Prepayments of any applicable Loan must be accompanied by unpaid accrued interest and the Prepayment Fee, if applicable;

      (d)     **All Amounts Due.** Permitted Prepayments of any applicable Loan are subject to payment of all amounts then due under such applicable Loan;

      (e)     **Application of Prepayment.** Each Prepayment of a portion of any applicable Loan will be applied to the most remote payment of the principal due under such Loan;

      (f)     **Effect of Acceptance.** If Lender receives any Prepayment which Lender is permitted to refuse, Lender may accept the Prepayment and Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due under the MCA, whichever is earlier;

      (g)     **Application of Fee.** The Prepayment Fee shall apply to all Prepayments of any applicable Loan, including any payments or Prepayments made upon the acceleration of the due date of such Loan because of default or otherwise, and such Prepayment Fee shall be payable in addition to any default interest and other sums required to be paid under such Loan;

      (h)     **Insurance and Condemnation.** The application of the proceeds of insurance or of a Condemnation Award in reduction of the indebtedness shall require payment of Prepayment Fee;

      (i)     **LIBOR and SOFR Prepayment.** Borrower shall have no right to Prepay any LIBOR Rate Loan or SOFR Rate Loan bearing an Interest Period except at the end of an Interest Period; and

      (j)     **Last 30 Days Free.** Notwithstanding any provisions of the Loan Documents to the contrary, no Prepayment Fee shall be due if Borrower voluntarily Prepays a Loan in full within the period of thirty (30) days immediately preceding the Maturity Date; provided that on the date such Prepayment is made, no Event of Default (or event which, with the passage of time or the giving of Notice, or both, would be an Event of Default) shall have occurred and still be outstanding.

      (k)     **Daily Compounded SOFR Rate Loan Prepayments.**

           (i)     No prepayment of a SOFR Rate Loan which computes interest using Daily Compounded SOFR shall be made on any day that is not a U.S. Government Securities Business Day, and if any prepayment to be made by the Borrowers shall fall due on such day, payment shall be made on the next succeeding U.S. Government Securities Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be

           (ii)     In the event of any repayment or prepayment of any Daily Compounded SOFR Rate Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any Daily Compounded SOFR Rate Conversion or Daily Compounded SOFR Rate Continuation of any borrowings computed by reference to Daily Compounded SOFR prior to the end of the Interest Period therefor, accrued interest on such Borrowing shall be payable on the effective date of such conversion or continuation.

1.269     **Prepayment Fee** means a fee payable to Lender in connection with the Prepayment of any applicable Loan as fair and reasonable consideration to compensate the Lender in connection with such Loan that is made on the basis and assumption that Lender would receive the payments of principal and interest set forth therein for the full term of such Loan.

v.009.20220131

1.270    Prepayment Free Percentage means a percentage of principal advanced that may be Prepaid with no fee in any calendar year.

1.271    Prepayment Options means one of the following:

(a)    Prepayment Completely Locked Out means that no Prepayment of a Loan, in full or in part, is permitted except as may be permitted or required by Lender in the event of a casualty or condemnation as provided in the Loan Documents. The Lender reserves the right to require principal reduction payments for release of Collateral or for the modification of Loan Documents. The application of proceeds of Insurance or of a Condemnation Award in reduction of the applicable Loan, if permitted or required by the Lender shall be deemed a Prepayment and shall require Borrower to pay a Prepayment Fee. The amount of the Prepayment Fee shall be equal to the amount of interest which would have accrued on the Prepaid sum from the date of Prepayment until the next date on which the applicable Interest Rate is Adjusted, or if none, the Maturity Date of the applicable Loan.

(b)    Prepayment Locked Out Period means a period of time following the making of a Loan during which no Prepayment of a Loan, in full or in part, is permitted. The applicable Loan may be Prepaid following the Prepayment Locked Out Period upon payment of the applicable Prepayment Fee.

(c)    Prepayment Open means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due on the applicable Loan and following the passage of any Prepayment Locked Out Period, Prepayment of a Loan may be made at any time without Prepayment Fee.

(d)    Prepayment Yield Maintenance means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due on the applicable Loan and following the passage of any Prepayment Locked Out Period, the Borrower shall have the privilege of making any of the following payments of principal before such principal is due: (1) On any date on which interest is scheduled to be paid, the Borrower may make payments in multiples of $100 of additional sums to be applied in reduction of principal, without fee, provided the amount so paid in any calendar year (January 1 to December 31) shall not exceed the Prepayment Free Percentage of the principal advanced hereunder and this right shall be non-cumulative; (2) On any date in any calendar year (January 1 to December 31) on which interest is scheduled to be paid, the Borrower may make payments in multiples of $100 of sums in reduction of principal, in addition to any amounts paid under clause "(1)" of this paragraph, upon payment of a fee of an amount to compensate the Lender for the present value of the difference between the Interest Rate under this Note and comparable Treasury yields as Adjusted by a Reinvestment Spread which amount is equal to the product of the two fractions defined in "I" and "II" below which product is expressed in the mathematical formula set forth below in "III." In addition, following any applicable Prepayment Locked out Period, on any date other then a date on which the above privileges may be exercised, the Borrower may Prepay the applicable Loan in full upon payment of a fee of an amount to compensate the Lender for the present value of the difference between the Interest Rate under the applicable Loan and comparable Treasury yields as Adjusted by a Reinvestment Spread, which amount is equal to the product of the two fractions defined in "I" and "II" below, which product is expressed in the mathematical formula set forth below in "III":

(i)    The numerator of the first fraction is equal to the product of (A) the amount of principal to be Prepaid (designated as "P" in the formula below) and (B) the amount by which the Interest Rate, stated as a decimal, in effect under this Note at the time of the Prepayment of principal, as Adjusted to reflect an assumption of semiannual payments (Bond Equivalent Yield, as defined in "V" below) as determined solely by the Lender hereof regardless of the actual payment schedule (designated as "i" in the formula below) exceeds the sum of (a) the Treasury Rate (as defined below and designated as "t" in the formula below) and (b) the Reinvestment Spread. The denominator of the first fraction is equal to two (2).

(ii)    The numerator of the second fraction is equal to the difference of (A) one (1) minus (B) a fraction the numerator of which is equal to one (1) and the denominator of which is the sum of (a) one half of the sum of (x) the Treasury Rate (as defined below and designated as "t" in the formula below) and (y) the Reinvestment Spread and (b) one (1), all of said sum then raised to a power equal to the number of semiannual periods then remaining in the loan term (the number of months and partial months then remaining in the loan term divided by six and rounded up to the next whole number) or, if sooner, the number of semiannual periods then remaining prior to the next date on which the applicable Interest Rate is Adjusted (designated as "n" in the formula below). The denominator of the second fraction is equal to one half of the sum of (x) the Treasury Rate (as defined below and designated as "t" in the formula below) and (y) a Reinvestment Spread of 1.50%.

(iii)    Assuming that the Reinvestment Spread is 1.5% (0.010), the formula for computing the Prepayment yield maintenance Fee may be expressed mathematically as:

$$\text{Yield Maintenance Fee} \quad \frac{[i-(t+0.015)] \times P}{2} \quad \times \quad \frac{1-\dfrac{1}{[1+((t+0.015)/2)]^{n}}}{(t+0.015)/2} \quad =$$

(iv)    Notwithstanding anything to the contrary herein contained, in no event shall the Yield Maintenance Fee be less than an amount equal to 1.0% of the outstanding principal to be Prepaid.

(v)    The conversion of the Interest Rate hereunder, if the payment of interest is on a schedule other than semiannual, to reflect an assumption of semiannual payments (Bond Equivalent Yield) as called for in "I" above is accomplished by means of the following formula in which "i" = the Interest Rate stated as a decimal (e.g. 10% = 0.10); and "n" = number of scheduled interest payments per year under this Note:

$$\text{Bond} \quad \text{Equivalent} \quad \left\{[(1+i/n)^{n}]^{\frac{1}{2}} - 1\right\} \times 2 \quad \text{Yield} =$$

(vi)     For purposes of the calculations herein, specifically including the calculations of the amount being Prepaid and of the loan term, it shall be conclusively presumed that the Borrower would have (on the next available date occurring after, the Prepayment to which any other privilege above applies) made one, and only one, allowed 10% Prepayment without fee under clause "(1)" above.

(vii)     The term "Treasury Rate" means a rate per annum, expressed as a decimal calculated to five digits, equal to the yield on the Interpolated Treasury Constant Maturity maturing on the Yield Maintenance Date as published by the Federal Reserve System or as reported by the Department of the Treasury as of the fifth business day prior to the date of receipt of Prepayment of principal by Lender.

(viii)     The term "Yield Maintenance Date" means the date which is the first to occur of a regularly scheduled date on which the Interest Rate is Adjusted, if any, or the Maturity Date hereof.

(ix)     The term "Yield Maintenance Minimum" means the minimum for purposes of calculation of the Yield Maintenance Fee to be paid with respect to a Prepayment.

(e)     Prepayment §-4-3-2-1 means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due hereunder and following any Prepayment Locked Out Period, the Borrower shall have the privilege of making any of the following payments of principal before such principal is due ("Prepayment Date") in multiples of $100 of additional sums to be applied in reduction of principal on any business day to be paid together with all interest accrued on the amount Prepaid: (1) the Borrower may make payments, without fee, provided the amount so paid in any calendar year (January 1 to December 31) shall not exceed ten per centum (10%) of the principal advanced hereunder and this right shall be non-cumulative; (2) in addition to any amounts paid under clause "(1)" of this paragraph, upon payment of a fee ("Prepayment Fee Percentage") calculated as follows: (a) five per centum (5%) of the amount Prepaid if Prepaid during the first year after the date of this Note ("First Prepayment Fee Period"); (b) four per centum (4%) of the amount Prepaid if Prepaid during the second year after the date of this Note; (c) three per centum (3%) of the amount Prepaid if Prepaid during the third year after the date of this Note; (d) two per centum (2%) of the amount Prepaid if Prepaid during the fourth year after the date of this Note; (e) one per centum (1%) of the amount Prepaid if Prepaid during or after the fifth year after the date of this Note. "Subsequent Prepayment Fee Period" means each successive period following the First Prepayment Fee Period. Notwithstanding anything to the contrary herein contained, in no event shall the Prepayment Fee be less than an amount equal to 1.00% of the outstanding principal to be Prepaid. If there is a Prepayment Locked Out Period applicable to the applicable Loan, then each of the foregoing Prepayment time periods shall not commence until after the expiration of the Prepayment Locked Out Period.

(f)     Prepayment §-4-3-2-1-0 means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due hereunder, the Borrower shall have the privilege of making any of the following payments of principal before such principal is due ("Prepayment Date") in multiples of $100 of additional sums to be applied in reduction of principal on any business day to be paid together with all interest accrued on the amount Prepaid: (1) the Borrower may make payments, without fee, provided the amount so paid in any calendar year (January 1 to December 31) shall not exceed the Prepayment Free Percentage of the principal advanced hereunder and this right shall be non-cumulative; (2) in addition to any amounts paid under clause "(1)" of this paragraph titled "Prepayment privileges," upon payment of a fee ("Prepayment Fee Percentage") calculated as follows: (a) five per centum (5%) of the amount Prepaid if Prepaid during the first year after the date of this Note ("First Prepayment Fee Period"); (b) four per centum (4%) of the amount Prepaid if Prepaid during the second year after the date of this Note; (c) three per centum (3%) of the amount Prepaid if Prepaid during the third year after the date of this Note; (d) two per centum (2%) of the amount Prepaid if Prepaid during the fourth year after the date of this Note; (e) one per centum (1%) of the amount Prepaid if Prepaid during the fifth year after the date of this Note; (f) zero per centum (0%) of the amount Prepaid during or after the sixth year after the date of this Note. "Subsequent Prepayment Fee Period" means each successive period following the First Prepayment Fee Period. If there is a Prepayment Locked Out Period applicable to the applicable Loan, then each of the foregoing Prepayment time periods shall not commence until after the expiration of the Prepayment Locked Out Period.

1.272     Prime Rate means for any day the highest rate published from time to time in the "Money Rates" section of *The Wall Street Journal* as the Prime Rate for that day (or, if *The Wall Street Journal* is not available, any other authoritative source of that rate selected by Lender).

1.273     Prohibited Transfer means: (a) any sale, contract to sell, conveyance, encumbrance, pledge, Mortgage, or lease of the Collateral described in any Mortgage to or for the benefit of a Person not the original Borrower under any Mortgage, and not expressly permitted under any Mortgage or the other Collateral Documents, or other transfer of all or any material part of the Collateral secured by any Mortgage or any interest in it, including any transfer of Mineral Rights, Water Rights, or water stock, whether voluntary, involuntary, by operation of law or otherwise; (b) if Borrower is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Borrower; (c) if Borrower is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Borrower is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Borrower; or (e) if Borrower is a trust, withdrawal or removal of any trustee or revocation of the trust.

1.274     Project means that certain project more particularly described in an EPC Agreement or other agreement from time to time entered into between Borrower and Contractor in connection with Lender extending to Borrower, at Borrower's request, any Construction Line of Credit Loan.

1.275     Project Assessments means all fees for the issuance of the Permits, assessments, impact fees, capacity charges and other governmental charges and levies of any nature, required as a condition of the construction, occupancy and operation of the Project, as more particularly described in the MCA or any amendment, modification or supplement thereto.

1.276     Project Budget means all costs from time to time approved by Lender in connection with the Project, as more particularly described in the MCA or any amendment, modification or supplement thereto.

1.277     Project Completion Deadline means the deadline from time to time agreed upon between Borrower and Lender as to when Substantial Completion of the Project must be achieved, as more particularly described in the MCA or any amendment, modification or supplement thereto.

**1.278**    **Project Costs** means all costs actually incurred by Borrower in connection with the Project, as more particularly described in the MCA or any amendment, modification or supplement thereto.

**1.279**    **Project Inspector** means any Inspector retained by Lender to inspect the Project, as more particularly described in the MCA or any amendment, modification or supplement thereto.

**1.280**    **Project Punch List** means a list prepared and certified by an engineer or architect or other Person acceptable to Lender, describing any incomplete work, uninstalled equipment or unperformed repairs required for final completion of the Project in accordance with the Plans and Specifications, as more particularly described in the MCA or any amendment, modification or supplement thereto.

**1.281**    **Qualifying Facility** means a qualifying small power production facility, as such term is defined by Energy Law, including without limitation, the Public Utility Regulatory Policies Act of 1978, as amended and FERC's regulations related thereto.

**1.282**    **Rabobank** means Coöperatieve Rabobank U.A. (trading as "Rabobank"), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands.

**1.283**    **Rate Conversion** means the conversion of all or part of an applicable Loan into a Loan bearing interest at another rate at Borrower's election in accordance with the terms and conditions herein.

**1.284**    **Rate Request** means the request that Borrower must submit to Lender to request a Rate Conversion or LIBOR Rate Continuation or SOFR Rate Continuation (other than a SOFR Rate Continuation where the SOFR Rate Loan is automatically continued pursuant to the MCA), which request must specify the amount of the applicable Loan subject to the Rate Conversion, LIBOR Rate Continuation or SOFR Rate Continuation, the rate to be applicable to the applicable Loan, and if a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan is selected, the applicable Interest Period, as more particularly described in the MCA or any amendment, modification or supplement thereto.

**1.285**    **Real Estate** means that portion of the Collateral which is real property, as opposed to personal property.

**1.286**    **Reinvestment Spread** means the percentage amount as used in calculation of the Prepayment Yield Maintenance.

**1.287**    **Related Payables and Liabilities** means all accounts payable including trade account payables or other unpaid costs of acquiring or maintaining, storing, processing or packing any Collateral included in a Borrowing Base, listed on a Position Report or otherwise accounted for by Borrower, as required by Lender, and the amount of all Liens on and any expenses, fees, brokerage fees, commissions, offsets or contra accounts relating or pertaining to that Collateral, or as otherwise required by Lender.

**1.288**    **RELOC** means any Loan secured by Real Estate and made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto.

**1.289**    **Reportable Event** means any of the events set forth in Section 4043(c) of ERISA or in regulations of the Pension Benefit Guaranty Corporation issued thereunder, other than events for which the 30-day Notice period has been waived.

**1.290**    **Reporting Requirements** means all reporting requirements of Borrower set forth under the MCA, which shall be in effect until such time as all Obligations have been paid in full and Lender has no obligation to make any advance on the applicable Loan.

**1.291**    **Request for Advance** means each request made by Borrower, which request:

     (a)     **Irrevocable**. Shall be irrevocable,

     (b)     **Amount of Request**. Must specify the amount of the Request for Advance,

     (c)     **Specify Rate**. If Borrower may select from Optional Rates of Interest, must specify the rate to be applicable to the applicable Loan,

     (d)     **LIBOR or Term SOFR Period**. If a LIBOR Rate Loan, Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan is selected, the Interest Period requested therefore,

     (e)     **Time of Request**. Must be received by Lender before 12:00 noon (St. Louis, Missouri time):

         (i)     If the applicable Loan is to be a LIBOR Rate Loan or SOFR Rate Loan, on a Business Day which is not less than two Business Days prior to the date of such Loan, and

         (ii)     In the case of any other applicable Loan, on a Business Day which is not less than one Business day prior to the date of such Loan.

**1.292**    **Request for Rate Conversion** means the election of the Rate Conversion made by Borrower to Lender with no less than 30 days' Notice before the effective date of the Rate Conversion.

**1.293**    **Revolving Line of Credit** means any Loan made by Lender to Borrower pursuant to in the MCA or any amendment, modification or supplement thereto.

1.294     **Roads** means all streets, roads, entrances, easements and rights of way for the passage of motor vehicles, equipment and pedestrians.

1.295     **Schedule of Definitions and Covenants** means this Schedule of Definitions and Covenants, as may from time to time be amended, modified, replaced or supplemented in Lender's sole discretion and marked as Exhibit A and incorporated into the MCA.

1.296     **Secured Obligations** means any and all of the Obligations secured by any of the Collateral Documents.

1.297     **Security Agreement** means any document or agreement pledging, granting or creating a Lien or security interest in any personal property, now or hereafter entered into by a Party, Borrower or other Person in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

1.298     **Security Instrument** means any Security Agreement, Mortgage, or Collateral Assignment, or other document or agreement now or hereafter entered into by a Party, Borrower or other Person in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

1.299     **Self Prepared** means for the financial statement of any Person, prepared by that Person, and not compiled, reviewed or audited by a CPA.

1.300     **SOFR** means a rate equal to the secured overnight financing rate published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York currently at http://www.newyorkfed.org, (or any successor source for the secured overnight financing rate identified as such by administrator of such secured overnight financing rate).

1.301     **SOFR Rate** means Term SOFR, Daily Simple SOFR or Daily Compounded SOFR, as applicable.

1.302     **SOFR Rate Continuation** means a Daily Compounded SOFR Rate Continuation or Term SOFR Rate Continuation, as applicable.

1.303     **SOFR Rate Conversion** means a Daily Compounded SOFR Rate Conversion, Daily Simple SOFR Rate Conversion or Term SOFR Rate Conversion, as applicable.

1.304     **SOFR Rate Loan** means a Daily Compounded SOFR Rate Loan, Term SOFR Rate Loan or Daily Simple SOFR Rate Loan, as applicable.

1.305     **SOFR Rate Prepayment Costs** means that amount as determined by Lender as its loss, cost or expense incurred as a result of: (a) the Prepayment of a Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan on a day other than the last day of the Interest Period for that Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); (b) any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain that Term SOFR Rate Loan or Daily Compounded SOFR Rate Loan or from fees payable to terminate the deposits from which those funds were obtained; or (c) the Prepayment of a Daily Simple SOFR Rate Loan on a day other than the Interest Payment Date. Borrower shall also pay any administrative fees charged by Lender in connection with any event described in this paragraph.

1.306     **Soft Costs** means all costs, other than Hard Costs, necessary for final completion of the Project, including without limitation, architects' and engineers' fees and expenses, management fees and expenses; Legal Fees and expenses; real estate taxes; survey costs; insurance premiums; ground rents; fees and contributions required by Governmental Authorities; utility extension or other charges or deposits for establishment of utility services; interest during the period prior to the completion of the Project in excess of the balance of any interest reserve included in the Project Budget; and the costs of tenant improvements, tenant allowances, and leasing commissions not included as a separate item in the Project Budget.

1.307     **Specifically Designated Nationals and Blocked Person List** means that certain list entitled "Specifically Designated and Blocked Person List" published by OFAC.

1.308     **Spread Adjustment** means the applicable spread listed below that may be added to the relevant SOFR Rate in addition to the Interest Rate Margin or may be incorporated into the Interest Rate Margin:

     (a)     For Term SOFR, (i) 0.11448% (11.448 basis points) for an Interest Period of one-month's duration, (ii) 0.26161% (26.161 basis points) for an Interest Period of three-months' duration, (iii) 0.42826% (42.826 basis points) for an Interest Period of six-months' duration, and (iv) 0.71513% (71.513 basis points) for an Interest Period of twelve-months' duration; and

     (b)     For Daily Simple SOFR or Daily Compounded SOFR, (i) 0.11448% (11.448 basis points) if the Interest Payment Date is monthly, (ii) 0.26161% (26.161 basis points) if the Interest Payment Date is quarterly, (iii) 0.42826% (42.826 basis points) if the Interest Payment Date is semi-annual, and (iv) 0.71513% (71.513 basis points) if the Interest Payment Date is annual.

1.309     **Stabilized EBITDA** means EBITDA excluding nonrecurring, extraordinary items (includes "off farm income" if deemed to be recurring).

1.310     **Subsidiary** of a Person which is anything other than an individual means a business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly by that Person. Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" shall refer to any Subsidiary or Subsidiaries, if any.

1.311     **Substantial Completion** means in Lender's sole discretion and more particularly described in the MCA or any amendment, modification or supplement thereto, the Project has been completed in accordance with the Plans and Specifications to the extent required to permit

v.009.20220131

Borrower to use the Project for its intended purpose, and any incomplete work, uninstalled equipment or unperformed repairs does not in Lender's Judgment, materially affect the operation or market value of the Project.

1.312     **Swap Counterparty** means any party to a Hedging Agreement which is Rabobank or an Affiliate of Rabobank.

1.313     **Tangible Net Worth** means total assets, less the sum of (without limitation and without duplication of deductions) (a) total liabilities, (b) any reserves established by a Person for anticipated Losses or expenses, (c) the amount, if any, of all intangible items including any leasehold rights, the amount of any investment in any Affiliate or other entity including a Subsidiary, good will (including any amounts, however designated on the balance sheet, representing the cost of acquisition of business and investments in excess of underlying tangible assets), trademarks, trademark rights, trade name rights, copyrights, patents, patent rights, licenses, unamortized debt discount, marketing expenses, and customer and/or mailing lists, (d) all amounts due from employees, stockholders, and Subsidiaries; and (e) any other asset deemed intangible by Lender.

1.314     **Term Loan** means any Loan made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto or any Conversion.

1.315     **Term SOFR** means, with respect to any SOFR Rate Loan for any Interest Period which may be agreed between the Lender and the Borrower, as set forth in the MCA or any amendment, modification or supplement thereto, a forward-looking term index rate per annum for a period comparable to such Interest Period based on SOFR that is published by an authorized benchmark administrator and is displayed on a screen or other information service, each as identified or selected by the Lender in its reasonable discretion at approximately a time and as of a date prior to the commencement of such Interest Period determined by the Lender in its reasonable discretion in a manner substantially consistent with market practice; provided, that Term SOFR shall be increased by the Spread Adjustment, if any, and an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs, all comprising the Interest Rate with respect to each applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto. Term SOFR Rate shall be Adjusted on the first day of the applicable Term SOFR Rate Interest Period. Notwithstanding anything contained in the MCA or any other Loan Document, the Lender shall not be required to accept any Loan Request or Rate Request for a Term SOFR Rate Loan.

1.316     **Term SOFR Rate Continuation** means the continuation of the Interest Rate of any Term SOFR Rate Loan for another Interest Period.

1.317     **Term SOFR Rate Conversion** means a Rate Conversion of any Term SOFR Rate Loan.

1.318     **Term SOFR Rate Interest Period** means the Interest Period during which a Term SOFR Rate is applicable.

1.319     **Term SOFR Rate Loan** means a Loan which bears an Interest Rate indexed at Term SOFR as set forth in the MCA or any amendment, modification or supplement thereto.

1.320     **Total Property** means the aggregate of all Collateral as that term is defined in all Security Instruments.

1.321     **Trade Receivables** means Eligible Accounts Receivable as defined herein.

1.322     **Transaction Documents** means the Loan Documents and all Hedging Agreements.

1.323     **U.S. Government Securities Business Day** means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

1.324     **U.S. Treasury Rate** means the interest rate yield on actively traded non-inflation-indexed U.S. Government Treasury Securities, Adjusted to a constant maturity equal to the specified maturity, as reported in Federal Reserve Statistical Release H.15-Selected Interest rates under the heading U.S. government securities/Treasury constant maturities/Nominal.

1.325     **U.S. Treasury Reinvestment Rate** means the U.S. Treasury Rate which Lender determines could be obtained by reinvesting a specified Prepaid Installment payment in U.S. Treasury Securities maturing on the Original Payment Date.

1.326     **U.S. Treasury Rate Loan** means a Loan or portion thereof which bears interest calculated by reference to the U.S. Treasury Rate.

1.327     **UCC** means the Uniform Commercial Code as adopted and in effect in any relevant jurisdiction.

1.328     **UCC-1** means any UCC Financing Statement (Form1).

1.329     **Utilities** means all utility services necessary for the operation of the Real Estate.

1.330     **Value** means the value as determined by Lender (if not otherwise specified herein for a particular type of Collateral) of any Borrower asset, including without limitation, any item of Collateral, whether or not included in a Borrowing Base, listed on a Position Report or otherwise accounted for by Borrower.

1.331     **Working Capital** means (a) current assets minus (b) current liabilities.

### ARTICLE 2 - Covenants

2.01     Financial Covenants: Lender may require any one or more of the following, as applicable:

v.009.20220131

(a)     **Capital Expenditures.** Parties spends or incur obligations (including Capital Leases) to acquire fixed assets in an aggregate amount greater than the amount set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(b)     **Working Capital.** Parties shall maintain not less than the amount set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(c)     **Tangible Net Worth.** Parties shall maintain not less than the amount set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(d)     **Current Ratio.** Parties shall maintain a Current Ratio of at least as set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(e)     **Debt Service Coverage Ratio.** Parties shall maintain a Debt Service Coverage Ratio as set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(f)     **Debt to Tangible Net Worth.** Parties shall maintain a Debt to Tangible Net Worth as set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(g)     **Debt to Total Assets Ratio.** Parties shall maintain a Debt to Total Assets Ratio as set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(h)     **Interest Coverage Ratio.** Parties shall maintain an Interest Coverage Ratio as set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(i)     **Cash Available for Debt Service.** Parties shall maintain an EBITDA equal to or greater than the amount required to pay interest and the current portion of amortization of principal on all Funded Debt, as set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

(j)     **Annual Reduction of Unpaid Balance of Loans.** Parties shall reduce the total aggregate unpaid principal balance as set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

2.02     **Other Covenants:**

(a)     **Change in Management.** There shall be no change in the present executive or management personnel of Parties.

(b)     **Change in Ownership.** There shall be no change in the equity interest of Parties.

2.03     **Reporting Requirements.** Borrower shall furnish to Lender:

(a)     as soon as available, but no later than the timing, frequency and type of reports set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' financial statements;

(b)     as soon as available, but no later than the timing and frequency set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' tax returns, including all schedules and exhibits and any extensions of the filing date;

(c)     within the timing and frequency set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' updated budget of projected income and expenses relating to Parties' operations;

(d)     within the timing and frequency set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' financial projections for Parties' operations, specifying the assumptions on which they are based.

v.009.20220131

EXHIBIT B

APPLICABLE OBLIGOR COVENANTS SCHEDULE

Covenants

Until such time as all Obligations have been paid in full:

1.01    Financial Covenants.

    (a)    Working Capital. Capital Farms, Inc., Sutter Enterprises, LLC, Sutter Land LLC, United Farm LLC, Baljit Singh Gill, Gurmej Singh Gill, and Sukhwant Singh Gill shall maintain not less than $500,000.00 in Consolidated Working Capital, determined as of the end of each fiscal year.

    (b)    Debt to Tangible Net Worth. Sutter Enterprises, LLC, Sutter Land LLC, and United Farm LLC shall maintain a Debt to Tangible Net Worth of not greater than 1.30:1.00, determined as of the end of each fiscal year, based on Fair Market Value.

    (c)    Debt Service Coverage Ratio. Capital Farms, Inc., Sutter Enterprises, LLC, Sutter Land LLC, United Farm LLC, Baljit Singh Gill, Gurmej Singh Gill, and Sukhwant Singh Gill shall maintain a Consolidated Debt Service Coverage Ratio of not less than 1.00:1.00, determined as of the end of each fiscal year 2023, not less than 1.10:1.00, determined as of the end of each fiscal year 2024, and not less than 1.25:1.00, determined as of the end of each fiscal year thereafter.

2.01    Reporting Requirements. Party shall furnish to Lender:

    (a)    as soon as available, but no later than 150 days after the end of each fiscal year, a copy of CPA Compiled Consolidated financial statements of Capital Farms, Inc., Sutter Enterprises, LLC, Sutter Land LLC, and United Farm LLC for that period;

    (b)    no later than March 1st of each fiscal year, an updated budget of projected income and expenses relating to Capital Farms, Inc., Sutter Enterprises, LLC, Sutter Land LLC, and United Farm LLC's operations for the upcoming fiscal year;

    (c)    no later than December 1st of each fiscal year, an updated Consolidated Position Report of Capital Farms, Inc., Sutter Enterprises, LLC, Sutter Land LLC, and United Farm LLC for that period;



Capital Farms et al MCA 2023
Master Credit Agreement
v.009.20220131

Exhibit C

Facility Sheet – Term Loan 2

26586001 (486205-1)

## FACILITY SHEET

### (TERM LOAN 2)

This Facility Sheet (as may be amended, modified or supplemented from time to time, referred to herein as this "Facility Sheet") is dated as of May 19, 2023 and is between regard to Facility Loan No. 26586001 (486205-1) between CAPITAL FARMS, INC., a California corporation ("Borrower"), SUTTER ENTERPRISES, LLC, a California limited liability company ("Sutter Enterprises, LLC"); SUTTER LAND LLC, a California limited liability company ("Sutter Land LLC"); UNITED FARM LLC, a California limited liability company ("United Farm LLC"); BALJIT SINGH GILL ("Baljit Singh Gill"), a married person or member of a civil union or domestic partnership; GURMEJ SINGH GILL ("Gurmej Singh Gill"), a married person or member of a civil union or domestic partnership; and SUKHWANT SINGH GILL ("Sukhwant Singh Gill"), a married person or member of a civil union or domestic partnership (Sutter Enterprises, LLC; Sutter Land LLC; United Farm LLC; Baljit Singh Gill; Gurmej Singh Gill; and Sukhwant Singh Gill are herein individually and collectively, "Guarantor") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender") and hereby supersedes any and all previous facility sheets that governed this obligation.

Parties and Lender have entered into a Master Credit Agreement ("MCA") dated May 19, 2023 which may include schedules, addendums, and exhibits thereto. The MCA incorporates by reference and includes a Schedule of Definitions and Covenants ("Schedule of Definitions and Covenants") dated of even date with the MCA and any Applicable Obligor Covenant Schedule. Borrower and Guarantor agree that Borrower and Guarantor have received and reviewed the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. All terms, covenants, conditions and restrictions set forth in the MCA are incorporated herein by reference as if fully set forth herein. Capitalized terms contained in this Facility Sheet are used as defined in the Schedule of Definitions and Covenants and any Applicable Obligor Covenant Schedule. Some or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Facility Sheet as so defined and the terms of such Schedule of Definitions and Covenants are incorporated by reference into this Facility Sheet for purposes of so defining the capitalized terms that are used in this Facility Sheet in accordance with the Schedule of Definitions and Covenants. To the extent any term is defined in the Schedule of Definitions and Covenants but is not used in this Facility Sheet or any amendment, modification or supplement to this Facility Sheet, such term shall be deemed to be disregarded, of no meaning and without any effect. Except as otherwise defined in this Facility Sheet, the MCA or in the Schedule of Definitions and Covenants, or unless the context otherwise requires, each term that is used in this Facility Sheet which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC.

Borrower requests that Lender make a Loan pursuant to this Facility Sheet. Lender agrees to make such Loan, subject to the terms and conditions of this Facility Sheet, the MCA and the Schedule of Definitions and Covenants.

### ARTICLE 1 - PRINCIPAL LOAN TERMS

This Facility Sheet is made and entered on the following Loan terms:

1.01    **Loan Type**: The Loan Type being made pursuant to this Facility Sheet is as follows: Term Loan 2

1.02    **Loan Amount**. Lender shall lend or has loaned Borrower the original principal amount of $1,300,000.00.

1.03    **Purpose**. The Term Loan 2 must be used only for conversion of Development Line of Credit for the development of an almond orchard on approximately 315 acres in Placer County.

1.04    **Interest Rate**. The unpaid principal balance of the Term Loan 2 will bear an Interest Rate equal to the one month Term SOFR (the "Index Rate") plus 3.250% per annum, Adjusted on the first day of each month, provided that in no event shall the Interest Rate be less than the Floor Rate of zero, notwithstanding any contrary Floor Rate provision for Daily Simple SOFR or Term SOFR in the MCA or any amendment, modification or supplement thereto.

1.05    **Required Payments; Maturity Date**.

(a)      Borrower shall pay accrued interest on the Term Loan 2 on August 1, 2021 and on the first day of each February and August after the Closing Date to the Term Loan 2 Maturity Date.

(b)      Borrower shall pay principal in the amount of $65,000.00, on August 1, 2021, and on the first day of each February and August after the Closing Date to the Term Loan 2 Maturity Date.

(c)      The unpaid principal balance of, all unpaid accrued interest on, and other charges under this Facility Sheet with respect to the Term Loan 2, shall be paid on December 31, 2030 (the "Term Loan 2 Maturity Date").

1.06    **Prepayments**. Prepayments of the Term Loan 2 may be made at any time without Prepayment Fee or penalty.

1.07    **The Term Loan 2 Note**. The Term Loan 2 has been or will be evidenced by this Facility Sheet and a promissory note in a form provided by Lender (the "Term Loan 2 Note").

### ARTICLE 2 - COVENANTS REGARDING THE LOAN TYPE MADE UNDER THIS FACILITY SHEET

2.01    **Prepayments Generally**. Prepayments must be accompanied by all unpaid accrued interest on the Prepayment and all other amounts due under this Facility Sheet. Each Prepayment of a portion of the Loan will be applied to the most remote payment of the principal due under this Facility Sheet. If Lender receives any Prepayment which it is permitted to refuse, Lender may accept the Prepayment; except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due under this Facility Sheet, whichever is earlier.

2.02    **Default Rate**. Upon the occurrence of an Event of Default, the principal balance of the Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Term Loan 2 Default Rate. Subject to the provisions of the Schedule of Definitions and Covenants and this Facility Sheet, the "Term Loan 2 Default Rate" means the rate applicable to the unpaid principal balance of the Term Loan 2 plus 10.000% per annum. Interest payable at the Term Loan 2 Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

474

## ARTICLE 3 - CONDITIONS

3.01    Conditions of the Loan. Lender's obligation to make the Loan(s) is subject to the following conditions precedent:

(a)    Guarantor has executed and delivered to Lender a guaranty of the payment and performance of the Loan Obligations (the "Guaranty") and

(b)    reimbursement of Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the Loans or the Closing.

## ARTICLE 4 – REPRESENTATIONS AND WARRANTIES

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under the Loan, Borrower (or the Person or Persons being one or more of the Borrowers as may be specifically named in any of the following representations and covenants) agrees to and makes the following representations and covenants:

4.01    Master Credit Agreement Representations. Borrower re-makes and confirms all of Borrower Representations set forth in the MCA.

4.02    Entire Agreement. This Facility Sheet and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

4.03    Covenants. Borrower hereby makes and agrees to be bound by all of the Covenants as set forth on Schedule 1 attached hereto and made a part hereof.

4.04    Reporting Requirements. Borrower hereby makes and agrees to be bound by all of the Reporting Requirements as set forth on Schedule 2 attached hereto and made a part hereof.

4.05    Expenses. The Borrower shall pay within ten (10) Business Days after demand from Lender, all costs and expenses incurred (or reimburse Lender for payment of) in connection with the preparation, execution, delivery, filing, and administration of this Facility Sheet (including, without limitation, Legal Fees incurred in connection with the preparation of this Facility Sheet and advising the Lender as to its rights, and the cost of any credit verification reports or field examinations of the Borrower's properties or books and records).

4.06    State Specific Addendum. The following state specific language is hereby added to this Facility Sheet as set forth on Schedule 3 attached hereto and made a part hereof.

4.07    Counterpart Execution. This Facility Sheet may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. The counterparts of the Facility Sheet may be executed by electronic signature and delivered by email or facsimile, so long as such method of execution and delivery is acceptable to Lender in Lender's sole discretion.

BORROWER:

Address for Notices:                CAPITAL FARMS, INC., a California corporation

1973 Hardial Drive
Yuba City, California 95993

By: _____
GURMEJ SINGH GILL
President

The undersigned is a Guarantor pursuant to the terms of an existing Master Guaranty from the undersigned to Lender with respect to this Facility Sheet and hereby acknowledges the terms and conditions hereof.

GUARANTOR UNDER THE MASTER GUARANTY:

Address for Notices:                SUTTER ENTERPRISES, LLC, a California limited liability company

251 Shrike Circle
Sacramento, California 95834

By: _____
BALJIT SINGH GILL
Managing Member

By: _____
SUKHWANT SINGH GILL
Managing Member

Address for Notices:

251 Shrike Circle
Sacramento, California 95834

SUTTER LAND LLC a California limited liability company

By: _____
BALJIT SINGH GILL
Managing Member

By: _____
SUKHWANT SINGH GILL
Managing Member

Address for Notices:

251 Shrike Circle
Sacramento, California 95834

UNITED FARM LLC, a California limited liability company

By: _____
SUKHWANT SINGH GILL
Managing Member

Address for Notices:
251 Shrike Circle
Sacramento , California 95834

_____
BALJIT SINGH GILL

Address for Notices:
1973 Hardial Dr
Yuba City, California 95993

_____
GURMEJ SINGH GILL

Address for Notices:
251 Shrike Circle
Sacramento, California 95834

_____
SUKHWANT SINGH GILL

LENDER:

RABO AGRIFINANCE LLC

Address for notices:

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention: Loan Operations

By: _____

Name: _____

Title: _____

## SCHEDULE 1

### Covenants

Until such time as all Obligations have been paid in full:

1.01    **Insurance.**

(a)    If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the full unpaid principal balance of the Loan, 2) the total replacement value of any structure located in the flood hazard area or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

<u>SCHEDULE 2</u>

<u>Reporting Requirements</u>

2.01    <u>Reporting Requirements</u>. Borrower shall furnish to Lender:

(a)      promptly upon receipt, copies of all Notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(b)      promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower or Guarantor requested by Lender.

SCHEDULE 3

STATE SPECIFIC ADDENDUM

1.01     WAIVER OF PRIOR CLAIMS. BORROWER WAIVES AND RELEASES ANY AND ALL CLAIMS AGAINST LENDER, ITS PARENT, SUBSIDIARIES, AFFILIATES AND ITS MERGED PREDECESSOR, AG SERVICES OF AMERICA, INC., THE SUBSIDIARY OF SUCH PREDECESSOR, AG ACCEPTANCE CORPORATION, AND THE RESPECTIVE SUCCESSORS, ASSIGNS, PARTICIPANTS, AGENTS AND EMPLOYEES OF EACH AND ALL OF THE FOREGOING, RELATING OR PERTAINING TO OR AS A RESULT OF THE EXISTING LOANS, AND ANY OTHER ACT OR OMISSION WHICH HAS OCCURRED PRIOR TO THE EXECUTION OF THIS FACILITY SHEET, INCLUDING ALL CLAIMS OF USURY, FRAUD, DECEIT, MISREPRESENTATION, UNCONSCIONABILITY, DURESS, OR LENDER LIABILITY, ANY OTHER CLAIM IN TORT OR IN CONTRACT, OR FOR VIOLATION OF ANY LAW, RULE OR REGULATION. In addition, Borrower expressly waive and relinquish any and all rights and benefits under Section 1542 of the Civil Code of the State of California and any similar law of any state or territory of the United States. Said Section 1542 reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

BORROWER INITIALS: _____

1.02     JURY TRIAL WAIVER. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS NOTE HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS NOTE MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

1.03     Consent to Judicial Reference. If and to the extent any waiver of jury trial contained in the Transaction Documents is determined by a court of competent jurisdiction to be unenforceable or is otherwise not applied by any such court, each of the parties to this agreement hereby consents and agrees that (a) any and all disputes, controversies or claims that arise out of or relates to: (i) this agreement; (ii) any Transaction Document; or (iii) the transactions contemplated hereby and thereby, whether arising in contract, tort, breach of duty or by common law or statute (individually and collectively, a "Dispute"); Disputes shall be heard by a referee in accordance with the judicial reference provisions of California Code of Civil Procedure Section 638 et seq., sitting without a jury in the County of Fresno, California, (b) such referee shall hear and determine all of the issues in any Dispute (whether of fact or of law), including issues pertaining to a "provisional remedy" as defined in California Code of Civil Procedure Section 1281.8, including without limitation, entering restraining orders, entering temporary restraining orders, issuing temporary and permanent injunctions and appointing receivers, and shall report a statement of decision, provided that, if during the course of any Dispute any party desires to seek such a "provisional remedy" but a referee has not been appointed, or is otherwise unavailable to hear the request for such provisional remedy, then such party may apply to the Superior Court in the County of Fresno, California for such provisional relief, and (c) pursuant to California Code of Civil Procedure Sections 644 and 645, judgment may be entered upon the decision of such referee in the same manner as if the Dispute had been tried directly by a court. The parties shall use their respective commercially reasonable and good faith efforts to agree upon and select such referee, provided that such referee must be a retired California state or federal judge, further provided that the parties shall not seek to appoint a referee that may be disqualified pursuant to California Code of Civil Procedure Sections 641 or 641.2, and further provided that if the parties cannot agree upon a referee within ten (10) days after one party serves a written notice of intent for judicial reference upon the other party or parties, then the referee shall be appointed by the Superior Court in the County of Fresno, California in accordance with California Code of Civil Procedure Section 640(b). If a Dispute includes multiple claims, some of which are found not subject to this Section, the parties shall stay the proceedings of the Disputes or part or parts thereof not subject to this section until all other Disputes or parts thereof are resolved in accordance with this section. If there are Disputes by or against multiple parties, some of which are not subject to this section, the parties shall sever the Disputes subject to this section and resolve them in accordance with this section. Each party hereto acknowledges that this consent and agreement is a material inducement to enter into this agreement, the Transaction Documents and all other agreements and instruments provided for herein or therein, and that each will continue to be bound by and to rely on this consent and agreement in their related future dealings. The parties shall share the cost of the referee and reference proceedings equally; provided that, the referee may award attorneys' fees and reimbursement of the referee and reference proceeding fees and costs to the prevailing party, whereupon all referee and reference proceeding fees and charges shall be payable by the non-prevailing party (as so determined by the referee). Each party hereto further warrants and represents that it has reviewed this consent and agreement with legal counsel of its own choosing, or has had an opportunity to do so, and that it knowingly and voluntarily gives this consent and enters into this agreement having had the opportunity to consult with legal counsel. This consent and agreement is irrevocable, meaning that it may not be modified either orally or in writing, and this consent and agreement shall apply to any subsequent amendments, renewals, supplements, or modifications to this agreement or any other agreement or document entered into between the parties in connection with this agreement or the transactions contemplated hereby. In the event of litigation, this agreement may be filed as evidence of either or both parties' consent and agreement to have any and all Disputes heard and determined by a referee under California Code of Civil Procedure Section 638. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that nothing in this section shall be deemed to apply to or limit the right of Lender (i) to exercise self-help remedies such as setoff, or (ii) to foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, or (iii) to pursue rights against a person or entity in a third party proceeding in any action brought against Lender (including actions or proceedings in bankruptcy court) or the Swap Counterparties. Lender and Swap Counterparties may exercise the rights set forth in the foregoing clauses (i) through (iii) before, during or after the pendency of any judicial reference proceedings. Neither the exercise of self-help remedies nor the institution or maintenance of an action for foreclosure shall constitute a waiver of the right of any person or entity, including the claimant in any such action, to require submission to judicial reference the merits of the Dispute occasioning resort to such remedies. No provision in the Transaction Documents regarding submission to jurisdiction and/or venue in any court is intended or shall be construed to be in derogation of the provisions in any Transaction Document for judicial reference of any Dispute.

BORROWER INITIALS: _____

1.04     Insurance.

(a)     Borrower acknowledges that Borrower has been advised by Lender of, and agrees that the requirements of Section 7.10 of the MCA are in compliance with, the following legal limitation regarding hazard insurance coverage for the project pursuant to Civil Code Section 2955.5:

Capital Farms et al MCA 2023
Term Loan 2 Facility Sheet

6

479

"No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property."

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government including, without limitation, the California Energy Commission.

1.05     **Late Fee.** Borrower acknowledges and agrees that by its execution of this agreement, it has received prior notice of Lender's right to collect any late charge payable hereunder in full compliance with the provisions of California Civil Code Section 2954.5 (as such section or any successor section may now or hereafter be in effect), and that no further or additional notice shall be required by Borrower as a condition to Lender's right to collect any such charge in the event Borrower fails to make a timely payment hereunder.

1.06     **Office of Foreign Assets Control; Patriot Act; Anti-Corruption.** Without limiting the provisions of any other provision hereof above, the Borrower shall, and the Borrower shall cause each of its Subsidiaries to, (1) ensure that no Person who owns a controlling interest in or otherwise controls such Person shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control, the Department of the Treasury or included in any Executive Orders, (2) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, (3) comply with all applicable Bank Secrecy Act laws and regulations, as amended, and (4) comply with all applicable anti-corruption laws and maintain policies and procedures designed to promote and achieve compliance with such laws. Federal law requires all financial institutions to obtain, verify and record information that identifies each Person who obtains a Loan. Lender will ask for the Borrower's legal name and address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, any Guarantors or other related Persons. As required by federal law and each Lender's policies and practices, each Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services.

Exhibit D

Placer Deed of Trust

Filed 08/21/25      Case 25-10074      Doc 294

Filed 03/19/25      Case 25-10074      Claim 11



**PLACER, County Recorder**
**RYAN RONCO**
**DOC- 2016-0052371-00**
5354
THURSDAY, JUN 30, 2016 11:53:18
MIC   $12.00 | AUT   $20.00 | SBS     $16.00
ERD   $4.00 | RED   $4.00 | REC   $52.00
ADD   $0.00

Ttl Pd   $108.00      Rcpt # 02524934
                       CLK98CT282/MB/4-17

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

RABOBANK, N.A.
P.O. Box 6010
Santa Maria, CA 93456-6010
Attn: Santa Maria Operations

Space above this line for Recorder's Use

Capital Farms, Inc. Development NRLOC to Term 2016

Development Line of Credit: 486205-1
Term Loan: Assigned at conversion

### LEASEHOLD DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

(Placer County, California)

THIS DOCUMENT SERVES AS A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER SECTION 9-502 OF THE
CALIFORNIA UNIFORM COMMERCIAL CODE

This deed of trust is dated as of June 17, 2016. It is by CAPITAL FARMS, INC., a California corporation ("Grantor"), as
trustor and debtor, to and in favor RABOBANK, N.A., a national banking association, as trustee ("Trustee"), whose address for
purposes of this deed of trust is 45 E. River Park Place West, Suite 401, Fresno, CA 93720, for the benefit of RABOBANK, N.A.,
a national banking association ("Beneficiary"), as beneficiary and secured party.

Beneficiary has agreed to make up to $1,300,000.00 in loans to Grantor under the terms and conditions of the Credit
Agreement between Grantor and Beneficiary dated as of the date of this deed of trust (the "Credit Agreement"). Each capitalized
term used in this deed of trust that is defined in the Credit Agreement and not defined in this deed of trust will have the meaning
specified in the Credit Agreement. This deed of trust will be interpreted in accordance with the Drafting Conventions.

#### ARTICLE 1 – GRANT

To secure repayment of the indebtedness evidenced by the Note (defined herein) and payment and performance of all
other Secured Obligations (defined herein), Grantor irrevocably and unconditionally grants, bargains, sells, and conveys to
Trustee, in trust, for the benefit of Beneficiary, WITH POWER OF SALE and right of entry and possession, all of Grantor's estate,
right, title and interest in and to the following, wherever located, whether now owned or hereafter acquired or arising, and, except
as indicated, whether constituting real estate or personal property (collectively, the "Property");

(a)        the leasehold and any other interest in the real estate located in Placer County, California, and described in
EXHIBIT A (the "Land") pursuant to the Crop Share Farming Lease between AKT Brewer 315, LLC, as landlord, and Grantor, as
tenant, dated as of July 8, 2015 that agreement, and any other agreement or instrument held by Grantor and creating a
leasehold or other estate or interest in the Land the "Leasehold Agreement"), including the right to surrender, terminate, cancel,
waive, change, supplement, grant subleases of, alter, or amend the Leasehold Agreement, together with all rights and privileges
of Grantor under any option to purchase said the Land or any right of first refusal granted to Grantor under the Leasehold
Agreement or otherwise, and all right, title and interest which Grantor now has or may hereafter acquire in and to the Land or the
other Property (the leasehold interest and all other rights title and interest of Grantor under the Leasehold Agreement or in the
Land, the "Leasehold");

(b)        all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other
articles now or hereafter erected on, affixed or attached to, or located in or on the Land, including all watering and irrigation
apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements");

(c)        all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a
means of access thereto ("Easements");

①

271 5390

(d)    the ground water on, under, pumped from or otherwise available to the Property or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any Governmental Authority and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Property or Grantor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use, contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Property, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity and any shares, or any rights under such shares, of any private water company, mutual water company, or other non-governmental entity pursuant to which Grantor or the Property may receive water (collectively, "Water Rights");

(e)    all other tenements, hereditaments and appurtenances to the Land;

(f)    minerals, oil, gas, and other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized (the "Mineral Rights");

(g)    timber now or hereafter standing or cut;

(h)    leases, subleases, licenses, occupancy agreements, concessions and other agreements (except the Leasehold Agreement), granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property (collectively, the "Leases");

(i)    all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Property;

(j)    all bushes, groves, trees, plants, vines or other plantings, upon or under the Land ("Plantings") including all varieties of Plantings that produce fruit, nuts, or other crops in more than one crop year ("Permanent Crop Plantings");

(k)    any shares, or any rights under such shares, of any private water company, mutual water company, or other non-governmental entity pursuant to which Grantor or the Property may receive water (collectively, the "Water Stock") and any other certificated and uncertificated securities, securities entitlements, securities accounts and commodities accounts;

(l)    all Permanent Crop Planting IP Rights (defined herein);

(m)    working drawings, instructional manuals, and rights in processes directly related to the operation of the Property;

(n)    other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment or which is in all cases (i) directly related to the operation of the Property or acquired in connection with any construction or maintenance of the Land or the Improvements or (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements;

(o)    all permits and licenses relating or pertaining to the use or enjoyment of the Property;

(p)    proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (the "Insurance Claims");

(q)    all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the "Condemnation Awards");

(r)     all deposit accounts at Beneficiary and all other deposit accounts from which Grantor may from time to time authorize Beneficiary to debit payments due on the Secured Obligations, and all money or other personal property of Grantor in addition to the foregoing deposited with or otherwise in Beneficiary's or Trustee's possession;

(s)     the right, in the name and on behalf of Grantor, upon notice to Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee or Beneficiary in the Property; and

(t)     substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

## ARTICLE 2 - ASSIGNMENT OF RENTS

2.01     **Assignment.** Grantor irrevocably and unconditionally assigns Beneficiary all rents and other benefits derived from the Leases, and all other issues, profits, royalties, bonuses, income and other proceeds of the Property, whether now due, past due or to become due, including all prepaid rents, security deposits and other supporting obligations (the "Rents", and this assignment, the "Assignment of Rents"). Beneficiary may collect Rents with or without taking possession of the Property. Beneficiary, by its acceptance of this deed of trust does not assume any duty or obligation under the Leases.

2.02     **Grant of License.** Notwithstanding the provisions of Section 2.01, Beneficiary confers upon Grantor a license to collect and retain the Rents as they become due and payable, so long as there is no Event of Default (the "License"). If an Event of Default has occurred, Beneficiary may terminate the License without notice to or demand upon Grantor.

2.03     **Collection and Application of Rents.** Subject to the License granted to Grantor under Section 2.02, Beneficiary has the right, power and authority to collect any and all Rents. Beneficiary may apply all amounts received by it pursuant to this assignment to pay Secured Obligations, expenses of leasing, operating, maintaining and managing the Property, taxes, charges, claims, assessments, any other liens, and premiums for insurance, in such amounts and in such order as Beneficiary deems appropriate.

2.04     **Notice.** All lessees under any and all Leases are hereby irrevocably authorized and notified by Grantor to rely upon and to comply with (and are fully protected in so doing) any notice or demand by Beneficiary for the payment to Beneficiary of Rents, or for the performance of any of lessees' undertakings under the Leases, and lessees shall have no right or duty to inquire as to whether any Event of Default has actually occurred or is then existing hereunder.

2.05     **Proceeds.** Beneficiary may apply all amounts received by it pursuant to this assignment to pay any of the following in such amounts and in such order as Beneficiary deems appropriate: (a) any and all Secured Obligations; (b) all expenses of leasing, operating, maintaining and managing the Property, including without limitation, the salaries, fees, commissions and wages of a managing agent and such other employees, agents or independent contractors as Beneficiary deems necessary or desirable; (c) all taxes, charges, claims, assessments, any other liens, and premiums for all insurance Beneficiary deems necessary or desirable; (d) the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property.

## ARTICLE 3 – SECURITY AGREEMENT

3.01     **Grant of Security Interest.** Grantor grants to Beneficiary a security interest in and pledges and assigns to Beneficiary all of Grantor's right, title and interest in and to the Property, to the extent characterized as personal property (the "Personalty").

3.02     **Addresses of Debtor and Secured Party.** The address of Grantor adjacent to its signature below is the mailing address of Grantor as debtor under the UCC. The address for Trustee specified in the first paragraph of this deed of trust is the address for Trustee as secured party under the UCC; and the address for Beneficiary specified in Article 9 is the address for Beneficiary as secured party under the UCC.

3.03     **Fixture Filing.** This deed of trust constitutes a financing statement filed as a fixture filing under the UCC, covering any Property which now is or later may become a fixture attached to the Land or any Improvement.

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

## ARTICLE 4 – SECURED OBLIGATIONS

**4.01    Secured Obligations.**  Grantor makes the grant, conveyance, transfer and assignment above, makes the irrevocable and absolute assignment in Section 2.01, and grants the security interest under Section 3.01, to secure payment and performance of the following obligations (the "Secured Obligations") in any order of priority that Beneficiary may choose:

(a)    all Obligations (defined in the Credit Agreement), including (i) the Development Line of Credit Note dated as of the date of this deed of trust, from Grantor to Beneficiary in the original principal amount of $1,300,000.00(ii) the Term Loan Note dated as of the date of this deed of trust, from Grantor to Beneficiary in the original principal amount of $1,300,000.00 (the Development Line of Credit Note and the Term Loan Note are herein collectively, the "Note") all other indebtedness, liabilities and obligations of Grantor to Beneficiary arising pursuant to any of the Loan Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several;

(b)    all obligations of Grantor under this deed of trust;

(c)    all future advances and other obligations that Grantor may agree to pay or perform (whether as principal, surety or guarantor) for the benefit of Beneficiary, when a writing evidences the parties' agreement that the advance or obligation be secured by this deed of trust; and

(d)    any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding.

**4.02    Future Secured Obligations.**  The Secured Obligations include future advances made by Beneficiary, and for any purpose, and all other future Secured Obligations.  Those future advances and other future Secured Obligations are secured to the same extent as if made or incurred on the date of the execution of this deed of trust, and have priority as to third persons with or without actual notice from the time this deed of trust is filed for record as provided by law.  If this deed of trust secures a line of credit or there is a future advance, the total amount of indebtedness secured by this deed of trust may decrease or increase from time to time.  Grantor shall not file for record any notice limiting the maximum amount secured by this deed of trust (a "Maximum Amount Notice").  A Maximum Amount Notice will be an Event of Default (defined herein).  Nothing in this Section 4.02 will constitute a commitment to make additional or future advances which are not specified by the other terms of the Credit Agreement in any amount.

**4.03    Notice of terms of Secured Obligation Documents.**  All persons who have or acquire an interest in the Property will be deemed to have received notice of, and will be bound by, the terms of the Credit Agreement, the other Loan Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (the Loan Documents and those other agreements or instruments, the "Secured Obligation Documents").  These terms include any provisions in the Secured Obligation Documents which permit borrowing, repayment and reborrowing, or which provide that the rate of interest on one or more of the Secured Obligations may vary from time to time.

**4.04    Unsecured Obligations.**  This deed of trust does not secure any obligation which is unsecured pursuant to the express terms of the Credit Agreement or any other document, agreement or instrument.

## ARTICLE 5 – WARRANTY OF TITLE

**5.01    Warranty of Title.**  Grantor represents and warrants that Grantor lawfully possesses and holds a leasehold interest in all of the Land and the Improvements; that Grantor has the right, power and authority to grant, convey and assign the Property; and that the Property is unencumbered.  Grantor especially agrees and declares that the separate estate of each of them, whether vested, contingent or in expectancy, is hereby conveyed and shall be bound for the payment and performance of the Secured Obligations.

**5.02    Defense and Notice of Claims and Actions.**  At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this deed of trust and the rights and powers of Beneficiary and Trustee created under it, against all adverse claims.  Grantor must give Beneficiary and Trustee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing
4

393

**5.03    Liens, Charges and Encumbrances.**  Grantor shall immediately discharge any lien on the Property other than Permitted Encumbrances, which Beneficiary has not consented to in writing.  Grantor must pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now does or later may encumber or appear to encumber all or part of the Property or any interest in it, whether the lien, charge or encumbrance is or would be senior or subordinate to this deed of trust.  "Permitted Encumbrances" shall mean those exceptions to Beneficiary's policy of title insurance covering this deed of trust that Beneficiary deems acceptable in its sole discretion.

**5.04    Permanent Plantings.**  All Permanent Crop Plantings are real estate and will remain a part of the Land.  In addition to the provisions of this Article above, Grantor represents and warrants that the Permanent Crop Plantings are not subject to intellectual property rights under U.S. or foreign patent, copyright or trademark laws, the Plant Variety Protection Act or similar laws or subject to license from the holder of any such intellectual property rights (collectively "Permanent Crop Planting IP Rights").  To the extent the Land does contain or in the future is cultivated to grow any variety of Permanent Crop Plantings that are subject to Permanent Crop Planting IP Rights, (a) Grantor represents and warrants that Grantor is the owner of such IP Rights free and clear of any claim, right, title, interest or lien of any other person; (b) Grantor shall notify Beneficiary in writing of the existence of any Permanent Crop Planting IP Rights and Grantor grants Beneficiary a security interest in and a lien upon all of Grantor's present and future rights, title and interests in, to and under Permanent Crop Planting IP Rights; all cash and non-cash proceeds and products of Permanent Crop Planting IP Rights; and all causes of action, past, present and future for infringement, misappropriation or dilution of, or unfair competition regarding any of Permanent Crop Planting IP Rights.

## ARTICLE 6 - REPRESENTATIONS

**6.01    Representations.**  Grantor represents to Beneficiary that:

(a)        the Property does not represent the proceeds of unlawful activity under any state, federal or foreign law;

(b)        the Property includes all property and rights which may be reasonably necessary or desirable to enable Grantor to use, enjoy and operate the Land and the Improvements for the present uses thereof;

(c)        none of the Land or Improvements is subject to any Lien, offset or claim except any easements and restrictions expressly listed on a schedule of exceptions to coverage in the final commitment for title insurance or pro forma policy of title insurance received by Beneficiary prior to the Closing and not objected to by Beneficiary that are shown in the policy of title insurance insuring the validity and priority of this deed of trust (those Liens, offsets or claims, if any, the "Permitted Exceptions");

(d)        Grantor owns the Personalty free and clear of any security interests, reservations of title or conditional sales contracts, and there is no presently valid financing statement affecting the Personalty on file in any public office;

(e)        Grantor has title to, or (in the case of leased property) valid leasehold interests in, all of their properties and assets, real and personal, including the properties and assets and leasehold interests reflected in the Financial Information (other than any properties or assets disposed of in the ordinary course of business);

(f)        the legal name of Grantor is as appears in the first paragraph of this agreement;

(g)        Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this agreement;

(h)        if Grantor is anything other than a natural Person, it has complied with all applicable laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business;

(i)        the execution, delivery and performance by Grantor of this deed of trust is within the powers and authority of Grantor and has been duly authorized;

(j)        to Grantor's knowledge, this deed of trust does not conflict with any Applicable Law;

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing
5

394

(k)     this deed of trust is a legal, valid and binding agreement of Grantor, enforceable against Grantor in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable ;

(l)     there has been no Material Adverse Effect as to Grantor since the effective date the Financial Information was provided to Beneficiary;

(m)     there is no lawsuit, tax claim or other dispute pending or to Grantor's knowledge threatened against Grantor or the Property that, if determined adverse to Grantor, is reasonably likely to have a Material Adverse Effect;

(n)     Grantor is not the subject of any Judgment;

(o)     this deed of trust does not conflict with, nor is Grantor in default on any credit agreement, indenture, purchase agreement, guaranty, capital lease, or other investment, agreement, or arrangement presently in effect providing for or relating to extensions of credit in respect of which Grantor is in any manner directly or contingently obligated;

(p)     Grantor has filed all tax returns (federal, state, and local) required to be filed and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(q)     Grantor has complied with all current laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws");

(r)     Grantor has not received any notices of violations of any Applicable Laws; and Grantor is in compliance with all Applicable Laws;

(s)     there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Property with respect to any violations of Applicable Laws;

(t)     Grantor's place of business, or its chief executive office, if it has more than one place of business, is located at the address specified below; and

(u)     unless otherwise disclosed to Beneficiary, Grantor is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

## ARTICLE 7 – COVENANTS

**7.01     Performance of Secured Obligations.** Grantor shall promptly pay and perform each Secured Obligation in accordance with its terms.

**7.02     Maintenance and Preservation of Property.** Grantor shall:

(a)     observe and perform all obligations of Grantor under the Leasehold Agreement and shall not take any actions prohibited by the Leasehold Agreement. Grantor shall preserve and protect the leasehold estate and its value;

(b)     immediately discharge any lien on the Property which Beneficiary has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this deed of trust;

(c)     not alter, remove or demolish any portion of the Improvements, except as permitted or required by the Credit Agreement;

(d)     maintain (or cause to be maintained) all policies of insurance required under the Credit Agreement and pay (or cause payment of) all premiums for that insurance on or prior to the date when due;

(e)     promptly and completely repair and/or restore any portion of the Property which becomes damaged or destroyed, in a good and workmanlike manner in accordance with sound building practices, whether or not Grantor has received the proceeds of any Insurance Claim;

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing
6

(f)      not commit or allow any waste of the Property, nor do or suffer to be done any act whereby the value of any part of the Property may be lessened;

(g)      not initiate any change in any zoning or other land use classification which affects the Property or any part of it, except as permitted or required by the Credit Agreement;

(h)      comply with all current and future Environmental Laws;

(i)      if the Land is agricultural, keep the Property in good condition and repair; operate the Property, whether improved pastures, orchards, grazing, timber, or crop lands, in a good and husbandmanlike manner in accordance with accepted principles of sound agricultural and forestry practices; take all reasonable precautions to control wind and water erosion; fertilize improved pastures, if any, where necessary to maintain a good stand of desirable grasses; protect orchards and timber, if any, by reasonable precautions against loss or damage by fire including the maintenance of appropriate fire breaks; and neither to remove nor permit the removal of any timber, buildings, oil, gas, mineral, stone, rock, clay, fertilizer, gravel or top soil without the prior written consent of Beneficiary;

(j)      keep all Permanent Plantings cultivated, irrigated, fertilized, sprayed and fumigated, and shall replace all dead or unproductive trees, vines and other Permanent Plantings with new ones;

(k)      complete appropriation and all other requirements, if any, necessary to obtain the issuance of any license or water permit issued to Grantor, and take all other steps required or advisable for purposes of perfecting and maintaining in good status all other Water Rights;

(l)      not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this deed of trust; and

(m)      perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value and utility.

7.03      **Compliance with Applicable Law**  Grantor shall not commit or allow any act upon or use of the Property which would violate any Applicable Law, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property.

7.04      **Taxes and Assessments**.  Grantor shall pay (a) prior to delinquency all taxes, levies, charges and assessments, including all ditch, canal, reservoir or other water charges, and assessments on appurtenant Water Stock, imposed by Applicable Law or any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it (individually and collectively "**Impositions**"); (b) any and all intangible taxes and documentary stamp taxes determined at any time to be due on or as a result of the Secured Obligations, this deed of trust or any other Loan Documents, together with any and all interest and penalties thereon; and (c) taxes, levies, charges and assessments on Beneficiary's or Secured Parties' interest therein or upon this mortgage or the Secured Obligations (collectively, "**Mortgage Taxes**"); except that if the amount of Mortgage Taxes exceeds the Maximum Rate, Grantor will not be required to pay any such excess.  If after the date of this deed of trust, the State of California passes any law deducting from the value of Land for the purpose of taxation any lien thereon, or changing in any way the laws for the taxation of mortgages or debts secured by mortgage for state or local purposes, or the manner of the collection of any such taxes, so as to affect this deed of trust, then within 180 days after notice by Beneficiary to Grantor, Grantor shall pay all Secured Obligations.  Notwithstanding the foregoing provisions of this Section 7.04, Grantor may, at its expense, contest the validity or application of any Imposition by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, provided that (a) Beneficiary is satisfied that neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, or lost as a result of such contest, and (b) Grantor shall have posted a bond or furnished such other security required from time to time by Beneficiary.

7.05      **Damages and Insurance and Condemnation Proceeds**.  Beneficiary may, at its option, (a) in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of the Property, and it may make any compromise or settlement of the action or proceeding; (b) participate in any action or proceeding relating to any Condemnation Award; and (c) join Grantor in adjusting any Insurance Claim.  All insurance proceeds, Condemnation Awards, and proceeds of any other claim based on warranty, or for damage, injury or loss to the

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

7

Property which Grantor may receive or be entitled to must be paid to Beneficiary. In each instance, Beneficiary may apply those proceeds first toward reimbursement of all of Beneficiary's costs and expenses of recovering the proceeds or Condemnation Award, including Legal Fees. The balance shall, at Beneficiary's option, be applied to pay or Prepay some or all of the Secured Obligations in such order and proportions as it may choose. GRANTOR HEREBY SPECIFICALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ALL RIGHTS OF A PROPERTY OWNER GRANTED UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1265.225(A), WHICH PROVIDES FOR ALLOCATION OF CONDEMNATION PROCEEDS BETWEEN A PROPERTY OWNER AND A LIENHOLDER, AND ANY OTHER LAW OR SUCCESSOR STATUTE OF SIMILAR IMPORT.

    **7.06**    <u>Site Visits, Observation and Testing.</u> Beneficiary and its agents and representatives may enter and visit the Property at any reasonable time for the purposes of observing it, performing appraisals or inspections, taking and removing soil or groundwater samples, and conducting tests on any part of it, as provided in the Credit Agreement, and otherwise to determine Grantor's compliance with this deed of trust.

    **7.07**    <u>Prohibited Transfers.</u> Grantor agrees that a material factor in Beneficiary's decision to enter into the Secured Obligation Documents is the expertise, financial status and other characteristics of Grantor. Grantor shall not make or permit any Prohibited Transfer. Upon any Prohibited Transfer Beneficiary may declare all Secured Obligations to be due and payable immediately. "Prohibited Transfer" means: (a) any sale, contract to sell, conveyance, encumbrance, pledge, mortgage, lease of the Property not expressly permitted under this instrument or the other Secured Obligation Documents, or other transfer of all or any material part of the Property or any interest in it, including any transfer of Mineral Rights, Water Rights, or Water Stock, whether voluntary, involuntary, by operation of law or otherwise; (b) if Grantor is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Grantor; (c) if Grantor is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Grantor is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Grantor; or (e) if Grantor is a trust, withdrawal or removal of any trustee or revocation of the trust.

    **7.08**    <u>Compensation and Reimbursement of Costs and Expenses.</u> Grantor shall pay (a) fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Beneficiary or Trustee when the law provides no maximum limit, for any services that Beneficiary or Trustee may render in connection with this deed of trust, including Beneficiary's providing a statement or Trustee's rendering of services in connection with a reconveyance; (b) all of Beneficiary's or Trustee's costs and expenses which may be incurred in rendering any such services; and (c) all costs, expenses and other advances which may be incurred or made by Beneficiary or Trustee in any efforts to enforce any terms of this deed of trust or protect the Property, including any rights or remedies afforded to Beneficiary or Trustee under Section 8.02, whether any lawsuit is filed or not, including any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships, or in defending any action or proceeding arising under or relating to this deed of trust, including attorneys' fees and other legal costs, costs of any Foreclosure Sale (defined herein) and any cost of evidence of title. If Beneficiary chooses to dispose of Property through more than one Foreclosure Sale, Grantor must pay all costs, expenses or other advances that may be incurred or made by Beneficiary or Trustee in each of those Foreclosure Sales.

    **7.09**    <u>Indemnification.</u> GRANTOR SHALL INDEMNIFY TRUSTEE AND BENEFICIARY AGAINST AND SHALL HOLD THEM HARMLESS FROM ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES WHICH EITHER MAY SUFFER OR INCUR: (A) IN PERFORMING ANY ACT REQUIRED OR PERMITTED BY THIS DEED OF TRUST OR ANY OF THE OTHER SECURED OBLIGATION DOCUMENTS OR BY LAW; (B) BECAUSE OF ANY FAILURE OF GRANTOR TO PAY OR PERFORM ANY OF THE SECURED OBLIGATIONS; OR (C) BECAUSE OF ANY ALLEGED OBLIGATION OF OR UNDERTAKING BY BENEFICIARY TO PERFORM OR DISCHARGE ANY OF THE REPRESENTATIONS, WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN ANY DOCUMENT RELATING TO THE PROPERTY (OTHER THAN SUCH WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN THE SECURED OBLIGATION DOCUMENTS). THIS AGREEMENT BY GRANTOR TO INDEMNIFY TRUSTEE AND BENEFICIARY SURVIVES THE RELEASE AND CANCELLATION OF ANY OR ALL OF THE SECURED OBLIGATIONS AND THE FULL OR PARTIAL RELEASE AND/OR RECONVEYANCE OF THIS DEED OF TRUST

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

8

397

7.10    <u>Payments Due Under This Deed Of Trust</u>. Grantor must pay all obligations to pay money arising under this deed of trust immediately upon demand by Trustee or Beneficiary. Each such obligation shall bear interest from the date the obligation arises at the Default Rate.

## ARTICLE 8 – EVENTS OF DEFAULT AND REMEDIES

8.01    <u>Events of Default</u>. The following each shall be an event of default under this deed of trust (an "Event of Default"):

(a)    an Event of Default under the Credit Agreement;

(b)    a Prohibited Transfer;

(c)    the Financial Information or any representation in this deed of trust is materially substantially incorrect or materially misleading;

(d)    the filing of any notice limiting the maximum amount secured by this deed of trust to a sum less than the maximum amount secured as specified herein, or if no such amount is specified, to any amount;

(e)    for more than 10 days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this deed of trust not previously described in this <u>Section 8.01</u>, which can be cured by the payment of a sum of money; or

(f)    for 30 days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this deed of trust not previously described in this <u>Section 8.01</u>; provided that if (i) it is reasonably certain that the default can be cured by Grantor within that 30 day period and (ii) Grantor has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period shall be extended for so long as reasonably required by Grantor in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Grantor of the Event of Default.

8.02    <u>Remedies</u>. At any time after an Event of Default:

(a)    <u>Acceleration</u>. Beneficiary may declare any or all of the Secured Obligations to be due and payable immediately.

(b)    <u>Receiver</u>. Beneficiary may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for the Property.

(c)    <u>Entry</u>. Beneficiary, in person, by agent or by court- appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and may also do any and all other things in connection with those actions that Beneficiary may consider necessary and appropriate to protect the security of this deed of trust. Such other things may include: taking and possessing all of Grantor's or the then owner's books and records; entering into, enforcing, modifying, or canceling leases on such terms and conditions as Beneficiary may consider proper; obtaining and evicting tenants; fixing or modifying rents; collecting and receiving any payment of money owing to Grantor; completing any unfinished construction; and/or contracting for and making repairs and alterations. If Beneficiary so requests, Grantor will assemble all of the Property that has been removed from the Land and make all of it available to Beneficiary at the site of the Land. GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS BENEFICIARY AS GRANTOR'S ATTORNEY-IN-FACT TO PERFORM SUCH ACTS AND EXECUTE SUCH DOCUMENTS AS BENEFICIARY CONSIDERS APPROPRIATE IN CONNECTION WITH TAKING THESE MEASURES, INCLUDING ENDORSEMENT OF GRANTOR'S NAME ON ANY INSTRUMENTS. Regardless of any provision of this deed of trust or the other Secured Obligation Documents, Beneficiary shall not be considered to have accepted any property other than cash or immediately available funds in satisfaction of any obligation of Grantor to Beneficiary, unless Beneficiary has given express written notice of its election of that remedy in accordance with the UCC.

(d)    <u>Cure; Protection of Security</u>. Trustee or Beneficiary may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Trustee or Beneficiary may also enter the Property and/or do any and all other things which it considers necessary or appropriate to protect the security of this deed of trust. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Trustee or Beneficiary under, this deed of trust; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Trustee's or Beneficiary's judgment is or may be senior in priority to this deed of trust, such judgment of Trustee or Beneficiary to be conclusive as among the parties to this deed of trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Credit Agreement; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Trustee or Beneficiary. Trustee and Beneficiary may take any of the actions permitted under this Section 8.02 either with or without giving notice to any person. Notwithstanding the foregoing, in no event will Trustee or Beneficiary have any obligation to take any of the actions set forth in this clause (d).

(e)    Uniform Commercial Code Remedies.  Beneficiary may exercise any or all of the remedies granted to a secured party under the UCC.

(f)    Judicial Action.  Beneficiary may bring an action in any court of competent jurisdiction to foreclose this deed of trust or to obtain specific enforcement of any of the covenants or agreements of this deed of trust.

(g)    Power of Sale.  Under the power of sale granted under this deed of trust (the "Power of Sale") , Beneficiary has the discretionary right to cause some or all of the Property, including the Personalty, to be sold or otherwise disposed of in any combination and in any manner permitted by Applicable Law.

(i)    Sales of Personal Property.  For purposes of the Power of Sale, Beneficiary may elect to treat as Personalty any Property which is intangible or which can be severed from the Land or Improvements without causing structural damage.  If it chooses to do so, Beneficiary may dispose of any Personalty separately from the sale of real property, in any manner permitted by Division 9 of the UCC, including any public or private sale, or in any manner permitted by any other applicable law.  Any proceeds of any such disposition shall not cure any Event of Default or reinstate any Secured Obligation for purposes of Section 2924c of the California Civil Code.

(ii)    Non-Judicial Foreclosure Sales of Real Property or Mixed Collateral.  Beneficiary may choose to dispose of some or all of the Property which consists solely of real property in any manner then permitted by applicable law.  In its discretion, Beneficiary may also or alternatively choose to dispose of some or all of the Property, in any combination consisting of both real and personal property, together in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by the UCC.  Grantor agrees that such a sale of Personalty together with real property constitutes a commercially reasonable sale of the personal property.  For purposes of the Power of Sale, either a sale of real property alone, or a sale of both real and personal property together in accordance with the UCC, will sometimes be referred to as a "Non-Judicial Foreclosure Sale."  Before any Non-Judicial Foreclosure Sale, Beneficiary or Trustee must give such notice of default and election to sell as may then be required by law.  When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Trustee must sell the property being sold at a public auction to be held at the time and place specified in the notice of sale.  Neither Trustee nor Beneficiary have any obligation to make demand on Grantor before any Non-Judicial Foreclosure Sale.  From time to time in accordance with then applicable law, Trustee may, and in any event at Beneficiary's request must, postpone any Non-Judicial Foreclosure Sale by public announcement at the time and place noticed for that sale.  At any Non-Judicial Foreclosure Sale, Trustee must sell to the highest bidder at public auction for cash in lawful money of the United States.  Trustee must execute and deliver to the purchaser(s) a deed or deeds conveying the property being sold without any covenant or warranty whatsoever, express or implied.  The recitals in any such deed of any matters or facts, including any facts bearing upon the regularity or validity of any Non-Judicial Foreclosure Sale, are conclusive proof of their truthfulness.  Any such deed shall be conclusive against all persons as to the facts recited in it.

(h)    Single or Multiple Foreclosure Sales.  If the Property consists of more than one lot, parcel or item of property, Beneficiary may: (i) Designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for sale or disposition; and (ii) elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under the Power of Sale, or in connection with judicial proceedings, or by virtue of a judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner Beneficiary may deem to be in its best interests (any such sale or disposition, a "Foreclosure Sale;" any two or more, "Foreclosure Sales").  If it chooses to have more than one Foreclosure Sale, Beneficiary at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same day, or on such different days and at such different times and in such order as it may deem to be in its best interests.  No

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing
10

399

Non-Judicial Foreclosure Sale will terminate or affect the liens of this deed of trust on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full.

**8.03**     <u>Credit Bids</u>. At any Foreclosure Sale, any person, including Grantor, Trustee or Beneficiary, may bid for and acquire the Property or any part of it to the extent permitted by then applicable law. Instead of paying cash for that property, Beneficiary may settle for the purchase price by crediting the sales price of the property against the following obligations:

     (a)     First, the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Grantor is obligated to reimburse Trustee or Beneficiary; and

     (b)     Second, all other Secured Obligations in any order and proportions as Beneficiary may choose.

**8.04**     <u>Application of Foreclosure Sale Proceeds</u>. Trustee and Beneficiary shall apply the proceeds of any Foreclosure Sale in the following manner:

     (a)     First, to pay the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Grantor is obligated to reimburse Trustee or Beneficiary;

     (b)     Second, to pay the portion of the Secured Obligations attributable to any sums expended or advanced by Trustee or Beneficiary under the terms of this deed of trust which then remain unpaid;

     (c)     Third, to pay all other Secured Obligations in any order and proportions as Beneficiary may choose; and

     (d)     Fourth, to remit the remainder, if any, to the person or persons entitled to it.

**8.05**     <u>Application of Rents and Other Sums</u>. Beneficiary must apply any and all Rents collected by it pursuant to the assignment provided in <u>Article 2</u> of this deed of trust, and any and all other sums, other than the proceeds of a Foreclosure Sale, received or collected by Beneficiary, in the following manner:

     (a)     First, to pay the portion of the Secured Obligations attributable to the costs and expenses of collection of such sums incurred by Trustee, Beneficiary or any receiver appointed in accordance with this deed of trust;

     (b)     Second, to pay any and all Secured Obligations in any order and proportions as Beneficiary in its sole discretion may choose, and any and all expenses incident to the Property as provided in <u>Section 2.05</u>, and in such order and proportions as Beneficiary in its sole discretion may choose; and

     (c)     Third, to remit the remainder, if any, to the person or persons entitled thereto.

**8.06**     <u>No Liability for Funds Not Received</u>. Trustee and Beneficiary have no liability for any funds which it does not actually receive.

## ARTICLE 9 – NOTICES

All notices, approvals, consents, and other communications, under this deed of trust ("<u>Notices</u>") must be given in accordance with and will be subject to the terms and provisions of the Credit Agreement. Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Trustee, to the address in the first paragraph of this deed of trust; if to Beneficiary, to 45 E. River Park Place West, Suite 401, Fresno, CA 93720, Attention: Commercial Loan Administration Services; and in the case of any other Person, to the address designated by that Person in a notice to Grantor and Beneficiary.

## ARTICLE 10 – REQUEST FOR NOTICE

Grantor requests that a copy of any notice of default and any notice of sale be mailed to it at the address specified adjacent to its signature below.

## ARTICLE 11 – TRUSTEE AND BENEFICIARY

**11.01**     <u>Releases, Extensions, Modifications and Additional Security</u>. Without affecting the personal liability of any Person, including Grantor and Borrower, for the payment of the Secured Obligations or the lien of this deed of trust on the remainder of the Property for the unpaid amount of the Secured Obligations:

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

(a)    Beneficiary may from time to time and without notice: (i) release any person liable for payment of any Secured Obligation; (ii) extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation; (iii) accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security; or (iv) alter, substitute or release any property securing the Secured Obligations.

11.02    **Authority of Beneficiary.** Without affecting the personal liability of any Person, including Grantor, for the payment of the Secured Obligations or the lien of this deed of trust on the remainder of the Property for the unpaid amount of the Secured Obligations, Trustee may perform any of the following acts when requested to do so by Beneficiary in writing: (a) consent to the making of any plat or map of the Property or any part of it; (b) join in granting any easement or creating any restriction affecting the Property; (c) join in any subordination or other agreement affecting this deed of trust or the lien of it; or (d) reconvey the Property or any part of it without any warranty.

11.03    **Exculpation of Trustee and Beneficiary.** None of Beneficiary, Trustee will be directly or indirectly liable to Grantor or any other person as a consequence of any of the following: (a) the exercise of or failure to exercise any rights, remedies or powers granted to it in this deed of trust; (b) any failure or refusal to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this deed of trust; or (c) any loss sustained by Grantor or any third party resulting from any failure to lease the Property or from any other act or omission in managing the Property after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Beneficiary, Trustee, respectively. GRANTOR HEREBY EXPRESSLY WAIVES AND RELEASES ALL LIABILITY OF THE TYPES DESCRIBED ABOVE, AND AGREES THAT NO SUCH LIABILITY BE ASSERTED AGAINST OR IMPOSED UPON TRUSTEE or BENEFICIARY.

11.04    **Substitution of Trustee.** Beneficiary may substitute a successor to any Trustee named in or acting under this deed of trust in any manner now or later to be provided at Applicable Law.

### ARTICLE 12 – RECONVEYANCE

When all Secured Obligations have been paid in full, Beneficiary has no obligation to make additional Loans and there are no further obligations under the Loan Documents, Trustee shall execute and deliver an instrument reconveying the Property, or so much of it as is then held under this deed of trust, without warranty to the person or persons legally entitled to it. In the reconveyance, the grantee may be described as "the person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness. Trustee and Beneficiary will have no duty to determine the rights of persons claiming to be rightful grantees of any reconveyance of the Property.

### ARTICLE 13– MISCELLANEOUS

13.01    **Additional Provisions.** The Secured Obligation Documents state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this deed of trust. The Secured Obligation Documents also grant further rights to Beneficiary and contain further agreements and affirmative and negative covenants by Grantor which apply to this deed of trust and to the Property.

13.02    **Entire Agreement.** This deed of trust and the other Secured Obligation Documents collectively: (i) represent the sum of the understandings and agreements between Beneficiary and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Beneficiary and Grantor concerning this credit; and (iii) are intended by Beneficiary and Grantor as the final, complete and exclusive statement of the terms agreed to by them. In the event of any conflict between this deed of trust and any other agreements required by this deed of trust, this deed of trust will prevail.

13.03    **Other Acts.** Grantor shall cooperate with Beneficiary for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this deed of trust or to carry out the intent of this agreement. Promptly (but in no event more than ten days) after request by Beneficiary, Grantor will execute, acknowledge and deliver any document which Beneficiary deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Beneficiary in the preparation, execution and filing of any such documents.

13.04    **No Waiver or Cure.** Each waiver by Trustee or Beneficiary must be in writing, and no waiver is to be construed as a continuing waiver. No waiver is to be implied from any delay or failure by Trustee or Beneficiary to take action on

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

12

account of any default of Grantor. Consent by Trustee or Beneficiary to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Trustee's or Beneficiary's consent to be obtained in any future or other instance. The exercise by Trustee or Beneficiary of any right or remedy under this deed of trust or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or notice of default under this deed of trust or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, have been cured); or impair the security of this deed of trust; or prejudice Trustee, Beneficiary or any receiver appointed in accordance with this deed of trust, in the exercise of any right or remedy afforded any of them under this deed of trust; or be construed as an affirmation by Beneficiary of any tenancy, lease or option, or a subordination of the lien of this deed of trust.

    **13.05**     **Merger**. No merger shall occur as a result of Beneficiary's acquiring any other estate in or any other lien on the Property.

    **13.06**     **Waiver of Dower, Homestead, and Distributive Share**. Grantor relinquishes all right of dower and waives all right of homestead and distributive share in and to the Property. Grantor waives any right of exemption as to the Property.

    **13.07**     **Waiver of Marshalling**. Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshalling of assets or to require upon foreclosure sales of assets in a particular order, including any rights provided by California Civil Code Sections 2899 and 3433, as those sections may be amended from time to time. Each successor and assign of Grantor, including any holder of a lien subordinate to this deed of trust, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

    **13.08**     **Waiver of Certain Other Laws**. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor, and its representatives, successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, or notice of election to mature or declare due the whole of the Secured Obligations in the event of foreclosure of the lien created by this deed of trust.

    **13.09**     **Joint and Several Obligations**. If Grantor consists of more than one Person, each Grantor (a) acknowledges and undertakes, together with the other Grantors, joint and several liability for the indebtedness, liabilities and obligations of Grantor under this deed of trust; (b) acknowledges that this deed of trust is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (c) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT BENEFICIARY EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS DEED OF TRUST, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

    **13.10**     **Authority to Bind Grantor**. If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all parties comprising Grantor. Beneficiary may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

    **13.11**     **Binding Effect; Successors and Assigns**. The Secured Obligation Documents shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided, that Grantor shall not assign its rights or obligations hereunder without Beneficiary's consent. However, this section does not waive the provisions of Section 7.07; and Grantor shall not assign its rights or obligations hereunder without Beneficiary's consent. Beneficiary may transfer all or any portion of their rights under the Secured Obligation Documents to any other Person. Beneficiary may disclose to any actual or proposed transferee any information that Grantor has delivered to Beneficiary in connection with the negotiation of this deed of trust or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Beneficiary in providing that information to any actual or proposed transferee.

**13.12    Rights and Remedies Cumulative.** All rights and remedies under this deed of trust and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

**13.13    Severability.** Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Beneficiary may, at its option, declare all Secured Obligations immediately due and payable.

**13.14    Amendments in Writing.** This deed of trust may not be amended, changed, modified, altered or terminated without the prior written consent of Beneficiary.

**13.15    Governing Law.** This deed of trust shall be governed and interpreted by applying the laws of the State of California (the "Governing Law State") without regard or reference to its conflict of laws principles.  Grantor understands that the laws of the Governing Law State may differ from the laws of the State where Grantor resides or otherwise is located or where the Property is located.  However, Grantor understands, agrees and acknowledges that (a) this deed of trust and the Secured Obligation Documents have significant and substantial contacts with the Governing Law State, (b) it is convenient to Grantor and Beneficiary to select  the law of the Governing Law State to govern this deed of trust and the transactions evidenced hereby, (c) the transactions evidenced  by the Credit Agreement and this deed of trust bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Secured Parties to enter into the Secured Obligation Documents and Secured Parties have entered into the Secured Obligation Documents in reliance on this choice.

**13.16    JURISDICTION AND VENUE.** GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF BENEFICIARY, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER LOAN DOCUMENT WILL BE LITIGATED IN THE SUPERIOR COURT OF CALIFORNIA, FRESNO COUNTY, CALIFORNIA, OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA. GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

**13.17    Counterpart Execution.** This deed of trust may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument.

**13.18    Necessary Action.** Beneficiary is authorized to execute any other documents or take any other actions necessary to effectuate this deed of trust and the consummation of the transactions contemplated herein.

**13.19    Credit Report.** Beneficiary is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Grantor. Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Beneficiary shall authorize third Persons to provide the information requested from time to time.

**13.20    Time of the Essence.** Time is of the essence of this deed of trust.

**13.21    No Construction Against Drafter.** Each Party has participated in negotiating and drafting this deed of trust, so if an ambiguity or a question of intent or interpretation arises, this deed of trust is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this deed of trust.

**13.22    INDEMNIFICATION.** GRANTOR SHALL DEFEND, INDEMNIFY AND HOLD TRUSTEE AND BENEFICIARY ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing
14

403

IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (I) INCURRED AS A RESULT OF THE FAILURE BY GRANTOR TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF DEPOSITS OR OTHER FUNDS ACQUIRED BY BENEFICIARY TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY GRANTOR OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY GRANTOR OF ANY ENVIRONMENTAL LAW; (IV) RESULTING FROM THE RELIANCE BY TRUSTEE OR BENEFICIARY ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF GRANTOR; AND (V) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF TRUSTEE OR BENEFICIARY BEING PARTY TO THIS DEED OF TRUST OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS DEED OF TRUST; except that Grantor shall have no obligation to an Indemnified Person under this section with respect to Losses resulting from the gross negligence or willful misconduct of that Indemnified Person as determined by a court of competent jurisdiction. If and to the extent that an Indemnity is unenforceable for any reason, Grantor shall make the maximum contribution to the payment and satisfaction thereof which is permissible under Applicable Law. The provisions of all Indemnities shall survive the reconveyance of this deed of trust.

13.23   WAIVER OF TRIAL BY JURY. GRANTOR (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS DEED OF TRUST; OR (II) ANY LOAN DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY; AND ARE A MATERIAL INDUCEMENT FOR THE BENEFICIARY ENTERING INTO THE CREDIT AGREEMENT AND OTHER LOAN DOCUMENTS.

Grantor is signing and delivering this deed of trust effective as of the day and year first written above.

GRANTOR

CAPITAL FARMS, INC., a California corporation

Address for notices:

1496 Bridge St. #1
Yuba City, CA 95993

By: _____
GURMEJ S. GILL
President / Vice President / Secretary

404

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA              )
                                 ) ss
COUNTY OF Sacramento             )

On June 23 , 2016 before me, Antigone Vaccaro , a notary public, personally appeared Gurmej S. Gill , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Antigone Vaccaro_

ANTIGONE VACCARO
Commission # 2047180
Notary Public - California
Sacramento County
My Comm. Expires Oct 27, 2017

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing
16

## EXHIBIT A

Capital Farms, Inc. Development NRLOC to Term 2016
DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

### Legal Description of Real Estate

Placer County, California

**Parcel One:**

The Southeast quarter of Section 30, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Excepting therefrom the interest conveyed to the County of Placer in Deed recorded January 4, 1922 in Book 193 of Deeds, Page No. 318, Placer County Records.

Apn: 017-130-006

**Parcel Two:**

The Northeast quarter of Section 31, Township 11 North, Range 5 East, Mount Diablo Base and Meridian.

Apn: 017-130-021

Capital Farms, Inc. Development NRLOC to Term 2016
Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

406

EXHIBIT W

Placer Deed of Trust Assignment

**Return To:**
LIEN SOLUTIONS
PO BOX 29071
GLENDALE , CA 91209-9071
Phone #: 800-833-5778

Recording Requested By:
**RABO AGRIFINANCE**
**STEPHANIE VIVIANO**



**PLACER**, County Recorder
RYAN RONCO
**DOC- 2019-0105337-00**
3636
THURSDAY, DEC 26, 2019 04:24 PM
MIC   $3.00 | AUT    $2.00 | SBS    $1.00
ERD   $1.00 | SB2   $75.00 | REC   $10.00
ADD   $0.00

Ttl Pd    $92.00    Rcpt # 02846316
                    CLKBZPK9T2/KJ/1-2

## ASSIGNMENT OF LEASEHOLD DEED OF TRUST



     For Value Received, the undersigned holder of a Leasehold Deed of Trust (herein "Assignor") whose address is **45 E RIVER PARK PLACE WEST, SUITE 401, FRESNO, CA, 93720** , does hereby grant, sell, assign, transfer and convey, unto Rabo AgriFinance LLC, a Delaware limited liability company (herein "Assignee"), whose address is **14767 North Outer 40 Road, Chesterfield, MO, 63017** , a certain Leasehold Deed of Trust, dated **06/17/2016** , made and executed by **CAPITAL FARMS, INC. ,** to **RABOBANK, N.A., a national banking association,** Trustee, upon the following described property situated in **Placer County** , State of California:

**Property Address: Legal description as set forth in said Leasehold Deed of Trust, Placer County, CA**
**PIN: VARIOUS**

Such Leasehold Deed of Trust having been given to secure payment of One Million Three Hundred Thousand dollars and Zero cents **( $1,300,000.00 )** which Leasehold Deed of Trust is recorded on: **06/30/2016** as **Instrument No: 2016-0052371-00** , Records of **Placer County**, State of California, together with the note(s) and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Leasehold Deed of Trust.

**(Such Leasehold Deed of Trust includes without limitation any and all prior assignments thereof and any and all amendments, supplements or modifications to, or extensions or replacements of, such Leasehold Deed of Trust.)**

Original Beneficiary Name: RABOBANK, N.A., a national banking association

     TO HAVE AND TO HOLD, the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Leasehold Deed of Trust.
     IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Leasehold Deed of Trust on **12/18/2019** .

**RABOBANK, N.A., a national banking association By: RABO AGRIFINANCE LLC, a Delaware limited liability company, its Attorney-In-Fact**
(Assignor)

By: **Kristina M. Jones**
Its: **Vice President**

STATE OF **MINNESOTA, STEARNS COUNTY**

On **December 18, 2019** before me, the undersigned, a notary public in and for said state, personally appeared **Kristina M. Jones, Vice President of RABOBANK, N.A., a national banking association By: RABO AGRIFINANCE LLC, a Delaware limited liability company, its Attorney-in-Fact** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public **Alex L Hinnenkamp**

Commission Expires: 01/31/2024

ALEX L HINNENKAMP
NOTARY PUBLIC
MINNESOTA
My Commission Expires 1/31/2024

Exhibit E

Placer Real Property UCC

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Phone: (800) 331-3282 Fax: (818) 662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**   14571 - RABOBANK N.A.

> CT Lien Solutions      54615696
> P.O. Box 29071
> Glendale, CA 91209-9071      CALI
>      FIXTURE

File with: Secretary of State, CA

```
16-7534054318
07/01/2016 17:00
        FILED
        CALIFORNIA
        SECRETARY OF STATE
S05

56066940002  UCC 1 FILING
```

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only **one** Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Capital Farms, Inc. | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1496 Bridge St #1 | Yuba City | CA | 95993 | USA |

2. **DEBTOR'S NAME:** Provide only **one** Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only **one** Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rabobank N.A. | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 45 River Park Place West, Suite 401 | Fresno | CA | 93720 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:
See Attached

5. Check **only** if applicable and check **only** one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check **only** if applicable and check **only** one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check **only** if applicable and check **only** one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
54615696      4256      486205-1

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

Capital Farms, Inc.

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☒ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

See attached

17. MISCELLANEOUS: 5421939-CA-0 14371 - RABOBANK N.A.    Rabobank N.A.    File with: Secretary of State, CA    4256  436209-1

412

**EXHIBIT A**

Description of Development Vehicle Form 2015
LEGAL DESCRIPTION / LAND INFORMATION

(a) all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles hereafter erected on, affixed or attached to, or located in or on the real estate, and any interest in the real estate in Placer County, California, and described in [EXHIBIT B] (the "Land") (together all materials and objects, pumps, motors, generators, pipes, conduit, plant irrigation and sprinklers, vehicles, and others (the "_____"));

(b) all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a benefit thereto ("Easements");

(c) the ground water on, under, pumped from or otherwise available to the Oakland or any drainage, retention, or storage of or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise, that appurtenant, appropriative, or otherwise, the right to remove or extract any such ground water including any permits, licenses granted by any state or government, and/or rights to use any permitted jurisdiction thereof, any agency, authority, entity, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, regulatory or administrative powers or functions of or pertaining to government ("Governmental Authority") and/or all rights created by any easement, covenant, agreement or contract with any Person and any rights to which the Oakland is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise, and all rights reserved or created pursuant to any law, decree, or order of any court or governmental authority, and all rights to use or participate in the Oakland's water storage right, or other governmental subordinate, any and all rights to store water in the Oakland, whether pursuant to any present or future permit or otherwise applicable to the Oakland, water storage right, or other water-related entitlement and/or district irrigation district or other land and agency or which the boundaries of any private water company, mutual water district or other non-governmental entity and any private, or which lie within the boundaries of any private water company, mutual water company, or other non-governmental entity pursuant to which holder of this Oakland may receive water ("Water Rights");

(d) all other easements, hereditaments and appurtenances to the Land;

(e) minerals, oil, gas, and other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalty interests, net profit interests and other interests and other interests and estates in, under and on the Land and production payments, and geothermal rights and other interests and all other interests of any kind or nature in, under and on the Land of oil, gas and mineral interests with any of the foregoing interests or estates are present or utilized (the "Mineral _____");

(f) timber now or hereafter standing or cut;

(g) leases, subleases, licenses, occupancy agreements, concessions and other agreements (except that certain Farming Lease between ABC Grower 331, LLC, as tenant, and Grantor, as landlord, dated as of July 8, 2015 that landlord, and any other agreement or instrument entered by Grantor and covering a leasehold or other estate or interest in the "Leasehold _____"), granting a possessory interest in and to, or the right to extract, mine, reside in, use, or consume leasehold, (the "Leases");

(h) all sales contracts, maintenance agreements, management agreements, service contracts and other rights directly related to the operation and maintenance of the Oakland;

(i) all leases, grants, lots, plats, sites or other plantings, open or under the Land ("Plantings") including all of Plantings that produce fruit, nuts, or other crops in more than one crop year ("Permanent Crop Plantings")

(j) any shares, or any rights under such shares, of any private water company, mutual water company, or other mutual entity pursuant to which holder or the Oakland may receive water (collectively, the "Water Stock") and any distribution and beneficial interests, securities entitlements, securities accounts and commodities accounts

5694000?

413

(k)    all intellectual property rights under U.S. or foreign patent, copyright or trademark laws, the Plant Variety Protection Act or similar laws or subject to license from the holder of any such intellectual property rights (collectively "Permanent Crop Planting IP Rights")

(l)    working drawings, instructional manuals, and rights in processes directly related to the operation of the Collateral

(m)    other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment or which is in all cases (i) directly related to the operation of the Collateral or acquired in connection with any construction or maintenance of the Land or the Improvements or (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements

(n)    all permits and licenses relating or pertaining to the use or enjoyment of the Collateral

(o)    proceeds of and any unearned premiums on any insurance policies covering the Collateral, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Collateral (the "Insurance Claims")

(p)    all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the "Condemnation Awards")

(q)    all deposit accounts at Beneficiary and all other deposit accounts from which Debtor may from time to time authorize Beneficiary to debit payments due on the Secured Obligations, and all money or other personal property of Debtor in addition to the foregoing deposited with or otherwise in Beneficiary's or Trustee's possession

(r)    the right, in the name and on behalf of Debtor, upon notice to Debtor, to appear in and defend any action or proceeding brought with respect to the Collateral and to commence any action or proceeding to protect the interest of Trustee or Beneficiary in the Collateral

(s)    substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data

**EXHIBIT B**

Capital Farms, Inc. Development NRLOC 5 Term 2015
UCC-1 FINANCING STATEMENT FILING INFORMATION

Legal Description of Real Estate

Placer County, California

5606594B0002

**Parcel One:**

The Southwest quarter of Section 30, Township 11 North, Range 6 East, Mount Diablo Base and Meridian.

Excepting therefrom the interest conveyed to the County of Placer in Deed recorded January 4, 1922 in Book 183 of Deeds, Page No. 318, Placer County Records.

Apn: 017-130-006

**Parcel Two:**

The Northeast quarter of Section 31, Township 11 North, Range 6 East, Mount Diablo Base and Meridian.

Apn: 017-130-021

415

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**1977503278**

**12/04/2019 17:00**

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

8423137002   UCC 3 FILING

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**   47087 - Rabo

Lien Solutions      72785627
P.O. Box 29071
Glendale, CA 91209-9071    **CALI FIXTURE**

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☒ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 16-7534054318  7/1/2016  SS CA | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☒ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rabo AgriFinance LLC | | | |
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| P.O. Box 411995 | St. Louis | MO | 63141 | USA |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rabobank N.A. | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. **OPTIONAL FILER REFERENCE DATA:** Debtor Name: Capital Farms, Inc.
72785627      4256      486205-1

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

**11. INITIAL FINANCING STATEMENT FILE NUMBER:** Same as item 1a on Amendment form

16-7534054318  7/1/2016  SS CA

84231370002

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:** Same as item 9 on Amendment form

| | 12a. ORGANIZATION'S NAME |
| --- | --- |
| | Rabobank N.A. |
| OR | 12b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S) |  SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**13.** Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only **one** Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| | 13a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- | --- |
| | Capital Farms, Inc. | | | |
| OR | 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**14. ADDITIONAL SPACE FOR ITEM 8** (Collateral):

| **15. This FINANCING STATEMENT AMENDMENT:** | **17.** Description of real estate: |
| --- | --- |
| ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing | See attached |
| **16.** Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest): | |

**18. MISCELLANEOUS:** 72785627-CA-0  47087 - Rabo AgriFinance- Pr          Rabobank N.A.          File with: Secretary of State, CA    4250  486205-1

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

B0361-1290 01/05/2021 5:00 PM Received by California Secretary of State

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

For Office Use Only

**-FILED-**

File #: U210017005111

Date Filed: 1/5/2021

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**   8477 - RABO

Lien Solutions     78365671
P.O. Box 29071
Glendale, CA 91209-9071    CALI FIXTURE

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
16-7534054318   7/1/2016   SS CA

**1b.** ☒ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

**6a. ORGANIZATION'S NAME**

OR **6b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

**7a. ORGANIZATION'S NAME**

OR **7b. INDIVIDUAL'S SURNAME**

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**7c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | COUNTRY

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

**9a. ORGANIZATION'S NAME**
Rabo AgriFinance LLC

OR **9b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**10. OPTIONAL FILER REFERENCE DATA:** Debtor Name: Capital Farms, Inc.
78365671    26586001        Capital Farms, Inc.

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

B0361-1291 01/05/2021 5:00 PM Received by California Secretary of State

## UCC FINANCING STATEMENT AMENDMENT ADDENDUM
FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form
16-7534054318   7/1/2016   SS CA

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

| 12a. ORGANIZATION'S NAME |
|---|
| Rabo AgriFinance LLC |

OR

| 12b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| 13a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Capital Farms, Inc. | | | |

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

15. This FINANCING STATEMENT AMENDMENT:
[ ] covers timber to be cut   [ ] covers as-extracted collateral   [X] is filed as a fixture filing.

17. Description of real estate:
See attached

16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):

18. MISCELLANEOUS: 78365371-CA-0  8477 - RABO AGRIFINANCE    Rabo AgriFinance LLC    File with: Secretary of State, CA    26586001  Capital Farms, Inc.

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282